1  Ronald J. Kohut, Esq. (SBN 66463)
   ron@kohutlaw.com
2  Sarah K. Kohut, Esq. (SBN 197655)
   sarah@kohutlaw.com
3  KOHUT & KOHUT LLP
   3554 Round Barn Blvd., Suite 204
4  Santa Rosa, California  95403
   Telephone: (707) 573-3100
5  Facsimile:  (707) 573-3101

6  Attorneys for Plaintiff and Cross-Defendant
   AT&T MOBILITY II, LLC

7

8                  UNITED STATES DISTRICT COURT

9                NORTHERN DISTRICT OF CALIFORNIA

10 AT&T MOBILITY II, LLC, a Delaware limited      )  **Case No. CV 07-05463 WHA**
   liability company,                            )
11                                               )
                                                 )  **DECLARATION OF MARC**
12              Plaintiff,                        )  **MIGUEL IN SUPPORT OF**
                                                 )  **MOTION BY AT&T**
13      v.                                        )  **MOBILITY II, LLC TO**
                                                 )  **COMPEL ARBITRATION OF**
14                                               )  **COUNTERCLAIMS OF**
   CAROLYN PESTANO, an individual,               )  **CAROLYN PESTANO AND**
15                                               )  **MOTION TO DISMISS THE**
                Defendant.                        )  **FIRST, SECOND, FIFTH AND**
16                                               )  **SIXTH COUNTERCLAIMS OF**
   AND RELATED COUNTERCLAIMS                      )  **CAROLYN PESTANO**
17                                               )  **WITHOUT LEAVE TO**
                                                 )  **AMEND [REDACTED]**
18                                               )
                                                 )  **[Proposed Orders, Motions,**
19                                               )  **Declaration of Sarah K. Kohut,**
                                                 )  **and Motion to Seal Filed**
20                                               )  **Concurrently]**
                                                 )
21                                               )  **DOCUMENT SUBMITTED**
                                                 )  **UNDER SEAL  [SUBJECT TO**
22                                               )  **A PENDING MOTION TO**
                                                 )  **FILE UNDER SEAL]**
23                                               )
                                                 )  Date:  March 6, 2008
24                                               )  Time:  8:00 a.m.
                                                 )  Courtroom: 9
25 _____        )

26

27

28 _____
   **CASE NO. CV 07-05463 WHA: DECLARATION OF MARC MIGUEL IN SUPPORT OF**
   **MOTION BY AT&T MOBILITY II, LLC TO COMPEL ARBITRATION OF**
   **COUNTERCLAIMS OF CAROLYN PESTANO AND MOTION TO DISMISS FIRST,**
   **SECOND, FIFTH AND SIXTH COUNTERCLAIMS**

I, MARC MIGUEL, declare:

1.    I am an Area Retail Sales Manager for AT&T Mobility II, LLC, a party to this action. Between 2001 and 2007 I was employed by Cingular Wireless LLC ("Cingular") as a Retail Account Executive; Retail Account Manager, and lastly, an Area Retail Sales Manager.

2.    This Declaration is being submitted in support of "Motion by AT&T Mobility II, LLC to Compel Arbitration of Counterclaims of Carolyn Pestano" and "Motion of AT&T Mobility II, LLC to Dismiss the First, Second, Fifth and Sixth Counterclaims of Carolyn Pestano Without Leave to Amend." I have personal knowledge of the following facts and, if called to testify, I could and would competently testify to those facts.

3.    Attached as Exhibit "A" is a true copy of the "AT&T Wireless Exclusive Dealer Agreement" entered into by Viva Wireless Inc. ("Viva") and AT&T Wireless Services, Inc. effective September 1, 2001. AT&T Wireless Services, Inc. ("AWS") had a regular business practice of electronically storing (at the time all parties had executed such agreements) and maintaining all agreements to which it was a party. That practice was continued by Cingular Wireless II, LLC and is currently used by AT&T Mobility II.

4.    Attached as Exhibit "B" is a true copy of the "Cingular Wireless Exclusive Dealer Agreement" entered into by Viva and AT&T Mobility II's predecessor, Cingular Wireless II, LLC, effective January 1, 2006.[1] Cingular Wireless II, LLC had a regular business practice of electronically storing (at the time all parties had executed such agreements) and maintaining all agreements to which it was a party. That practice is currently used by AT&T Mobility II.

---

[1]    Exhibit "B" contains a confidentiality provision at section 4.2 and is subject to a pending motion to seal.

**CASE NO. CV 07-05463 WHA: DECLARATION OF MARC MIGUEL IN SUPPORT OF MOTION BY AT&T MOBILITY II, LLC TO COMPEL ARBITRATION OF COUNTERCLAIMS OF CAROLYN PESTANO AND MOTION TO DISMISS FIRST, SECOND, FIFTH AND SIXTH COUNTERCLAIMS**

5.    Attached as Exhibit "C" is a true copy of the "Settlement and Release Concerning Dealer's Pre-2/1/06 Total Subscriber Base" entered into by Viva and AT&T Mobility II's predecessor, Cingular Wireless II, LLC, effective February 1, 2006.[2] Cingular Wireless II, LLC had a regular business practice of electronically storing (at the time all parties had executed such agreements) and maintaining all agreements to which it was a party. That practice is currently used by AT&T Mobility II.

6.    Attached as Exhibit "D" is a true copy of the "Advanced Payment Agreement" ("APA") entered into by Viva and AT&T Mobility II's predecessor, Cingular Wireless II, LLC, in October 2006. Attached as Exhibit "B" to the APA is the "Dealer Principal Personal Guaranty" executed by Carolyn Pestano on October 3, 2006.[3] Cingular Wireless II, LLC had a regular business practice of electronically storing (at the time all parties had executed such agreements) and maintaining all agreements to which it was a party. That practice is currently used by AT&T Mobility II.

---

[2]    Exhibit "C" contains a confidentiality provision at section 4b and is subject to a pending motion to seal.

[3]    Exhibit "D" contains a confidentiality provision at section 4 and pages 1-5 are subject to a pending motion to seal.

**CASE NO. CV 07-05463 WHA: DECLARATION OF MARC MIGUEL IN SUPPORT OF MOTION BY AT&T MOBILITY II, LLC TO COMPEL ARBITRATION OF COUNTERCLAIMS OF CAROLYN PESTANO AND MOTION TO DISMISS FIRST, SECOND, FIFTH AND SIXTH COUNTERCLAIMS**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I declare under penalty of perjury that the foregoing is true and correct.  Executed on January 23, 2008, at Pleasanton, California.

Marc Miguel

3

# EXHIBIT A

# EXHIBIT A

## AT&T WIRELESS
## EXCLUSIVE DEALER AGREEMENT

| DEALER | AT&T Wireless |
|---|---|
| Legal Name: **Viva Wireless**<br>Business Name (if different):<br>Type of Entity: **San Francisco corporation**<br>("**Dealer**") | AT&T Wireless Services, Inc., a Delaware corporation, as agent for each of the companies listed on Schedule 1 (each as to its own market known as the Company ("**Company**")) |
| **DEALER Address (For Official Notices)** | **Company Address (For Official Notices)** |
| 376 Imperial Way #106<br>Daly City CA 94015 | AT&T Wireless<br>7277 164th Avenue NE<br>Redmond WA 98052<br>Attn: Legal Department |
| **DEALER Contact** | **Company Contact** |
| Name: Carolyn Pestano<br>Title: CEO   454<br>Telephone: 415-545-8377<br>Fax: 415-454-8387 | Name: Nancy Espitallier<br>Title: Indirect Account Executive<br>Telephone: 510-589-1000<br>Fax: 650-827-5557 |
| **DEALER Billing Address** | |
| same as above | |

This Agreement consists of this Cover Page, the attached Terms and Conditions, Schedule 1 (Company Name(s)/Area), Schedule 2 (Compensation), and Schedule 2.1 (Compensation), and all Policies and Procedures issued in accordance with the Terms and Conditions (collectively, this "**Agreement**").

This Agreement is effective as of September 1, 2001, and continues in effect for a term of 2 years, unless earlier terminated in accordance with the provisions of the Agreement.

### DEALER'S SIGNATURE BELOW ACKNOWLEDGES THAT DEALER HAS READ AND UNDERSTANDS EACH OF THE PROVISIONS OF THIS AGREEMENT AND AGREES TO BE BOUND BY THEM.

| VIVA WIRELESS | AT&T WIRELESS SERVICES, INC., as agent for each of the companies listed on Schedule 1 |
|---|---|
| By: *[signature]*<br>(Authorized Signature) | By: *[signature]*<br>(Authorized Signature) |
| Name: Carolyn Pestano<br>Title: CEO<br>Date: 8/24/01 | Name: Trish Kapos<br>Title: Regional Director, Indirect Distribution<br>Date: 8·28·01 |

## AT&T WIRELESS EXCLUSIVE DEALER AGREEMENT
### Terms and Conditions

Company has received regulatory authority to operate as a facilities-based provider of wireless voice and data service ("Service") within the market(s) shown on Schedule 1, which area may change from time to time ("Area"). Dealer desires to sell Equipment and to offer the Company's Service to potential customers who are the ultimate users of Service provided by or through the Company ("Subscribers"). Company desires to enter into this Agreement with Dealer in part as a result of the commitment by Dealer to promote Company's Service in the Area.

