# EXHIBIT A

# EXHIBIT A

# AT&T WIRELESS
## EXCLUSIVE DEALER AGREEMENT

| DEALER | AT&T Wireless |
|---|---|
| Legal Name: **Viva Wireless**<br>Business Name (if different):<br>Type of Entity: **San Francisco corporation**<br>("**Dealer**") | AT&T Wireless Services, Inc., a Delaware corporation, as agent for each of the companies listed on Schedule 1 (each as to its own market known as the Company ("**Company**") |
| **DEALER Address (For Official Notices)** | **Company Address (For Official Notices)** |
| 376 Imperial Way  #106<br>Daly City  CA  94015 | AT&T Wireless<br>7277 164th Avenue NE<br>Redmond  WA  98052<br>Attn: Legal Department |
| **DEALER Contact** | **Company Contact** |
| Name: Carolyn Pestano<br>Title: CEO<br>Telephone: 415-545-8377  / 454<br>Fax: 415-454-8387 | Name: Nancy Espitallier<br>Title: Indirect Account Executive<br>Telephone: 510-589-1000<br>Fax: 650-827-5557 |
| **DEALER Billing Address** | |
| same as above | |

This Agreement consists of this Cover Page, the attached Terms and Conditions, Schedule 1 (Company Name(s)/Area), Schedule 2 (Compensation), and Schedule 2.1 (Compensation), and all Policies and Procedures issued in accordance with the Terms and Conditions (collectively, this "Agreement").

This Agreement is effective as of September 1, 2001, and continues in effect for a term of 2 years, unless earlier terminated in accordance with the provisions of the Agreement.

---

## DEALER'S SIGNATURE BELOW ACKNOWLEDGES THAT DEALER HAS READ AND UNDERSTANDS EACH OF THE PROVISIONS OF THIS AGREEMENT AND AGREES TO BE BOUND BY THEM.

| VIVA WIRELESS | AT&T WIRELESS SERVICES, INC., as agent for each of the companies listed on Schedule 1 |
|---|---|
| By: *(signature)*<br>(Authorized Signature)<br><br>Name: Carolyn Pestano<br>Title: CEO<br>Date: 8/24/01 | By: *(signature)*<br>(Authorized Signature)<br><br>Name: Trish Kapos<br>Title: Regional Director, Indirect Distribution<br>Date: 8·28·01 |

AT&T Wireless Proprietary & Confidential
Use Pursuant to Company Instructions

1

Exhibit  A
Page  6

## AT&T WIRELESS EXCLUSIVE DEALER AGREEMENT
### Terms and Conditions

Company has received regulatory authority to operate as a facilities-based provider of wireless voice and data service ("Service") within the market(s) shown on Schedule 1, which area may change from time to time ("Area"). Dealer desires to sell Equipment and to offer the Company's Service to potential customers who are the ultimate users of Service provided by or through the Company ("Subscribers"). Company desires to enter into this Agreement with Dealer in part as a result of the commitment by Dealer to promote Company's Service in the Area.

**DEFINITIONS:** As used in this Agreement, the following terms have the meanings specified herein:

**Affiliate** means:

(A)  Dealer's employees, contracted workers, or officers; or

(B)  any person, company, partnership or other entity, or its successors or assigns that directly or indirectly, through one or more intermediaries controls, is controlled by, or is under common control with:

(1)  Dealer; or

(2)  Dealer's employees, contracted workers, or officers.

For purposes of this Agreement, "control" means the power, directly or indirectly, to cause the direction of the management or policies of an entity, whether through the ownership of voting securities, by contract, or by agency, or otherwise.

**Competitive Service** means: Any wireless telecommunications service offered by any person, entity, or business (other than Company) in the Area that is capable of providing functionally similar or equivalent wireless voice or data service to Company's Service, irrespective of the radio frequency on which the services are offered, including, without limitation: enhanced specialized mobile radio communications, digital mobile radio communications, specialized mobile radio communications, mobile satellite communications, personal communications services, personal communications networks, and similar frequencies or technologies. Competitive Service does not include paging services, unless it is two-way paging with voice transmission capabilities.

## 1.  RELATIONSHIP OF THE PARTIES

### 1.1  Authorization.

**1.1.1** Company authorizes Dealer and Dealer agrees to offer and obtain orders for the Company's Service under Service rate plans authorized by Company ("Authorized Rate Plans") through all of Dealer's locations in the Area, subject to the terms and conditions of this Agreement and the Policies and Procedures.

**1.1.2** Company specifically reserves the right to restrict Dealer from selling Service: 1) on certain "non-authorized" rate plans (voice or data); 2) to certain specifically enumerated Subscribers; 3) to certain classes of Subscribers, such as those that generate revenues above a specific level, or governmental or corporate entities; and 4) by certain methods, including without limitation, the Internet. All of these restrictions will be defined in the Policies and Procedures.

AT&T Wireless Proprietary & Confidential
Use Pursuant to Company Instructions

Exhibit __A__

Page __7__

2

**1.1.3** Any telemarketing or Internet effort to solicit Subscribers from the general public must be approved in writing by Company before Dealer's telemarketing or Internet effort begins.

**1.1.4** Dealer acknowledges that the Company may sell Service directly to potential Subscribers and may appoint other dealers, retailers, or others to sell the Company's Service in the Area. Company and others may also sell wireless telephones and related equipment and provide installation, repair or warranty service in the Area.

**1.2    Nature of Relationship.** In all dealings within the scope of this Agreement, the parties acknowledge and agree that the relationship created by this Agreement is that of independent contracting parties and is not, and will not be deemed to be any other relationship, including, without limitation, that of joint venturers, joint employers, or a partnership. Personnel employed by, or acting under the authority of, a party to this Agreement are not employees or agents of the other party. Company and Dealer assume full responsibility for the acts, supervision and control of their own respective employees. Dealer is not a general agent of Company. When conducting business under this Agreement, Dealer must identify itself as an "Authorized Dealer" of Company. Dealer has not paid and will not be required to pay any franchise fee or other fee to be a dealer for Company or to use Company's name or other intellectual property. This Agreement does not create any franchise between the parties.

**1.3    Other Agreements.** Dealer represents and warrants to Company that the execution and performance of this Agreement does not and will not violate any other contract or obligation to which Dealer is a party, including terms relating to covenants not to compete and confidentiality covenants. Dealer will not disclose to Company, or use or induce Company to use, any proprietary information or trade secrets of any other person, association or entity.

## 2.    DUTIES AND RESPONSIBILITIES OF DEALER

**2.1    General.** Dealer must faithfully, honestly and diligently perform its obligations under this Agreement, and must use its best efforts to promote and enhance the use of Service provided by or through Company. Dealer will take no action inconsistent with the provisions of this Agreement and must support the Company's efforts in providing Service to Subscribers. Dealer must provide timely, courteous and efficient service to Subscribers and must be governed in all dealings with members of the public and with Company by the highest standards of honesty, integrity, ethical conduct and fair dealing. Dealer must refrain from any business practice, promotion or advertising that may be injurious to the business or good will of Company. Neither Dealer nor any affiliate may be a reseller of Company's Service.

**2.2.    No Sharing of Commissions; No Subdealers.** Dealer must not, directly or indirectly, share any compensation earned under this Agreement with any other persons or entities that sell to the public, except for Dealer's own employees or contracted sales agents. Dealer may not appoint other entities with a retail presence to solicit Subscribers for Company's Service.

**2.3    Confidentiality.**

**2.3.1** Dealer acknowledges that it may be in receipt of certain confidential or proprietary information relating to the Company, including without limitation, lists of Subscribers, financial and business information, including commission structures, technical information and other information not generally known to the public relating to the Company, including the terms of this Agreement (collectively, "Confidential Information"). Dealer acknowledges that any Confidential Information of the Company that has been disclosed to Dealer has been disclosed solely for the performance of its duties

under this Agreement. Dealer agrees that all Confidential Information of the Company is the exclusive property of the Company. Dealer further acknowledges that the disclosure or improper use of such Confidential Information would irreparably injure the Company and that Company's Confidential Information is a trade secret of Company.

      **2.3.2** Dealer agrees that, during and after the term of this Agreement, neither Dealer, nor any employee, affiliate, or other person or entity otherwise connected with Dealer, may directly or indirectly, without the prior written consent of Company, divulge, use, sell, exchange, give away or transfer any Confidential Information. Dealer further agrees that it will advise its employees of these restrictions and will use reasonable efforts to prevent the disclosure or the improper use of Confidential Information by any current or former employees.

      **2.3.3** If Dealer is served with any form of process to obtain any Confidential Information, the Dealer must immediately notify Company, which has the right to seek to quash such process.

    **2.4**    **Non-Solicitation/Non-Diversion.** While this Agreement is in effect and for one year thereafter, neither Dealer nor any of its affiliates will contact Company's Subscribers for the purpose of soliciting or giving incentive to those Subscribers to terminate their agreement with Company or to convert to a competitive Service provider within the Area. During the one year period after the Agreement is no longer in effect, any Subscribers who contact Dealer regarding any aspect of Company's Service must be referred directly to Company. Dealer is responsible for ensuring compliance with this paragraph by its personnel.

    **2.5**    **Solicitation and Enrollment.**

      **2.5.1** Dealer must solicit Subscriber subscriptions strictly in accordance with Company's procedures for enrollment of Subscribers. Company has the sole right to accept or reject all customer applications for Service. Dealer may be responsible for activating a minimum number of Authorized Subscribers as set forth in the Policies and Procedures. Dealer must market Service to potential Subscribers under Authorized Rate Plans at prices and on terms established solely by Company. Dealer has no right or authority to offer any other, or to vary in any way, the rates, rate plans, terms, or conditions related to Service. Dealer and its affiliates may not take any financial responsibility for payment of Service on behalf of Subscribers, nor otherwise suggest or facilitate the establishment of any arrangement to mitigate the Subscriber's financial risk arising out of its agreement for Service or for management of the account, nor otherwise interfere with the intended contractual relationship between Company and Subscriber. Dealer must maintain in stock Company's current rate plan brochures and other materials required in the Policies and Procedures. Once activated, the Subscriber is a customer of Company. Except as expressly provided herein, Dealer is not permitted to bill or collect from Subscribers or potential Subscribers any money or charges for Service.

      **2.5.2** Dealer will assist Company's efforts to prevent fraudulent or abusive subscription to or use of Company's Service and will comply with all fraud prevention Policies and Procedures. Dealer must not process any application for Service or facilitate Service enrollment that would in any way inflate the amount of compensation payable to Dealer for a Subscriber.

      **2.5.3** Dealer must provide adequate training for its salespersons regarding the solicitation and enrollment of Subscribers, the operation of Service, and the provision and maintenance of Equipment.

G./legal/distrib/ex dealer agr
Rev. 0501

**AT&T Wireless Proprietary & Confidential
Use Pursuant to Company Instructions**
Exhibit __A__
Page __9__

4

**2.6    Regulatory Matters.** This Agreement is subject to changes or modifications necessary to comply with the laws, orders, or regulations of, and any necessary approvals of, local, state and federal regulatory agencies having jurisdiction over the offering or provision of Service in the Area or Dealer's activities in connection therewith. Accordingly, Company may add, delete, suspend or modify the rates for, and features included in, Service, and determine whether these changes apply to both existing or future Subscribers. Company will notify Dealer as soon as practicable of each modification. Dealer may not take any action inconsistent with any efforts by the Company before regulatory authorities or others regarding any modification of rates for Service.

**2.7    Deposits/Billing and Collections.** Dealer must, as trustee for Company, collect deposits and advance payments required by Company from new Subscribers before activation. These payments must be made payable to Company only, not to Dealer, and must be delivered to Company in accordance with Company's activation procedures.

**2.8    Insurance.** Dealer must at all times during the term of this Agreement, at Dealer's sole expense, be insured by a reputable insurance company licensed to do business in the states where Dealer operates under this Agreement, under a comprehensive general liability insurance policy against claims for bodily and personal injury, death or property damage caused by, arising out of or occurring in conjunction with the operation of Dealer's business, and products/completed operations liability insurance and independent contractors liability insurance with respect to Equipment, installation, and Service. The Company must be an additional insured under such policy. This insurance coverage must provide liability coverage of a least $1,000,000 per occurrence and $1,000,000 aggregate. Dealer must provide Company with a certificate of insurance evidencing compliance with the provisions of this paragraph upon request.

**2.9    Exclusivity.**

**2.9.1** While this Agreement is in effect, through all of Dealer's locations in the Area (including locations opened after the date of this Agreement), neither Dealer nor any Affiliate, may directly or indirectly, without the written consent of the Company, (a) solicit, sell, offer, or accept offers for a Competitive Service, (b) induce or refer any actual or prospective Subscriber of Company's Service to subscribe to a Competitive Service, (c) provide any Subscriber leads to a Competitive Service, or (d) activate Subscribers through a reseller or act as a reseller of Service.

**2.9.2** Dealer acknowledges that if, as a result of a violation of section 2.9.1 of this Agreement, Dealer or Affiliate activates any customer on Competitive Service, the Company will suffer monetary damages and loss of good will, the value of which is difficult to measure. Dealer therefore agrees to pay Company $1500 as liquidated damages for each customer that Dealer activates on Competitive Service, which sum Dealer agrees is reasonable. Dealer must, upon Company's written notice, make its books and records available to the Company to permit verification of Dealer's compliance with this section. In the event of Dealer's refusal to permit this inspection, Dealer must pay Company $1500 as liquidated damages for each customer that Dealer activates on Competitive Service, as calculated by Company. Acceptance by Company of liquidated damages for any breach of this section does not limit Company's right to terminate this Agreement. Company agrees that the terms of this paragraph relate solely to Dealer's activities in the Area.

**2.9.3** Any claim for liquidated damages will be submitted to the Dealer by the Company no later than 6 months from the date of an identified or suspected violation.

**2.10    No Co-location of Competitive Services.** Dealer is prohibited from leasing, sub-leasing, or otherwise providing space to any Competitive Service provider or seller at any location where Dealer promotes or sells Service. Dealer is also prohibited from permitting any Competitive Service provider or seller to share resources with Dealer.

