Venkat Balasubramani (SBN 189192)
*venkat@balasubramani.com*
BALASUBRAMANI LAW
8426 40TH Ave SW
Seattle, WA 98136
Telephone: (206) 529-4827
Facsimile: (206) 260-3966

Attorney for Defendant
CAROLYN PESTANO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AT&T MOBILITY II, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>CAROLYN PESTANO, an individual,<br><br>Defendant.<br><br>AND RELATED COUNTERCLAIMS | **Case No. C07-05463 WHA**<br><br>**DEFENDANT CAROLYN PESTANO'S OPPOSITION TO AT&T'S MOTION TO COMPEL ARBITRATION**<br><br>DATE: **March 6, 2008**<br><br>TIME: **8AM**<br><br>COURTROOM 9 |

# TABLE OF CONTENTS


**I. INTRODUCTION AND ISSUES TO BE DECIDED ..... 1**

**II. RELEVANT FACTS ..... 2**

**A. BACKGROUND: VIVA WIRELESS, INC. AND PESTANO ..... 2**

**B. THE AGREEMENTS BETWEEN AT&T AND VIVA ..... 2**

1. The 2001 Dealer Agreement. ..... 2
2. The 2006 Dealer Agreement. ..... 3
3. The SMF Release. ..... 3
4. The APA/Guaranty. ..... 3

**III. PROCEDURAL BACKGROUND ..... 4**

**IV. ARGUMENT ..... 4**

**A. AT&T HAS LOST THE RIGHT TO COMPEL ARBITRATION OF PESTANO'S CLAIMS. ..... 4**

1. AT&T's Guaranty claims against Pestano are arbitrable. ..... 4
2. AT&T's breach of the Arbitration Clause deprives it of the right to enforce that provision. ..... 5
3. AT&T has waived the right to compel arbitration by initiating the lawsuit ..... 6

**B. THE ARBITRATION CLAUSE OF THE 2006 DEALER AGREEMENT IS PROCEDURALLY AND SUBSTANTIVELY UNCONSCIONABLE AND, THEREFORE, UNENFORCEABLE ..... 8**

1. The Arbitration Clause of the 2006 Dealer Agreement is procedurally unconscionable because it is adhesive. ..... 10
2. The Arbitration Clause of the 2006 Dealer Agreement contains numerous provisions that render it substantively unconscionable. ..... 11

**C. THE SMF RELEASE AND THE APA ARE NOT SUBJECT TO ARBITRATION. ..... 15**

1. There was no meeting of the minds as to the arbitration provision contained in the SMF Release. ..... 15
2. The APA does not contain or incorporate an arbitration provision. ..... 17
3. Pestano has the right to litigate her affirmative defenses. ..... 18

**V. CONCLUSION ..... 19**

# TABLE OF AUTHORITIES

## CASES

A&M Produce Co. v. FMC Corp., 135 Cal. App. 3d 473 (Cal. Ct. App. 1982)......................... 9

Ajida Tech., Inc. v. Roos Instruments, Inc., 87 Cal. 4th 534, 545 (Cal. 2001) ...................... 16

American v. Employment, 154 Cal.App.4th 836 (Cal. Ct. App. 2007) ................................ 16

Amkor Tech., Inc. v. Alcatel Bus. Sys., 178 F. Supp. 2d 519 (E.D. Pa. 2004)........................ 5

Arbercheski v. Oracle Corp., 2007 U.S. Dist. LEXIS 60781 (S.D.N.Y. 2007) ....................... 7

Armendariz v. Found. Health Psychcare Servs., Inc., 24 Cal. 4th 83 (Cal. 2000)................. 9, 10

Baker v. Aubry, 216 Cal.App.3d 1259 (Cal. Ct. App. 1989) ............................................... 17

Bateman Bros. v. Mapel, 145 Cal. 241, (Cal. 1904)........................................................... 18

Beauperthuy v. 24 Hour Fitness USA, Inc., 2006 U.S. Dist. LEXIS 88988 (N.D. Cal. 2006) 8

Bragg v. Linden Research, Inc., 487 F. Supp. 2d 593 (D. Pa. 2007).............................. 9, 12, 14

Britton v. Co-op Banking Group, 916 F.2d 1405 (9th Cir. 1990) ........................................... 6

Brown v. Dillard's, Inc., 430 F.3d 1004, 1010 (9th Cir. 2005) ............................................... 5

Cadle Co. v. World Wide, Inc., 144 Cal. App. 4th 504 (Cal. Ct. App. 2006)....................... 18

Chan v. Drexel Burnham Lambert, Inc., 178 Cal.App.3d 632 (Cal. Ct. App. 1986)............. 17

Circuit City Stores v. Adams, 279 F.3d 889 (9th Cir. 2002)...................................................... 8

Cole v. Burns Int'l Sec. Serv., 105 F.3d 1465 (D.C. Cir. 1997)............................................ 13

Comb v. Paypal, Inc., 218 F. Supp. 2d 1165 (N.D. Cal. 2002)......................................... 9, 10

Comer v. Micor, Inc., 436 F. 3d 1098 (9th Cir. 2006)............................................................ 8

Davis v. O'Melveny & Myers, 485 F.3d 1066 (9th Cir. 2007) ...................................... 11, 14

Doctor's Associates, Inc. v. Casarotto, 517 U.S. 681 (1996) .................................................. 8

Fair v. Bakhtiari, 40 Cal. 4th 189, (Cal. 2006). .............................................................. 15, 16

Ferguson v. Countrywide Credit Indus., 298 F.3d 778, (9th Cir. 2002) .............................. 12

Fischer v. First Internat. Bank, 109 Cal. App. 4th 1433, (Cal. Ct. App. 2003)...................... 18

Flores v. Transamerica HomeFirst, Inc., 93 Cal. App. 4th 846 (Cal. Ct. App. 2001)........... 10

Galion Iron Works & Mfg. Co. v. J. D. Adams Mfg. Co., 128 F.2d 411 (7th Cir. 1942)........ 7

Graham v. Scissor-Tail, Inc., 28 Cal. 3d 807 (Cal. 1981)........................................................ 9

