Venkat Balasubramani (SBN 189192)
venkat@balasubramani.com
BALASUBRAMANI LAW
8426 40TH Ave SW
Seattle, WA 98136
Telephone: (206) 529-4827
Facsimile:   (206) 260-3966

Attorney for Defendant
CAROLYN PESTANO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AT&T MOBILITY II, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>CAROLYN PESTANO, an individual,<br><br>Defendant. | Case No. C07-05463 WHA<br><br>**DECLARATION OF CAROLYN PESTANO'S IN SUPPORT OF PESTANO'S OPPOSITION TO AT&T'S MOTION TO DISMISS AND MOTION TO COMPEL ARBITRATION** |

I, Carolyn Pestano, make the following declaration based on my personal knowledge as to the matters set forth herein. I am over the age of 18 and was the CEO of Viva Wireless, Inc. ("*Viva*"), the AT&T dealer whose underlying claims are asserted in this lawsuit. I entered into all of the underlying agreements in this matter on behalf of Viva.

**A.     Background:  Viva Wireless, Inc. and AT&T**

1. Viva was an authorized exclusive dealer of AT&T wireless products and services.
2. Viva is a closely held company with many of my family members as shareholders and employees.  Viva sold AT&T products and services through kiosks located in shopping malls in Northern California.
3. During the underlying relationship Viva was consistently one of the top performing

1

AT&T dealers, and won numerous accolades.

4. The relationship between Viva and AT&T began in 2001, when Viva entered into an "Exclusive Dealer Agreement" (the "***Original Dealer Agreement***") with AT&T Wireless Services, Inc.

5. The Original Dealer Agreement contained numerous restrictions on Viva's marketing practices, including an exclusivity provision. The agreement contained a license with respect to AT&T's trademarks and servicemarks. The agreement required Viva to purchase equipment (phones) from AT&T and sell such equipment "at prices established by [AT&T] from time to time."

6. At all times during the relationship, Viva was required to pay AT&T monies beyond the ordinary costs of business which AT&T passed on to Viva, such as a markup on products, services, and inventory and other items that AT&T made available to Viva in order to sell to customers. The amounts of such indirect fees exceeded at least $5000 on a yearly basis.

7. In December 2005, Viva entered into a "Cingular Wireless Exclusive Dealer Agreement" (the "***Dealer Agreement***") with Cingular Wireless II, LLC ("***Cingular***"), which was the operative agreement during the bulk of the events which gave rise to the counterclaims in this lawsuit. I did not have an opportunity to negotiate the provisions of the 2006 Dealer Agreement, including in particular the dispute resolution provisions. AT&T was in a position of far greater bargaining strength (as is every carrier vis a vis the dealer). In previous experiences entering into agreements with AT&T, the terms of the agreements were rarely negotiable. The 2006 Dealer Agreement was no exception, and was presented on a take it or leave it basis. Since the Agreement was necessary to continue Viva's status as a dealer, the Agreement presented greater opportunity for abuse by AT&T. Viva was not a dealer just entering into a dealership relationship. Viva had been a dealer for approximately 5 years. As such, Viva, its principals (myself included) and employees had a tremendous amount of investment in Viva, as far as time and resources spent. Additionally Viva was

2

owed residual compensation payments that AT&T would ostensibly terminate if Viva did not enter into the Dealer Agreement. AT&T was under no contractual obligation to enter into the Dealer Agreement. It could easily ask one of its existing dealers to expand into Viva's market. Viva, on the other hand, had little choice. If it did not enter into the Dealer Agreement, it would lose its existing investment in the relationship, have to terminate its employees, and significantly, potentially forfeit the right to receive a significant amount of compensation.

**B.    The SMF Release**

8. A significant source of compensation for Viva was residual payments based on the numbers of subscribers who initiated subscriptions to AT&T services. In February 2006, Viva and Cingular discussed the restructuring of various subscriber compensation payments owed to Viva by Cingular.

9. Cingular wished to simplify and streamline its compensation structure due to its various corporate restructurings. Accordingly, at Cingular's request, Viva and Cingular entered into an agreement (the "*SMF Release*") pursuant to which Cingular agreed to pay Viva a total amount of $735,883.44, consisting of a one-time payment of $192,152.64 and "the sum of $22,655.45 each month for 24 months."

10. Cingular drafted this agreement (the SMF Release), and did not provide Viva any opportunity to negotiate any of its terms. The agreement was presented on a take-or-leave-it basis. Cingular at any time could terminate the underlying dealer agreement which would have required Viva to wind down. As such, Viva did not have any choice in accepting the SMF Release or its terms.