**DEFINITIONS:** As used in this Agreement, the following terms have the meanings specified herein:

**Affiliate** means:
- (A)   Dealer's employees, contracted workers, or officers; or
- (B)   any person, company, partnership or other entity, or its successors or assigns that directly or indirectly, through one or more intermediaries controls, is controlled by, or is under common control with:
  - (1)   Dealer; or
  - (2)   Dealer's employees, contracted workers, or officers.

For purposes of this Agreement, "control" means the power, directly or indirectly, to cause the direction of the management or policies of an entity, whether through the ownership of voting securities, by contract, or by agency, or otherwise.

**Competitive Service** means: Any wireless telecommunications service offered by any person, entity, or business (other than Company) in the Area that is capable of providing functionally similar or equivalent wireless voice or data service to Company's Service, irrespective of the radio frequency on which the services are offered, including, without limitation: enhanced specialized mobile radio communications, digital mobile radio communications, specialized mobile radio communications, mobile satellite communications, personal communications services, personal communications networks, and similar frequencies or technologies. Competitive Service does not include paging services, unless it is two-way paging with voice transmission capabilities.

## 1.   RELATIONSHIP OF THE PARTIES

### 1.1   Authorization.

**1.1.1** Company authorizes Dealer and Dealer agrees to offer and obtain orders for the Company's Service under Service rate plans authorized by Company ("Authorized Rate Plans") through all of Dealer's locations in the Area, subject to the terms and conditions of this Agreement and the Policies and Procedures.

**1.1.2** Company specifically reserves the right to restrict Dealer from selling Service: 1) on certain "non-authorized" rate plans (voice or data); 2) to certain specifically enumerated Subscribers; 3) to certain classes of Subscribers, such as those that generate revenues above a specific level, or governmental or corporate entities; and 4) by certain methods, including without limitation, the Internet. All of these restrictions will be defined in the Policies and Procedures.

AT&T Wireless Proprietary & Confidential
Use Pursuant to Company Instructions

Exhibit  A
Page  7

**1.1.3** Any telemarketing or Internet effort to solicit Subscribers from the general public must be approved in writing by Company before Dealer's telemarketing or Internet effort begins.

**1.1.4** Dealer acknowledges that the Company may sell Service directly to potential Subscribers and may appoint other dealers, retailers, or others to sell the Company's Service in the Area. Company and others may also sell wireless telephones and related equipment and provide installation, repair or warranty service in the Area.

**1.2    Nature of Relationship.** In all dealings within the scope of this Agreement, the parties acknowledge and agree that the relationship created by this Agreement is that of independent contracting parties and is not, and will not be deemed to be any other relationship, including, without limitation, that of joint venturers, joint employers, or a partnership. Personnel employed by, or acting under the authority of, a party to this Agreement are not employees or agents of the other party. Company and Dealer assume full responsibility for the acts, supervision and control of their own respective employees. Dealer is not a general agent of Company. When conducting business under this Agreement. Dealer must identify itself as an "Authorized Dealer" of Company. Dealer has not paid and will not be required to pay any franchise fee or other fee to be a dealer for Company or to use Company's name or other intellectual property. This Agreement does not create any franchise between the parties.

**1.3    Other Agreements.** Dealer represents and warrants to Company that the execution and performance of this Agreement does not and will not violate any other contract or obligation to which Dealer is a party, including terms relating to covenants not to compete and confidentiality covenants. Dealer will not disclose to Company, or use or induce Company to use, any proprietary information or trade secrets of any other person, association or entity.

## 2.    DUTIES AND RESPONSIBILITIES OF DEALER

**2.1    General.** Dealer must faithfully, honestly and diligently perform its obligations under this Agreement, and must use its best efforts to promote and enhance the use of Service provided by or through Company. Dealer will take no action inconsistent with the provisions of this Agreement and must support the Company's efforts in providing Service to Subscribers. Dealer must provide timely, courteous and efficient service to Subscribers and must be governed in all dealings with members of the public and with Company by the highest standards of honesty, integrity, ethical conduct and fair dealing. Dealer must refrain from any business practice, promotion or advertising that may be injurious to the business or good will of Company. Neither Dealer nor any affiliate may be a reseller of Company's Service.

**2.2.    No Sharing of Commissions; No Subdealers.** Dealer must not, directly or indirectly, share any compensation earned under this Agreement with any other persons or entities that sell to the public, except for Dealer's own employees or contracted sales agents. Dealer may not appoint other entities with a retail presence to solicit Subscribers for Company's Service.

**2.3    Confidentiality.**

**2.3.1** Dealer acknowledges that it may be in receipt of certain confidential or proprietary information relating to the Company, including without limitation, lists of Subscribers, financial and business information, including commission structures, technical information and other information not generally known to the public relating to the Company, including the terms of this Agreement (collectively, "Confidential Information"). Dealer acknowledges that any Confidential Information of the Company that has been disclosed to Dealer has been disclosed solely for the performance of its duties

AT&T Wireless Proprietary & Confidential
Use Pursuant to Company Instructions

3

Exhibit __A__
Page __8__

under this Agreement. Dealer agrees that all Confidential Information of the Company is the exclusive property of the Company. Dealer further acknowledges that the disclosure or improper use of such Confidential Information would irreparably injure the Company and that Company's Confidential Information is a trade secret of Company.

        2.3.2  Dealer agrees that, during and after the term of this Agreement, neither Dealer, nor any employee, affiliate, or other person or entity otherwise connected with Dealer, may directly or indirectly, without the prior written consent of Company, divulge, use, sell, exchange, give away or transfer any Confidential Information. Dealer further agrees that it will advise its employees of these restrictions and will use reasonable efforts to prevent the disclosure or the improper use of Confidential Information by any current or former employees.

        2.3.3  If Dealer is served with any form of process to obtain any Confidential Information, the Dealer must immediately notify Company, which has the right to seek to quash such process.

    **2.4**    **Non-Solicitation/Non-Diversion.**  While this Agreement is in effect and for one year thereafter, neither Dealer nor any of its affiliates will contact Company's Subscribers for the purpose of soliciting or giving incentive to those Subscribers to terminate their agreement with Company or to convert to a competitive Service provider within the Area. During the one year period after the Agreement is no longer in effect, any Subscribers who contact Dealer regarding any aspect of Company's Service must be referred directly to Company. Dealer is responsible for ensuring compliance with this paragraph by its personnel.

    **2.5**    **Solicitation and Enrollment.**

        2.5.1  Dealer must solicit Subscriber subscriptions strictly in accordance with Company's procedures for enrollment of Subscribers. Company has the sole right to accept or reject all customer applications for Service. Dealer may be responsible for activating a minimum number of Authorized Subscribers as set forth in the Policies and Procedures. Dealer must market Service to potential Subscribers under Authorized Rate Plans at prices and on terms established solely by Company. Dealer has no right or authority to offer any other, or to vary in any way, the rates, rate plans, terms, or conditions related to Service. Dealer and its affiliates may not take any financial responsibility for payment of Service on behalf of Subscribers, nor otherwise suggest or facilitate the establishment of any arrangement to mitigate the Subscriber's financial risk arising out of its agreement for Service or for management of the account, nor otherwise interfere with the intended contractual relationship between Company and Subscriber. Dealer must maintain in stock Company's current rate plan brochures and other materials required in the Policies and Procedures. Once activated, the Subscriber is a customer of Company. Except as expressly provided herein, Dealer is not permitted to bill or collect from Subscribers or potential Subscribers any money or charges for Service.

        2.5.2  Dealer will assist Company's efforts to prevent fraudulent or abusive subscription to or use of Company's Service and will comply with all fraud prevention Policies and Procedures. Dealer must not process any application for Service or facilitate Service enrollment that would in any way inflate the amount of compensation payable to Dealer for a Subscriber.

        2.5.3  Dealer must provide adequate training for its salespersons regarding the solicitation and enrollment of Subscribers, the operation of Service, and the provision and maintenance of Equipment.

G:/legal/distrib/ex dealer agr
Rev. 0501

AT&T Wireless Proprietary & Confidential
Use Pursuant to Company Instructions
**Exhibit**   A

**Page**   9

4

**2.6    Regulatory Matters.** This Agreement is subject to changes or modifications necessary to comply with the laws, orders, or regulations of, and any necessary approvals of, local, state and federal regulatory agencies having jurisdiction over the offering or provision of Service in the Area or Dealer's activities in connection therewith. Accordingly, Company may add, delete, suspend or modify the rates for, and features included in, Service, and determine whether these changes apply to both existing or future Subscribers. Company will notify Dealer as soon as practicable of each modification. Dealer may not take any action inconsistent with any efforts by the Company before regulatory authorities or others regarding any modification of rates for Service.

**2.7    Deposits/Billing and Collections.** Dealer must, as trustee for Company, collect deposits and advance payments required by Company from new Subscribers before activation. These payments must be made payable to Company only, not to Dealer, and must be delivered to Company in accordance with Company's activation procedures.

**2.8    Insurance.** Dealer must at all times during the term of this Agreement, at Dealer's sole expense, be insured by a reputable insurance company licensed to do business in the states where Dealer operates under this Agreement, under a comprehensive general liability insurance policy against claims for bodily and personal injury, death or property damage caused by, arising out of or occurring in conjunction with the operation of Dealer's business, and products/completed operations liability insurance and independent contractors liability insurance with respect to Equipment, installation, and Service. The Company must be an additional insured under such policy. This insurance coverage must provide liability coverage of a least $1,000,000 per occurrence and $1,000,000 aggregate. Dealer must provide Company with a certificate of insurance evidencing compliance with the provisions of this paragraph upon request.