## 3.    DUTIES AND RESPONSIBILITIES OF COMPANY

**3.1    General.** Company must adhere to the highest standards of fair dealing and ethical business conduct in performing its duties under this Agreement.

**3.2    Training.** Company will provide training to Dealer to the extent necessary to properly offer and sell products and services under this Agreement.

**3.3    Promotional Literature.** Company will provide for each of Dealer's retail locations in the Area, during the term of this Agreement, reasonable quantities of Company's promotional literature including coverage maps, pricing information and Service forms. Company reserves the right to charge Dealer for promotional literature beyond what Company normally provides.

**3.4.    Compliance with Laws.** Company will comply with all local, state and federal laws applicable to Company's business under this Agreement.

## 4.    COMPENSATION

**4.1    Payment/Compensation Schedule.** Subject to the terms of this Agreement, including, without limitation, section 4.3, Company will pay Dealer the amounts set forth in the Compensation Schedule (Schedule 2). The Compensation Schedule specifies the full payment to Dealer for the performance of Dealer's services and obligations under this Agreement.

**4.2    Modifications.** Company may modify the terms and conditions or the payments listed in the Compensation Schedule in any way with 30 days' advance written notice to Dealer. Company may, without prior notice to Dealer, stop offering any service plans or may introduce new service plans and new services with different compensation than what is set forth in the Compensation Schedule.

**4.3    Offset\Recoupment.** Company or its affiliates may, at any time, offset and recoup against any and all amounts owed to Dealer or its subsidiaries or affiliates any amounts owed by Dealer or its subsidiaries or affiliates to Company, including but not limited to amounts owed or to be owed under this Agreement, or any other agreement between Company and Dealer, also including any expenses, attorney's fees, or damages incurred by Company and indemnified by Dealer.

## 5.    EQUIPMENT

**5.1    Certified Equipment.**

In connection with its obligations under this Agreement, Dealer will only sell models of equipment that meet FCC and reasonable Company technical standards, have been certified by Company for use on Company's Service, and comply with any authentication or other fraud prevention specifications used by Company in the Area ("Equipment"). Dealer must not recommend, sell, or furnish any equipment disapproved by the FCC or Company for failure to meet minimum technical, security or reliability standards.

G:/legal/distrib/ex dealer agr
Rev. 0501

AT&T Wireless Proprietary & Confidential
Use Pursuant to Company Instructions
Exhibit ___A___
Page ___11___

6

**5.2    Dealer Purchase of Equipment.**

**5.2.1** All Equipment sold by Company to Dealer will be sold at prices established by Company from time to time and under the terms and conditions of this Agreement. All purchases must be made by Dealer in the form of a written purchase order which must be placed with Company, subject to acceptance by Company. The terms and conditions appearing on the purchase order form and made a part of this Agreement are limited to the following: (i) order number, (ii) delivery information, (iii) quantity (within applicable limits), (iv) description, (v) Company's price, (vi) applicable tax, (vii) shipping charges, and (viii) signed purchase authorization. Any additional terms or terms inconsistent with this Agreement contained in the purchase order are deemed deleted and are of no force or effect.

**5.2.2** Delivery of Equipment will be made to Dealer's designated delivery point. Company may charge delivery costs at its discretion. Title and risk of loss of Equipment will pass to Dealer upon delivery of Equipment to Dealer.

**5.2.3** If Dealer meets all Company credit standards, payment for Equipment sold to Dealer is due 30 days from the date of invoice. Late payments by Dealer may be subject to a finance charge of 1.5 percent per month or up to the legally allowed rate, whichever is less. Dealer must pay the full invoiced amount without deductions. If Company agrees that any disputed invoice is incorrect, Company will submit another invoice for the corrected amount.

**5.2.4** If Dealer fails to make payment for Equipment delivered under this Agreement, or if, in Company's reasonable opinion, Dealer's financial condition is such that Company does not feel secure in obtaining payments for shipments of Equipment, Company may, at any time, (i) inspect Dealer's books and records to determine Dealer's financial stability, (ii) limit or cancel the credit of Dealer, (iii) demand payment in cash on or before delivery, and (iv) declare the amount outstanding immediately due and payable, which amount must then be paid by Dealer within 10 days after notice by Company that the entire sum is due and payable.

**5.3    Manufacturer's Warranty.** A manufacturer's limited warranty, a copy of which accompanies each unit of Equipment, is the only warranty, except for warranty of title, provided with Equipment furnished under this Agreement. Dealer must make the limited warranty statement readily available to Dealer's end-user purchasers prior to sale. Any warranty statements made by Dealer that are in addition to the statements in the limited warranty apply against Dealer only and any costs, administrative, legal, or otherwise connected with any such additional warranty statements must be borne by Dealer. Dealer agrees to indemnify, defend and hold Company harmless from all direct and indirect results and claims flowing from such statements.

**5.4    Disclaimer of Warranty by Company.** EXCEPT FOR THE WARRANTY OF TITLE, AS STATED ABOVE, COMPANY MAKES NO WARRANTIES, EXPRESS OR IMPLIED, AS TO ANY EQUIPMENT. COMPANY SPECIFICALLY DISCLAIMS ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR ANY OTHER WARRANTY OF FITNESS OR QUALITY.

**5.5    Limitation of Liability for Equipment Purchased.** IN NO EVENT WILL COMPANY BE LIABLE TO DEALER FOR LOST PROFITS OR REVENUES, WHETHER PRESENT OR PROSPECTIVE, FOR LOSS OF TIME OR BUSINESS REPUTATION, INCONVENIENCE, LOSS OF USE OF ANY EQUIPMENT OR PROPERTY DAMAGE CAUSED BY ANY EQUIPMENT OR ITS FAILURE TO WORK, OR FOR ANY OTHER INDIRECT, SPECIAL, RELIANCE, INCIDENTAL OR CONSEQUENTIAL LOSS OR DAMAGE ARISING OUT OF THIS AGREEMENT OR ANY

AT&T Wireless Proprietary & Confidential
Use Pursuant to Company Instructions

Exhibit   A
Page   12

OBLIGATION RESULTING THEREFROM, OR FROM THE USE OR PERFORMANCE OF ANY EQUIPMENT. THESE LIMITATIONS OF LIABILITY APPLY TO ALL CAUSES OF ACTION IN ANY WAY RELATED TO THIS AGREEMENT OR THE EQUIPMENT, INCLUDING, WITHOUT LIMITATION, ALLEGED BREACH OF WARRANTY, BREACH OF CONTRACT, PATENT OR COPYRIGHT INFRINGEMENT, OR TORT, WHETHER IN NEGLIGENCE, STRICT LIABILITY, OR OTHERWISE, EVEN IF COMPANY HAS BEEN ADVISED OF THE POSSIBILITY OF ANY SUCH LOSSES OR DAMAGES. IN THE EVENT OF ANY LIABILITY OF COMPANY TO DEALER RELATED TO EQUIPMENT SOLD UNDER THIS AGREEMENT, THIS LIABILITY WILL BE LIMITED TO THE LESSER OF (A) DEALER'S PROVEN DIRECT DAMAGES AND (B) THE PURCHASE PRICE OF THE EQUIPMENT WITH RESPECT TO WHICH THE ALLEGED LOSSES OR DAMAGES ARE CLAIMED.

**5.6    Creation of Security Interest.**

5.6.1 In order to secure the payment and performance of all obligations of Dealer under this Agreement, including all renewals, extensions and rearrangements of any such obligations as may arise between Dealer and Company, Dealer grants to Company a purchase money security interest in (a) all Equipment now or hereafter owned by Dealer and sold to Dealer by Company under this Agreement, including but not limited to any and all Equipment returned to or repossessed by Dealer, (b) all present and future "accounts" (as defined in the Uniform Commercial Code) arising from the sale, lease, license, exchange or other disposition of Equipment by Dealer, and (c) all "proceeds" (as defined in the Uniform Commercial Code) of such Equipment and accounts (collectively, the "Collateral")." Dealer must execute, file and refile such financing statements or other security agreement documents as Company may require from time to time with respect to all or any portion of the Collateral. Dealer authorizes Company, as its lawful attorney and agent in fact, to execute and file such financing statements and other documents as Company deems necessary for the purpose of perfecting or continuing any security interest or lien created hereby.

5.6.2 Dealer warrants, covenants and agrees that, except for the security interest granted in this Agreement, there are no other security interests granted as to the Collateral in existence as of the date hereof, and that Dealer owns and will keep the Collateral free and clear of liens, security interests, or encumbrances, and will not assign, sell, mortgage, lease, transfer, pledge or grant a security interest in the Collateral without the prior written consent of Company except for the sale of Equipment in the ordinary course of business.

5.6.3 Dealer will be in default under the security provisions of this Agreement upon the happening of any of the following events or conditions: (i) the failure of Dealer to pay when due any amount owing to Company, (ii) the failure of Dealer to perform punctually any of its obligations under this Agreement, (iii) a breach by Dealer of any warranty, representation or covenant made by Dealer in connection with this Agreement, or (iv) a breach by Dealer of this Agreement.

5.6.4 Upon the occurrence of a default as described above, Dealer must pay immediately, without further notice or demand, all amounts due and owing from Dealer to Company. In addition to Company's rights and remedies as a secured party under the Uniform Commercial Code, Company has the following rights: the right to sell, lease or otherwise dispose of any or all of the Collateral and to take possession of the Collateral, and for that purpose, Dealer hereby irrevocably agrees that Company may enter upon or into any premises on or in which the Collateral or any part thereof may be situated and remove the same therefrom. Company may require Dealer to assemble the Collateral and make it available to Company at a place designated by Company that is reasonably convenient to both parties.

AT&T Wireless Proprietary & Confidential
Use Pursuant to Company Instructions
8

Exhibit  A
Page  13

**5.6.5** Dealer must pay to Company on demand all amounts and expenses including, without limitation, reasonable attorneys' fees and disbursements, incurred or paid by Company in exercising or protecting its interests, rights or remedies under this Agreement or in remedying any default of Dealer, plus interest thereon at the highest rate permitted by applicable law. All such expenses and the interest thereon will be included as obligations secured under this Agreement.

**5.7     Equipment Availability/Pricing.** Dealer may obtain Equipment and accessories from any source. All prices and terms and conditions of sale of Equipment and accessories by Dealer to Subscribers will be established solely by Dealer.

**5.8     Transshipment/ Unactivated Equipment.** Dealer must sell Equipment purchased from Company to individuals or businesses that it reasonably believes are the actual end users of this Equipment for activation to Company's Service within the Area. Dealer must not sell or ship this Equipment to any location outside of the Area, directly or indirectly. Dealer must comply with all Policies and Procedures regarding transshipment and unactivated Equipment levels. Dealer agrees to pay for losses suffered by Company due to discounted Equipment sales to Dealer, and agrees to immediate termination of this Agreement if Company determines that unactivated Equipment levels are unreasonably high or that Dealer has engaged in transshipment.

**5.9     Equipment Returns.** Dealer must abide by Company's Equipment return policies relative to Subscribers and to Dealer, as set forth in the Policies and Procedures.

## 6.     DEALER'S OPERATING MATTERS

**6.1     Dealer's Business Records.** Dealer must create and maintain at its locations, and preserve for the period legally required from the date of their preparations, complete, and accurate records of its business conducted under this Agreement. Dealer must also provide or update its financial information, including without limitation, balance sheet and income statement. These records must be available for inspection and copying by the Company at all reasonable times.

**6.2     Compliance with Laws and Policies and Procedures.**

**6.2.1** Dealer must comply with all laws, FCC rules and regulations, tariffs, and any rules of other governmental bodies applicable to Dealer's business.

**6.2.2** Dealer must comply with all Policies and Procedures concerning the conduct of Dealer's business relating to Service or Equipment and all Policies and Procedures relating to the distribution of other products and services reasonably prescribed from time to time by the Company, which Policies and Procedures are incorporated by reference in this Agreement in their entirety, ("Policies and Procedures"). If Dealer chooses to accept any offer made by Company to participate in the distribution of other products and services, it must comply with all additional terms and conditions set forth in the relevant Policies and Procedures and accept any compensation levels associated with these products and services.

**6.2.3** Dealer's failure to comply with any of these Policies and Procedures will constitute a material breach of this Agreement and may subject Dealer to monetary penalties, forfeiture of Dealer's right to sell certain products or services, or other sanctions in accordance with the Policies and Procedures. The Company will send written notice to Dealer of any new Policies and Procedures issued by the Company or of any changes to existing Policies and Procedures.

    **6.3**    **Limited Offers.** Company, in its sole discretion will choose which products and services to offer Dealer and it is not obligated to offer any or all of these products and services to Dealer.

## 7.    USE OF MARKS; PROTECTION OF THE COMPANY'S RIGHTS

    **7.1**    **Use of Marks.** During the term of this Agreement, the Company authorizes Dealer to be an "Authorized Dealer" of Company and to use its trademarks, service marks, trade names, logos, or similar markings which the Company owns or is licensed to use ("Marks") subject to the limitations contained herein. Dealer acknowledges that all Marks are the exclusive property of Company. Dealer must indicate that Company is the provider of the Service in its advertising, and may utilize the Marks in its advertising as long as Dealer complies with all Policies and Procedures pertaining to this use. Dealer will not use the Marks for any other purpose without the express prior written consent of Company. Dealer must conform to the highest ethical standards for advertising, take all reasonable steps to make sure that its advertising materials with respect to Company's Services are factually correct, comply with all applicable laws and correctly use Company Marks.

    **7.2**    **No Transfer of Rights.** Dealer acknowledges that this Agreement does not transfer any rights to use any Marks (except to the limited extent expressly set forth in this Agreement) and that this Agreement does not and will not confer any goodwill or other interest in any Marks upon Dealer, all rights to which remain with the Company. Dealer will not challenge Company's ownership of the Marks in any way.

    **7.3**    **Unauthorized Use.** Any unauthorized use of the Marks by Dealer or its respective employees, affiliates, or subagents constitutes infringement of Company's rights and a material breach of this Agreement. Upon expiration or termination of this Agreement for any reason, Dealer must immediately discontinue use of the Marks.