Independent Assn. of Mailbox Center Owners, Inc. v. Superior Court, 133 Cal. App. 4th 396 (Cal. Ct. App. 2005)............ 9, 13

Intl. Marble & Granite v. Congress Fin. Corp., 456 F.Supp.2d 993 (C.D. Cal. 2006)............ 6

Merrill Lynch Commodities, Inc. v. Richal Shipping Corp., 581 F. Supp. 933 (S.D.N.Y. 1984) ............ 5

Midwest Window Systems, Inc. v. Amcor Industries, Inc., 630 F.2d 535 (7th Cir. 1980)...... 6

Nagrampa v. MailCoups, Inc., 469 F.3d 1257 (9th Cir. 2006) ............ 8, 9, 10, 12, 15

Nyulassy v. Lockheed Martin Corp., 120 Cal. App. 4th 1267 (Cal. Ct. App. 2004)............ 9

Pearl v. General Motors Acceptance Corp., 13 Cal. App. 4th 1023 (Cal. Ct. App. 1993)..... 18

Shankle v. B-G Maint., Inc., 163 F.3d 1230 (10th Cir. 1999)............ 13

Shaw v. Regents of University of California, 58 Cal.App.4th 44 (Cal. Ct. App. 1997) .. 15, 17

Ting v. AT&T, 319 F. 3d 1126 (9th Cir. 2003)............ 13

Union Bank v. Gradsky, 265 Cal. App. 2d 40 (Cal. CT. App. 1968)............ 18

**STATUTES**

9 U.S.C. § 2 ............ 8

Cal. Bus. & Prof. Code §§ 17200 *et seq.*............ 13

Cal. Civ. Code § 1670.5............ 15

Cal. Civ. Code § 1671(b)............ 13

Cal. Civ. Code, § 1642............ 18

Cal. Civ. Code, § 1654............ 18

## I. INTRODUCTION AND ISSUES TO BE DECIDED

Plaintiff AT&T Mobility II, LLC ("***AT&T***") moves to compel arbitration of claims asserted against it by Defendant Carolyn Pestano ("***Pestano***"). At the same time, AT&T has chosen to litigate its claims against Pestano by initially filing a lawsuit in Superior Court. By choosing to litigate its claims, which AT&T alleges arise out of the same transaction giving rise to Pestano's claims, AT&T has breached any obligation that existed to arbitrate disputes, and therefore it cannot now compel Pestano to arbitrate her claims. AT&T's actions amount to nothing more than forum shopping. AT&T cannot initiate litigation and then seek to switch part of the dispute to an arbitral forum when it does not like the direction the litigation is headed in. However, regardless of whether or not AT&T has lost the right to compel arbitration, the arbitration provisions which AT&T relies on are both procedurally and substantively unconscionable, and therefore unenforceable.

The claims at issue in this dispute can be separated into two components. The first component consists of claims relating to a dealer agreement which contains the arbitration provisions relied on by AT&T. The second component consists of claims relating to two ancillary agreements – one which restructured compensation payments that AT&T owed to Viva Wireless, Inc. (Pestano was the CEO of this entity), and another in which AT&T "advanced" some of the funds payable under the restructured compensation agreement. Neither of the two ancillary agreements contain arbitration provisions. However, AT&T alleges that the ancillary agreements incorporate the arbitration provision found in the dealer agreement. The arguments regarding waiver/breach and unconscionability apply to both sets of claims. In addition, the second group of claims are not subject to arbitration for independent reasons. The incorporation clauses contained in the ancillary agreements are not "clear and unequivocal" as required under California law, and there was no meeting of the minds with regards to the dispute resolution of claims arising under these agreements. Finally, even assuming these agreements properly incorporated the arbitration clause, Pestano should still be allowed (in her own capacity) to assert affirmative defenses to the underlying claims asserted by AT&T against her. The personal guaranty (which AT&T

agrees is not subject to arbitration) did not contain provisions waiving Pestano's right to assert the underlying defenses and the right of offset.

A ruling in Pestano's favor with respect to either AT&T's waiver/breach or regarding unconscionability is sufficient to keep this dispute in court, where it belongs. Regardless, to the extent Pestano will be subject to the inequitable and inefficient result of having to litigate the claims against her in court while having to assert counterclaims in a separate forum, she should be permitted to assert all available defenses and rights of offset in this forum.

## II. RELEVANT FACTS

### A. Background: Viva Wireless, Inc. and Pestano

Pestano was the CEO of Viva Wireless, Inc. ("***Viva***") an authorized AT&T dealer for approximately 7 years. (*See* Declaration of Carolyn Pestano ("***Pestano Decl.***").) In her capacity as CEO, she entered into all of the underlying agreements on behalf of Viva. (Pestano Decl., ¶ 1.) Given the nature of the relationship, AT&T did not make any pretense about negotiating any portions of the underlying agreements, much less the arbitration provisions. The agreements were all presented on a take or leave it basis. Viva had little or no bargaining power in the relationship. (Pestano Decl., ¶ 10.) The principals of Viva had invested a significant amount of time and energy into the business, and were dependent on ongoing compensation payments from AT&T. AT&T had the right to terminate the contractual relationship at any time – any such termination would have required Viva to shut down immediately, causing tremendous hardship to the principals of Viva. (Pestano Decl., ¶ 10.)

### B. The Agreements Between AT&T and Viva

#### 1. The 2001 Dealer Agreement.

The relationship between Viva and AT&T began September 1, 2001, when Viva entered into the "AT&T Wireless Exclusive Dealer Agreement" (the "***2001 Dealer Agreement***") with an AT&T predecessor, AT&T Wireless Services, Inc. Section 10 of the 2001 Dealer Agreement contains terms regarding dispute resolution, including provisions that purport to bind the parties to arbitration. (*See* Miguel Decl. (Dkt.# 34), Ex. A.)