11. I understood the foregoing amounts to be unconditionally owed to Viva, although the amounts would be paid over time.

12. The amounts which Viva purportedly relinquished in exchange for the amounts AT&T agreed to pay Viva under the SMF Release were vested (i.e., these were amounts due to Viva as residual subscriber compensation under the Original Dealer Agreement). However, the amounts due under the SMF Release represented a

material reduction of amounts which Viva would have been paid as residual compensation under the Original Dealer Agreement.

13. Prior to entry into the SMF Release, Viva and Cingular did not discuss any approximation of damages which AT&T may suffer upon termination of the Dealer Agreement, and how this would be tied to the amounts outstanding under the SMF Release at the time of such termination.

14. The parties did not discuss termination of the monthly payments under the SMF Release at all.

15. The SMF Release refers to the "Dealer Agreement". I read this to refer to the Original Dealer Agreement. No one from AT&T discussed with me that the term "Dealer Agreement," as used in the SMF Release purported to refer to the (2006) Dealer Agreement, rather than the (2001) Original Dealer Agreement.

16. I did not discuss with AT&T any dispute resolution provisions relating to the SMF Release. AT&T did not advise – prior to signing the SMF Release – that AT&T's position regarding any claims arising under the SMF Release was that all such claims were subject to arbitration under the provisions of the Dealer Agreement.

**C.   The Advance Payment Agreement**

17. On or around this time, Cingular also changed its inventory terms from 60 days to 30 days (i.e., Viva would have to pay AT&T for inventory within 30 days as opposed to 60).

18. The restructuring of the residual income (pursuant to the SMF Release) and change in inventory terms materially affected Viva's cashflow, and caused Viva to experience a cash crunch.

19. Later that year, Cingular and Viva discussed the possibility of Viva receiving an advance of the funds owed under the SMF Release in order to facilitate Viva's expansion of its operations.

20. Cingular and Viva discussed the possibility of Viva opening four additional kiosks, and refurbishing two existing kiosks. Viva required Cingular's permission to open

4

     any additional kiosks and undertake such material expansions. Viva expressed its concerns that there was a high degree of dealer concentration in the Northern California market. Viva also expressed its concerns that another dealer who was servicing the Northern California market engaged in lax customer service practices, and that the business and customer service practices of the other Northern California dealer were having a negative impact on Viva's operations.

21. Cingular provided assurances to Viva that the market could support additional stores and that Cingular would take affirmative steps to address the practices of the other dealer which concerned Viva. Based on these assurances, and based on numerous conversations with Cingular account managers, Viva signed the "Advanced Payment Agreement," pursuant to which Cingular "advanced" Viva $250,000.00. This agreement expressly provided that Cingular would be "reimbursed . . . from future monthly payments due to [Company] under the . . . SMF Release."

22. The Advance Payment Agreement (the "***APA***") did not contain any prohibition on offsetting amounts owed by Viva to Cingular under the Advance Payment Agreement against funds otherwise owed to Viva by Cingular (i.e., under the SMF Release).

23. Indeed, the agreement expressly envisioned that Cingular would merely net the amounts due to Viva against the amounts advanced to Viva. Cingular requested, and I agreed, to sign a document titled "Dealer Principal Personal Guaranty" ("***Personal Guaranty***"). This document was an exhibit to the APA and viewed by me as part and parcel of the APA. Cingular would not agree to the APA but for my agreement to sign the Personal Guaranty. Viva did not have an opportunity to negotiate the terms of the APA or the Guaranty – these were also presented on a take-or-leave-it basis.

24. The APA did not contain any dispute resolution provisions – and no one from AT&T discussed with me any dispute resolution mechanism relating to the APA.

**D.    Arbitration of the Underlying Claims**

25. AT&T has not approached me about arbitrating its claims against me under the Personal Guaranty. It did not do so prior to filing the underlying lawsuit or during the

5

pendency of the lawsuit.

26. To the extent claims asserted by me underlying the APA are arbitrable, I would expect AT&T's claims under the Personal Guaranty to be equally arbitrable. I viewed the Personal Guaranty and the APA as integrated (i.e., as one single agreement).

27. Having to arbitrate the counterclaims asserted by me in this lawsuit would cause an undue hardship and would mean that I would not be able to assert these claims.

28. Having to pay even $5,000.00 as a fee to arbitrate the claims would preclude me from pursuing those claims. At this point, Viva has largely wound down and simply lacks the resources to pay such an amount.

29. Pursuing two separate actions (one set of claims in arbitration and one set in court) would cause a further hardship in the form of two sets of costs, expenses and fees. This would further preclude either Viva or myself from pursuing the underlying causes of action.

I declare that the foregoing is true and correct under the laws of the state of Washington. Executed this 13th day of February, 2008.

_____
Carolyn Pestano