**2.9    Exclusivity.**

**2.9.1** While this Agreement is in effect, through all of Dealer's locations in the Area (including locations opened after the date of this Agreement), neither Dealer nor any Affiliate, may directly or indirectly, without the written consent of the Company, (a) solicit, sell, offer, or accept offers for a Competitive Service, (b) induce or refer any actual or prospective Subscriber of Company's Service to subscribe to a Competitive Service, (c) provide any Subscriber leads to a Competitive Service, or (d) activate Subscribers through a reseller or act as a reseller of Service.

**2.9.2** Dealer acknowledges that if, as a result of a violation of section 2.9.1 of this Agreement, Dealer or Affiliate activates any customer on Competitive Service, the Company will suffer monetary damages and loss of good will, the value of which is difficult to measure. Dealer therefore agrees to pay Company $1500 as liquidated damages for each customer that Dealer activates on Competitive Service, which sum Dealer agrees is reasonable. Dealer must, upon Company's written notice, make its books and records available to the Company to permit verification of Dealer's compliance with this section. In the event of Dealer's refusal to permit this inspection, Dealer must pay Company $1500 as liquidated damages for each customer that Dealer activates on Competitive Service, as calculated by Company. Acceptance by Company of liquidated damages for any breach of this section does not limit Company's right to terminate this Agreement. Company agrees that the terms of this paragraph relate solely to Dealer's activities in the Area.

**2.9.3** Any claim for liquidated damages will be submitted to the Dealer by the Company no later than 6 months from the date of an identified or suspected violation.

G:/legal/distrib/ex dealer agr
Rev. 0501

AT&T Wireless Proprietary & Confidential
Use Pursuant to Company Instructions

5

Exhibit ___A___
Page ___10___

**2.10    No Co-location of Competitive Services.** Dealer is prohibited from leasing, sub-leasing, or otherwise providing space to any Competitive Service provider or seller at any location where Dealer promotes or sells Service. Dealer is also prohibited from permitting any Competitive Service provider or seller to share resources with Dealer.

## 3.    DUTIES AND RESPONSIBILITIES OF COMPANY

**3.1    General.** Company must adhere to the highest standards of fair dealing and ethical business conduct in performing its duties under this Agreement.

**3.2    Training.** Company will provide training to Dealer to the extent necessary to properly offer and sell products and services under this Agreement.

**3.3    Promotional Literature.** Company will provide for each of Dealer's retail locations in the Area, during the term of this Agreement, reasonable quantities of Company's promotional literature including coverage maps, pricing information and Service forms. Company reserves the right to charge Dealer for promotional literature beyond what Company normally provides.

**3.4.    Compliance with Laws.** Company will comply with all local, state and federal laws applicable to Company's business under this Agreement.

## 4.    COMPENSATION

**4.1    Payment/Compensation Schedule.** Subject to the terms of this Agreement, including, without limitation, section 4.3, Company will pay Dealer the amounts set forth in the Compensation Schedule (Schedule 2). The Compensation Schedule specifies the full payment to Dealer for the performance of Dealer's services and obligations under this Agreement.

**4.2    Modifications.** Company may modify the terms and conditions or the payments listed in the Compensation Schedule in any way with 30 days' advance written notice to Dealer. Company may. without prior notice to Dealer, stop offering any service plans or may introduce new service plans and new services with different compensation than what is set forth in the Compensation Schedule.

**4.3    Offset\Recoupment.** Company or its affiliates may, at any time, offset and recoup against any and all amounts owed to Dealer or its subsidiaries or affiliates any amounts owed by Dealer or its subsidiaries or affiliates to Company, including but not limited to amounts owed or to be owed under this Agreement, or any other agreement between Company and Dealer, also including any expenses, attorney's fees, or damages incurred by Company and indemnified by Dealer.

## 5.    EQUIPMENT

**5.1    Certified Equipment.**

In connection with its obligations under this Agreement, Dealer will only sell models of equipment that meet FCC and reasonable Company technical standards, have been certified by Company for use on Company's Service, and comply with any authentication or other fraud prevention specifications used by Company in the Area ("Equipment"). Dealer must not recommend, sell, or furnish any equipment disapproved by the FCC or Company for failure to meet minimum technical, security or reliability standards.

G:/legal/distrib/ex dealer agr
Rev. 0501

AT&T Wireless Proprietary & Confidential
Use Pursuant to Company Instructions

6

Exhibit __A__
Page __11__

**5.2    Dealer Purchase of Equipment.**

5.2.1  All Equipment sold by Company to Dealer will be sold at prices established by Company from time to time and under the terms and conditions of this Agreement. All purchases must be made by Dealer in the form of a written purchase order which must be placed with Company, subject to acceptance by Company. The terms and conditions appearing on the purchase order form and made a part of this Agreement are limited to the following: (i) order number, (ii) delivery information, (iii) quantity (within applicable limits), (iv) description, (v) Company's price, (vi) applicable tax, (vii) shipping charges, and (viii) signed purchase authorization. Any additional terms or terms inconsistent with this Agreement contained in the purchase order are deemed deleted and are of no force or effect.

5.2.2  Delivery of Equipment will be made to Dealer's designated delivery point. Company may charge delivery costs at its discretion. Title and risk of loss of Equipment will pass to Dealer upon delivery of Equipment to Dealer.

5.2.3  If Dealer meets all Company credit standards, payment for Equipment sold to Dealer is due 30 days from the date of invoice. Late payments by Dealer may be subject to a finance charge of 1.5 percent per month or up to the legally allowed rate, whichever is less. Dealer must pay the full invoiced amount without deductions. If Company agrees that any disputed invoice is incorrect, Company will submit another invoice for the corrected amount.

5.2.4  If Dealer fails to make payment for Equipment delivered under this Agreement, or if, in Company's reasonable opinion, Dealer's financial condition is such that Company does not feel secure in obtaining payments for shipments of Equipment, Company may, at any time, (i) inspect Dealer's books and records to determine Dealer's financial stability, (ii) limit or cancel the credit of Dealer, (iii) demand payment in cash on or before delivery, and (iv) declare the amount outstanding immediately due and payable, which amount must then be paid by Dealer within 10 days after notice by Company that the entire sum is due and payable.

**5.3    Manufacturer's Warranty.**  A manufacturer's limited warranty, a copy of which accompanies each unit of Equipment, is the only warranty, except for warranty of title, provided with Equipment furnished under this Agreement. Dealer must make the limited warranty statement readily available to Dealer's end-user purchasers prior to sale. Any warranty statements made by Dealer that are in addition to the statements in the limited warranty apply against Dealer only and any costs, administrative, legal, or otherwise connected with any such additional warranty statements must be borne by Dealer. Dealer agrees to indemnify, defend and hold Company harmless from all direct and indirect results and claims flowing from such statements.

**5.4    Disclaimer of Warranty by Company.**  EXCEPT FOR THE WARRANTY OF TITLE, AS STATED ABOVE, COMPANY MAKES NO WARRANTIES, EXPRESS OR IMPLIED, AS TO ANY EQUIPMENT. COMPANY SPECIFICALLY DISCLAIMS ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR ANY OTHER WARRANTY OF FITNESS OR QUALITY.

**5.5    Limitation of Liability for Equipment Purchased.**  IN NO EVENT WILL COMPANY BE LIABLE TO DEALER FOR LOST PROFITS OR REVENUES, WHETHER PRESENT OR PROSPECTIVE, FOR LOSS OF TIME OR BUSINESS REPUTATION, INCONVENIENCE, LOSS OF USE OF ANY EQUIPMENT OR PROPERTY DAMAGE CAUSED BY ANY EQUIPMENT OR ITS FAILURE TO WORK, OR FOR ANY OTHER INDIRECT, SPECIAL, RELIANCE, INCIDENTAL OR CONSEQUENTIAL LOSS OR DAMAGE ARISING OUT OF THIS AGREEMENT OR ANY

G./legal/distrib/ex dealer agr
Rev. 0501

AT&T Wireless Proprietary & Confidential
Use Pursuant to Company Instructions

7

Exhibit ___A___
Page ___12___

OBLIGATION RESULTING THEREFROM, OR FROM THE USE OR PERFORMANCE OF ANY EQUIPMENT. THESE LIMITATIONS OF LIABILITY APPLY TO ALL CAUSES OF ACTION IN ANY WAY RELATED TO THIS AGREEMENT OR THE EQUIPMENT, INCLUDING, WITHOUT LIMITATION, ALLEGED BREACH OF WARRANTY, BREACH OF CONTRACT, PATENT OR COPYRIGHT INFRINGEMENT, OR TORT, WHETHER IN NEGLIGENCE, STRICT LIABILITY, OR OTHERWISE, EVEN IF COMPANY HAS BEEN ADVISED OF THE POSSIBILITY OF ANY SUCH LOSSES OR DAMAGES. IN THE EVENT OF ANY LIABILITY OF COMPANY TO DEALER RELATED TO EQUIPMENT SOLD UNDER THIS AGREEMENT, THIS LIABILITY WILL BE LIMITED TO THE LESSER OF (A) DEALER'S PROVEN DIRECT DAMAGES AND (B) THE PURCHASE PRICE OF THE EQUIPMENT WITH RESPECT TO WHICH THE ALLEGED LOSSES OR DAMAGES ARE CLAIMED.