    **7.4**    **No Disparagement.** Dealer must not in any way disparage Company's Service or Equipment and all use of Company's Marks by Dealer must not injure or diminish the goodwill associated with Company's Marks.

**8.**    **EXTENSION OF TERM.** This Agreement is automatically extended for successive one-year periods under the same terms and conditions in effect at the time of the renewal. This Agreement will terminate if either party gives written notice to the other party of its intention to terminate this Agreement at least 60 days before the expiration of the then current term.

## 9.    TERMINATION OR EXPIRATION OF AGREEMENT

    **9.1**    **Termination for Cause.** Subject to the provisions contained in section 9.2, either party may terminate this Agreement by written notice to the other party if the other party breaches any material provision of this Agreement. Either party may terminate this Agreement immediately upon written notice to the other party if the FCC or any other regulatory agency promulgates any rule, regulation, or order that in effect or application prohibits or substantially impedes the Company from fulfilling its obligations under this Agreement or prohibits or substantially impedes Dealer's ability to sell Equipment or if the other party 1) becomes financially insolvent, 2) makes an assignment for the benefit of creditors, 3) has an Order for Relief under the United States Bankruptcy Code entered by any United States Court against it, or 4) has a trustee or receiver of any substantial part of its assets appointed by any court. Company may terminate this Agreement immediately upon written notice if for any reason Company is no longer authorized to provide Service within the Area, if Dealer is found to have made a material

G:/legal/distrib/ex dealer agr
Rev 0501

**AT&T Wireless Proprietary & Confidential**
Use Pursuant to Company Instructions

10

**Exhibit  A
Page  15**

misrepresentation to Company during the application process, or if Dealer is found to have engaged in fraudulent or illegal conduct.

**9.2    Breach and Cure Period.** Neither party will be in breach of this Agreement unless the other party provides written notice to the allegedly breaching party of any violation of this Agreement and the allegedly breaching party fails to cure this violation within 30 days after receiving this notice. If the default is not cured by the end of the 30 day period, then termination will be effective without further notice. Notwithstanding the above, a breach by Dealer of any part of sections 2, 5, or 7 of this Agreement is not subject to cure and, accordingly, any such breach gives Company the right to terminate the Agreement immediately upon written notice to Dealer.

**9.3    Termination Without Cause.** This Agreement may be terminated by either party without cause with 90 days prior written notice.

**9.4    Obligations of Dealer Upon Termination or Expiration.** Upon the expiration or termination of this Agreement for any reason, Dealer and its affiliates must: (a) discontinue the use of all Marks, such as signs, logos, stationery, or business cards, and must return to Company all materials containing any Mark or otherwise identifying or relating to Company's business; (b) cease representing themselves in any fashion as a Dealer or representative of Company; (c) return to Company or destroy those documents, records or other materials (including, without limitation, all copies, either photocopies or computer copies), which were provided to Dealer by Company or which contain any Confidential Information of Company; and (d) not solicit, directly or indirectly any Subscribers to terminate their relationship with Company for one year, in accordance with section 2.4 of this Agreement.

**9.5    Post-Termination Reserve.** Upon termination of this Agreement and during the cure period of any default by Dealer, Company is entitled to establish and withhold a reserve from any compensation owed to Dealer that may be used to satisfy any obligations owed by Dealer to Company, including but not limited to, Subscriber deactivations following any termination of this Agreement. At all times following the initial 180 days of this Agreement, the reserve will equal the average compensation paid to Dealer per Subscriber during the preceding 180 days, multiplied by the number of Subscribers whose deactivations resulted in reimbursement due from Dealer during the preceding 180 days. Any remaining balance in the reserve 180 days from the date of the termination of this Agreement will be promptly paid to Dealer.

**9.6    No Compensation.** Upon termination of this Agreement for any reason, Dealer's right to compensation and Cooperative Advertising funds under this Agreement will expire, and become null and void, except for compensation earned prior to the termination date of this Agreement.

## 10.    DISPUTES

**10.1    Notification and Limitation of Actions.** Dealer must notify Company in writing of any grievance or dispute it may have regarding the Agreement or its relationship with Company within 120 days of the date Dealer became aware or should have become aware of this grievance or dispute. If the Dealer fails to notify Company of the grievance or dispute within 120 days, then Company will not be liable to Dealer for any loss of injury relating to that grievance or dispute.

**10.2    Arbitration of Disputes.**

**10.2.1 Arbitration Clause.** Except as stated in section 10.2.4 of this Agreement, all claims (including counterclaims and cross-claims) and disputes between Dealer and Company must be

G:/legal/distrib/ex dealer agr
Rev. 0501

AT&T Wireless Proprietary & Confidential
Use Pursuant to Company Instructions
Exhibit __A__
Page __16__

11

resolved by submission to binding arbitration. The parties must submit any such disputes to the office of the American Arbitration Association ("AAA") nearest to Dealer within the Area, to be decided under the then current AAA commercial arbitration rules.

**10.2.2 Limitations of Actions.** All claims and disputes covered by this section 10 must be submitted to arbitration by initiating the arbitration not later than 180 days after the act or omission giving rise to the claim or dispute occurred, except for the failure to pay invoices for equipment purchased by Dealer from Company. The failure to initiate arbitration within the period constitutes an absolute bar to the institution of any proceedings based on such act or omission. The aggrieved party must initiate arbitration under this section 10 by sending written notice of an intention to arbitrate to all parties. The notice must contain a description of the dispute, the amount involved, and the remedy sought.

**10.2.3 Procedures and Discovery.** Company and Dealer agree that a prehearing conference must take place to reach agreement on procedural matters, arrange for the exchange of information, obtain stipulations, schedule the arbitration hearing, and attempt to narrow the issues. In order to expedite the arbitration proceedings, the parties have agreed to place the following limitations on discovery:

(i)    Each party may propound only one interrogatory requesting the names and addresses of the witnesses to be called at the arbitration hearing;

(ii)   On a date to be determined at the prehearing conference, each party may serve one request for the production of documents. The documents are to be exchanged 21 days after service of the request; and

(iii)  Each party may depose 4 witnesses. Each deposition must be concluded within four hours and all depositions must be taken within 60 days of the prehearing conference. Any party deposing an opponent's expert witness must pay the expert's fee for attending the deposition.

**10.2.4 Company's Right to Seek Injunction.** Notwithstanding anything in this section 10, Company may bring court proceedings to seek an injunction or other equitable relief to enforce any right, duty or obligation under this Agreement. To obtain injunctive or other equitable relief, Company is not required to post a bond or, if required by law or by the court, the Dealer hereby consents to a bond in the lowest amount permitted by law.

**10.2.5 Enforcement of Award.** Neither party has the right to appeal the decision of the arbitrator. The award of the arbitrator may be confirmed or enforced in any court having jurisdiction.

**10.2.6 Attorney's Fees.** If any arbitration or court action is commenced by either party, the substantially prevailing party in that action is entitled to recover its out-of-pocket and court costs and reasonable attorneys' fee incurred therein.

## 11.    MISCELLANEOUS

**11.1    Governing Law.** Except to the extent governed by federal laws or regulations, the entire relationship of the parties based on this Agreement is governed by the substantive laws of the State of New York, without reference to its choice of law rules.

G./legal/distrib/ex dealer agr
Rev. 0501

AT&T Wireless Proprietary & Confidential
Use Pursuant to Company Instructions

12

Exhibit   A
Page   17

**11.2    Waivers.** The rights of the parties under this Agreement, including the Policies and Procedures, are cumulative and not exclusive of any other rights and remedies. The waiver by any party of any right under this Agreement, or any breach of this Agreement does not constitute a waiver of any other right or remedy on a future occasion.

**11.3    Force Majeure.** Neither party is liable for loss or damage or will be in breach of this Agreement if its failure to perform its obligations results from: (1) compliance with any law, ruling, order, regulation, requirement or instruction of any federal, state or municipal government or any department or agency thereof or any court of competent jurisdiction; (2) acts or omissions of the other party in violation of this Agreement; or (3) acts of God, fires, strikes, embargoes, war, insurrection, riot, and other causes beyond the reasonable control of the party. Any delay resulting from any of these causes extends performance accordingly or excuses performance, in whole or in part, as may be reasonable.

**11.4    Entire Agreement.** This Agreement, including all Policies and Procedures issued under it, represents the entire agreement of the parties with respect to the subject matter of the Agreement. There are no other oral or written understandings or agreements between the Company and Dealer relating to the subject matter hereof, and this Agreement supersedes all prior negotiations, communications, agreements and addenda between the parties hereto with respect to the subject matter hereof, except that any releases or post-termination covenants are not superseded. Nothing in this Agreement is intended or should be deemed to confer any rights or remedies upon any entity not a party hereto.

**11.5    Modification.** This Agreement may only be amended or superseded by written agreement executed by authorized representatives of both parties, except as otherwise explicitly stated in this Agreement. Each such modification will be effective only in the specific instance for the specific purpose for which given. No course of dealing, course of performance, or usage of trade may be invoked to modify or supplement in any way the terms and conditions of this Agreement. No other understandings or representations, whether oral or in writing, will amend or supersede this Agreement.

**11.6    Assignability.** Neither party may assign this Agreement or any of its rights or obligations under this Agreement without the other party's prior written consent, except that (a) Company may assign its rights under this Agreement to any affiliate or to any entity or person in connection with any merger or consolidation of Company or with any sale of all or any portion of the assets or business of Company, and (b) Dealer may grant to an institutional lender as collateral for a loan or other credit facility a security interest in the other monies payable to Dealer under this Agreement subject to the offset rights of Company provided in this Agreement and in any other agreement between Company and Dealer. Any material change of control of the legal entity of Dealer will be deemed to be an assignment of this Agreement. Any assignment by Dealer in violation of the provisions of this section will immediately render this Agreement null and void, and will convey no rights or interest.

**11.7    Survivability.** Upon termination of this Agreement, all rights and duties of the parties terminate, except the following survive: Dealer's duties under sections 2.3, 2.4, 5.6, 9.4 and sections 4.3, 7, 9.5, 10 and 11 of this Agreement. The parties must fulfill all surviving obligations in a timely manner.

**11.8    Acknowledgments.** Company and Dealer acknowledge that they have read this Agreement and understand and accept the terms, conditions and covenants contained in it as being reasonably necessary to maintain the Company's high standards for Service and thereby to protect and preserve the goodwill of the Company's Service and its Marks. Dealer acknowledges and understands that Company may at any time compete directly with Dealer in the soliciting of Subscribers for the

G:/legal/distrib/ex dealer agr
Rev. 0501

AT&T Wireless Proprietary & Confidential
Use Pursuant to Company Instructions

13

Exhibit  A
Page  18

service or in the sale, lease, installation, repair or warranty servicing of equipment and may also appoint other Dealers and others to offer or sell Company's Service and related equipment in the Area. Dealer has independently investigated the business outlined in this Agreement and the profitability (if any) and risks, and is not relying on any representation, guarantee, or statement of Company other than as set forth in this Agreement.

**11.9    Indemnification.** Dealer and Company agree to defend and hold the other party, its affiliates and employees harmless for all liability, damages, punitive damages, expenses, including reasonable attorneys' fees and disbursements, claims, demands or suits arising from their breach of this Agreement, their negligent, willful, or fraudulent acts, or for their failure to act, with respect to the performance of each parties' obligations under this Agreement and all Policies and Procedures, including, without limitation, any allegedly unauthorized use of a trademark, patent, copyright, process, idea, method or device covered by this Agreement, or bodily injury or damage to property to the extent occasioned by the acts or omissions of the indemnifying party or its affiliates, employees, or subcontractors. Prompt written notice must be provided to the indemnifying party of any claim for indemnification. Each party may conduct its own defense of any claim in which it is named as a defendant without diminishing its indemnity rights. Each party is only responsible for any losses or damages proximately caused by it. The Limitation of Liability clause in paragraph 11.11 does not limit recovery under this Indemnification clause.

**11.10    Severability.** A determination by a court or arbitrator of competent jurisdiction that any provision of this Agreement or any part thereof is unenforceable will not cancel or invalidate the remainder of such provision or this Agreement, which will remain in full force and effect and will be construed to carry out the intent of the parties.

**11.11    Limitation of Liability.** EXCEPT TO THE EXTENT OTHERWISE PROVIDED UNDER THE INDEMNIFICATION CLAUSE, NEITHER COMPANY NOR DEALER IS LIABLE TO THE OTHER FOR ANY INDIRECT, SPECIAL, CONSEQUENTIAL, PUNITIVE, OR EXEMPLARY DAMAGES, INCLUDING WITHOUT LIMITATION LOST PROFITS, AS A RESULT OF ANY DEFAULT OR BREACH OF THIS AGREEMENT OR THE TERMINATION OR NON-RENEWAL OF THIS AGREEMENT OR ANY OTHER EVENT, CONDUCT, ACT OR OMISSION ARISING OUT OF OR RELATED TO THIS AGREEMENT WHETHER BASED ON CONTRACT, TORT, STATUTE OR OTHERWISE. THIS LIMITATION OF LIABILITY IS MADE KNOWINGLY, INTENTIONALLY AND VOLUNTARILY. Equipment accounts receivable, and commissions actually paid to Dealer, including without limitation all discounted Equipment sales by Company to Dealer, are expressly excluded from the limitation of liability in this section.

**12.    NOTICES.**    All notices, requests, demands, and other communications under this Agreement, must be in writing and are deemed given if personally delivered or mailed, certified mail, return receipt requested, or sent by nationally recognized overnight carrier to the address indicated on the cover page of this Agreement. Despite the foregoing, Company's notices regarding Policies and Procedures or changes to compensation may also be sent by facsimile, by electronic means, or by U.S. Mail.

SCHEDULES FOLLOW.