2. The 2006 Dealer Agreement.

Effective January 1, 2006, Viva entered into the "Cingular Wireless Exclusive Dealer Agreement" (the "***2006 Dealer Agreement***") with another AT&T predecessor, Cingular Wireless II, LLC. ("***Cingular***"). Section 11 of the 2006 Dealer Agreement contains terms regarding dispute resolution, including provisions that purport to bind the parties to arbitration (the "***Arbitration Clause***"). (*See* Miguel Decl. (Dkt.# 34), Ex. B.) The dispute provisions of the 2006 Dealer Agreement are materially different from those of the 2001 Dealer Agreement. (Compare Section 10 of the 2001 Dealer Agreement with Section 11 of the 2006 Dealer Agreement.)

3. The SMF Release.

AT&T underwent numerous corporate changes over the course of its relationship with Viva. As part of one such transition, Cingular sought to restructure the subscriber-based compensation payments owed to its dealers. (Pestano Decl., ¶ 8.) To achieve this restructuring, Viva and Cingular entered (in February 2006) into the "Settlement and Release Concerning Dealer's Pre-2/1/06 Total Subscriber Base" (the "***SMF Release***") with Cingular. (*See* Miguel Decl. (Dkt.# 34), Ex. C.) The "Background" section of the SMF Release states "Dealer and Cingular (through Cingular's predecessor AT&T Wireless Services, Inc.) are parties to an Exclusive Dealer Agreement for the Northern California market dated September 1, 2001 (the "Dealer Agreement.")." Section 4(f) of the SMF Release states "[a]ny disputes related to this 2/1/06 SMF Release between the parties must be resolved under the dispute provisions of the Dealer Agreement." The SMF Release does not contain any dispute resolution provisions of its own. (*See* Miguel Decl. (Dkt.# 34), Ex. C.)

4. The APA/Guaranty.

In late 2006, Viva sought to expand its operations (with AT&T's encouragement). AT&T offered to extend funds to Viva in order to facilitate its proposed expansion. (Pestano Decl., ¶ 19.) Effective October 10, 2006, Viva entered into the Advance Payment Agreement (the "***APA***") with Cingular. (*See* Miguel Decl. (Dkt.# 34), Ex. D.) The "Recitals" section of the APA states "Dealer is a party with Cingular to an existing Exclusive

Dealer Agreement effective January 1, 2006 ("Dealer Agreement") and a Settlement and Release Concerning Dealer's Pre-2/1/06 Total Subscriber Base effective February 1, 2006 ("2/1/06 SMF Release")." (Id.) Section 13 of the APA states "[t]his APA shall be construed and interpreted in conjunction with the Dealer Agreement and the 2/1/06 SMF Release . . . If a conflict exists between the terms of the Dealer Agreement, the 2/1/06 SMF Release and this APA, the terms of this APA shall control." (Id.) In conjunction with the APA, Pestano executed the "Dealer Principal Personal Guaranty" (the "***Guaranty***") which is "Exhibit B" to the APA. (*See* Miguel Decl. (Dkt.# 34), Ex. D.) Neither the APA nor the Guaranty contain any dispute resolution provisions of their own. (Id.)

## III. PROCEDURAL BACKGROUND

AT&T initiated the underlying case by filing a complaint (asserting claims under the Guaranty) in Alameda County Superior Court in September of 2007. (*See* Dkt. # 1.) Pestano removed the dispute to this Court and thereafter answered the Complaint and asserted underlying defenses and counterclaims. (*See* Dkt. # 5.) After Pestano filed her responsive pleading and during the joint status conference between counsel for the parties, AT&T for the first time raised the issue of arbitration. AT&T contended that Pestano's counterclaims were subject to arbitration. (*See* Dkt. # 25.) AT&T did not, at any time, offer to arbitrate its underlying claims against Pestano, whether during the status conference or otherwise. (Declaration of Venkat Balasubramani, ¶ 2.)

## IV. ARGUMENT

### A. AT&T HAS LOST THE RIGHT TO COMPEL ARBITRATION OF PESTANO'S CLAIMS

AT&T argues that Pestano's claims arising under the APA are subject to the Arbitration Clause of the 2006 Dealer Agreement. Assuming that is true, AT&T breached the Arbitration Clause by filing suit in Superior Court. Alternatively, by demanding arbitration after filing suit, AT&T has waived the right to compel arbitration of Pestano's claims.

#### 1. AT&T's Guaranty claims against Pestano are arbitrable.

Assuming arguendo that (as AT&T contends) the APA incorporates the Arbitration

Clause of the 2006 Dealer Agreement, the Guaranty must also be subject to the Arbitration Clause. AT&T, in its Motion to Compel (Dkt. # 33), states matter-of-factly that the Guaranty is a "stand alone agreement" and that it "does not contain an arbitration provision." (Motion to Compel, p. 4.) However this ignores the fact that the Guaranty is "Exhibit B" to the APA, which AT&T contends *does* contain an arbitration provision. Furthermore, AT&T's contention that the Guaranty is not subject to arbitration is inconsistent with its position that all other claims arising from relationship of the parties (conveniently, all of Pestano's claims) are subject to arbitration. It is clear that the Guaranty, which cannot be untwined from the APA, is part of the APA. Therefore, assuming for the moment AT&T's contention that the APA is subject to arbitration, AT&T's claims arising under the Guaranty are subject to arbitration as well. AT&T's position that its claims against Pestano are not arbitrable are in conflict with numerous decisions forcing non-signatories to arbitration clauses to arbitrate their claims. *See*, *e.g.*, Merrill Lynch Commodities, Inc. v. Richal Shipping Corp., 581 F. Supp. 933, 936 (S.D.N.Y. 1984) (compelling non-signatory to arbitrate based on personal guaranty); Amkor Tech., Inc. v. Alcatel Bus. Sys., 178 F. Supp. 2d 519, 521 (E.D. Pa. 2004) (same).

Assuming that AT&T's claims against Pestano are arbitrable, the effect of AT&T's act of filing suit on its Guaranty claims can be analyzed in two ways. Courts have analyzed the loss of the right to arbitrate under (1) a breach of contract analysis and (2) under the doctrines governing waiver of the right to arbitrate. *See* Brown v. Dillard's, Inc., 430 F.3d 1004, 1012-13 (9th Cir. 2005). While the Dillard's Court stated that the more appropriate approach was via breach of contract analysis, both methods are discussed below. Id.