### 5.6    Creation of Security Interest.

      **5.6.1**  In order to secure the payment and performance of all obligations of Dealer under this Agreement, including all renewals, extensions and rearrangements of any such obligations as may arise between Dealer and Company, Dealer grants to Company a purchase money security interest in (a) all Equipment now or hereafter owned by Dealer and sold to Dealer by Company under this Agreement, including but not limited to any and all Equipment returned to or repossessed by Dealer, (b) all present and future "accounts" (as defined in the Uniform Commercial Code) arising from the sale, lease, license, exchange or other disposition of Equipment by Dealer, and (c) all "proceeds" (as defined in the Uniform Commercial Code) of such Equipment and accounts (collectively, the "Collateral")." Dealer must execute, file and refile such financing statements or other security agreement documents as Company may require from time to time with respect to all or any portion of the Collateral. Dealer authorizes Company, as its lawful attorney and agent in fact, to execute and file such financing statements and other documents as Company deems necessary for the purpose of perfecting or continuing any security interest or lien created hereby.

      **5.6.2**  Dealer warrants, covenants and agrees that, except for the security interest granted in this Agreement, there are no other security interests granted as to the Collateral in existence as of the date hereof, and that Dealer owns and will keep the Collateral free and clear of liens, security interests, or encumbrances, and will not assign, sell, mortgage, lease, transfer, pledge or grant a security interest in the Collateral without the prior written consent of Company except for the sale of Equipment in the ordinary course of business.

      **5.6.3**  Dealer will be in default under the security provisions of this Agreement upon the happening of any of the following events or conditions: (i) the failure of Dealer to pay when due any amount owing to Company, (ii) the failure of Dealer to perform punctually any of its obligations under this Agreement, (iii) a breach by Dealer of any warranty, representation or covenant made by Dealer in connection with this Agreement, or (iv) a breach by Dealer of this Agreement.

      **5.6.4**  Upon the occurrence of a default as described above, Dealer must pay immediately, without further notice or demand, all amounts due and owing from Dealer to Company. In addition to Company's rights and remedies as a secured party under the Uniform Commercial Code, Company has the following rights: the right to sell, lease or otherwise dispose of any or all of the Collateral and to take possession of the Collateral, and for that purpose, Dealer hereby irrevocably agrees that Company may enter upon or into any premises on or in which the Collateral or any part thereof may be situated and remove the same therefrom. Company may require Dealer to assemble the Collateral and make it available to Company at a place designated by Company that is reasonably convenient to both parties.

G:/legal/distrib/ex dealer agr
Rev. 0501

AT&T Wireless Proprietary & Confidential
Use Pursuant to Company Instructions

8

Exhibit __A__
Page __13__

**5.6.5** Dealer must pay to Company on demand all amounts and expenses including, without limitation, reasonable attorneys' fees and disbursements, incurred or paid by Company in exercising or protecting its interests, rights or remedies under this Agreement or in remedying any default of Dealer, plus interest thereon at the highest rate permitted by applicable law. All such expenses and the interest thereon will be included as obligations secured under this Agreement.

**5.7    Equipment Availability/Pricing.** Dealer may obtain Equipment and accessories from any source. All prices and terms and conditions of sale of Equipment and accessories by Dealer to Subscribers will be established solely by Dealer.

**5.8    Transshipment/ Unactivated Equipment.** Dealer must sell Equipment purchased from Company to individuals or businesses that it reasonably believes are the actual end users of this Equipment for activation to Company's Service within the Area. Dealer must not sell or ship this Equipment to any location outside of the Area, directly or indirectly. Dealer must comply with all Policies and Procedures regarding transshipment and unactivated Equipment levels. Dealer agrees to pay for losses suffered by Company due to discounted Equipment sales to Dealer, and agrees to immediate termination of this Agreement if Company determines that unactivated Equipment levels are unreasonably high or that Dealer has engaged in transshipment.

**5.9    Equipment Returns.** Dealer must abide by Company's Equipment return policies relative to Subscribers and to Dealer, as set forth in the Policies and Procedures.

## 6.    DEALER'S OPERATING MATTERS

**6.1    Dealer's Business Records.** Dealer must create and maintain at its locations, and preserve for the period legally required from the date of their preparations, complete, and accurate records of its business conducted under this Agreement. Dealer must also provide or update its financial information, including without limitation, balance sheet and income statement. These records must be available for inspection and copying by the Company at all reasonable times.

**6.2    Compliance with Laws and Policies and Procedures.**

**6.2.1** Dealer must comply with all laws, FCC rules and regulations, tariffs, and any rules of other governmental bodies applicable to Dealer's business.

**6.2.2** Dealer must comply with all Policies and Procedures concerning the conduct of Dealer's business relating to Service or Equipment and all Policies and Procedures relating to the distribution of other products and services reasonably prescribed from time to time by the Company, which Policies and Procedures are incorporated by reference in this Agreement in their entirety, ("Policies and Procedures"). If Dealer chooses to accept any offer made by Company to participate in the distribution of other products and services, it must comply with all additional terms and conditions set forth in the relevant Policies and Procedures and accept any compensation levels associated with these products and services.

**6.2.3** Dealer's failure to comply with any of these Policies and Procedures will constitute a material breach of this Agreement and may subject Dealer to monetary penalties, forfeiture of Dealer's right to sell certain products or services, or other sanctions in accordance with the Policies and Procedures. The Company will send written notice to Dealer of any new Policies and Procedures issued by the Company or of any changes to existing Policies and Procedures.

AT&T Wireless Proprietary & Confidential
Use Pursuant to Company Instructions

9

Exhibit ___A___
Page ___14___

**6.3    Limited Offers.** Company, in its sole discretion will choose which products and services to offer Dealer and it is not obligated to offer any or all of these products and services to Dealer.

## 7.    USE OF MARKS; PROTECTION OF THE COMPANY'S RIGHTS

**7.1    Use of Marks.** During the term of this Agreement, the Company authorizes Dealer to be an "Authorized Dealer" of Company and to use its trademarks, service marks, trade names, logos, or similar markings which the Company owns or is licensed to use ("Marks") subject to the limitations contained herein. Dealer acknowledges that all Marks are the exclusive property of Company. Dealer must indicate that Company is the provider of the Service in its advertising, and may utilize the Marks in its advertising as long as Dealer complies with all Policies and Procedures pertaining to this use. Dealer will not use the Marks for any other purpose without the express prior written consent of Company. Dealer must conform to the highest ethical standards for advertising, take all reasonable steps to make sure that its advertising materials with respect to Company's Services are factually correct, comply with all applicable laws and correctly use Company Marks.

**7.2    No Transfer of Rights.** Dealer acknowledges that this Agreement does not transfer any rights to use any Marks (except to the limited extent expressly set forth in this Agreement) and that this Agreement does not and will not confer any goodwill or other interest in any Marks upon Dealer, all rights to which remain with the Company. Dealer will not challenge Company's ownership of the Marks in any way.

**7.3    Unauthorized Use.** Any unauthorized use of the Marks by Dealer or its respective employees, affiliates, or subagents constitutes infringement of Company's rights and a material breach of this Agreement. Upon expiration or termination of this Agreement for any reason, Dealer must immediately discontinue use of the Marks.

**7.4    No Disparagement.** Dealer must not in any way disparage Company's Service or Equipment and all use of Company's Marks by Dealer must not injure or diminish the goodwill associated with Company's Marks.

**8.    EXTENSION OF TERM.** This Agreement is automatically extended for successive one-year periods under the same terms and conditions in effect at the time of the renewal. This Agreement will terminate if either party gives written notice to the other party of its intention to terminate this Agreement at least 60 days before the expiration of the then current term.

## 9.    TERMINATION OR EXPIRATION OF AGREEMENT

**9.1    Termination for Cause.** Subject to the provisions contained in section 9.2, either party may terminate this Agreement by written notice to the other party if the other party breaches any material provision of this Agreement. Either party may terminate this Agreement immediately upon written notice to the other party if the FCC or any other regulatory agency promulgates any rule, regulation, or order that in effect or application prohibits or substantially impedes the Company from fulfilling its obligations under this Agreement or prohibits or substantially impedes Dealer's ability to sell Equipment or if the other party 1) becomes financially insolvent, 2) makes an assignment for the benefit of creditors, 3) has an Order for Relief under the United States Bankruptcy Code entered by any United States Court against it, or 4) has a trustee or receiver of any substantial part of its assets appointed by any court. Company may terminate this Agreement immediately upon written notice if for any reason Company is no longer authorized to provide Service within the Area, if Dealer is found to have made a material

G:/legal/distrib/ex dealer agr    AT&T Wireless Proprietary & Confidential    10
Rev. 0501    Use Pursuant to Company Instructions

Exhibit  A
Page  15

misrepresentation to Company during the application process, or if Dealer is found to have engaged in fraudulent or illegal conduct.

**9.2     Breach and Cure Period.** Neither party will be in breach of this Agreement unless the other party provides written notice to the allegedly breaching party of any violation of this Agreement and the allegedly breaching party fails to cure this violation within 30 days after receiving this notice. If the default is not cured by the end of the 30 day period, then termination will be effective without further notice. Notwithstanding the above, a breach by Dealer of any part of sections 2, 5, or 7 of this Agreement is not subject to cure and, accordingly, any such breach gives Company the right to terminate the Agreement immediately upon written notice to Dealer.