G:/legal/distrib/ex dealer agr
Rev. 0501

AT&T Wireless Proprietary & Confidential
Use Pursuant to Company Instructions
Exhibit  A
Page  19

14

## SCHEDULE 1
## COMPANY NAME(S)/AREA

**Effective Date:  September 1, 2001**

| <u>STATE</u> | <u>COMPANY</u> | <u>AREA</u> |
|---|---|---|
| CA | Bay Area Cellular Telephone Company | San Francisco CA MSA<br>San Jose CA MSA |
|  | Cagal Cellular Communications Corporation | Santa Rosa CA MSA |
|  | Napa Cellular Telephone Company | Vallejo CA MSA |
|  | Salinas Cellular Telephone Company | Salinas CA MSA |

Exhibit ___A___
Page ___20___

# GSM ADDENDUM
## TO AT&T WIRELESS EXCLUSIVE DEALER AGREEMENT

| DEALER | AT&T Wireless |
|---|---|
| Legal Name: **Viva Wireless, *Inc*.**<br>Business Name (if different):<br>Type of Entity: **California corporation**<br>("**Dealer**") | **AT&T Wireless Services, Inc.**, a Delaware corporation, dba **AT&T Wireless** ("**Company**") |
| **DEALER Address (For Official Notices)** | **Company Address (For Official Notices)** |
| 26120 Eden Landing Road, Suite 5<br>Hayward CA 94545 | AT&T Wireless<br>Attn:   Legal Dept.<br>         7277 164th Avenue N.E.<br>         Redmond WA 98052 |
| **DEALER Contact** | **Company Contact** |
| Name:  Carolyn Pestano<br>Title:  CEO<br>Telephone: 510-783-9097<br>Fax: 510-783-9618 | Name: Nancy Espitallier<br>Title: Dealer Account Executive<br>Telephone: 510-589-1000<br>Fax: 650-827-5557 |
| **DEALER Billing Address** | |
| same as above | |

Dealer and Company are parties to that certain Exclusive Dealer Agreement dated September 1, 2001 ("**Dealer Agreement**").  The parties desire to amend the Dealer Agreement only as expressly set forth in this GSM Addendum.

This GSM Addendum is effective as of September 1, 2002, or Market GSM Launch Date, which ever is earlier, and consists of this Cover Page, the attached Terms and Conditions, Schedule 1 GSM (Company Name(s)/GSM Area), and Schedule 2 GSM (Compensation), (collectively, this "**GSM Addendum**").

---

**DEALER'S SIGNATURE BELOW ACKNOWLEDGES THAT DEALER HAS READ AND UNDERSTANDS EACH OF THE PROVISIONS OF THIS GSM ADDENDUM AND AGREES TO BE BOUND BY THEM.**

---

| VIVA WIRELESS, *Inc*. | AT&T WIRELESS SERVICES, INC., DBA AT&T Wireless |
|---|---|
| By: *(signature)*<br>(Authorized Signature) | By: *(signature)*<br>(Authorized Signature) |
| Name:  Carolyn Pestano<br>Title:   CEO<br>Date:  8/1/02 | Name:  ~~Charles Bernstein~~ *Frederick J. Devereux*<br>Title:   District General Manager<br>Date:  9/17/02 |

G:/legal/distribution/GSM addendum dlr
12/01

AT&T Wireless Proprietary and Confidential
Use Pursuant to Company Instructions

Page 1

Exhibit A
Page 21

## GSM ADDENDUM DEALER TERMS AND CONDITIONS

1.    **Technology.** Company is launching a new wireless service based on wireless technology that will be referred to in this GSM Addendum as "GSM." The term GSM includes wireless voice technology and wireless packet data technology that is also known as GPRS. The term "GSM Service" refers to the provision of GSM voice and data service to authorized subscribers on Company's GSM network.

2.    **Authorization/No-Conflict/Confidentiality.** Company appoints and Dealer accepts appointment as a dealer of GSM Service and Approved GSM Equipment within Company's market(s) shown on Schedule 1 GSM to this GSM Addendum, which area may change from time to time upon Company's issuance of a revised Schedule 1 GSM ("GSM Area"). Dealer has no current contractual obligation that would prohibit Dealer from becoming authorized to sell GSM Service for Company or prohibit Dealer from entering into or acting under this GSM Addendum with Company. This GSM Addendum and all subscriber information gathered by Dealer or provided by Company under this GSM Addendum or under the Dealer Agreement are Confidential Information under the Dealer Agreement and must be treated accordingly.

3.    **Applicability Of Dealer Agreement.** Except as expressly modified by this GSM Addendum, the terms and conditions of the Dealer Agreement, including all Policies and Procedures, and Company Wholesale Supplement, if any, remain unchanged and in full force and effect. Company will issue Dealer a new dealer code that Dealer must use for all transactions under this GSM Addendum. All capitalized terms not otherwise defined in this GSM Addendum take the meaning provided in the Dealer Agreement. If the Dealer Agreement states that Dealer must sell Company's wireless service exclusively, then Dealer must also follow this exclusivity provision for the sale of GSM Service under this GSM Addendum; otherwise, this GSM Addendum is non-exclusive.

4.  **Equipment**

4.1    **Dealer Purchase of GSM Equipment.**

4.1.1  Dealer may only sell for use on the GSM Service GSM equipment or devices of any kind that have been approved for use by Company on its GSM Service ("Approved GSM Equipment"). Approved GSM Equipment offered by Company will be sold to Dealer under the terms and conditions of the Dealer Agreement. All GSM equipment or devices purchased from Company are Approved GSM Equipment.

4.1.2  Certain Approved GSM Equipment and certain GSM rate plans may not be made available to Dealer at Company's sole discretion.

4.1.3.  Company will be the sole source of all new Approved GSM Equipment and Dealer must not purchase it from any other source for use on the GSM Service without the prior written permission of Company. Company will provide a complete listing of Approved GSM Equipment that Dealer may purchase from sources other than Company for use on the GSM Service. Equipment that is not approved by Company is prohibited from use on the GSM Service, as it may not function properly and could interfere with the GSM Service. Dealer must not encourage or assist any subscriber to use any equipment or devices other than Approved GSM Equipment on the GSM Service.

AT&T Wireless Proprietary and Confidential
Use Pursuant to Company Instructions
Exhibit  A
Page  22

**4.1.4** A Subscriber Identity Module known as a "SIM" is necessary for the operation of all Approved GSM Equipment on the GSM Service. Company uses SIMs as the direct association to each subscriber of its GSM Service. Every SIM that Dealer purchases or offers for use on the GSM Service must be Approved GSM Equipment and must have been supplied by Company directly to Dealer.

**4.1.5** All Approved GSM Equipment originally purchased from Company (including purchases by a sub-dealer from its assigned Wholesale Dealer) must be sold to end user Authorized GSM Subscribers in the original packaging with all of the components originally provided by Company. Dealer is specifically prohibited from removing the SIM that is packaged together with another piece of Approved GSM Equipment sold by Company. Dealer must facilitate the activation of each SIM and the Approved GSM Equipment with which it was packaged, together with the end-user subscriber who purchases these items. Failure to follow these provisions may result in Dealer not earning any compensation. The only exception to this paragraph is that Dealer may remove a SIM from the Approved GSM Equipment when upgrading the device of an existing customer of Company's GSM Service.

**4.2    GSM Equipment Programming.** All Approved GSM Equipment is intended to be programmed by over-the-air programming. Approved GSM Equipment not programmed using over-the-air programming likely will not function correctly. Therefore, Dealer is not permitted to program any Approved GSM Equipment manually, without the express consent of Company.

**4.3    Prohibition of Transshipping.** Transshipping of any Approved GSM Equipment sold by Company is strictly prohibited. All terms and conditions of the Dealer Agreement relating to transshipping, including without limitation, the Prevention of Transshipping Policy and Procedure, are extended to all Approved GSM Equipment sold by Company.

**5.    Compensation.** Company will pay Dealer the amounts set forth in the GSM Compensation Schedule ("Schedule 2 GSM"). This payment is subject to the terms and conditions of the Dealer Agreement and this GSM Addendum, including without limitation Company's sole and absolute right to offset against amounts owed to Dealer and Company's sole and absolute right to modify the Schedule 2 GSM in any way upon 30 days advance written notice.

**6.    Term and Termination.** This GSM Addendum is coterminous with the Dealer Agreement and terminates immediately upon termination of the Dealer Agreement. However, this GSM Addendum may also be terminated earlier in accordance with its terms. Either party may terminate this GSM Addendum without cause upon 30 days prior written notice. Company may terminate this GSM Addendum upon material breach by Dealer if that breach is not cured within 14 days after Dealer receives notice of the breach.

## SCHEDULE 1 GSM
## AREA

### Effective Date:  January 1, 2002

Dealer is authorized to offer GSM products and Service in the Areas shown on the Schedule 1 to the Dealer Agreement and where Company has officially launched GSM Service, subject to limitations of build-out of the system and availability of phone numbers/area codes.  These limitations may result in partial coverage within some Areas.

G:/legal/distribution/GSM addendum dlr
12/01

**AT&T Wireless Proprietary and Confidential
Use Pursuant to Company Instructions
Exhibit _A_
Page _24_**

Page 4



February 4, 2002

AT&T Wireless Services, Inc.
651 Gateway Blvd . Suite 1500
South San Francisco. CA 94080

Carolyn Pestano
Viva Wireless
376 Imperial Way, Suite 106
Daly City CA 94015

Re: Out-of-Market Activation Authorization Letter

Dear Ms. Pestano:

You have requested authorization to perform activations for AT&T Wireless (AWS) outside of the market(s) listed on Schedule 1 of your Dealer Agreement with AWS.  AWS is willing to grant your request based on the conditions and understandings set forth in this letter.

First, you must not actively solicit, market or promote your presence in any market not listed in Schedule 1 of your Dealer Agreement.

Second, in keeping with the provisions of the Dealer Agreement, you must not solicit governmental agencies or any business customer that has a Corporate Digital Advantage (CDA) contract with AWS.

Third, you must use the designated code assigned by AWS for all out-of-market activations.  You must provide every AWS subscriber with current AWS rate plan collateral, coverage maps, and promotional information for the specific rate plan in the specific market for which the subscriber is taking service.  You must be knowledgeable about each AWS product or service that it sells, including any local variations.

Fourth, you must perform all steps necessary to activate on AWS' wireless network every phone sold out of market before the phone leaves the your possession.  You must not allow any phone you purchased from AWS to be sold without first being activated on the AWS wireless network. AWS' transshipping polices apply to all phone sales.

Fifth, you are NOT permitted to use the Internet or to use direct marketing (including telemarketing) to solicit new customers without separate written consent from AWS. Furthermore, in keeping with the Brand Identity Policy, you are not authorized to use the Marks in any fax broadcast, unsolicited email, instant or text message.

Sixth, each Authorized DMN Subscriber in any one of these markets constitutes an "out-of-market activation."  AWS will compensate Dealer in accordance with the attached Schedule 2.1(a) for each out-of-market activation.  Schedule 2.1(a) may be amended in any way upon 30 days advance written notice to Dealer.

Seventh, the authorization in this letter is in the sole discretion of AWS and may be revoked by AWS at any time by written notice to Dealer.

Eighth, except as stated in this letter, all terms and conditions of your Dealer Agreement and all Policies and Procedures apply to the performance regarding and compensation for out-of-market activations.

Therefore, based on the conditions and understandings set forth in this letter, AWS authorizes you to perform out-of-market activations in any domestic AWS market.

Very truly yours,

Charlie Bernstein
Vice President/General Manager
San Francisco

cc:    Gary Dettwiller
       Margaret Ireland

G:/legal/distribution/OMA authorization
Rev. 0800

AT&T Proprietary and Confidential
Use Pursuant to Company Instructions
Exhibit A
Page 26

2

## SCHEDULE 2.1(a)

## COMPENSATION – OUT-OF-MARKET ACTIVATION

### Effective Date:  May 1, 2004

Effective in areas where AT&T Wireless provides Service that are not listed on Schedule 1, Area, of the Dealer Agreement.

**All Authorized Subscribers (including Shared Advantage):**  $150

This is the total compensation.  No other compensation is offered, including for features or upgrades.

G:/legal/distribution/OMA authorization
Rev. 0800

**AT&T Proprietary and Confidential
Use Pursuant to Company Instructions**

3

Exhibit A
Page 27

## CAB AGREEMENT

To:    **Authorized Dealer**

From:  AT&T Wireless Services, Inc.

**Dealer's Committed Activation Bonus ("CAB") Agreement**

Dear Dealer:

As additional compensation under your Dealer Agreement, AT&T Wireless is offering Dealer the opportunity to agree to a specific CAB Commitment Tier for the 3 month period beginning on November 1, 2004, and ending on January 31, 2005 (the "CAB Period"). Dealer hereby agrees to the complete terms and conditions of this CAB program set forth in Schedule 2 of your Dealer Agreement in effect during the CAB Period. Capitalized terms not defined in this CAB Agreement are defined in the Dealer Agreement. This CAB Agreement form must be received by your local Indirect District Manager at AT&T Wireless by October 29, 2004, fully executed with no changes of any kind in order to be considered by AT&T Wireless. This CAB Agreement becomes effective when AT&T Wireless sends Dealer a written confirmation that its selected CAB has been accepted.

| CAB Commitment Tier | Total CAB Transactions during CAB Period | Monthly CAB Transactions (approximate) | CAB per Authorized Subscriber |
|---|---|---|---|
| | 0-2697 | 0 - 899 | $0 |
| | 2698-3897 | 900 - 1299 | $65 |
| Custom CAB | 3900 + | 1300 + | $75 |

Dealer hereby commits to achieve the CAB Commitment Tier selected below. In order to achieve its selected CAB Commitment Tier, Dealer must achieve equal to or above the number of Total CAB Transactions (Authorized Subscribers) during the CAB Period, aggregated in all markets on Dealer's Schedule 1 to its Dealer Agreement. In return, Dealer will earn the specified CAB per Authorized Subscriber.