2. AT&T's breach of the Arbitration Clause deprives it of the right to enforce that provision.

"A bedrock principle of California contract law is that he who seeks to enforce a contract must show that he has complied with the conditions and agreements of the contract on his part to be performed." Brown v. Dillard's, Inc., 430 F.3d 1004, 1010 (9th Cir. 2005) (internal quotations omitted); *see also* Intl. Marble & Granite v. Congress Fin. Corp., 456 F.

Supp. 2d 993, 999 (C.D. Cal. 2006). Breach is a generally applicable contract rule available to Pestano as a defense against AT&T's attempt to enforce the Arbitration Clause. Dillard's, 430 F.3d at 1010. Assuming there was a contractual duty to arbitrate, AT&T has breached this obligation by filing its claims in court. Allowing AT&T to compel arbitration notwithstanding its own breach of an duty to arbitrate "would set up a perverse incentive scheme." Dillard's, 430 F. 3d at 1012. Companies like AT&T would have an incentive to not abide by arbitration clauses in the hopes that they can simply intimidate dealers by filing lawsuits and forcing settlements. Id. AT&T should be penalized for choosing to not proceed initially with arbitration. Consequently, the Court should deny AT&T's attempt to enforce the Arbitration Clause.

3. AT&T has waived the right to compel arbitration by initiating the lawsuit.

AT&T's actions may also be analyzed under the doctrines governing waiver of the right to compel arbitration. A party seeking to prove waiver of a right to arbitrate must demonstrate "(1) knowledge of an existing right to compel arbitration; (2) acts inconsistent with that existing right; and (3) prejudice to the party opposing arbitration resulting from such inconsistent acts." Britton v. Co-op Banking Group, 916 F.2d 1405, 1412 (9th Cir. 1990). Waiver is a determination that the Court makes on a case by case basis, and there is no mechanical rule underlying the waiver determination. Midwest Window Systems, Inc. v. Amcor Industries, Inc., 630 F.2d 535, 537 (7th Cir. 1980) (no need to rigidly or mechanically apply waiver rule).

Here, there is no dispute with respect to the first two elements (AT&T is presumed to know the contents of documents it drafted, and by proceeding in Superior Court it acted inconsistent with its right to compel arbitration). The only issue is whether Pestano suffered prejudice as a result of AT&T's actions. Dillard's illustrates that prejudice is appropriately found in this instance. *See* Dillard's, 430 F.3d at 1010. Dillard's involved an employee who initially sought to arbitrate her claims against Dillard's. Dillard's refused, then later sought to compel arbitration once the employee proceeded in court. The employee argued that Dillard's waived its right to compel arbitration. Dillard's argued that litigation costs and

delay are not sufficient to constitute prejudice. The court disagreed:

> The problem for Dillard's is that the question in these cases was whether a delay by a defendant in moving to compel arbitration after the initiation of litigation caused cognizable prejudice to the plaintiff. Unsurprisingly, courts are reluctant to find prejudice to the plaintiff who has chosen to litigate, simply because the defendant litigated briefly (e.g., by filing a motion to dismiss or requesting limited discovery) before moving to compel arbitration.

Id. The critical distinguishing factor in Dillard's, unlike the typical situation where waiver is asserted against a party who merely delayed the assertion of the right to arbitrate, is that the party seeking to compel arbitration had the option to initially arbitrate but failed to do so. AT&T's act of filing suit on claims subject to arbitration is aptly analogous to the refusal to arbitrate in Dillard's. Therefore AT&T's attempt to compel arbitration should be denied. Dillard's is in accord with cases from other jurisdictions which hold that a party who initiates litigation cannot then turn around and seek to arbitrate claims which arise in that litigation. Galion Iron Works & Mfg. Co. v. J. D. Adams Mfg. Co., 128 F.2d 411, 413 (7th Cir. 1942) ("commencement of a suit in court rather than reliance upon arbitration, with answer by the opposing party upon the merits, was a waiver of the right to arbitrate . . .").

AT&T's actions also smack of forum shopping. AT&T was initially content to proceed in court on its Guaranty claims. But now, facing counterclaims (including those relating to the Guaranty) and a jury, it seeks to move those claims to arbitration. Courts have looked skeptically at this type of procedural maneuvering in denying the right to compel arbitration. *See*, *e.g.*, Arbercheski v. Oracle Corp., 2007 U.S. Dist. LEXIS 60781 (S.D.N.Y. 2007). In Arbercheski, the plaintiff initially proceeded pro se. Defendant initially did not move to compel arbitration, but sought to compel arbitration only when an attorney appeared for plaintiff. The court found that defendant waived its right to compel arbitration, and specially mentioned the potential for gamesmanship in defendant's actions. Arbercheski v. Oracle Corp., 2007 U.S. Dist. LEXIS 60781 (S.D.N.Y. 2007). A judge from this district reached a similar result in Beauperthuy v. 24 Hour Fitness USA, Inc., where the court (Judge Conti) denied defendants' request to compel arbitration. In Beauperthuy, the court noted,

among other things, that plaintiffs had been forced to deal with "Defendants' confusing, contradictory, and time-consuming strategic maneuvering." Beauperthuy v. 24 Hour Fitness USA, Inc., 2006 U.S. Dist. LEXIS 88988 (N.D. Cal. 2006). These holdings reflect a trend of decreased tolerance of efforts by a party to maneuver or gain strategic advantage through relying on an arbitration clause. AT&T sought to litigate its dispute arising from the same set of facts in court, but when faced with counterclaims, it cannot now decide that it prefers arbitration.