**9.3     Termination Without Cause.** This Agreement may be terminated by either party without cause with 90 days prior written notice.

**9.4     Obligations of Dealer Upon Termination or Expiration.** Upon the expiration or termination of this Agreement for any reason, Dealer and its affiliates must: (a) discontinue the use of all Marks, such as signs, logos, stationery, or business cards, and must return to Company all materials containing any Mark or otherwise identifying or relating to Company's business; (b) cease representing themselves in any fashion as a Dealer or representative of Company; (c) return to Company or destroy those documents, records or other materials (including, without limitation, all copies, either photocopies or computer copies), which were provided to Dealer by Company or which contain any Confidential Information of Company; and (d) not solicit, directly or indirectly any Subscribers to terminate their relationship with Company for one year, in accordance with section 2.4 of this Agreement.

**9.5     Post-Termination Reserve.** Upon termination of this Agreement and during the cure period of any default by Dealer, Company is entitled to establish and withhold a reserve from any compensation owed to Dealer that may be used to satisfy any obligations owed by Dealer to Company, including but not limited to, Subscriber deactivations following any termination of this Agreement. At all times following the initial 180 days of this Agreement, the reserve will equal the average compensation paid to Dealer per Subscriber during the preceding 180 days, multiplied by the number of Subscribers whose deactivations resulted in reimbursement due from Dealer during the preceding 180 days. Any remaining balance in the reserve 180 days from the date of the termination of this Agreement will be promptly paid to Dealer.

**9.6     No Compensation.** Upon termination of this Agreement for any reason, Dealer's right to compensation and Cooperative Advertising funds under this Agreement will expire, and become null and void, except for compensation earned prior to the termination date of this Agreement.

## 10.     DISPUTES

**10.1     Notification and Limitation of Actions.** Dealer must notify Company in writing of any grievance or dispute it may have regarding the Agreement or its relationship with Company within 120 days of the date Dealer became aware or should have become aware of this grievance or dispute. If the Dealer fails to notify Company of the grievance or dispute within 120 days, then Company will not be liable to Dealer for any loss of injury relating to that grievance or dispute.

**10.2     Arbitration of Disputes.**

**10.2.1 Arbitration Clause.** Except as stated in section 10.2.4 of this Agreement, all claims (including counterclaims and cross-claims) and disputes between Dealer and Company must be

resolved by submission to binding arbitration. The parties must submit any such disputes to the office of the American Arbitration Association ("AAA") nearest to Dealer within the Area, to be decided under the then current AAA commercial arbitration rules.

**10.2.2 Limitations of Actions.** All claims and disputes covered by this section 10 must be submitted to arbitration by initiating the arbitration not later than 180 days after the act or omission giving rise to the claim or dispute occurred, except for the failure to pay invoices for equipment purchased by Dealer from Company. The failure to initiate arbitration within the period constitutes an absolute bar to the institution of any proceedings based on such act or omission. The aggrieved party must initiate arbitration under this section 10 by sending written notice of an intention to arbitrate to all parties. The notice must contain a description of the dispute, the amount involved, and the remedy sought.

**10.2.3 Procedures and Discovery.** Company and Dealer agree that a prehearing conference must take place to reach agreement on procedural matters, arrange for the exchange of information, obtain stipulations, schedule the arbitration hearing, and attempt to narrow the issues. In order to expedite the arbitration proceedings, the parties have agreed to place the following limitations on discovery:

    **(i)** Each party may propound only one interrogatory requesting the names and addresses of the witnesses to be called at the arbitration hearing;

    **(ii)** On a date to be determined at the prehearing conference, each party may serve one request for the production of documents. The documents are to be exchanged 21 days after service of the request; and

    **(iii)** Each party may depose 4 witnesses. Each deposition must be concluded within four hours and all depositions must be taken within 60 days of the prehearing conference. Any party deposing an opponent's expert witness must pay the expert's fee for attending the deposition.

**10.2.4 Company's Right to Seek Injunction.** Notwithstanding anything in this section 10, Company may bring court proceedings to seek an injunction or other equitable relief to enforce any right, duty or obligation under this Agreement. To obtain injunctive or other equitable relief, Company is not required to post a bond or, if required by law or by the court, the Dealer hereby consents to a bond in the lowest amount permitted by law.

**10.2.5 Enforcement of Award.** Neither party has the right to appeal the decision of the arbitrator. The award of the arbitrator may be confirmed or enforced in any court having jurisdiction.

**10.2.6 Attorney's Fees.** If any arbitration or court action is commenced by either party, the substantially prevailing party in that action is entitled to recover its out-of-pocket and court costs and reasonable attorneys' fee incurred therein.

## 11.    MISCELLANEOUS

    **11.1    Governing Law.** Except to the extent governed by federal laws or regulations, the entire relationship of the parties based on this Agreement is governed by the substantive laws of the State of New York, without reference to its choice of law rules.

G:/legal/distrib/ex dealer agr
Rev. 0501

AT&T Wireless Proprietary & Confidential
Use Pursuant to Company Instructions

12

Exhibit   A

Page   17

**11.2    Waivers.** The rights of the parties under this Agreement, including the Policies and Procedures, are cumulative and not exclusive of any other rights and remedies. The waiver by any party of any right under this Agreement, or any breach of this Agreement does not constitute a waiver of any other right or remedy on a future occasion.

**11.3    Force Majeure.** Neither party is liable for loss or damage or will be in breach of this Agreement if its failure to perform its obligations results from: (1) compliance with any law, ruling, order, regulation, requirement or instruction of any federal, state or municipal government or any department or agency thereof or any court of competent jurisdiction; (2) acts or omissions of the other party in violation of this Agreement; or (3) acts of God, fires, strikes, embargoes, war, insurrection, riot, and other causes beyond the reasonable control of the party. Any delay resulting from any of these causes extends performance accordingly or excuses performance, in whole or in part, as may be reasonable.

**11.4    Entire Agreement.** This Agreement, including all Policies and Procedures issued under it, represents the entire agreement of the parties with respect to the subject matter of the Agreement. There are no other oral or written understandings or agreements between the Company and Dealer relating to the subject matter hereof, and this Agreement supersedes all prior negotiations, communications, agreements and addenda between the parties hereto with respect to the subject matter hereof, except that any releases or post-termination covenants are not superseded. Nothing in this Agreement is intended or should be deemed to confer any rights or remedies upon any entity not a party hereto.

**11.5    Modification.** This Agreement may only be amended or superseded by written agreement executed by authorized representatives of both parties, except as otherwise explicitly stated in this Agreement. Each such modification will be effective only in the specific instance for the specific purpose for which given. No course of dealing, course of performance, or usage of trade may be invoked to modify or supplement in any way the terms and conditions of this Agreement. No other understandings or representations, whether oral or in writing, will amend or supersede this Agreement.

**11.6    Assignability.** Neither party may assign this Agreement or any of its rights or obligations under this Agreement without the other party's prior written consent, except that (a) Company may assign its rights under this Agreement to any affiliate or to any entity or person in connection with any merger or consolidation of Company or with any sale of all or any portion of the assets or business of Company, and (b) Dealer may grant to an institutional lender as collateral for a loan or other credit facility a security interest in the other monies payable to Dealer under this Agreement subject to the offset rights of Company provided in this Agreement and in any other agreement between Company and Dealer. Any material change of control of the legal entity of Dealer will be deemed to be an assignment of this Agreement. Any assignment by Dealer in violation of the provisions of this section will immediately render this Agreement null and void, and will convey no rights or interest.

**11.7    Survivability.** Upon termination of this Agreement, all rights and duties of the parties terminate, except the following survive: Dealer's duties under sections 2.3, 2.4, 5.6, 9.4 and sections 4.3, 7, 9.5, 10 and 11 of this Agreement. The parties must fulfill all surviving obligations in a timely manner.

**11.8    Acknowledgments.** Company and Dealer acknowledge that they have read this Agreement and understand and accept the terms, conditions and covenants contained in it as being reasonably necessary to maintain the Company's high standards for Service and thereby to protect and preserve the goodwill of the Company's Service and its Marks. Dealer acknowledges and understands that Company may at any time compete directly with Dealer in the soliciting of Subscribers for the

G:/legal/distrib/ex dealer agr
Rev. 0501

AT&T Wireless Proprietary & Confidential
Use Pursuant to Company Instructions
Exhibit ___A___
Page __18__

13

service or in the sale, lease, installation, repair or warranty servicing of equipment and may also appoint other Dealers and others to offer or sell Company's Service and related equipment in the Area. Dealer has independently investigated the business outlined in this Agreement and the profitability (if any) and risks, and is not relying on any representation, guarantee, or statement of Company other than as set forth in this Agreement.

**11.9    Indemnification.** Dealer and Company agree to defend and hold the other party, its affiliates and employees harmless for all liability, damages, punitive damages, expenses, including reasonable attorneys' fees and disbursements, claims, demands or suits arising from their breach of this Agreement, their negligent, willful, or fraudulent acts, or for their failure to act, with respect to the performance of each parties' obligations under this Agreement and all Policies and Procedures, including, without limitation, any allegedly unauthorized use of a trademark, patent, copyright, process, idea, method or device covered by this Agreement, or bodily injury or damage to property to the extent occasioned by the acts or omissions of the indemnifying party or its affiliates, employees, or subcontractors. Prompt written notice must be provided to the indemnifying party of any claim for indemnification. Each party may conduct its own defense of any claim in which it is named as a defendant without diminishing its indemnity rights. Each party is only responsible for any losses or damages proximately caused by it. The Limitation of Liability clause in paragraph 11.11 does not limit recovery under this Indemnification clause.