# CAB Commitment Tier selected _____ Custom CAB

**Agreed and Accepted by Dealer:**

Dealer Name: <u>Viva Wireless</u> dba  ("Dealer")

Dealer Address: <u>3521 Investment Blvd Ste 2, Hayward, CA  94545</u>

Signed: _____

Printed Name: Carolyn Pestano            Date: 11/4/04

**Agreed and Accepted by AT&T Wireless Services, Inc.:**

Authorized Signature: _____

Printed Name: Fred Devereux            Oracle A/P Vendor No.: 10917

Master Dealer Code: 1309F

AT&T WIRELESS PROPRIETARY & CONFIDENTIAL
Use pursuant to Company instructions
Exhibit A
Page 28

# EXHIBIT B

# EXHIBIT B

## CINGULAR WIRELESS
## EXCLUSIVE DEALER AGREEMENT

| Dealer | Cingular Wireless |
|---|---|
| Legal Name:  Viva Wireless, Inc.<br>Business Name (if different):<br>Type of Entity:  A California corporation ("Dealer") | Cingular Wireless II, LLC, on behalf of its affiliated companies operating in the Area ("Company") |
| **Dealer Address (For Official Notices)** | **Company Address (For Official Notices)** |
| 3521 Investment Blvd., Ste. 2<br>Hayward, CA 94545 | Cingular Wireless<br>4420 Rosewood, Bldg. 2<br>Pleasanton, CA 94588<br>Attn:   Vice President/General Manager |
| **Dealer Contact** | **Company Contact** |
| Name:  Carolyn Pestano    415 298-6588<br>Title:  CEO                                   or<br>Telephone: ~~415-454-8377~~   510 783-9119<br>Fax: ~~415-454-8387~~  510 783-9618 | Name:  Matthew Woolsey<br>Title:  Director of Sales<br>Telephone: 925-227-3272<br>Fax:  925-227-4355 |
| **Dealer Billing Address** | |
| Same as above | |

This Agreement consists of this Cover Page, the attached Terms and Conditions, **Schedule 1 (Area & Approved Retail Locations), Schedule 2 (Compensation Schedule)**, and all **Dealer Policies** issued in accordance with the Terms and Conditions (collectively, this **"Agreement"**).

This Agreement is effective as of January 1, 2006, and continues in effect for an initial term of 3 years, unless earlier terminated in accordance with the provisions of this Agreement.

**DEALER'S SIGNATURE BELOW ACKNOWLEDGES THAT DEALER HAS READ AND UNDERSTANDS EACH OF THE PROVISIONS OF THIS AGREEMENT AND AGREES TO BE BOUND BY THEM.**

| VIVA WIRELESS, INC. | Cingular Wireless II, LLC, on behalf of its affiliated companies operating in the Area |
|---|---|
| By: _(Authorized Signature)_ | By: _(Authorized Signature)_ |
| Name: Carolyn Pestano<br>Title:  CEO<br>Date:  12/20/05 | Name:  Frederick Devereux<br>Title:   Vice President, General Manager<br>Date: 01/12/06 |

## CINGULAR WIRELESS EXCLUSIVE DEALER AGREEMENT
### Terms and Conditions

## 1.    DEFINITIONS.

**1.1    Affiliate**: Dealer's employees, officers, directors, consultants, owners' immediate family members, or any person, company, partnership or other entity that directly or indirectly, through one or more intermediaries controls, is controlled by, or is under common control with Dealer, Dealer's employees, officers, directors, or owners' immediate family members.

**1.2    Competitive Service**: Any wireless communications service offered by any person, entity, or business (other than Company) in the Area that is capable of providing wireless voice or data service that is functionally similar or equivalent to Company's Service, irrespective of the radio frequency on which the service is offered, including, without limitation: commercial mobile radio service, specialized mobile radio communications, mobile satellite communications, cellular service, personal communications services, Wi-Fi, Wi-Max, one and two-way paging services, and services on similar frequencies or technologies; and any service that competes with any other service that Company offers under this Agreement.

**1.3    Equipment**:   Wireless devices necessary for using Service that meet FCC and Company technical standards, that comply with all fraud prevention specifications required by Company, and that are certified by Company for use on its Service.

**1.4    Service:**    All voice and data wireless services that Company provides within the Area, whether or not Dealer is authorized to sell these services.

**1.5    Subscriber:**   A customer of Service, including without limitation all end-users of Service, or an applicant to Service.

## 2.    RELATIONSHIP OF THE PARTIES.

**2.1    Area.**  Company has received regulatory authority to operate as a facilities-based provider of Service within the Area.  The Area is defined as the one or more Company operating markets that are listed on the attached **Schedule 1 – Area & Approved Retail Locations**. If Dealer is authorized to operate in more than one market, an additional Schedule 1 will correspond to each additional market.  Company's authorization to add a market to the Area listed on Schedule 1 must be in writing and signed by Company.  Each Company market may have a different Compensation Schedule and different Dealer Policies from those of other markets operating under this Agreement.  Company may terminate Dealer's authorization to operate in any individual market due to a breach of this Agreement or as otherwise specified in this Agreement.

**2.2    Authorization from Approved Retail Locations.**  Company authorizes Dealer to offer and sell Service -- excluding Service that Company has defined as non-authorized Service -- only from **Approved Retail Locations**, which are Dealer's retail locations within the Area that have been approved by Company in writing under this Agreement.  The Approved Retail Locations are listed on Schedule 1, which Company may issue from time to time to update the list of Approved Retail Locations within an existing market.

**2.3    Nature of Relationship.** The relationship created by this Agreement is that of independent contracting parties and is not any other relationship, including, without limitation, that

of joint employers, a joint venture, or a partnership. Personnel employed by, or acting under the authority of a party to this Agreement are not employees or agents of the other party. Company and Dealer assume sole responsibility for the employment, compensation, discharge, and control of their own respective employees, contractors, and agents, and for ensuring their compliance with this Agreement. Dealer is not a general agent of Company. Dealer has not paid and is not required to pay any franchise fee or other fee to be a dealer for Company or to use Company's name or other intellectual property. This Agreement does not create any franchise between the parties. Neither Dealer nor any Affiliate may be a reseller of Company's Service.

**2.4    Prohibitions and Restrictions.**

**2.4.1**    Dealer is prohibited from conducting any telemarketing, direct marketing, or electronic commerce effort to solicit Subscribers from the general public. Any exceptions to this restriction must be made in writing and signed by Company. Further details regarding this restriction and any limited exceptions may be contained in the Dealer Policies related to direct marketing and electronic commerce.

**2.4.2**    Company reserves the right to declare selected Service as non-authorized Service by restricting Dealer from selling Service:  (a) on certain non-authorized service rate plans (voice or data); (b) on certain types of technologies; (c) on certain models of Equipment; (d) to certain specifically enumerated Subscribers; (e) to certain classes of Subscribers, such as those that generate revenues above a specific level, or governmental or corporate entities; and (f) by certain sales or marketing methods. All applicable restrictions are defined in the Dealer Policies or may be communicated to Dealer in writing from time to time.

**2.4.3**    Dealer is prohibited from having subdealers under this Agreement. Dealer must not, directly or indirectly, share any compensation earned under this Agreement with any other person or entity that sells Service to the public, except for Dealer's own employees or contracted sales representatives. Dealer must not allow any other person or entity to use its dealer codes issued by Company under this Agreement. Any exceptions to these prohibitions must be under a separate written amendment between the parties.

**2.5    Other Competitive Distributors.** Company currently sells Service and equipment directly to potential Subscribers and has also appointed other dealers, retailers, resellers, and others to sell Company's Service in the Area in direct competition with Dealer. Company reserves the right to continue these direct and indirect distribution practices in the future at any location within the Area regardless of the proximity to any Approved Retail Location. Company and others may also sell other products and services and provide installation, repair, or warranty service in the Area. In addition, Company may enter into agreements with other exclusive or nonexclusive distributors that contain compensation and terms and conditions that are different than the compensation and terms and conditions in this Agreement, and that permit these competitive distributors to offer products and services in the Area that are different than the products and Services that Dealer is authorized to distribute under this Agreement. Company, in its sole discretion, determines which products and services that Dealer is authorized to distribute under this Agreement and Company is not obligated to authorize Dealer to distribute any of the products or services offered by the competitive distributors.

**2.6    Acknowledgments and Representations.**

**2.6.1**   Company and Dealer understand and accept that the terms, conditions, and covenants contained in this Agreement are reasonably necessary to maintain Company's high standards for Service and to protect and preserve the goodwill of Company's Service and its brand.  Dealer has made material representations to Company in its application to become an authorized dealer of Company and Company has relied upon these representations as a material inducement to enter into this Agreement.

**2.6.2**   Dealer represents and warrants to Company that the execution and performance of this Agreement does not violate any other contract or obligation to which Dealer is a party, including terms relating to covenants not to compete, exclusive dealing, and confidentiality covenants.  Dealer must not disclose to Company, or use or induce Company to use, any proprietary information or trade secrets of any other person, association, or entity.

**2.6.3**   Company expressly disclaims the making of, and Dealer acknowledges that it and its Affiliates have not received, have no knowledge of, and are not relying on any representation by any employee or representative of Company or its affiliates as to: (i) the revenue or profitability that Dealer might achieve as a result of entering into this Agreement; (ii) the number of activations, upgrades, or other business activity that Dealer may facilitate as a result of entering into this Agreement; (iii) the quality of the network from which Services are provided; and (iv) any other factor relating to the business operations of Dealer, except as expressly set forth in this Agreement.  Dealer represents that it has independently investigated the risks and opportunities of the business outlined in this Agreement and has independently decided to sign this Agreement. Dealer acknowledges that it is responsible for independently deciding on the location of each Approved Retail Location and Company is not responsible for Dealer's decision to open any Approved Retail Location.

## 3.    APPROVED RETAIL LOCATIONS.

**3.1**     **Opening an Approved Retail Location.**  When Dealer is opening its initial Approved Retail Location(s), and if Dealer desires to open any additional location, Dealer must first receive written approval from Company.  Dealer is solely responsible for selecting any potential location, but Company may approve or deny any location at its sole discretion.  The lease for any location that Company approves must be in Dealer's own name. Company must be named in each lease as a preapproved assignee of that lease. Dealer expressly acknowledges that it does not have the authority to bind Company or its affiliates to any lease agreements. Upon request by Company, Dealer must submit any proposed lease to Company for its approval before Dealer signs the lease. Dealer must promptly notify Company of the date a new location opens so that Company may issue a revised Schedule 1.  Any retail location approved by Company under this Agreement that Dealer opens in the Area constitutes an Approved Retail Location subject to the terms and conditions of this Agreement, whether or not the change is actually reflected on Schedule 1.

**3.2**     **Selling or Closing a Leased Approved Retail Location.**

**3.2.1**     If Dealer wants to terminate, transfer, sell, or otherwise dispose of its leasehold interest in an Approved Retail Location, Dealer must provide Company with 90 days advance written notice setting forth the reasons for the closure, transfer, sale, or disposal, and with a copy of the relevant lease. Company has 45 days from the date it receives this notice to decide to either assume or reject the remainder of each lease.  If Company decides to assume a lease, Dealer must assign the lease, together with all leasehold improvements to this Approved Retail

Location, to Company without any additional consideration. However, Company will reimburse Dealer for the depreciated value of any direct out-of-pocket expenses that Dealer incurred for the purchase of any equipment, furniture, or fixtures that were required by Company and for which Dealer was not previously reimbursed. Company has no obligation to reimburse Dealer for any expenditures that were not required by Company. Dealer remains responsible for all of its obligations under the lease through the effective date of the assignment. If Company decides not to assume any lease, Dealer must notify Company as soon as the Approved Retail Location actually closes or is transferred so that Company may issue a revised Schedule 1. If Dealer closes down or stops selling Service from any Approved Retail Location, that location automatically loses its approval and is no longer an Approved Retail Location, whether or not Dealer complied with this Agreement regarding that closure or transfer and whether or not the change is actually reflected on Schedule 1.

   **3.2.2** Failure to provide Company with the required advance written notice may result in the unnecessary closure of an Approved Retail Location, which would cause the Company to suffer monetary damages and damages to its reputation and goodwill. These damages would be difficult to quantify and measure. As a result, Dealer must pay Company $50,000 as liquidated damages for each Approved Retail Location that is closed without providing the required advance written notice. Acceptance by Company of liquidated damages under this provision does not limit Company's right to seek any other appropriate remedies under this Agreement, including without limitation termination of this Agreement.

  **3.3**  **Termination of Agreement.** If Dealer elects to terminate this Agreement without cause, or to not renew this Agreement at the end of any term, then Company has the option in its sole discretion, to require Dealer to assign to Company the leases together with all leasehold improvements for those Approved Retail Locations that Company selects without any additional consideration. However, Company will reimburse Dealer for the depreciated value of any direct out-of-pocket expenses that Dealer incurred for the purchase of any equipment, furniture, or fixtures that were required by Company and for which Dealer was not previously reimbursed. Company has no obligation to reimburse Dealer for any expenditures that were not required by Company. Dealer remains responsible for all of its obligations under all leases through the effective date of the assignment.

  **3.4**  **Right of First Refusal for Dealer-Owned Approved Retail Locations.** If Dealer owns one or more Approved Retail Location and if at any time during the term of this Agreement or upon termination of this Agreement, Dealer receives a bona fide offer from a third party to lease any or all of these Approved Retail Locations (whether directly or indirectly), and Dealer desires to accept this offer, Dealer must notify Company in writing of the terms of this offer. Dealer must provide Company 60 days in which to exercise Company's right of first refusal from the date Company receives notice of the pending lease. If Company elects to exercise this right related to leasing Dealer's Approved Retail Locations, then Company will deliver a written notice to Dealer representing Company's desire to lease these Approved Retail Locations at the same price that is offered to Dealer by the third-party.

  **3.5**  **Dealer Cooperation.** If Company elects assignment or purchase of any Approved Retail Location, then Dealer must cooperate with Company to provide and sign all appropriate documents requested by Company to facilitate the transaction. Dealer must convey all right, title, and interest to Company in all furniture, fixtures, improvements, and other personal property located in the assigned Approved Retail Locations. Dealer must also cooperate with Company if the landlord or other third party requires additional steps to facilitate the transaction.