### B. THE ARBITRATION CLAUSE OF THE 2006 DEALER AGREEMENT IS PROCEDURALLY AND SUBSTANTIVELY UNCONSCIONABLE AND, THEREFORE, UNENFORCEABLE

"The arbitrability of a particular dispute is a threshold issue to be decided by the courts." Nagrampa v. MailCoups, Inc., 469 F.3d 1257, 1268 (9th Cir. 2006). The Federal Arbitration Act (FAA) mandates enforcing arbitration agreements where such agreements are (1) written; (2) part of a contract or transaction involving interstate commerce; and (3) valid under general principles of contract law. 9 U.S.C. § 2. In analyzing whether an arbitration agreement is valid and enforceable, courts take into account "generally applicable contract defenses, such as fraud, duress, or unconscionability" Doctor's Associates, Inc. v. Casarotto, 517 U.S. 681, 687 (1996). "The federal policy favoring arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties; instead ordinary contract principles determine who is bound." Comer v. Micor, Inc., 436 F. 3d 1098, 1104 n.11 (9th Cir. 2006) (internal citations and quotations omitted). Because contract principles are applied to determine whether or not an arbitration provision is valid and enforceable, state law controls (i.e., California law).[1] *See also* Circuit City Stores v. Adams, 279 F.3d 889, 892 (9th Cir. 2002) (In determining whether an agreement to arbitrate is valid, federal courts must "apply ordinary state-law principles that govern the formation of contracts.").

---

[1] The various agreements entered into by the parties contain different governing law provisions. However, AT&T, in its Motion to Dismiss (Dkt. # 35), has cited exclusively to California law, waiving the issue. Given the important policy considerations involved, California law should apply. Since AT&T has not relied on the law of any other state, Pestano's arguments also rely on California law.

Under California law, an arbitration clause is unenforceable due to unconscionability if it is procedurally and substantively unconscionable. Nagrampa, 469 F.3d at 1280 (9th Cir. 2006) (citing Armendariz v. Found. Health Psychcare Servs., Inc., 24 Cal. 4th 83, 114 (Cal. 2000)). The procedural component can be satisfied by showing: (1) oppression through the existence of unequal bargaining positions or (2) surprise through hidden terms common in the context of adhesion contracts. *See*, *e.g.*, Comb v. Paypal, Inc., 218 F. Supp. 2d 1165, 1172 (N.D. Cal. 2002). The substantive component can be satisfied by showing overly harsh or one-sided results that "shock the conscience." Id. The two types of unconscionability "need not both be present to the same degree." Nagrampa, 469 F.3d at 1280. Rather, California courts apply a "sliding scale," so that "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." Id. (quoting Armendariz, 24 Cal. 4th at 114).

Courts are particularly sensitive when reviewing dispute resolution procedures contained in contracts where one side typically has increased bargaining power. *See*, *e.g.*, Nagrampa, 469 F.3d at 1280 (franchise context); Bragg v. Linden Research, Inc., 487 F. Supp. 2d 593, 611 (E.D. Pa. 2007) (online terms of service agreement). California courts recognize that franchise agreements can have "characteristics of contracts of adhesion." In the franchise context, "[t]here is a clear disparity in the bargaining power of franchisors versus franchisees." Independent Assn. of Mailbox Center Owners, Inc. v. Superior Court, 133 Cal. App. 4th 396, 407 (Cal. Ct. App. 2005). Moreover, the sophistication of one party cannot be used to defeat a claim of unconscionability. *See* Graham v. Scissor-Tail, Inc., 28 Cal. 3d 807, 818-19 (Cal. 1981) (finding procedural unconscionability where successful and prominent music producer Bill Graham was required by the "realities of his business as a concert promoter to sign [union] form contracts"); A&M Produce Co. v. FMC Corp., 135 Cal. App. 3d 473, 489-90 (Cal. Ct. App. 1982) (commenting that the California Supreme Court is among the many courts that "have begun to recognize that experienced but legally unsophisticated businessmen may be unfairly surprised by unconscionable contract terms"); Nyulassy v. Lockheed Martin Corp., 120 Cal. App. 4th 1267, 1283-84 (Cal. Ct. App. 2004) (finding procedural unconscionability even

where employee was represented by a lawyer in settlement negotiations). Here, an examination of the Arbitration Clause and the surrounding context shows that both procedural and substantive unconscionability are met.

1. The Arbitration Clause of the 2006 Dealer Agreement is procedurally unconscionable because it is adhesive.

A contract or clause is procedurally unconscionable if it is a contract of adhesion. Comb, 218 F. Supp. 2d at 1172; Flores v. Transamerica HomeFirst, Inc., 93 Cal. App. 4th 846, 853 (Cal. Ct. App. 2001). A contract of adhesion, in turn, is a "standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." Comb, 218 F. Supp. 2d at 1172; Armendariz, 6 P.3d at 690. "[T]he manner in which the contract or the disputed clause was presented and negotiated" plays a central role in the unconscionability analysis. Nagrampa, 469 F.3d at 1282. Where a party with lesser bargaining power is told to "take it or leave it" and presented a contract "without the opportunity for meaningful negotiation," oppression and procedural unconscionability are present. Id.

Here, Pestano did not have an opportunity to negotiate the provisions of the 2006 Dealer Agreement, including in particular the dispute resolution provisions. (Pestano Decl., ¶ 7.) AT&T was in a position of far greater bargaining strength (as is every carrier vis a vis the dealer). In previous experiences entering into agreements with AT&T, the terms of the agreements were rarely negotiable. The 2006 Dealer Agreement (as well as the APA and the SMF Release) was no exception, and was presented to Viva on a take it or leave it basis. (Pestano Decl., ¶ 7.) Since the Agreement was necessary to continue Viva's status as a dealer, the Agreement presented greater opportunity for abuse by AT&T. Viva was not a dealer just entering into a dealership/franchise relationship. Viva had been a dealer for approximately 5 years. As such, Viva, its principals and employees had a tremendous amount of investment in Viva, as far as time and resources spent. (Pestano Decl., ¶ 7.) Additionally Viva was owed a significant amount of residual compensation payments that AT&T would ostensibly terminate if Viva did not enter into the Dealer Agreement. AT&T

was under no contractual obligation to enter into the Dealer Agreement. It could easily ask one of its existing dealers to expand into Viva's market. Viva, on the other hand, had little choice. If it did not enter into the Dealer Agreement, it would lose its existing investment in the relationship, have to terminate its employees, and significantly, potentially forfeit the right to receive a significant amount of compensation. (Pestano Decl., ¶ 7.) These circumstances satisfy the standards for procedural unconscionability under California law.

2. The Arbitration Clause of the 2006 Dealer Agreement contains numerous provisions that render it substantively unconscionable.