**11.10    Severability.** A determination by a court or arbitrator of competent jurisdiction that any provision of this Agreement or any part thereof is unenforceable will not cancel or invalidate the remainder of such provision or this Agreement, which will remain in full force and effect and will be construed to carry out the intent of the parties.

**11.11    Limitation of Liability.** EXCEPT TO THE EXTENT OTHERWISE PROVIDED UNDER THE INDEMNIFICATION CLAUSE, NEITHER COMPANY NOR DEALER IS LIABLE TO THE OTHER FOR ANY INDIRECT, SPECIAL, CONSEQUENTIAL, PUNITIVE, OR EXEMPLARY DAMAGES, INCLUDING WITHOUT LIMITATION LOST PROFITS, AS A RESULT OF ANY DEFAULT OR BREACH OF THIS AGREEMENT OR THE TERMINATION OR NON-RENEWAL OF THIS AGREEMENT OR ANY OTHER EVENT, CONDUCT, ACT OR OMISSION ARISING OUT OF OR RELATED TO THIS AGREEMENT WHETHER BASED ON CONTRACT, TORT, STATUTE OR OTHERWISE. THIS LIMITATION OF LIABILITY IS MADE KNOWINGLY, INTENTIONALLY AND VOLUNTARILY. Equipment accounts receivable, and commissions actually paid to Dealer, including without limitation all discounted Equipment sales by Company to Dealer, are expressly excluded from the limitation of liability in this section.

**12.    NOTICES.**    All notices, requests, demands, and other communications under this Agreement, must be in writing and are deemed given if personally delivered or mailed, certified mail, return receipt requested, or sent by nationally recognized overnight carrier to the address indicated on the cover page of this Agreement. Despite the foregoing, Company's notices regarding Policies and Procedures or changes to compensation may also be sent by facsimile, by electronic means, or by U.S. Mail.

SCHEDULES FOLLOW.

G:/legal/distrib/ex dealer agr
Rev. 0501

AT&T Wireless Proprietary & Confidential
Use Pursuant to Company Instructions
Exhibit  A
Page  19

14

**SCHEDULE 1**
**COMPANY NAME(S)/AREA**

**Effective Date: September 1, 2001**

| STATE | COMPANY | AREA |
|-------|---------|------|
| CA | Bay Area Cellular Telephone Company | San Francisco CA MSA<br>San Jose CA MSA |
|  | Cagal Cellular Communications Corporation | Santa Rosa CA MSA |
|  | Napa Cellular Telephone Company | Vallejo CA MSA |
|  | Salinas Cellular Telephone Company | Salinas CA MSA |

G:/legal/distrib/ex dealer agr
Rev. 0501

AT&T Wireless Proprietary & Confidential
Use Pursuant to Company Instructions
Exhibit  A 
Page   _20_

15

6249.011
(L)

# GSM ADDENDUM
## TO AT&T WIRELESS EXCLUSIVE DEALER AGREEMENT

| DEALER | AT&T Wireless |
|---|---|
| Legal Name: **Viva Wireless,** *Inc*.<br>Business Name (if different):<br>Type of Entity: **California corporation**<br>("Dealer") | **AT&T Wireless Services, Inc.,** a Delaware corporation, dba AT&T Wireless ("Company") |
| **DEALER Address (For Official Notices)** | **Company Address (For Official Notices)** |
| 26120 Eden Landing Road, Suite 5<br>Hayward  CA  94545 | AT&T Wireless<br>Attn:   Legal Dept.<br>7277 164th Avenue N.E.<br>Redmond  WA  98052 |
| **DEALER Contact** | **Company Contact** |
| Name:  Carolyn Pestano<br>Title: CEO<br>Telephone: 510-783-9097<br>Fax: 510-783-9618 | Name:  Nancy Espitallier<br>Title:  Dealer Account Executive<br>Telephone:  510-589-1000<br>Fax:  650-827-5557 |
| **DEALER Billing Address** | |
| same as above | |

**Dealer and Company are parties to that certain Exclusive Dealer Agreement dated September 1, 2001 ("Dealer Agreement"). The parties desire to amend the Dealer Agreement only as expressly set forth in this GSM Addendum.**

**This GSM Addendum is effective as of September 1, 2002, or Market GSM Launch Date, which ever is earlier, and consists of this Cover Page, the attached Terms and Conditions, Schedule 1 GSM (Company Name(s)/GSM Area), and Schedule 2 GSM (Compensation), (collectively, this "GSM Addendum").**

## DEALER'S SIGNATURE BELOW ACKNOWLEDGES THAT DEALER HAS READ AND UNDERSTANDS EACH OF THE PROVISIONS OF THIS GSM ADDENDUM AND AGREES TO BE BOUND BY THEM.

| VIVA WIRELESS, *Inc* . | AT&T WIRELESS SERVICES, INC.,<br>DBA AT&T Wireless |
|---|---|
| By: *[signature]*<br>(Authorized Signature) | By: *[signature]*<br>(Authorized Signature) |
| Name:  Carolyn Pestano<br>Title:   CEO<br>Date: *8/1/02* | Name:  ~~Charles Bernstein~~ *Frederick J Deveraux*<br>Title:   District General Manager<br>Date: *9/17/02* |

## GSM ADDENDUM DEALER TERMS AND CONDITIONS

1.      **Technology.** Company is launching a new wireless service based on wireless technology that will be referred to in this GSM Addendum as "GSM." The term GSM includes wireless voice technology and wireless packet data technology that is also known as GPRS. The term "GSM Service" refers to the provision of GSM voice and data service to authorized subscribers on Company's GSM network.

2.      **Authorization/No-Conflict/Confidentiality.** Company appoints and Dealer accepts appointment as a dealer of GSM Service and Approved GSM Equipment within Company's market(s) shown on Schedule 1 GSM to this GSM Addendum, which area may change from time to time upon Company's issuance of a revised Schedule 1 GSM ("GSM Area"). Dealer has no current contractual obligation that would prohibit Dealer from becoming authorized to sell GSM Service for Company or prohibit Dealer from entering into or acting under this GSM Addendum with Company. This GSM Addendum and all subscriber information gathered by Dealer or provided by Company under this GSM Addendum or under the Dealer Agreement are Confidential Information under the Dealer Agreement and must be treated accordingly.

3.      **Applicability Of Dealer Agreement.** Except as expressly modified by this GSM Addendum, the terms and conditions of the Dealer Agreement, including all Policies and Procedures, and Company Wholesale Supplement, if any, remain unchanged and in full force and effect. Company will issue Dealer a new dealer code that Dealer must use for all transactions under this GSM Addendum. All capitalized terms not otherwise defined in this GSM Addendum take the meaning provided in the Dealer Agreement. If the Dealer Agreement states that Dealer must sell Company's wireless service exclusively, then Dealer must also follow this exclusivity provision for the sale of GSM Service under this GSM Addendum; otherwise, this GSM Addendum is non-exclusive.

4.  **Equipment**

    4.1     **Dealer Purchase of GSM Equipment.**

            4.1.1 Dealer may only sell for use on the GSM Service GSM equipment or devices of any kind that have been approved for use by Company on its GSM Service ("Approved GSM Equipment"). Approved GSM Equipment offered by Company will be sold to Dealer under the terms and conditions of the Dealer Agreement. All GSM equipment or devices purchased from Company are Approved GSM Equipment.

            4.1.2 Certain Approved GSM Equipment and certain GSM rate plans may not be made available to Dealer at Company's sole discretion.

            4.1.3. Company will be the sole source of all new Approved GSM Equipment and Dealer must not purchase it from any other source for use on the GSM Service without the prior written permission of Company. Company will provide a complete listing of Approved GSM Equipment that Dealer may purchase from sources other than Company for use on the GSM Service. Equipment that is not approved by Company is prohibited from use on the GSM Service, as it may not function properly and could interfere with the GSM Service. Dealer must not encourage or assist any subscriber to use any equipment or devices other than Approved GSM Equipment on the GSM Service.

G /legal/distribution/GSM addendum dlr
12/01

AT&T Wireless Proprietary and Confidential
Use Pursuant to Company Instructions

Page 2

Exhibit  A

Page  22

**4.1.4** A Subscriber Identity Module known as a "SIM" is necessary for the operation of all Approved GSM Equipment on the GSM Service. Company uses SIMs as the direct association to each subscriber of its GSM Service. Every SIM that Dealer purchases or offers for use on the GSM Service must be Approved GSM Equipment and must have been supplied by Company directly to Dealer.

**4.1.5** All Approved GSM Equipment originally purchased from Company (including purchases by a sub-dealer from its assigned Wholesale Dealer) must be sold to end user Authorized GSM Subscribers in the original packaging with all of the components originally provided by Company. Dealer is specifically prohibited from removing the SIM that is packaged together with another piece of Approved GSM Equipment sold by Company. Dealer must facilitate the activation of each SIM and the Approved GSM Equipment with which it was packaged, together with the end-user subscriber who purchases these items. Failure to follow these provisions may result in Dealer not earning any compensation. The only exception to this paragraph is that Dealer may remove a SIM from the Approved GSM Equipment when upgrading the device of an existing customer of Company's GSM Service.