Cingular Wireless Proprietary & Confidential
Use According to Company Instructions

exclu dlr - v.1, 7/1/05                   5

Exhibit 13
Page 33

## 4.    DEALER'S RESPONSIBILITIES.

**4.1    General.** Dealer must devote sufficient resources and use commercially reasonable efforts to promote and sell the Service authorized by Company at all times while this Agreement is in effect. Dealer must not take any action inconsistent with this Agreement and must support Company's efforts in providing Service to Subscribers. Dealer must provide timely, courteous, and efficient service to Subscribers and must be governed in all dealings with members of the public by the highest standards of honesty, integrity, ethical conduct, and fair dealing. Dealer must not engage in any business practice, promotion, or advertising that may be harmful to Company's business or goodwill.

### 4.2    Confidentiality.

**4.2.1** Dealer may receive certain confidential or proprietary information relating to Company or its affiliates, including without limitation, lists of Subscribers, Subscriber information, Customer Proprietary Network Information "CPNI" as defined in the Telecommunications Act (47 U.S.C § 222), technical, financial, and business information, including without limitation, compensation information, the terms of this Agreement, computer programs, data, specifications, and other information not generally known to the public relating to Company (collectively, "Confidential Information"). Any Confidential Information disclosed to Dealer has been disclosed solely for the performance of its duties under this Agreement, and any improper use or disclosure would irreparably injure Company. All Confidential Information is Company's trade secret and exclusive property, and must be returned to Company upon request or upon the termination of this Agreement.

**4.2.2** During and after the term of this Agreement, Dealer must not directly or indirectly, divulge, sell, give away, or transfer any Confidential Information. Dealer may only use Confidential Information for the performance of its duties under this Agreement and Dealer must comply with further restrictions related to Subscribers' Confidential Information and Subscriber privacy as set forth in the Dealer Policies. Dealer may only provide its Affiliates with the specific Confidential Information that they require for the performance of Dealer's duties under this Agreement. Dealer must advise these individuals of the non-disclosure restrictions, and make reasonable efforts to prevent the improper disclosure or use of Confidential Information, including without limitation, having any Affiliates who are not employees agree in writing not to disclose any Confidential Information. If Dealer is served with any form of legal process to obtain Confidential Information, it must immediately notify Company, which has the right to seek to quash this process.

**4.3    Access to Company Systems.** If Company, in its sole discretion, provides Dealer access to any of Company's systems for purposes of performing Dealer's duties under this Agreement, Dealer must use this access only for the purpose authorized explicitly in writing by Company. If Company provides any equipment or software for this purpose, the equipment and software are the sole property of Company at all times, and any software may be subject to a separate license agreement.

**4.4    Non-Solicitation.** While this Agreement is in effect and for one year after it is terminated, Dealer and its Affiliates must not contact Company's Subscribers for the purpose of soliciting or giving any incentive to those Subscribers to terminate their agreement with Company or to convert to a Competitive Service within the Area. During the one-year period after this

Agreement is terminated, any Subscribers who contact Dealer regarding any aspect of Company's Service must be referred directly to Company.

**4.5     Solicitation and Enrollment.**     Dealer must solicit Subscribers strictly in accordance with the Dealer Policies for enrollment of Subscribers and must provide adequate training for its salespersons. Company has the sole right to accept or reject all customer applications for Service. Dealer must market Service that Dealer is authorized to sell to potential Subscribers at rates and on terms and conditions established and published solely by Company, as revised by Company from time to time. Dealer has no right or authority to offer any other service plans, or to vary in any way, rates, rate plans, terms, or conditions related to Service. Dealer must comply with any Dealer Policies regarding security deposits for Service.

**4.6     Subscriber is Company's Customer.**     Once activated, the Subscriber is a customer of Company, and Company is solely responsible for providing billing services to Subscribers. Company may also directly market to and solicit Subscribers as it determines to be in its best interest, without obligation or liability to Dealer. Dealer must not interfere with the contractual relationship between Company and Subscriber in any way. Dealer is not permitted to: a) bill or collect any money from a Subscriber or potential Subscriber for Service, except for prepaid Service and security deposits; b) take any financial responsibility for a Subscriber's Service charges; or c) suggest or facilitate any arrangement to improperly decrease a Subscriber's financial obligation under its Service agreement.

**4.7     Fraudulent Activity.**     Dealer must assist Company's efforts to prevent fraudulent or abusive subscription to or use of Company's Service and must comply with all fraud prevention Dealer Policies. Dealer must not process any application for Service or facilitate Service enrollment that would in any way improperly or fraudulently inflate the number of Subscribers for which it receives compensation or the amount of compensation payable to Dealer for a Subscriber. If Company determines that Dealer has performed any Subscriber activations in a fraudulent, deceitful, or misleading manner, then Dealer is not entitled to compensation under this Agreement for those activations and Dealer is required to compensate Company for losses caused by Dealer's actions in violation of this section or of the related Dealer Policies.

**4.8     Dealer's Business Records.**  Dealer must create and maintain at its principal office, and preserve for at least 4 years from the date of their preparation, complete and accurate records of its business conducted under this Agreement. These records must include, without limitation, records of all activations of Subscribers, compensation earned, advertising, Subscriber solicitations, equipment sales, and Subscriber complaints. Copies of these records must be provided to Company by Dealer upon reasonable advance notice. Dealer must comply with all requirements for the destruction of business records imposed by law, in addition to all Company requirements that are set forth in the Dealer Policies. Upon reasonable advance notice, Dealer must allow Company or its representative access to Dealer's facilities and Approved Retail Locations during normal business hours for inspection of these locations and of these business records and to verify compliance with Company's document destruction policy.

**4.9     Minimum Performance Requirements.**  Company may require Dealer to achieve minimum performance requirements related to Dealer's Subscriber activations, Subscriber churn, and average revenue per Subscriber within an individual market or within the Area, as set forth in the Dealer Policies. Company may add additional minimum performance requirements, or modify existing minimum performance requirements in any way with 30 days advance written notice to Dealer. Dealer's failure to achieve the applicable minimum performance requirements in any

Cingular Wireless Proprietary & Confidential
Use According to Company Instructions

Exhibit _ß___
Page _35___                                                    7

individual market or in the Area may result in termination of Dealer's authorization to operate in any individual market or in termination of this Agreement, or in making Dealer ineligible for certain compensation, as set forth in the Dealer Policies.

**4.10    Insurance.**  Dealer must maintain sufficient workers' compensation insurance and commercial general liability insurance for claims arising out of or occurring in connection with this Agreement, including but not limited to the acts, omissions, or representations of Dealer and its officers, employees, and representatives. This insurance coverage must be maintained at all times during the term of this Agreement at Dealer's sole expense.  Company must be named as an additional insured on each commercial general liability policy. This insurance coverage must be maintained under one or more policies from an insurance company qualified to do business within the Area, with an A.M. Best rating of at least A-, providing minimum liability protection of $1 million per occurrence for bodily and personal injury and death and $1 million per occurrence for property damage.  Dealer must provide Company with a certificate of insurance verifying compliance with the provisions of this paragraph upon request.

**4.11    Regulatory Matters.**  This Agreement is subject to changes necessary to comply with the laws, orders, or regulations of local, state, and federal regulatory agencies with jurisdiction over Service in the Area or over Dealer's activities.  Company may take any action it determines is reasonably necessary to comply with these laws, orders, and regulations.  Dealer must not take any action inconsistent with Company's efforts, and must cooperate with Company before any regulatory authorities.

**4.12    Compliance with Laws.**    Dealer must comply with all local, state, and federal laws and regulations applicable to Dealer's business under this Agreement. Dealer must not discriminate against any Subscriber, employee, or applicant for Service because of race, color, religion, age, sex, national origin, or physical handicap during the performance of this Agreement, and must comply with all applicable nondiscrimination laws.

**4.13    Exclusivity.**

**4.13.1**  Within the Area, Dealer and its Affiliates must not, directly or indirectly: (a) solicit, sell, offer, or accept offers for a Competitive Service; (b) induce or refer any actual or prospective Subscriber of Service to subscribe to a Competitive Service; (c) provide any leads to a distributor of Competitive Service; (d) activate subscribers through a reseller or act as a reseller, whether for Company or a Competitive Service; (e) lease, sub-lease, or otherwise provide space to any distributor of Competitive Service; or (f) share financial resources, retail space, administrative support, sales support, managerial support, or any other business resources with any distributor of Competitive Service.

**4.13.2**  If, as a result of a violation of this exclusivity provision of this Agreement, Dealer or any Affiliate activates a customer on Competitive Service, Company will suffer monetary damages and loss of goodwill, the value of which is difficult to measure.  As a result, Dealer must pay Company $1500 as liquidated damages for each end-user customer that Dealer or its Affiliate activates on Competitive Service, which sum Dealer agrees is reasonable.  Dealer must, upon Company's written notice, make its books and records available to Company to permit verification of Dealer's compliance with this provision.  In the event of Dealer's refusal to permit this inspection, Dealer must pay Company $1500 as liquidated damages for each end-user customer that Dealer or its Affiliate activates on Competitive Service, as determined by Company. Acceptance by Company of liquidated damages under this provision does not limit Company's

right to seek any other appropriate remedies under this Agreement, including without limitation termination of this Agreement.

## 5.    COMPANY'S RESPONSIBILITIES.

**5.1    Service.**    Company will provide Service to Subscribers subject to regulatory and legal approvals, and based on Company's own guidelines and standards for the provision of Service, which Company may change from time to time at its sole discretion.

**5.2    Training.**    Company will make sufficient training available to Dealer for it to properly offer and sell products and services under this Agreement, in Company's sole discretion.

**5.3    Marketing Support.**    Company will promote and advertise its Service and provide promotional literature from time to time as Company considers appropriate.

**5.4    Compliance with Laws.**    Company will comply with all local, state, and federal laws applicable to Company's business under this Agreement.

**5.5    Reporting.**    Company will provide information and reporting related to Dealer's business conducted under this Agreement as Company considers appropriate based on Company's systems and capabilities.

## 6.    COMPENSATION.

**6.1    Compensation Schedule.**    Subject to the terms and conditions of this Agreement, Dealer will earn from Company the compensation set forth in the attached **Schedule 2 – Compensation Schedule**.  The Compensation Schedule specifies the complete amount owed to Dealer for Dealer's performance of services and its compliance with obligations under this Agreement.

**6.2    Modifications.**  Company may modify the terms and conditions or the payment amounts of every type of compensation listed in the Compensation Schedule in any way with at least 30 days advance written notice to Dealer, including without limitation any Subscriber Management Fees that may be offered in the Compensation Schedule. Company may, without advance notice to Dealer, stop offering any Service plans, or may introduce new or revised Service plans and new services with different compensation than what is set forth in the Compensation Schedule.

**6.3    Offset/Recoupment.**  Company or its affiliates may, at any time, offset and recoup against any and all amounts owed to Dealer or its Affiliates any amounts owed by Dealer or its Affiliates to Company, including but not limited to amounts owed or to be owed under this Agreement, or any other agreement, and any costs or damages incurred by Company and indemnified by Dealer.

**6.4    Compensation Net of Chargebacks.**  All compensation earned by Dealer under this Agreement for a Subscriber must be paid back to Company if the Subscriber deactivates from Service or other changes to Service occur that constitute a Chargeback as defined in the Compensation Schedule.  The time period in which a Chargeback applies is called the Chargeback Period, which is also defined in the Compensation Schedule.  Any compensation

generated by Dealer under this Agreement is not owed by Company to Dealer until after Dealer's Chargebacks have been deducted.

## 7.    EQUIPMENT.

**7.1    Certified Equipment.**  Dealer may only sell or lease to Subscribers models of Equipment and SIMs that are fully compatible with Company's Service and that are certified by Company.  Dealer must not recommend, sell, or furnish any equipment or accessories disapproved by Company or the FCC for any reason, including without limitation for failure to meet reasonable technical, security, or reliability standards.  Equipment sold by Company meets all standards required under this Agreement.  Company may require or prohibit the use of certain Equipment with selected rate plans or in certain geographic areas, at Company's sole discretion.

**7.2    Credit Approval/Limitations on Equipment Sales.**  Dealer must apply for credit approval in order to purchase Equipment from Company other than on a cash delivery basis, and may be required to sign security agreements, financing statements, and related documents in seeking credit approval. Company may accept or reject Dealer's credit application and may reevaluate Dealer's credit status and limit or eliminate Dealer's credit purchases at Company's sole discretion at any time.  Company may not sell Equipment to Dealer at certain times for various reasons, including, but not limited to, exhaustion of Equipment supplies, manufacturing shortages, supply disruptions, legal prohibitions, or technological obsolescence.

**7.3    Dealer Purchase of Equipment.**

**7.3.1**  All Equipment sold by Company to Dealer is sold at prices established by Company from time to time and under the terms and conditions of this Agreement.  Company reserves the right to only make certain models of Equipment available for purchase by Dealer.  All purchases must be made by Dealer in the form of a written purchase order that must be placed with Company, subject to acceptance by Company.  The terms and conditions appearing on the purchase order form and made a part of this Agreement are limited to the following information, which is necessary to assure prompt processing:  (a) Company's invoice number; (b) delivery information; (c) Company's shipping charges (if applicable); (d) description; (e) quantity (within applicable limits); (f) applicable sales tax; (g) Company's price of each item and final total cost; and (h) signed purchase authorization.  Any additional terms or terms inconsistent with this Agreement contained in the purchase order are deleted and are of no effect.

**7.3.2**  Delivery of Equipment is made to Dealer's designated delivery point.  Company may charge delivery costs at its discretion to cover its expenses.  Title and risk of loss of Equipment pass to Dealer when the Equipment is shipped from the dock of either Company or its supplier.

**7.3.3**  Payment for Equipment sold on credit to Dealer is due 30 days from the date of invoice.  Dealer must pay the full invoiced amount without deductions.  If Company agrees that any disputed invoice is incorrect, Company will submit another invoice for the corrected amount.

**7.3.4**  If any amount payable by Dealer to Company becomes past due, in addition to other remedies for breach including but not limited to the immediate termination of this Agreement, Company may elect one or more of the following: (a) require Dealer to pay its account in full; (b) exercise Company's right of offset to collect any money owed by Dealer; (c) require Dealer to deposit with Company an irrevocable commercial letter of credit, cash, or other form of

security, in form and content acceptable to Company; or (d) require Dealer to pay interest charges of 1.5 percent per month, or the maximum rate allowed by law, whichever is lower, on the outstanding balance due.