The Arbitration Clause contains numerous provisions which render it unconscionable. These include one sided limitations provisions, an arbitration fee-splitting provision which will result in onerous fees, an overbroad confidentiality clause, and one sided assignment provisions. (*See generally* Miguel Decl., Ex. B.) Courts in previous cases have found these types of provisions to be unconscionable.

*a. The Arbitration Clause's notice provision supports a finding of unconscionability.*

The Arbitration Clause purports to require Viva to notify AT&T "of any controversy or claim it may have regarding [the Dealer Agreement] or its relationship with [AT&T] within 120 days of the date Dealer becomes aware or should have become aware of this grievance or dispute." (2006 Dealer Agreement, section 11.1.) The clause further states that the failure to provide this notice is an "absolute bar" to Viva's maintenance of any action against AT&T. Id. There is no comparable notice provision limiting AT&T's right to bring claims. Apart from the fact that the provision is completely one-sided, a hallmark of unconscionability in and of itself, the clause is unduly oppressive because it shortens the statutory limitations period for bringing claims. The Ninth Circuit has found similar provisions to be substantively unconscionable. Davis v. O'Melveny & Myers, 485 F.3d 1066, 1076-77 (9th Cir. 2007) (requiring an employee to give notice within one year from the time any claim was known or should have been known). The extremely broad scope of the provision is evidenced by the fact that it does not even contain exceptions for violations of statutes, such as anti-discrimination laws.

*b. The Arbitration Clause's requirement that all claims be submitted to arbitration within 180 days supports a finding of unconscionability.*

The Arbitration Clause also contains a provision which provides that the claims subject to the clause must be submitted to arbitration "no later than 180 days after the aggrieved party became aware or should have become aware" of the claim. (2006 Dealer Agreement, section 11.3.2.) However, this clause excludes Dealer's [Viva's] "failure to pay invoices for equipment purchased." Again, there is no similar exclusion for Pestano, such as an exclusion in the event that AT&T fails to pay out commissions. This provision is similar to a provision allowing only one side to bring a claim for injunctive relief in court, which courts have found to be unconscionable. Bragg v. Linden Research, Inc., 487 F. Supp. 2d 593, 611 (E.D. Pa. 2007) (finding unconscionability where the arbitration provisions provide the stronger party "with a variety of one-sided remedies to resolve disputes, while forcing its customers to arbitrate any disputes").

*c. The arbitration fee-splitting provision is unconscionable since it requires the payment of substantial sums in order to enforce statutory rights.*

Although fee-splitting provisions are not per se substantively unconscionable under California law, such provisions are unenforceable and illegal (and therefore unconscionable) where they impede the vindication of statutory rights. Nagrampa, 469 F.3d at 1285. The extent of fees that will be imposed by having a three arbitrator panel preside over a 14 day would deter all but the wealthiest of litigants from pursuing their claims.

The Arbitration Clause at issue here requires the parties to "split equally" the fees for any arbitration. Arbitrators typically charge between $300 and $400 per hour, which could result in fees of approximately $9600 *per day*. Ferguson v. Countrywide Credit Indus., 298 F.3d 778, 785 (9th Cir. 2002) ("arbitrators typically charge $ 300-400 per hour"). AT&T estimates that trial will take two weeks. (*See* Dkt. # 25.) Thus, a three-neutral arbitration spanning between ten to fourteen days would require an expenditure between $54,000 (at the low end, assuming $300/hour and 6 hour days) and $134,400. At the low end this means that Pestano would have to pay at least $15,000 up front (and the remainder upon conclusion).

Pestano offers testimony that this figure would deter her from pursuing various claims, including those stemming from rights granted by California statutes. (Pestano Decl., ¶ 28.) Pestano brings claims under Cal. Bus. & Prof. Code §§ 17200 *et seq*., California's unfair competition law, as well as claims under the SMF Release which rely on California's prohibition of penalty clauses. Additionally, Pestano brings what is essentially an earnings claim as a franchisee. These are exactly the types of claims that the California courts have held could be improperly impeded by enforcement of an arbitration clause such as the one found here. *See* Independent. Assn. of Mailbox Center. Owners, Inc. v. Superior Court, 133 Cal. App. 4th 396, 417 (Cal. Ct. App. 2005) (remanding to trial court to determine whether fee structure in arbitration agreement would impede rights under various statutes and laws).

A number of other courts have found arbitration fee-splitting provisions unenforceable regardless of whether any statutory rights are asserted by the party resisting arbitration. In a Tenth Circuit case, the plaintiff, as a condition of continued employment, signed an agreement containing a fee-splitting clause as part of an arbitration provision. This would have required him to pay between $1,800 and $5,000 to resolve his claims. The court held the arbitration clause to be unenforceable, stating "[t]he agreement thus placed [plaintiff] between the proverbial rock and a hard place – it prohibited use of the judicial forum, where a litigant is not required to pay for a judge's services, and the prohibitive cost substantially limited use of the arbitral forum." Shankle v. B-G Maint., Inc., 163 F.3d 1230, 1235 (10th Cir. 1999); *see also* Ting v. AT&T, 319 F. 3d 1126, 1151 (9th Cir. 2003) (finding an arbitration agreement to be unconscionable because it required customers of AT&T to split the arbitrator's fees, which could require some plaintiffs to face prohibitive costs); Cole v. Burns Int'l Sec. Serv., 105 F.3d 1465, 1484 (D.C. Cir. 1997) (concluding employee would be unable to pursue statutory claims if required to pay for arbitrator fees in addition to administrative costs and attorney fees, which accompany both arbitration and litigation). Here, the extent of fees imposed by the arbitration render this clause unconscionable, particularly since AT&T has brought claims against Pestano which it concedes should stay in court.