**4.2    GSM Equipment Programming.** All Approved GSM Equipment is intended to be programmed by over-the-air programming. Approved GSM Equipment not programmed using over-the-air programming likely will not function correctly. Therefore, Dealer is not permitted to program any Approved GSM Equipment manually, without the express consent of Company.

**4.3    Prohibition of Transshipping.** Transshipping of any Approved GSM Equipment sold by Company is strictly prohibited. All terms and conditions of the Dealer Agreement relating to transshipping, including without limitation, the Prevention of Transshipping Policy and Procedure, are extended to all Approved GSM Equipment sold by Company.

**5.    Compensation.** Company will pay Dealer the amounts set forth in the GSM Compensation Schedule ("Schedule 2 GSM"). This payment is subject to the terms and conditions of the Dealer Agreement and this GSM Addendum, including without limitation Company's sole and absolute right to offset against amounts owed to Dealer and Company's sole and absolute right to modify the Schedule 2 GSM in any way upon 30 days advance written notice.

**6.    Term and Termination.** This GSM Addendum is coterminous with the Dealer Agreement and terminates immediately upon termination of the Dealer Agreement. However, this GSM Addendum may also be terminated earlier in accordance with its terms. Either party may terminate this GSM Addendum without cause upon 30 days prior written notice. Company may terminate this GSM Addendum upon material breach by Dealer if that breach is not cured within 14 days after Dealer receives notice of the breach.

G:/legal/distribution/GSM addendum dlr
12/01

**AT&T Wireless Proprietary and Confidential**
**Use Pursuant to Company Instructions**
Exhibit ___A___
Page ___23___

Page 3

# SCHEDULE 1 GSM
## AREA

### Effective Date: January 1, 2002

Dealer is authorized to offer GSM products and Service in the Areas shown on the Schedule 1 to the Dealer Agreement and where Company has officially launched GSM Service, subject to limitations of build-out of the system and availability of phone numbers/area codes. These limitations may result in partial coverage within some Areas.

G:/legal/distribution/GSM addendum dlr
12/01

**AT&T Wireless Proprietary and Confidential**
**Use Pursuant to Company Instructions**

Page 4

**Exhibit  A**
**Page  24**





February 4, 2002

**AT&T Wireless Services, Inc.**
651 Gateway Blvd . Suite 1500
South San Francisco, CA 94080

Carolyn Pestano
Viva Wireless
376 Imperial Way, Suite 106
Daly City CA 94015

Re: Out-of-Market Activation Authorization Letter

Dear Ms. Pestano:

You have requested authorization to perform activations for AT&T Wireless (AWS) outside of the market(s) listed on Schedule 1 of your Dealer Agreement with AWS. AWS is willing to grant your request based on the conditions and understandings set forth in this letter.

First, you must not actively solicit, market or promote your presence in any market not listed in Schedule 1 of your Dealer Agreement.

Second, in keeping with the provisions of the Dealer Agreement, you must not solicit governmental agencies or any business customer that has a Corporate Digital Advantage (CDA) contract with AWS.

Third, you must use the designated code assigned by AWS for all out-of-market activations. You must provide every AWS subscriber with current AWS rate plan collateral, coverage maps, and promotional information for the specific rate plan in the specific market for which the subscriber is taking service. You must be knowledgeable about each AWS product or service that it sells, including any local variations.

Fourth, you must perform all steps necessary to activate on AWS' wireless network every phone sold out of market before the phone leaves the your possession. You must not allow any phone you purchased from AWS to be sold without first being activated on the AWS wireless network. AWS' transshipping polices apply to all phone sales.

Fifth, you are NOT permitted to use the Internet or to use direct marketing (including telemarketing) to solicit new customers without separate written consent from AWS. Furthermore, in keeping with the Brand Identity Policy, you are not authorized to use the Marks in any fax broadcast, unsolicited email, instant or text message.

Sixth, each Authorized DMN Subscriber in any one of these markets constitutes an "out-of-market activation." AWS will compensate Dealer in accordance with the attached Schedule 2.1(a) for each out-of-market activation. Schedule 2.1(a) may be amended in any way upon 30 days advance written notice to Dealer.

Seventh, the authorization in this letter is in the sole discretion of AWS and may be revoked by AWS at any time by written notice to Dealer.

Eighth, except as stated in this letter, all terms and conditions of your Dealer Agreement and all Policies and Procedures apply to the performance regarding and compensation for out-of-market activations.

Therefore, based on the conditions and understandings set forth in this letter, AWS authorizes you to perform out-of-market activations in any domestic AWS market.

Very truly yours,

Charlie Bernstein
Vice President/General Manager
San Francisco

cc:    Gary Dettwiller
       Margaret Ireland

G:/legal/distribution/OMA authorization
Rev. 0800

**AT&T Proprietary and Confidential
Use Pursuant to Company Instructions**

2

Exhibit  A
Page  26

## SCHEDULE 2.1(a)

## COMPENSATION – OUT-OF-MARKET ACTIVATION

### Effective Date: May 1, 2004

Effective in areas where AT&T Wireless provides Service that are not listed on Schedule 1, Area, of the Dealer Agreement.

**All Authorized Subscribers (including Shared Advantage): $150**

This is the total compensation. No other compensation is offered, including for features or upgrades.

G:/legal/distribution/OMA authorization
Rev. 0800

AT&T Proprietary and Confidential
Use Pursuant to Company Instructions

3

Exhibit A
Page 27

6249.11

**CAB AGREEMENT**

To:     **Authorized Dealer**

From:   **AT&T Wireless Services, Inc.**

**Dealer's Committed Activation Bonus ("CAB") Agreement**

Dear Dealer:

As additional compensation under your Dealer Agreement, AT&T Wireless is offering Dealer the opportunity to agree to a specific CAB Commitment Tier for the 3 month period beginning on November 1, 2004, and ending on January 31, 2005 (the "CAB Period"). Dealer hereby agrees to the complete terms and conditions of this CAB program set forth in Schedule 2 of your Dealer Agreement in effect during the CAB Period. Capitalized terms not defined in this CAB Agreement are defined in the Dealer Agreement. This CAB Agreement form must be received by your local Indirect District Manager at AT&T Wireless by October 29, 2004, fully executed with no changes of any kind in order to be considered by AT&T Wireless. This CAB Agreement becomes effective when AT&T Wireless sends Dealer a written confirmation that its selected CAB has been accepted.

| CAB Commitment Tier | Total CAB Transactions during CAB Period | Monthly CAB Transactions (approximate) | CAB per Authorized Subscriber |
|---|---|---|---|
| | 0-2697 | 0 - 899 | $0 |
| | 2698-3897 | 900 - 1299 | $65 |
| **Custom CAB** | 3900 + | 1300 + | $75 |

Dealer hereby commits to achieve the CAB Commitment Tier selected below. In order to achieve its selected CAB Commitment Tier, Dealer must achieve equal to or above the number of Total CAB Transactions (Authorized Subscribers) during the CAB Period, aggregated in all markets on Dealer's Schedule 1 to its Dealer Agreement. In return, Dealer will earn the specified CAB per Authorized Subscriber.

## CAB Commitment Tier selected _____ Custom CAB

**Agreed and Accepted by Dealer:**

Dealer Name: <u>Viva Wireless</u> dba  ("Dealer")

Dealer Address: <u>3521 Investment Blvd Ste 2, Hayward, CA  94545</u>

Signed: _____

Printed Name: <u>Carolyn Pestano</u>                Date: <u>11/4/04</u>

**Agreed and Accepted by AT&T Wireless Services, Inc.:**

Authorized Signature: _____        Oracle A/P Vendor No.: <u>10917</u>

Printed Name: <u>Fred Devereux</u>                    Master Dealer Code: <u>1309F</u>

AT&T WIRELESS PROPRIETARY & CONFIDENTIAL
Use pursuant to Company instructions
Exhibit <u>A</u>
Page <u>28</u>

# EXHIBIT B

# Redacted; subject to pending Motion to File Under Seal

# Redacted; subject to pending Motion to File Under Seal

# EXHIBIT B

# EXHIBIT C

# Redacted; subject to pending Motion to File Under Seal

# Redacted; subject to pending Motion to File Under Seal

# EXHIBIT C

# EXHIBIT D

# Pages 1-5 Redacted; subject to Pending Motion to File Under Seal

Pages 1-5 Redacted; subject to Pending Motion to File Under Seal

# EXHIBIT D

# EXHIBIT B
## DEALER PRINCIPAL PERSONAL GUARANTY

WHEREAS, pursuant to the **Advance Payment Agreement** ("APA") entered into on October 3 , 2006, between **Cingular Wireless II, LLC**, and its affiliates in the Area, ("COMPANY"), and **Viva Wireless, Inc.**, ("DEALER"), GUARANTOR hereunder has incurred and/or may in the future incur obligations to COMPANY, and has and/or may in the future become indebted to COMPANY in connection with DEALER's performance under the APA; and

WHEREAS, in order to induce COMPANY to advance DEALER funds for the build-out of new authorized dealer retail locations, GUARANTOR agrees to personally guarantee any and all indebtedness incurred by DEALER as a result of COMPANY's agreement to advance funds to DEALER under the APA.