**7.4    Manufacturer's Warranty.**  Dealer must make the manufacturer's limited warranty statement for Equipment readily available to its customers at the time of sale.  Dealer must not make any warranty representations that are in addition to the statements in the manufacturer's limited warranty.

**7.5    Disclaimer of Warranty by Company.**  Except for the warranty of title, which is provided by Company with Equipment purchased under this Agreement, COMPANY MAKES NO WARRANTIES, EXPRESS OR IMPLIED, AS TO ANY EQUIPMENT.  COMPANY SPECIFICALLY DISCLAIMS ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR ANY OTHER WARRANTY OF FITNESS OR QUALITY.

**7.6    Limitation of Liability for Equipment.**  COMPANY IS NOT LIABLE TO DEALER FOR LOST PROFITS OR REVENUES, WHETHER PRESENT OR PROSPECTIVE, FOR LOSS OF TIME OR BUSINESS REPUTATION, INCONVENIENCE, LOSS OF USE OF ANY EQUIPMENT, PROPERTY DAMAGE, OR FOR ANY OTHER INDIRECT, SPECIAL, RELIANCE, INCIDENTAL, OR CONSEQUENTIAL LOSS OR DAMAGE CAUSED BY ANY EQUIPMENT OR ITS FAILURE TO WORK.  THESE LIMITATIONS OF LIABILITY APPLY TO ALL CAUSES OF ACTION IN ANY WAY RELATED TO THE EQUIPMENT, INCLUDING, WITHOUT LIMITATION, ALLEGED BREACH OF WARRANTY, BREACH OF CONTRACT, PATENT OR COPYRIGHT INFRINGEMENT, OR TORT, WHETHER IN NEGLIGENCE, STRICT LIABILITY, OR OTHERWISE, EVEN IF COMPANY HAS BEEN ADVISED OF THE POSSIBILITY OF ANY SUCH LOSSES OR DAMAGES.  IN THE EVENT OF ANY LIABILITY OF COMPANY TO DEALER RELATED TO EQUIPMENT SOLD UNDER THIS AGREEMENT, THIS LIABILITY IS LIMITED TO THE LESSER OF (a) DEALER'S PROVEN DIRECT DAMAGES, OR (b) THE PURCHASE PRICE OF THE EQUIPMENT WITH RESPECT TO WHICH THE ALLEGED LOSSES OR DAMAGES ARE CLAIMED.

**7.7    Transshipment.**  Dealer must sell Equipment and SIMs purchased from Company or bearing Company's Marks to individuals or businesses that it reasonably believes are the actual end users of this Equipment for activation to Service within the Area.  Dealer must not sell or ship these SIMs or Equipment to any location outside of the Area, directly or indirectly.  Dealer must comply with all Dealer Policies regarding transshipment and inactivated Equipment levels.  If Company determines that Dealer has engaged in transshipment, this Agreement may be terminated immediately and Dealer must pay for losses suffered by Company.

**7.8    Equipment Pricing/Returns.**  All prices for sale of Equipment and accessories by Dealer to Subscribers must be established solely by Dealer.  Dealer must abide by Company's Equipment return policies relative to Subscribers and to Dealer, as set forth in the Dealer Policies.

**8.    DEALER POLICIES.**

**8.1    Compliance with Dealer Policies.**  Dealer must comply with all policies governing the conduct of Dealer's business under this Agreement reasonably prescribed from time to time by Company.  All policies issued by Company under this Agreement are incorporated by reference in this Agreement in their entirety ("Dealer Policies").  Dealer's failure to comply with these Dealer Policies constitutes a material breach of this Agreement and may subject Dealer to monetary

penalties that are specifically outlined in the Dealer Policies, forfeiture of Dealer's right to sell certain products or services, termination of this Agreement, or other remedies identified in the Dealer Policies. Company will send written notice to Dealer of any new Dealer Policies issued by Company or of any changes to existing Dealer Policies. In addition, Dealer must comply with other operational manuals, procedural guides, or information statements that Company may issue from time to time.

**8.2    Distribution of Other Products and Services.**   Company may, in its sole discretion, offer Dealer the opportunity to distribute other products and services under the terms and conditions of this Agreement through a Dealer Policy. If Dealer chooses to participate in distributing other products and services, it must comply with any additional terms and conditions set forth in the relevant Dealer Policies.

## 9.    USE AND PROTECTION OF MARKS.

**9.1    Use of Marks.**   During the term of this Agreement, Company authorizes Dealer to be an Authorized Dealer of Company and to use its trademarks, service marks, trade names, logos, or similar markings that Company owns or is licensed to use ("Marks") subject to the limitations contained in this Agreement, including the Dealer Policies. Company will publish a list of authorized Marks that Dealer is licensed to use on a nonexclusive basis and the words identifying or qualifying Dealer's relationship to Company, all of which Company may change from time to time. Dealer must indicate that Company is the provider of the Service in its advertising, and may use the authorized Marks in its advertising. Dealer must not use the Marks for any other purpose without the express prior written consent of Company.

**9.2    No Transfer of Rights.**   This Agreement does not transfer any rights to use any Marks (except to the limited extent expressly set forth in this Agreement) and does not confer any goodwill or other interest in the Marks. All Marks and the great value of the associated goodwill are the exclusive property of Company. All displays, banners, signs, and other similar tangible property bearing Company's name or Marks are the sole property of Company. Dealer must not challenge Company's ownership of the Marks in any way. Company transfers no rights and grants no licenses, express or implied, under any patents or other intellectual property owned or licensed by Company.

**9.3    Unauthorized Use.**   Any unauthorized use of the Marks by Dealer or its Affiliates or agents constitutes infringement of Company's rights and a material breach of this Agreement. Upon demand by Company or upon termination of this Agreement for any reason, Dealer must immediately discontinue use of all Marks. In this event, Dealer must promptly return all signage and other materials bearing Company's name, or allow Company to enter Dealer's premises to remove these materials upon 5 business days advance notice. If landlord or governmental approval is required to remove any signage, Dealer must take reasonable action to assist Company's efforts to obtain these approvals. Dealer must cooperate with Company's efforts to protect its Marks and other intellectual property.

**9.4    Advertising.**   Dealer is under no obligation to conduct any type of advertising. If Dealer chooses to advertise, however, Dealer must conform to the highest ethical standards for advertising, take all reasonable steps to make sure that its advertising materials are factually correct, comply with all applicable laws, and correctly use the Marks. Company may require that Dealer's marketing and advertising materials be submitted to Company for review before being used, as set forth in the Dealer Policies.

exclu dlr - v.1, 7/1/05

Exhibit   B   
Page   40   

12

**10.     TERM AND TERMINATION.**

**10.1     Term.**  This Agreement will automatically renew for successive one-year periods under the same terms and conditions as are in effect at the time of the renewal.  Either party may terminate this Agreement if it gives written notice to the other party of its intention to terminate this Agreement at least 60 days before the expiration of the then current term.

**10.2     Termination for Cause with Cure Period.**  Subject to the provisions contained in section 10.3, either party may terminate this Agreement by written notice to the other party if the other party breaches any material provision of this Agreement.  In the event of a breach, the allegedly breaching party must be provided with written notice of any violation of this Agreement and offered 30 days to cure this violation after receiving this notice.  If the breach is not cured by the end of the 30-day period, then any previously delivered termination notice becomes effective without further notice.

**10.3     Termination for Cause Immediately Upon Written Notice.**  Despite the above, a breach by Dealer of any part of sections 2.6.2, 3.2, 4.1, 4.2, 4.3, 4.4, 4.7, or 9 of this Agreement is not subject to cure and, accordingly, any such breach gives Company the right to terminate this Agreement immediately upon written notice to Dealer.  Either party may also terminate this Agreement immediately upon written notice to the other party if the FCC or any other regulatory agency promulgates any regulation or order that prohibits or substantially impedes either party from fulfilling its obligations, or if the other party: (a) becomes financially insolvent; (b) makes an assignment for the benefit of creditors; (c) has an Order for Relief under the United States Bankruptcy Code entered by any federal court against it; or (d) has a trustee or receiver of any substantial part of its assets appointed by any court.  Company may terminate this Agreement immediately upon written notice if for any reason Company is no longer authorized to provide Service within the Area, if Dealer is found to have made a material misrepresentation or omission to Company during the application process, or if Dealer is found to have engaged in fraudulent or illegal conduct that either harms Company or that is likely in Company's sole discretion to adversely affect Company's reputation or goodwill.

**10.4     Termination Without Cause.**  Either party may terminate this Agreement in its entirety, without cause, with 90 days prior written notice to the other party.  Either party may also terminate this Agreement with respect to any individual market or markets listed on Schedule 1, without cause, with 90 days prior written notice to the other party.

**10.5     Termination Reserve/Payment of Chargebacks.**  Upon any notice of termination of this Agreement, or notice of termination of Dealer's authorization to operate in any market, or if Company determines in its sole discretion that Dealer is likely to stop doing business in any market, Company may withhold a reserve from any money owed to Dealer that may be used to satisfy any obligations owed or to be owed by Dealer to Company, including but not limited to, anticipated Chargebacks after the termination of this Agreement or after Dealer stops doing business.  Accordingly, Company may hold a reserve in the amount of the approximate value of Dealer's Chargebacks over the previous 180 days, adjusted for the amount Company expects Dealer to owe, in Company's sole discretion.  Any remaining balance in the reserve 180 days after the termination date will be promptly paid to Dealer.  Despite any reserve, if Dealer still owes Company money for Dealer's post-termination Chargebacks, then Dealer must pay the remaining balance of the Chargebacks to Company within 30 days of written request.

Cingular Wireless Proprietary & Confidential
Use According to Company Instructions

Exhibit  _B_
Page  _41_

**10.6    Obligations of Dealer Upon Termination.**  Upon the termination of this Agreement, Dealer must: (a) discontinue the use of all Marks, and any similar trade names, service marks, trademarks, signs, or designs, and must return to Company all materials containing any Mark or otherwise identifying or relating to Company's business; (b) cease representing itself in any fashion as a Dealer or representative of Company; (c) return to Company or destroy those documents, records, or other materials (including all copies, either photocopies or electronic copies) that were provided to Dealer by Company or that contain any Confidential Information, including without limitation all information related to Subscribers and all CPNI; and (d) not solicit Subscribers for one year in accordance with the non-solicitation provision of this Agreement.

**10.7    No Compensation.**  Upon termination of this Agreement, Dealer's right to all forms of compensation under this Agreement ends, including without limitation any Subscriber Management Fees.  Similarly, upon termination of Dealer's authorization to operate in any individual market, Dealer's right to all compensation under this Agreement related to that market ends, including without limitation any Subscriber Management Fees. However, if under the relevant Compensation Schedule, Dealer is eligible for commission for a Subscriber activation before the termination date of this Agreement and that Subscriber remains active through the relevant Chargeback Period after the termination of the Agreement, then Dealer earns its one-time commission for that Subscriber.

# 11.    DISPUTES.

**11.1    Notification and Limitation of Actions.**  Dealer must notify Company in writing of any controversy or claim it may have regarding this Agreement or its relationship with Company within 120 days of the date Dealer became aware or should have become aware of this grievance or dispute.  If Dealer fails to notify Company of the controversy or claim within 120 days, then Company is not liable to Dealer for any loss or injury relating to that controversy or claim. The failure by Dealer to timely notify Company of any grievance or dispute is an absolute bar to the institution of any proceedings that may have been based upon this grievance or dispute.

**11.2  Mandatory Pre-arbitration Dispute Resolution Procedures.**  If a controversy or claim arises out of or related to this Agreement, the dispute resolution procedures in this section are required before either party may initiate arbitration. Either party must request to meet the other party within 14 days, at a mutually agreed time.  A representative of Dealer and of Company who are empowered to resolve the matter will meet at least once and will attempt in good faith to resolve the matter.  If the matter has not been resolved within 21 days of their first meeting, the matter then becomes the responsibility of a senior executive of each party who has authority to settle the dispute.  The parties must promptly prepare and exchange memoranda stating all of the disputed issues and their positions on these issues, an estimate of the amount of direct losses suffered and of the amount of damages claimed, a summary of the negotiations that have taken place, and attaching relevant documents.  A senior executive of Company and Dealer will meet for negotiations within 14 days after the end of the 21-day period referred to above at a mutually agreed time.  The first meeting of senior executives should be held at the offices of the party receiving the request to meet, and future meetings will rotate between the offices of Dealer and Company.

**11.3    Arbitration of Disputes.**

**11.3.1  Arbitration Clause.**  If the matter has not been resolved under the mandatory dispute resolution procedures above, then, except as stated in section 11.3.4 of this Agreement, all claims (including counterclaims and cross-claims and also including claims based

on tort or other legal theories) and disputes between Dealer and Company must be resolved by submission to binding arbitration. The parties understand that they are waiving all right to a jury trial, even if this arbitration clause is found to be inapplicable or invalid, in which case a judge must decide the dispute. The parties must submit any disputes to the American Arbitration Association ("AAA") nearest to Dealer within the Area to be decided under the then current AAA commercial arbitration rules, as modified by this Agreement. In the event that AAA declines to administer this arbitration, the parties will then mutually agree upon another qualified arbitration institution. The arbitration must be conducted by 3 arbitrators. The nature and outcome of any arbitration under this Agreement is Confidential Information.

**11.3.2  Limitations of Actions.**  All claims and disputes covered by this provision must be submitted to arbitration by initiating the arbitration no later than 180 days after the aggrieved party became aware or should have become aware that the act or omission giving rise to the claim or dispute occurred, except for the failure to pay invoices for equipment purchased by Dealer from Company. The failure to initiate arbitration within this period is an absolute bar to the institution of any proceedings based on such act or omission. The aggrieved party must initiate arbitration under this provision by sending written notice of an intention to arbitrate to all parties. The notice must contain a description of the dispute, the amount involved, and the remedy sought. Notwithstanding any other limitations set forth in this Agreement, either party is entitled to assert counterclaims within 30 days from the date that it receives notice of any claim asserted against it.