*d. The confidentiality provision supports a finding of unconscionability.*

The Arbitration Clause at issue in this case designates the nature and outcome of any arbitration as confidential information. The Ninth Circuit has held (applying California law) that such a confidentiality provision supports a finding that an arbitration clause is substantively unconscionable. O'Melveny & Myers, 485 F.3d at 1079 (citing Ting, 319 F. 3d at 1152). While O'Melveny dealt with a confidentiality provision within an employment context, the concerns raised are equally applicable in this case. AT&T, who will be subject to multiple and ongoing legal battles with dealers, gains a distinct legal advantage by learning how to negotiate and litigate its contracts in the future. At the same time, dealers are prevented from contacting other dealers to assist in litigating (or arbitrating) their claims. Id. at 1078; *see also* Bragg v. Linden Research, Inc., 487 F. Supp. 2d 593, 610 (E.D. Pa. 2007) ("[the company] places itself in a far superior legal posture by ensuring that none of its potential opponents have access to precedent while, at the same time, the company accumulates a wealth of knowledge on how to negotiate the terms of its own unilaterally crafted contract"). Of course, a confidentiality provision in an arbitration clause is not inherently unconscionable. Taken together with the other provisions cited above, however, it supports a finding of unconscionability. *See* O'Melveny & Myers, 485 F.3d at 1079 ("[t]he concern is not with confidentiality itself but, rather, with the scope of the language of the [Arbitration Clause] . . .).

*e. AT&T's unilateral right to assign its rights, including the right to enforce the arbitration provision, supports a finding of unconscionability.*

Section 12.6 of the 2006 Dealer Agreement provides that neither party may assign the Agreement or any rights or obligations under the agreement without prior written consent of the other party. However, the section then goes on to provide an extremely broad exception for AT&T, allowing AT&T to assign all its rights to "any affiliate, successor, or to any person in connection with the merger or consolidation of Company or with a sale of all or any portion of the assets or business of Company . . ." No such exception is made for Viva. In fact, the section provides that if any change were to occur in the ownership or control of

Viva, voluntarily or involuntarily, then the entire Agreement would be held null and void. This provision is yet another example of a one-sided provision that supports a finding of substantive unconscionability.

*f. The numerous unconscionable provisions render the Arbitration Clause invalid and not subject to judicial modification.*

In sum, the Arbitration Clause "is so permeated by substantive unconscionability that it cannot be cured by severance or any other action short of rewriting the contract." Nagrampa, 469 F.3d at 1293. As Nagrampa held in a similar circumstance, California Civil Code section 1670.5 does not grant this Court the discretion to reform or modify the Arbitration Clause through augmentation and neither does the FAA. Id. Consequently, the arbitration provision must be found invalid and unenforceable.

**C. THE SMF RELEASE AND THE APA ARE NOT SUBJECT TO ARBITRATION**

Because arbitration is a creature of contract, there must be a meeting of the minds in order for a dispute resolution provision to be valid and enforceable. *See* Fair v. Bakhtiari, 40 Cal. 4th 189, 203 (Cal. 2006). "For the terms of another document to be incorporated into the document executed by the parties the reference must be clear and unequivocal. . ." Shaw v. Regents of University of California, 58 Cal.App.4th 44, 54 (Cal. Ct. App. 1997). Here, this is not the case.

1. There was no meeting of the minds as to the arbitration provision contained in the SMF Release.

The SMF Release does not contain an arbitration provision of its own. AT&T alleges that the SMF Release contains a valid arbitration provision by way of incorporation. However, it is unclear what arbitration provision AT&T argues the SMF Release incorporates – the provision in the 2001 Dealer Agreement or the provision in the 2006 Dealer Agreement. In its Motion to Compel Arbitration, AT&T merely quotes the language of the SMF Release, which purports to incorporate the dispute resolution provisions of the 2001 Dealer Agreement. (Motion to Compel, p. 3.) In its Motion to Dismiss, AT&T interprets the SMF Release as incorporating the 2006 Dealer Agreement, despite the

language of the SMF Release itself. After quoting a provision of the SMF Release that provides for payment to Viva "as long as the Dealer Agreement is in effect . . .", AT&T states that "Viva admits that it terminated the Dealer Agreement." (The agreement referenced in AT&T's Motion to Dismiss (*see* p. 4) is the 2006 Dealer Agreement.)[2]

The difference between the two agreements is significant – the two agreements contain substantively different dispute resolution provisions. For example, the 2006 Dealer Agreement (Section 11) allows each party to propound 10 interrogatories, while the 2001 Dealer Agreement (Section 10) allows each party to propound "only one interrogatory requesting the names and addresses of the witnesses to be called at the arbitration hearing." The 2006 Dealer Agreement allows no limit on the document requests that may be propounded, but the 2001 Dealer Agreement allows each party to serve "one request for the production of documents." The 2006 Dealer Agreement contains mandatory pre-arbitration dispute resolution procedures, while the 2001 Dealer Agreement does not.

AT&T takes the position that the SMF Release incorporates the 2006 Dealer Agreement's dispute resolution provisions. AT&T's position is contrary to the text of the SMF Release and to Pestano's understanding of the provision. (Pestano Decl., ¶ 15.) Pestano's understanding is that the SMF Release refers to the 2001 Dealer Agreement. (Pestano Decl., ¶ 15.) There was no meeting of the minds on the issue of which dispute resolution provisions were incorporated by the SMF Release. Consequently, no valid and enforceable agreement as to arbitration was formed with regard to the SMF Release. *See* Fair, 40 Cal. 4th at 202-03; *see also* American v. Employment, 154 Cal. App. 4th 836, 846-47 (Cal. Ct. App. 2007).

---

[2] An arbitration clause in a contract that has been terminated can require arbitration of a dispute that arose under the contract while the agreement was still in force. *See*, *e.g.*, Ajida Tech., Inc. v. Roos Instruments, Inc., 87 Cal. 4th 534, 545 (Cal. 2001). Because of this, it is also unclear what AT&T's intent was regarding the resolution of disputes between the parties. What is clear is that the SMF Release itself refers to one dispute resolution procedure in an agreement that had expired, while AT&T in its Motion to Dismiss argues that the SMF Release refers to the later, 2006 Dealer Agreement.

2. The APA does not contain or incorporate an arbitration provision.

The APA, like the SMF, does not itself contain an arbitration provision. As it did with the SMF Release, AT&T alleges that the APA contains a valid arbitration provision by incorporation. However, there are numerous problems with AT&T's proposition.