NOW, THEREFORE, for and in consideration of the agreements contained herein, and other good and valuable consideration, including COMPANY's agreement to advance DEALER funds under the APA, the receipt and adequacy of which are hereby acknowledged, the undersigned, as GUARANTOR, hereby unconditionally and absolutely guarantees to COMPANY the prompt and full payment and/or performance of any and all of DEALER's obligations under the APA, including payment in full of the Advance of $250,000.00, when the same shall be due and payable to COMPANY. It is agreed by the parties that this Guaranty is subject to the following terms and conditions:

1. In the event GUARANTOR fails to make any payment due COMPANY when due, or to perform any other obligation guaranteed by GUARANTOR hereunder in a timely manner, GUARANTOR shall be deemed in default under this Guaranty, and COMPANY may, in addition to any other remedies available to COMPANY at law or in equity, immediately declare all amounts due and owing COMPANY by GUARANTOR to be immediately due and payable.

2. This Guaranty is absolute, continuing and unlimited for the benefit of COMPANY and its successors and assigns, and COMPANY will not be required to proceed first, or at all, against DEALER or against any other person, firm, or corporation, or against any collateral or other security for payment or performance of the Obligations before resorting to the Guarantor. This Guaranty is binding not only on GUARANTOR, but on GUARANTOR's heirs, personal representatives, successors and assigns. This Guaranty shall be governed by and constructed in accordance with the laws of the State of California. All obligations of GUARANTOR hereunder are performable in Alameda County, California, at a location designated by COMPANY. GUARANTOR shall pay any and all reasonable attorney's fees and all other reasonable costs and expenses which may be incurred by COMPANY in the enforcement of this Guaranty.

3. GUARANTOR's performance under this Guaranty shall not affect DEALER's obligations to COMPANY under the APA or Exclusive Dealer Agreement effective January 1, 2006 between COMPANY and DEALER ("Dealer Agreement"). If GUARANTOR becomes liable to COMPANY for any other obligations, by endorsement or otherwise, such liability shall not in any manner be impaired or affected by this Guaranty, and the rights of COMPANY hereunder or under the Agreement shall be cumulative of any and all other rights that COMPANY may ever have against GUARANTOR. COMPANY's exercise of any right hereunder or under any other instrument shall not preclude the concurrent or subsequent exercise of any other right. If, for any reason whatsoever, COMPANY is now, or hereafter becomes indebted to GUARANTOR, such indebtedness and all interest thereon shall at all times be subordinate in all respects to the obligations of GUARANTOR hereunder, and GUARANTOR shall not be entitled to enforce or receive payment thereof until such obligations have been fully paid and/or performed. GUARANTOR shall not have any right of subrogation in or under any documents securing payment of GUARANTOR's obligations hereunder, and GUARANTOR expressly waives and releases any such rights of subrogation.

4. GUARANTOR hereby agrees that GUARANTOR's responsibilities under the terms of this Guaranty shall not be released, diminished, impaired or affected by the occurrence of any one or more of the following events:

    a. COMPANY's acceptance of any other security, collateral or guarantee for any or all of DEALER's obligations to COMPANY;

    b. The release, surrender, exchange, subordination, or loss of any security or collateral at any time existing in connection with any or all of DEALER's or GUARANTOR's obligations to COMPANY;

    c. The partial release of GUARANTOR hereunder, or if there is more than one person or entity signing the Guaranty, the complete or partial release of any one or more of them;

    d. The death, insolvency, bankruptcy, disability or termination of GUARANTOR or of any one or more of the persons comprising DEALER, or the dissolution, receivership, or reorganization of DEALER;

    e. Any renewal, extension, modification or rearrangement in connection with DEALER's or GUARANTOR's payment of any or all of DEALER's or GUARANTOR's obligations to COMPANY, either with or without notice to or consent of DEALER or GUARANTOR, or any adjustment, indulgence, forbearance, or compromise that may be granted or given by COMPANY to GUARANTOR or DEALER;

f.  (f)  Any neglect, delay, omission, failure or refusal by COMPANY to take or prosecute any action for the collection of DEALER's or GUARANTOR's obligations hereunder,  or COMPANY's failure to commence any action to foreclose upon any security or collateral given by DEALER or GUARANTOR therefor;

g.  Any failure of COMPANY to notify DEALER or GUARANTOR of any renewal, extension, rearrangements, modification or assignment of the obligations or any part thereof, it being understood that COMPANY shall not be required to give GUARANTOR any notice of any kind under any circumstances with respect to or in connection with GUARANTOR's obligations hereunder;

h.  The unenforceability or uncollectability of all or any part of the obligations against DEALER for any reason, it being agreed that GUARANTOR shall remain liable hereon regardless of whether DEALER or any other person shall be found not liable with respect to the obligations or any part thereof; or

i.  If any payment made by DEALER to COMPANY is held to constitute a preference under the bankruptcy laws, or if for any other reason COMPANY is required to refund or surrender any such payment.

5.  This Guaranty shall continue in full force and effect until the amount owed to the COMPANY under the APA, $250,000.00, is paid in full. The amount owed to COMPANY may be paid in full at any time and shall not affect the obligation of GUARANTOR with respect to amounts thereafter incurred by DEALER or GUARANTOR.

6.  It is the intent of GUARANTOR and COMPANY hereunder that the obligations and liabilities of GUARANTOR hereunder are absolute and  unconditional and that until the obligations are fully and finally paid and/or performed, such obligations shall not be discharged or released in whole or in part, or by any act or occurrence which might, but for the provisions of this Guaranty, be deemed a discharge or release of  GUARANTOR's obligations to COMPANY.

7.  GUARANTOR represents that GUARANTOR is the owner of a direct or indirect interest in DEALER and that GUARANTOR will receive a direct and material benefit under this Guaranty.

IN WITNESS WHEREOF, this Guaranty is executed by GUARANTOR this *3rd* day of *October* , 2006.

GUARANTOR:

Signed: _Carolyn Pestano_

Name:  Carolyn Pestano

Title: Chief Executive Officer

THE STATE OF CALIFORNIA     §

                               §

COUNTY OF *Alameda*     §

SWORN TO AND SUBSCRIBED before me the undersigned notary public on this the *3rd* day of *October* , 2006, to which witness my hand and seal.

_Selena M. Jordan_
Notary Public, State of California

_Selena M. Jordan_
Printed Name

My Commission Expires:

_08.02.08_



*SELENA M. JORDAN*
*COMM. # 1505115*
*NOTARY PUBLIC – CALIFORNIA*
*ALAMEDA COUNTY*
*My Comm. Expires AUG 02, 2008*

# PROOF OF SERVICE

STATE OF CALIFORNIA    )
                       )    ss.
COUNTY OF ORANGE       )

     I am employed in the County of Orange, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 600 Anton Blvd, Suite 1075, Costa Mesa, California 92626.

     On January 23, 2008, I served the foregoing document: **DECLARATION OF MARC MIGUEL IN SUPPORT OF MOTION BY AT&T MOBILITY II, LLC TO COMPEL ARBITRATION OF COUNTERCLAIMS OF CAROLYN PESTANO AND MOTION TO DISMISS THE FIRST, SECOND, FIFTH AND SIXTH COUNTERCLAIMS OF CAROLYN PESTANO WITHOUT LEAVE TO AMEND [REDACTED]** on all interested parties in said action by placing a true copy thereof in a sealed envelope addressed as follows:

Venkat Balasubramani, Esq.
BALASUBRAMANI LAW
8426 40th Ave., SW
Seattle, Washington 98136
Fax: (206) 260-3966

(  )    **BY MAIL**, as follows:

            (  )    **STATE** – I am readily familiar with Kohut & Kohut LLP's practice of collection and processing correspondence for mailing.  Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Costa Mesa, California, in the ordinary course of business.  I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one (1) day after date of deposit for mailing in affidavit.

            (XX)    **FEDERAL** – I deposited such envelope in the U.S. Mail at Costa Mesa, California with postage thereon fully prepaid.

(  )    **BY PERSONAL SERVICE**, as follows:  I caused a copy of such document to be served by hand to the addresses.

(XX)    **BY OVERNIGHT DELIVERY**, as follows:  I caused such envelope to be delivered by overnight delivery service to the offices of the addressee.  The envelope was deposited in or with a facility regularly maintained by the overnight delivery service with delivery fees paid or provided for.

( )    **BY FACSIMILE**, as follows: I caused such documents to be transmitted to the telephone number of the addressee listed above, by use of facsimile machine telephone number (714) 384-4131  The facsimile machine used complied with *California Rules of Court*, Rule 2004 and no error was reported by the machine.  Pursuant to *California Rules of Court*, Rule 2006(d), a transmission record of the transmission was printed.

( )    **BY CERTIFIED MAIL**, as follows: I am "readily familiar" with Kohut & Kohut LLP's practice for the collection and processing of correspondence for mailing with the U.S. Postal Service, such envelope will be deposited with the U.S. Postal Service on the above date in the ordinary course of business at the business address shown above; and such envelope was placed for collection and mailing, by Certified U.S. Mail, Return Receipt Requested, on the above date according to Kohut & Kohut LLP's ordinary business practice.

( )    **STATE** – I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

(X)    **FEDERAL** – I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on **January 23, 2008**, at Costa Mesa, California.

AYRIKA. S. FERNANDES

PROOF OF SERVICE

2