**11.3.3  Procedures and Discovery.**  A prehearing conference must take place to reach agreement on procedural matters, arrange for the exchange of information, obtain stipulations, schedule the arbitration hearing, and attempt to narrow the issues. In order to expedite the arbitration proceedings, the parties agree to place the following limitations on discovery:

    (i)    Each party may propound only 10 interrogatories (each subpart counting as one interrogatory) to each other party;

    (ii)    The parties may serve document requests. Responsive documents are to be exchanged no later than 45 days after service of the request;

    (iii)    Each party may depose up to 8 witnesses of each other party (including current and former employees and officers) and up to two non-party witnesses per each adverse party. Any party deposing an opponent's expert witness must pay the expert's fee for attending the deposition; and

    (iv)    Parties may conduct additional discovery beyond the limitations of these express rules only by written stipulation or express permission from the arbitrator upon a showing of good cause.

**11.3.4  Right to Seek Injunction.**  Despite anything to the contrary in this arbitration provision, either party may bring court proceedings to seek an injunction or other equitable relief to enforce any right or obligation under this Agreement. To obtain injunctive or other equitable relief, neither party is required to post a bond, but if required by law or by the court, both parties consent to a bond in the lowest amount permitted by law.

**11.3.5  Enforcement of Award.**  This Agreement provides no greater right of review than that which is conferred under applicable state and federal law. The award of the

arbitrator may be confirmed or enforced in any court having jurisdiction under the enforcement provisions of the Federal Arbitration Act.

**11.3.6  Fees.**  Arbitrator's fees are split equally between the parties unless the arbitrator rules otherwise at the conclusion of the arbitration or this allocation is prohibited as a matter of law.  If a party defaults on its obligation to pay, the non-defaulting party has the option to either: (a) make the missed payments and recover them at the conclusion of the arbitration regardless of who prevails, or (b) forego the use of the arbitration process and bring its claim to a court having jurisdiction.  If the non-defaulting party brings its claim to a court having jurisdiction, then any statutory or contractual limitations period is tolled from the time that the arbitration was initiated until the matter is officially closed.

## 12.    MISCELLANEOUS.

**12.1    Governing Law.**  Except to the extent governed by federal laws or regulations that preempt state law, the entire relationship of the parties based on this Agreement is governed by the substantive laws of the State of Georgia, without reference to its choice of law rules.

**12.2    Cumulative Rights/Waivers.**  The rights of the parties under this Agreement are cumulative and not exclusive of any other rights or remedies.  Either party's waiver of any right or remedy under this Agreement does not constitute a waiver of that same right or remedy or of any other right or remedy on a future occasion.

**12.3    Events Beyond a Party's Control.**  Neither party is liable for loss or damage or is in breach of this Agreement if its failure to perform its obligations results from: (a) compliance with any law, order, regulation, or requirement of any federal, state, or local government, or any court of competent jurisdiction; (b) acts of God; or (c) fires, strikes, embargoes, war, terrorism, insurrection, riot, and other causes beyond the reasonable control of the party.  Any delay resulting from any of these causes extends performance accordingly or excuses performance, in whole or in part, as may be reasonable.

**12.4    Entire Agreement.**  This Agreement represents the entire agreement of the parties with respect to the subject matter of the Agreement.  There are no other oral or written understandings or agreements between Company and Dealer relating to the subject matter of this Agreement, and this Agreement supersedes all prior negotiations, communications, agreements, and addenda between the parties with respect to the subject matter of this Agreement, but any releases or post-termination covenants are not superseded.  Nothing in this Agreement is intended or should confer any rights or remedies upon any person or entity not a party to this Agreement.

**12.5    Modification.**  This Agreement may only be amended or superseded by written agreement signed by authorized representatives of both parties, unless expressly permitted under the terms of this Agreement.  Each written modification is effective only in the specific instance and for the specific purpose for which it was given.  No course of dealing, course of performance, or usage of trade may be invoked to modify the terms and conditions of this Agreement.  No other understandings or representations, whether oral or in writing, may amend or supersede this Agreement.

**12.6    Assignment.**  Neither party may assign this Agreement or any of its rights or obligations under this Agreement without the other party's prior written consent, except that: (a) Company may fully assign its rights and duties under this Agreement to any affiliate, successor, or

to any entity or person in connection with a merger or consolidation of Company or with a sale of all or any portion of the assets or business of Company; and (b) Dealer may grant to an institutional lender as collateral for a loan or other credit facility a security interest in the other moneys payable to Dealer under this Agreement subject to the offset rights of Company provided in this Agreement and in any other agreement between Company and Dealer.  Any material change of ownership or control of the legal entity of Dealer, whether voluntary or involuntary, constitutes an assignment of this Agreement.  Any assignment by Dealer in violation of this section immediately renders this Agreement null and void and conveys no rights or interest.

**12.7    Survival.**  The terms, provisions, representations, and warranties contained in this Agreement that by their sense, context, or express language are intended to survive do survive the termination of this Agreement.  The parties must fulfill all surviving obligations in a timely manner, and these obligations are binding upon each party's respective successors and assigns. Regarding compensation to Dealer, no compensation, including without limitation Subscriber Management Fees, or other compensation related to Dealer's base of Subscribers under this Agreement or any amendment, survives the termination of this Agreement. The only compensation items that survive are: (a) Company's obligation to pay Dealer a one-time commission under the Compensation Schedule for a Subscriber who was activated before the termination of this Agreement and who remains on Service beyond the Chargeback Period; (b) Company's right to Chargeback Dealer under the relevant Compensation Schedule after termination, and Dealer' obligation to pay Company for these Chargebacks; and (c) Company's right of Offset/Recoupment.

**12.8    Severability.**  A determination by a court or arbitrator of competent jurisdiction that any provision of this Agreement or any part of it is unenforceable does not cancel or invalidate the remainder of that provision or of this Agreement, which remain in full force and effect and must be construed to carry out the intent of the parties.

**12.9    Indemnity.**  Dealer and Company must defend and indemnify the other party and its affiliates, parents, subsidiaries, and their employees and agents from all liability, damages, punitive damages, fines, expenses, including reasonable attorneys' fees and disbursements, claims, demands, or suits arising from their breach of this Agreement or non-compliance with law, their negligent, willful, or fraudulent acts, or for their failure to act, with respect to the performance of each party's obligations under this Agreement, including, without limitation, any allegedly unauthorized use of a trademark, patent, copyright, process, method, or device, false or misleading advertising, or bodily injury, death, or damage to property to the extent occasioned by the acts or omissions of the indemnifying party or its affiliates, employees, or agents.  Prompt written notice must be provided to the indemnifying party of any claim for indemnity.  Each party may conduct its own defense of any claim in which it is named as a defendant without diminishing its indemnity rights.  This indemnity provision only applies to claims or liability from third parties and not to claims between the parties.  Each party is only responsible for any losses or damages proximately caused by it.  The Limitation of Liability provisions of this Agreement do not limit recovery under this Indemnity clause.

**12.10    Limitation of Liability.**  EXCEPT TO THE EXTENT OTHERWISE PROVIDED UNDER THE INDEMNITY PROVISION, NEITHER COMPANY NOR DEALER IS LIABLE TO THE OTHER FOR ANY INDIRECT, SPECIAL, RELIANCE, INCIDENTAL, CONSEQUENTIAL, PUNITIVE, OR EXEMPLARY DAMAGES, INCLUDING WITHOUT LIMITATION LOST PROFITS OR REVENUES, AS A RESULT OF ANY DEFAULT OR BREACH OF THIS AGREEMENT OR THE TERMINATION OR NON-RENEWAL OF THIS AGREEMENT OR ANY OTHER EVENT,

Cingular Wireless Proprietary & Confidential
Use According to Company Instructions

Exhibit _B_
Page _45_

CONDUCT, ACT OR OMISSION ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER BASED ON CONTRACT, TORT, STATUTE, OR OTHERWISE.  THIS LIMITATION OF LIABILITY IS MADE KNOWINGLY, INTENTIONALLY, AND VOLUNTARILY.

    **12.11  Notices.**    All notices, requests, demands, and other communications under this Agreement, must be in writing and are considered given if delivered personally, sent by certified mail, return receipt requested, or sent by nationally recognized overnight carrier to the current address for official notices under this Agreement. The official addresses for notices of this Agreement may be changed by written notice to the other party in accordance with this section. However, Company's notices regarding Dealer Policies and compensation changes may also be delivered by facsimile, electronic means, or by U.S. Mail.

## SCHEDULE 1
### Area & Approved Retail Locations
(List only one Company market per page of Schedule 1.)

### Effective Date: January 1, 2006

**Area:**    **Northern California Region**

**Market:**    The Northern California Market compromising the counties of Monterey, San Benito, Santa Cruz, San Mateo, Santa Clara, Alameda, San Francisco, Contra Costa, Solano, Napa, Marin, Sonoma, Lake, Mendocino, Trinity, Humbolt, Del Norte Siskiyou, Modoc, Shasta, Lassen, Tehama, Plumas, Glenn, Butte, Colusa, Yolo, Sutter, Sacramento, San Joaquin, Stanislaus, Tuolemne, Calaveras, Amador, Alpine, El Dorado, Placer, Nevada, Yuba, and Sierra,  and, the Nevada counties of Washoe, Carson, and Douglas.

### B. Approved Retail Locations (in the Company market named above):

| Approved Retail Locations: | Effective Date of Operation: |
|---|---|
| 1.   1350 Travis Blvd., Fairfield CA 94533 | 1/1/06 |
| 2.   925 Blossom Hill Rd., San Jose, CA 95123 | 1/1/06 |
| 3.   2556 Sommerville Rd., Antioch, CA 94509 | 1/1/06 |
| 4.   3521 Investment Blvd., Suite 2 Hayward, CA 94545 | 1/1/06 |
| 5.   3215 20th Avenue San Francisco, CA 94132 | 1/1/06 |
| 6.   447 Great Mall Drive Milpitas, CA 95035 | 1/1/06 |
| 7.   2855 Stevens Creek Blvd. Santa Clara, CA 95050 | 1/1/06 |
| 8.   1 Stoneridge Mall #15 Pleasanton, CA 94588 | 1/1/06 |

Cingular Wireless Proprietary & Confidential
Use According to Company Instructions

Exhibit __B__
Page __47__

**ADDENDUM TO**
**AUTHORIZED AGENCY AGREEMENT**
**BETWEEN**
**CINGULAR WIRELESS II, LLC, SUCCESSOR IN INTEREST TO SOUTHWESTERN**
**BELL MOBILE SYSTEMS, LLC**
**d/b/a CINGULAR WIRELESS ("CINGULAR")**
**AND**
**VIVA WIRELESS, INC. ("AGENT")**

WHEREAS, the parties entered into an Authorized Agency Agreement effective June 1, 2004, for the Sacramento Area ("Agreement"); and

WHEREAS, the parties desire to amend the Agreement.

NOW, THEREFORE in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, IT IS AGREED AS FOLLOWS:

Exhibit A is deleted in its entirety and the attached Exhibit A is substituted in lieu thereof.

This Addendum is effective January 1, 2006.

Except as modified herein, all terms and conditions of the Agreement and all Exhibits and Addenda thereto shall remain the same and in full force and effect.

IN WITNESS WHEREOF the parties hereto have executed, sealed and delivered this Addendum in two counterparts.

CINGULAR WIRELESS II, LLC, SUCCESSOR IN INTEREST          VIVA WIRELESS, INC
TO SOUTHWESTERN BELL MOBILE SYSTEMS, LLC
d/b/a CINGULAR WIRELESS

By: _____          By: _____

Title: Director of Sales          Title: CEO

Date: 12/22/2005          Date: 12/20/05

Exhibit ___B___
Page ___48___

**Exhibit A**
**Area and Agent Locations**

**Area:**

The Area is defined as the Northern California /Northern Nevada marketing region comprising San Francisco, Alameda, Amador, Calaveras, Carson City, Churchill, Clark, Contra Costa, Douglas, Elko, Esmeralda, Eureka, Fresno, Humboldt, Kings, Lander, Lincoln, Lyon, Madera, Marin, Merced, Mineral, Monterey, Napa, Nevada, Nye, Pershing, Sacramento, San Joaquin, San Mateo, Santa Clara, Santa Cruz, Stanislaus, Storey, Tulare, Tuolumne and Washoe Counties.

**Authorized AGENT Locations:**

This Exhibit A sets forth the locations at which VIVA WIRELESS is authorized to operate as described in this Agreement.

It is agreed by VIVA WIRELESS and CINGULAR that if the initial business location(s) and/or the date upon which operations of VIVA WIRELESS will commence are not known at the date of execution of this Agreement, the same may be added from time to time as such information becomes known but no later than the effective date of VIVA WIRELESS operations.

VIVA WIRELESS shall not close, change or add business locations without CINGULAR prior written approval in accordance with this Agreement.

Any business locations that THE WIRELESS STORE opens and operates in the Area shall be subject to all of the terms of the Agreement, whether or not an amendment is signed by the parties adding the addresses of any new or different locations.

Business Locations:

| | |
|---|---|
| 1. | 1350 Travis Blvd., Fairfield, CA  94553 |
| 2. | 925 Blossom Hill Rd., San Jose, CA  95123 |
| 3. | 2556 Sommerville Road, Antioch, CA  94509 |
| 4. | 3521 Investment Blvd., Suite 2, Hayward, CA  94545 |
| 5. | 3215 20th Avenue, San Francisco, CA  94132 |
| 6. | 447 Great Mall Drive, Milpitas, CA  95035 |
| 7. | 2855 Stevens Creek Blvd., Santa Clara, CA  95050 |

8.  1 Stoneridge Mall #15, Pleasanton, CA 94588

This Exhibit A may be amended from time to time, subject to the procedures and requirements of this Agreement.

This Exhibit A is effective as of January 1, 2006.

VIVA WIRELESS's Initials and Date: _CP_ _12/20/05_

CINGULAR's Initials and Date: _____ _12/22/05_

Exhibit _B_
Page _50_