Section 13 of the APA states "[t]his APA shall be construed and interpreted in conjunction with the [2006] Dealer Agreement and the 2/1/06 SMF Release." It also states "[i]f a conflict exists between the terms of the Dealer Agreement, the 2/1/06 SMF Release and this APA, the terms of this APA shall control." The 2006 Dealer Agreement contains dispute resolution procedures, however, as explained above, the SMF Release purports to incorporate the dispute resolution procedures of the 2001 Dealer Agreement. Therefore, to say that the APA shall be "construed and interpreted in conjunction with" those two agreements, which are conflicting, is ambiguous.

"For the terms of another document to be incorporated into the document executed by the parties the reference must be clear and unequivocal. . ." Shaw v. Regents of University of California, 58 Cal.App.4th 44, 54 (Cal. Ct. App. 1997). Here, the purported incorporation is not clear and unequivocal. The fact that the APA purports to incorporate the SMF Release (which is, itself unclear about what dispute resolution provisions it incorporates) and also purports to incorporate the 2006 Dealer Agreement render it unclear. In addition, as shown above, the incorporation language points to conflicting documents. The purported incorporation language of the APA does not include anything about dispute resolution generally, or arbitration specifically. It only includes a general statement that the APA shall be "construed and interpreted in conjunction with" two other documents. Courts have refused to find incorporation of an arbitration provision when the incorporation language does not specifically reference arbitration. *See*, *e.g.*, Chan v. Drexel Burnham Lambert, Inc., 178 Cal.App.3d 632, 643 (Cal. Ct. App. 1986) (referring to the paragraph containing the incorporation language the Court stated that "[a]rbitration is nowhere mentioned in paragraph 2C. . ."); *see also* Baker v. Aubry, 216 Cal.App.3d 1259, 1264 (Cal. Ct. App. 1989) (distinguishing the incorporation language in question from Chan on the basis that the

incorporation language contained the phrase "I agree to arbitrate . . ."). In addition to not mentioning arbitration, the language in Section 13 of the APA references two separate documents (the 2006 Dealer Agreement and the SMF Release) which differ with regard to dispute resolution. One contains one set of arbitration provisions while the other incorporates an entirely different set. Thus, the APA does not incorporate any one set of arbitration provisions in a "clear and unequivocal" manner.

3. Pestano has the right to litigate her affirmative defenses.

Pestano has asserted counterclaims arising out of the SMF Release and the APA. But these can also be asserted as defenses to AT&T's underlying claims under the APA/Guaranty. Regardless of whether or not Pestano's counterclaims (i.e., Viva's claims) are subject to arbitration, Pestano did not waive her right to assert these underlying defenses in court.

Pestano, as guarantor of the debts of Viva, may assert any defenses or setoffs that Viva could assert. *See*, *e.g.*, Cadle Co. v. World Wide, Inc., 144 Cal. App. 4th 504, 514 n. 7 (Cal. Ct. App. 2006). While the rights of a guarantor may be waived, any such waiver must be must be clear and explicit about the rights being waived at the time of execution. *See*, *e.g.*, Pearl v. General Motors Acceptance Corp., 13 Cal. App. 4th 1023, 1032 (Cal. Ct. App. 1993) (a guarantor's right to revoke the guaranty of future debts was not waived because the waiver language was not clear); *see also* Union Bank v. Gradsky, 265 Cal. App. 2d 40, 48 (Cal. Ct. App. 1968) ("[i]n absence of an explicit waiver, we shall not strain the instrument to find that waiver by implication"). Here the document must be interpreted in accordance with two maxims of interpretation. First, the surety (Pestano) is the favorite of the law. Bateman Bros. v. Mapel, 145 Cal. 241, 244 (Cal. 1904) ("A surety is a favorite of the law."). Second, a document should be construed against its drafter (AT&T), with any uncertainty resolved against it. Fischer v. First Internat. Bank, 109 Cal. App. 4th 1433, 1448 (Cal. Ct. App. 2003) ("Each of the related documents must be considered together as part of the whole agreement (Civ. Code, § 1642), resolving any uncertainty in their overall meaning against the bank as the drafter of the documents. (Civ. Code, § 1654.).")

In the instant case, there is no language in the APA/Guaranty explicitly waiving the right to assert defenses or setoffs. Therefore, Pestano may assert her defenses against AT&T's claims in court. It would be particularly inappropriate to disallow Pestano from litigating (with the full benefit of discovery and in front of a jury) all of Pestano's available defenses to the Guaranty claim since AT&T agrees that its claim against Pestano is not subject to arbitration. This would tie Pestano's hands in a manner contrary to any efficiency principles favoring arbitration and contrary to the intent of the parties.

## V. CONCLUSION

For the foregoing reasons, Carolyn Pestano respectfully requests that this Court deny AT&T's Motion to Compel Arbitration, and retain jurisdiction over the entirety of this case. The efficiencies underlying arbitration are not served by requiring this dispute to proceed simultaneously in two different tribunals. AT&T should not be allowed to impose further oppressive costs on Pestano by requiring her to pay substantial sums to arbitrate her claims against AT&T, while AT&T maintains its claims against her in court. To the extent the Court grants AT&T's Motion to Compel, it should not be granted with respect to any claims under the APA or the SMF Release.

Respectfully submitted, and dated this 13th day of February, 2008.

**BALASUBRAMANI LAW**

By:______________________________
Venkat Balasubramani (SBN 189192)
Attorney for Defendant Carolyn Pestano

## CERTIFICATE OF SERVICE

I hereby certify that I caused to be filed via the Court's CM/ECF system a copy of the foregoing **Defendant Carolyn Pestano's Opposition to AT&T's Motion to Compel Arbitration** – notice will be provided via the CM/ECF system to counsel for Plaintiff:

Ronald J. Kohut, Esq. (SBN 66463)
Sarah K Kohut, Esq. (SBN 197655)
KOHUT & KOHUT LLP
3354 Round Barn Blvd., Suite 204
Santa Rosa, California 95403
Facsimile: (707) 573-3101

I certify that the foregoing is true and correct. Executed on February 13, 2008 at Seattle, Washington.

By:________________________________
Venkat Balasubramani (SBN 189192)
Attorney for Defendant Carolyn Pestano