1   Venkat Balasubramani (SBN 189192)
    *venkat@balasubramani.com*
2   BALASUBRAMANI LAW
    8426 40TH Ave SW
3   Seattle, WA 98136
    Telephone: (206) 529-4827
4   Facsimile:   (206) 260-3966

5   Attorney for Defendant
    CAROLYN PESTANO
6

7

8                    UNITED STATES DISTRICT COURT
9                   NORTHERN DISTRICT OF CALIFORNIA
10

11  AT&T MOBILITY II, LLC, a Delaware          **Case No. C07-05463 WHA**
    limited liability company,
12                                             **DEFENDANT CAROLYN PESTANO'S**
13                                             **OPPOSITION TO AT&T'S MOTION**
                    Plaintiff,                 **TO DISMISS COUNTERCLAIMS**
14      v.

15  CAROLYN PESTANO, an individual,            **DATE:**      March 6, 2008
                    Defendant.                 **TIME:**      8AM
16

17  AND RELATED COUNTERCLAIMS                  COURTOOM 9

18

19

20

21

22

23

24

25

26

27

28

                                    1

# TABLE OF CONTENTS

I.   INTRODUCTION ......................................................................................... 1

II.  PROCEDURAL BACKGROUND ................................................................ 1

III. FACTUAL BACKGROUND ......................................................................... 1

    A.  BACKGROUND: VIVA WIRELESS, INC. AND PESTANO ............................. 1

    B.  THE SMF RELEASE ............................................................................ 2

    C.  THE ADVANCE PAYMENT AGREEMENT ............................................... 3

    D.  CINGULAR'S FAILURE TO ADDRESS ISSUES IN THE MARKET; VIVA WINDS DOWN ........ 4

IV.  DISCUSSION ............................................................................................. 5

    A.  APPLICABLE LEGAL STANDARD ........................................................ 5

       1.  Summary judgment standards. ..................................................... 5

       2.  AT&T's Motion assumes that California law applies. ................... 6

    B.  AT&T IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE BASIS THAT IT PROPERLY TERMINATED MONTHLY PAYMENTS UNDER THE SMF RELEASE ..................................... 6

       1.  Factual disputes preclude summary judgment in favor of AT&T on the basis that the terms of the SMF Release allow for termination of monthly payments. ..................... 6

       2.  AT&T's interpretation of the SMF Release is precluded by Cal. Civ. Code § 1671.... 8

       3.  AT&T cannot rely on termination of the Dealer Agreement to the extent its unfair and oppressive conduct forced Viva out of business .......................................... 9

    C.  VIVA'S CLAIMS UNDER THE 2001 DEALER AGREEMENT SURVIVE TO THE EXTENT THE SMF RELEASE IS UNENFORCEABLE OR AT&T MATERIALLY BREACHED ................... 10

    D.  PESTANO'S NEGLIGENT MISREPRESENTATION CLAIM IS NOT BARRED BY THE DISCLAIMER IN THE 2006 DEALER AGREEMENT ............................................. 11

       1.  The disclaimer is inapplicable since it was contained in a separate agreement. ......... 11

       2.  California law prohibits the use of disclaimers to insulate a party from negligent misrepresentations. ..................................................... 12

    E.  SECTION 17200 PROVIDES FOR BROAD RESTITUTION REMEDIES ................... 13

       1.  Section 17200 background. ......................................................... 13

       2.  Section 17200 provides for broad restitutionary remedies. ....................... 14

    F.  PESTANO IS ENTITLED TO RELIEF UNDER RULE 56(F) ............................. 15

    G.  PESTANO SHOULD BE GRANTED LEAVE TO AMEND ............................... 16

V.   CONCLUSION ......................................................................................... 16

1

# TABLE OF AUTHORITIES

CASES

ABC Internat. Traders v. Matsushita Elec. Corp., 14 Cal. 4th 1247 (Cal. 1997) ........................... 14

Allen v. Beverly Hills, 911 F.2d 367 (9th Cir. 1990) ................................................................. 16

Applied Elastomerics, Inc. v. Z-Man Fishing Prods.,

521 F. Supp. 2d 1031, 1038 (N.D. Cal. 2007) .................................................................... 8, 9

Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co., 20 Cal. 4th 163 (1999) ........... 14

Conley v. Gibson, 355 U.S. 41 (1957) .............................................................................. 5

Cont'l Airlines, Inc. v. Mundo Travel Corp., 412 F. Supp. 2d 1059 (E.D. Cal. 2006) ..................... 5

Cortez v. Purolator Air Filtration Products Co., 23 Cal.4th 163 (2000) ........................................ 14

De La Cruz v. Tormey, 582 F.2d 45 (9th Cir. 1978) ................................................................. 5

Freeman & Mills v. Belcher Oil Co., 11 Cal. 4th 85 (Cal. 1995) ............................................ 10

Harris v. Rudin, Richman & Appel, 95 Cal. App. 4th 1332 (2002) ........................................... 10

Hutton v. Elf Atochem North America, Inc., 273 F.3d 884 (9th Cir. 2001) ..................................... 5

International Bhd. of Elec. Workers v. Southern Cal. Edison Co.,

880 F.2d 104 (9th Cir. 1989) ............................................................................................ 8

McClain v. Octagon Plaza, LLC, 2008 Cal. App. LEXIS 157 (Cal. Ct. App. 2008) ............... 12, 13

N. Star Int'l v. Arizona Corp. Comm'n, 720 F.2d 578 (9th Cir. 1983) .......................................... 5

Nagrampa v. MailCoups, Inc., 469 F.3d 1257 (9th Cir. 2006) ................................................... 6

OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.,

157 Cal. App. 4th 835 (Cal. Ct. App. 2007) ..................................................................... 11

Ridgely v. Topa Thrift and Loan Assoc., 17 Cal. 4th 970 (1998) ............................................... 8

San Pedro Hotel Co., Inc. v. City of Los Angeles, 159 F.3d 470 (9th Cir. 1998) ............................. 5

Shersher v. Superior Court, 154 Cal. App. 4th 1491 (Cal. Ct. App. 2007) ................................... 14

State Farm Fire & Casualty Co. v. Superior Court, 45 Cal.App.4th 1093 (1996) ........................... 14

Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134 (2003) ............................................... 14

Travelodge Hotels v. Kim Shin Hospitality, 27 F. Supp. 2d 1377 (S.D. Fla. 1998) ..................... 9

United States v. Ritchie, 342 F.3d 903 (9th Cir. 2003) ...................................................... 5, 15

1  <u>Warner Bros. Pictures, Inc. v. Bumgarner</u>, 197 Cal. App. 2d 331 (1961) ....................................... 10

2  <u>S</u>TATUTES

3  Cal. Civ. Code § 1671…………………………………………..………………………………8, 9

4  Cal. Civ. Code § 1668…………………………………………………………………..12, 13

5  Cal. Bus. & Prof. Code § 17200………………………………………………13, 14, 15

6  <u>R</u>ULES

7  Fed. R. Civ. P. 12(b)(6)........................................................................................... 5

8  Fed. R. Civ. P. 56(f)…………………………………………………………15, 16

9  Fed. R. Civ. P. 15…………………………………………………………………...16

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. C07-05463 WHA – CAROLYN PESTANO'S OPP. TO AT&T'S MOT. TO DISMISS

# I.    INTRODUCTION

Plaintiff AT&T Mobility II, LLC ("**AT&T**") moves to dismiss various counterclaims brought by Carolyn Pestano ("**Pestano**").  AT&T's Motion (Dkt. # 35) should be denied.  While AT&T's Motion is styled as a motion to dismiss it is actually a motion for summary judgment.  At a minimum, given that this case is at the initial pleading stage, Pestano should be given an opportunity to conduct discovery in order to rebut AT&T's assertions.  Pestano's contractual and negligent misrepresentation claims require resolution of factual issues that render their disposition inappropriate at this time.  With respect to Pestano's 17200 claim, AT&T's position is not supported by California law.  Section 17200 authorizes the Court to fashion a broad range of equitable remedies to the extent it finds that AT&T's dealings with Viva Wireless, Inc. were unfair or oppressive.

# II.    PROCEDURAL BACKGROUND

AT&T initiated the underlying lawsuit by filing a complaint for breach of the personal guaranty in Superior Court (in Alameda County).  (See Dkt. # 1, Ex. A.)  Pestano removed the dispute to this Court, answered, asserted various defenses, and filed underlying counterclaims (the "**Counterclaims**").  AT&T has not yet filed an Answer to the Counterclaims.  AT&T filed a Motion to Compel Arbitration (Dkt. # 33) and a Motion to Dismiss (Dkt. # 35).  This opposition addresses AT&T's Motion to Dismiss.  Pestano responds to AT&T's Motion to Compel Arbitration in a separate filing.  (Dkt. # 37.)

# III.    FACTUAL BACKGROUND

## A.    BACKGROUND: VIVA WIRELESS, INC. AND PESTANO

Pestano is the former CEO of Viva Wireless, Inc., a company which was an authorized exclusive dealer of AT&T wireless products and services. Viva is a closely held company with many of Pestano's family members as shareholders and employees. (Declaration of Carolyn Pestano (Dkt. # 39) ("**Pestano Decl.**"), ¶ 1.)  Viva sold AT&T products and services through kiosks located in shopping malls in Northern California. During the underlying relationship Viva was consistently one of the top performing AT&T dealers, and won numerous accolades.  (Pestano Decl., ¶ 3.)

Case No. C07-05463 WHA – CAROLYN PESTANO'S OPP. TO AT&T'S MOT. TO DISMISS

1    The relationship between Viva and AT&T began in 2001, when Viva entered into an

2    "Exclusive Dealer Agreement" (the "*2001 Dealer Agreement*") with AT&T Wireless

3    Services, Inc.  (Pestano Decl., ¶ 4.)  The 2001 Dealer Agreement contained numerous

4    restrictions on Viva's marketing practices, including an exclusivity provision.  The

5    agreement contained a license with respect to AT&T's trademarks and servicemarks.  The

6    agreement required Viva to purchase equipment (phones) from AT&T and sell such

7    equipment "at prices established by [AT&T] from time to time."  (Pestano Decl., ¶ 5.)  Viva

8    was required to pay AT&T monies beyond the ordinary costs of business which AT&T

9    passed on to Viva, such as markups on products, services, and inventory.  (Pestano Decl., ¶

10   6.)  While not called a franchise, the relationship was in all material respects, a franchise.  In

11   December 2005, the Company entered into a "Cingular Wireless Exclusive Dealer

12   Agreement" (the "*2006 Dealer Agreement*") with Cingular Wireless II, LLC ("*Cingular*"),[1]

13   which was the operative agreement during the bulk of the events which gave rise to Pestano's

14   Counterclaims.  (Pestano Decl., ¶ 7.)

**B.    THE SMF RELEASE**

16   Commission payments, based on the numbers of subscribers who initiated

17   subscriptions for AT&T services, were a significant source of the compensation paid to Viva

18   as an AT&T dealer.  (Pestano Decl., ¶ 8.)  In February 2006, Viva and Cingular discussed the

19   restructuring of various such payments owed to Viva by Cingular.  Cingular wished to

20   simplify and streamline its compensation structure, likely due to its various corporate

21   restructurings.  (Pestano Decl., ¶ 9.)  Accordingly, Viva and Cingular entered into an

22   agreement (the "*SMF Release*") pursuant to which Cingular agreed to pay Viva a total

23   amount of $735,883.44, consisting of a one-time payment of $192,152.64 and "the sum of

24   $22,655.45 each month for 24 months."  Cingular drafted this agreement (the SMF Release),

25   and did not provide Viva any opportunity to negotiate any of its terms.  (Pestano Decl., ¶ 10.)

26

27   _____

[1]  The precise relationship between Cingular Wireless II, LLC, AT&T Wireless Services,
28   Inc., and AT&T Mobility II, LLC (the Plaintiff) is unknown to Pestano at this time.  Pestano
refers to the entities interchangeably, as "AT&T" or "Cingular".

2

1  Viva understood the foregoing amount to be unconditionally owed, although it would be paid
2  over time.  (Pestano Decl., ¶ 11.)  The amounts which Viva purportedly forfeited in exchange
3  for the amounts AT&T agreed to pay Viva under the SMF Release were vested (i.e., these
4  were amounts due to Viva as compensation under the 2001 Dealer Agreement, and not
5  subject to any sort of "chargeback").  However, the amounts due under the SMF Release
6  represented a material reduction of amounts which Viva would have been paid as
7  compensation under the 2001 Dealer Agreement.  (Pestano Decl., ¶ 12.)  Prior to entry into
8  the SMF Release, Viva and Cingular did not discuss any approximation of damages which
9  AT&T may suffer upon termination of the "Dealer Agreement," and how this would be tied
10 to the amounts outstanding under the SMF Release at the time of such termination.  (Pestano
11 Decl., ¶ 13.)  The parties did not discuss termination of the monthly payments under the SMF
12 Release at all.  (Pestano Decl., ¶ 14.)

13 **C.    THE ADVANCE PAYMENT AGREEMENT**

14        On or around this time, Cingular also changed its inventory terms from 60 days to 30
15 days (i.e., AT&T required Viva to pay for inventory within 30 days as opposed to 60).
16 (Pestano Decl., ¶ 17.)  The restructuring of the residual income (pursuant to the SMF
17 Release) and change in inventory terms materially affected Viva's cashflow, and caused Viva
18 to experience a cash crunch.  (Pestano Decl., ¶ 18.)  Later that year, Cingular and Viva
19 discussed the possibility of Viva receiving an advance of the funds owed under the SMF
20 Release in order to facilitate Viva's expansion of its operations.  (Pestano Decl., ¶ 19.)
21 Cingular and Viva discussed the possibility of Viva opening four additional kiosks, and
22 refurbishing two existing kiosks.  Viva required Cingular's permission to open any additional
23 kiosks and undertake such material expansions.  (*See* Advance Payment Agreement.)  Viva
24 expressed its concerns that there was a high degree of dealer concentration in the Northern
25 California market.  Viva also expressed its concerns that another dealer who was servicing
26 the Northern California market engaged in lax customer service practices, and that the
27 business and customer service practices of the other Northern California dealer were having a
28 negative impact on Viva's operations.  (Pestano Decl., ¶ 20.)  Cingular provided assurances

to Viva that the market could support additional stores and that Cingular would take affirmative steps to address the practices of the other dealer which concerned Viva.  Based on these assurances, and based on numerous conversations with Cingular account managers, Viva signed the "Advanced Payment Agreement," pursuant to which Cingular "advanced" Viva $250,000.00.  This agreement expressly provided that Cingular would be "reimbursed . . . from future monthly payments due to [Company] under the . . . SMF Release."  (Pestano Decl., ¶ 21.)

The Advance Payment Agreement (the APA) did not contain any prohibition on offsetting amounts owed by Viva to Cingular under the APA against funds otherwise owed to Viva by Cingular.  (Pestano Decl., ¶ 22.)  Indeed, the agreement expressly envisioned that Cingular would merely net the amounts due to Viva against the amounts advanced to Viva.  (Pestano Decl., ¶ 23.)  Cingular requested, and Pestano agreed to sign, a document titled "Dealer Principal Personal Guaranty."  This document required Pestano to guarantee "performance of any and all of [Viva's] obligations under the [Advance Payment Agreement]."  (Miguel Decl. (Dkt. #34), Ex. D.)

**D.    CINGULAR'S FAILURE TO ADDRESS ISSUES IN THE MARKET; VIVA WINDS DOWN**

Following the advance of funds to Viva by Cingular, Viva set about expanding into the four new retail locations discussed by the parties.  (See Counterclaims, ¶ 21.)  Viva substantially fulfilled its non-monetary obligations under the Advanced Payment Agreement.  In this process, Viva paid significant sums to Cingular, including to purchase inventory and to purchase other items (equipment mandated by Cingular for any dealer kiosk) necessary to effect the build out.  (Counterclaims, ¶ 22.)  Ultimately, Cingular did not adequately address the overall market issues the parties discussed prior to entry into the APA.  (Counterclaims, ¶ 23.)  Cingular did not adequately enforce its policies – which it committed to enforce – vis a vis the other Northern California Cingular dealer, whose lax customer service practices continued to negatively impact the market and Viva.  (Id.)

Customers continued to associate Viva with the other Northern California dealer who had less than acceptable customer service levels.  (Counterclaims, ¶ 24.)  Customers

1  repeatedly made complaints about this dealer to Viva.  Cingular failed to respond adequately

2  to these complaints.  Meanwhile, AT&T offered AT&T products for sale through its

3  company-owned store at prices Viva could not match.  The change in inventory pricing

4  coupled with changes in compensation to Viva exacerbated cashflow problems.  Eventually,

5  Viva was forced to suspend operations.  (Counterclaims, ¶ 14.)

6  ### IV.    DISCUSSION

7  **A.    APPLICABLE LEGAL STANDARD**

8      1.   Summary judgment standards.

9      Dismissal under Rule 12(b)(6) is proper if "it appears beyond doubt that the plaintiff can

10 prove no set of facts in support of his claim which would entitle him to relief." Conley v.

11 Gibson, 355 U.S. 41, 45-46 (1957). The Court must determine whether or not it appears to a

12 certainty under existing law that no relief can be granted under any set of facts that might be

13 proved in support of a plaintiff's claims. De La Cruz v. Tormey, 582 F.2d 45, 48 (9th Cir.

14 1978).  In testing the sufficiency of a complaint against a Rule 12(b)(6) challenge, a court must

15 "accept all material allegations in the complaint as true and construe them in the light most

16 favorable to the plaintiff." N. Star Int'l v. Arizona Corp. Comm'n, 720 F.2d 578, 580 (9th Cir.

17 1983).  Where the court considers matters outside the pleadings "a motion to dismiss is . . .

18 treated as one for summary judgment." San Pedro Hotel Co., Inc. v. City of Los Angeles, 159

19 F.3d 470, 477 (9th Cir. 1998).  In considering a motion for summary judgment, the evidence

20 must be viewed in the light most favorable to the moving party in order to determine "whether

21 any genuine issues of material fact exist." Hutton v. Elf Atochem North America, Inc., 273

22 F.3d 884, 891 (9th Cir. 2001).  In particular, where a court considers contractual documents

23 beyond the face of the complaint in the context of a motion for summary adjudication, the court

24 should "resolve any contractual ambiguities in [the non-moving party's] favor." Cont'l

25 Airlines, Inc. v. Mundo Travel Corp., 412 F. Supp. 2d 1059, 1065-1066 (E.D. Cal. 2006).

26 Finally, a party opposing a request for summary judgment may request a continuance of the

27 motion in order to conduct discovery necessary to oppose the request.  United States v. Ritchie,

28 342 F.3d 903, 907 (9th Cir. 2003).

2.  AT&T's Motion assumes that California law applies.

Pestano and AT&T were parties to four different agreements which had four different choice of law clauses.  (*See* Declaration of Marc Miguel (Dkt. # 34) 2001 Dealer Agreement (Ex. A) (New York law); 2006 Dealer Agreement (Ex. B) (Georgia law); SMF Release (Ex. C) (New York law); and APA (Ex. D) (California law).)  AT&T's briefing cites extensively to California law (it does not cite to any other state law), assuming that California law applies with respect to Pestano's Counterclaims.  Pestano thus responds to AT&T's arguments based on California law.  *See* Nagrampa v. MailCoups, Inc., 469 F.3d 1257, 1267 (9th Cir. 2006) (analyzing claims under California law since "parties . . . proceeded . . . on the assumption that the . . . agreement is governed by California law").

**B.  AT&T IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE BASIS THAT IT PROPERLY TERMINATED MONTHLY PAYMENTS UNDER THE SMF RELEASE**

Pestano alleges that AT&T has failed to pay out approximately $249,209.55 under the SMF Release.  AT&T does not dispute that it ceased making monthly payments under the SMF Release, but argues that the terms of the SMF Release leave no dispute that AT&T had the right to cease payments to Viva upon termination.  Therefore, it argues, summary judgment is appropriate.  (AT&T's Motion, pp. 4-5.)  However, summary judgment is inappropriate on this claim because there are disputes of material fact as to:  (1) the intent of the parties regarding the SMF Release and whether it allows for termination of payments; (2) whether interpreting Section 1 the SMF Release to allow AT&T to terminate monthly payments would render Section 1 an unenforceable contract penalty; and (3) whether AT&T is precluded from relying on Section 1 due to factual disputes as to whether AT&T's conduct forced Viva out of business.

1.  Factual disputes preclude summary judgment in favor of AT&T on the basis that the terms of the SMF Release allow for termination of monthly payments.

AT&T argues that the SMF release expressly provides that the $22,655.45 monthly payments are only payable "for as long as the Dealer Agreement is in effect. . . ," and that Viva would be ineligible to receive these monthly payments "upon termination or expiration of its Dealer Agreement under any circumstances."  (AT&T's Motion, p. 4.)  AT&T further reasons

6

1   that because "Viva admits that it terminated the Dealer Agreement," there is no factual dispute

2   that Viva has no further right to these monthly payments.  AT&T's arguments gloss over the

3   text of the agreement.

4          The SMF Release does provide that the monthly payments would continue to the extent

5   the "Dealer Agreement" remains in effect.  However, the SMF Release uses "Dealer

6   Agreement" as a defined term to refer to the "Exclusive Dealer Agreement for the Northern

7   California market *dated September 1, 2001*."  (SMF Release, Section 1 (emphasis added).)

8   This is obviously not the same agreement which AT&T alleges Viva terminated – *i.e.*, the

9   Dealer Agreement between different parties and containing substantively different terms which

10  the parties entered into in 2005 (and effective January 1, 2006).  The SMF Release does not

11  contain any reference to the 2006 Dealer Agreement at all.  Taking the SMF Release on its face,

12  the "Dealer Agreement" referenced by the SMF Release was already terminated at the time the

13  parties executed the SMF Release.  Thus, this provision of the SMF Release constitutes an

14  illusory promise on AT&T's part, or a provision with respect to which the parties were

15  mutually mistaken.  AT&T's interpretation of the SMF Release to allow for termination of

16  payments upon termination of the 2006 Dealer Agreement is problematic for another, separate

17  reason.  The 2006 Dealer Agreement is freely terminable by either side for any reason.  (*See*

18  2006 Dealer Agreement, section 10.4.)  The SMF Release unequivocally states that Viva would

19  be entitled to the $22,655.45 payment "each month for 24 months."  Given the nature of the

20  agreement (i.e., Viva was compromising its claims for vested compensation in exchange for

21  payment of a fixed sum) – it is not reasonable to conclude that Viva would enter into an

22  agreement which allowed the monthly payments to be terminated, particularly at the whim of

23  AT&T.  A final ambiguity in the SMF Release is whether Viva may use the amounts it was

24  owed under the SMF Release to offset amounts it owed to AT&T (i.e., under the APA).  The

25  SMF Release is silent on this point and does not preclude the use of amounts payable to Viva

26  under the SMF Release to offset amounts otherwise owed to AT&T.  These numerous

27  ambiguities preclude summary judgment in favor of AT&T on the basis that the unambiguous

28  text of the SMF Release allows for termination of the monthly payments.  Pestano is entitled to

1  conduct discovery on and present evidence regarding the intent of the parties, the surrounding

2  circumstances, the course of conduct of the parties, and to oppose AT&T's arguments based on

3  such evidence. International Bhd. of Elec. Workers v. Southern Cal. Edison Co., 880 F.2d 104,

4  107 (9th Cir. 1989) (ambiguity in agreement precludes grant of summary judgment).

5         2.   AT&T's interpretation of the SMF Release is precluded by Cal. Civ. Code § 1671.

6         Even assuming AT&T's interpretation of the SMF Release is correct, interpreting the

7  SMF Release in the manner urged by AT&T renders it an unenforceable contractual penalty.

8         California law prohibits enforcement of contractual penalties. Ridgely v. Topa Thrift

9  and Loan Assoc., 17 Cal. 4th 970, 977 (1998). Liquidated damages clauses, however, are

10  enforceable, as long as they are reasonable. Cal. Civ. § 1671(b) ("a provision in a contract

11  liquidating the damages for the breach of the contract is valid unless the party seeking to

12  invalidate the provision establishes that the provision was unreasonable under the

13  circumstances existing at the time the contract was made"). Whether a damages clause

14  constitutes an unenforceable penalty or a liquidated damages provision is evaluated by the court

15  – regardless of the label used by the parties. Applied Elastomerics, Inc. v. Z-Man Fishing

16  Prods., 521 F. Supp. 2d 1031, 1038 (N.D. Cal. 2007). The key issue is whether the clause

17  "represent[s] the result of a reasonable endeavor by the parties to estimate a fair compensation

18  for any loss that may be sustained." In Applied Elastomerics, the court (applying California

19  law) invalidated a treble damages provision for royalty underpayment in a patent licensing

20  agreement. The court rejected plaintiff's argument that the patent infringement rules provided

21  an apt analogy. The court found the treble damages clause bore "no reasonable relationship to

22  the range of actual damages that the parties could have anticipated would flow from a royalty

23  underpayment . . ." Accordingly, the court granted defendant's motion for summary judgment

24  and found the clause unenforceable. Applied Elastomerics, Inc. v. Z-Man Fishing Prods., 521

25  F. Supp. 2d at 1038.

26         As in Applied Elastomerics, interpreting Section 1 of the SMF Release to allow AT&T

27  to cease paying the monthly payments (which approximately equaled $249,209.55 at the time

28  of termination) would turn Section 1 into an unenforceable penalty. The sum which Viva

8

would have to forfeit upon termination bears no relationship to any actual damages suffered by AT&T upon termination of the Dealer Agreement.  The payments under the SMF Release were not payments with respect to which AT&T had any chargeback rights.  (*See* Pestano Decl., ¶ 12.)  Unlike the typical context where the carrier may wish to chargeback some compensation paid to the dealer where the subscriber terminates the service, the SMF Release represented a settlement of claims pursuant to which AT&T agreed to pay Viva a fixed sum to which Viva was entitled.  (Id.)  There is no justification – with reference to damage to AT&T –  as to why the payments should terminate upon termination of the relationship.  The parties had no discussions in this regard.  (*See* Pestano Decl., ¶ 13.)  Indeed, the SMF Release purports to allow AT&T to terminate the monthly payments regardless of the circumstances of the termination of the "Dealer Agreement" (and whether the Dealer Agreement is terminated by AT&T or Viva).  To the extent AT&T is damaged by termination, AT&T's actual damages would vary depending on the circumstances of the termination.  The SMF Release fails to account for this at all. [2]  Thus, the amount of monthly payments outstanding at the time of termination of the "Dealer Agreement" cannot conceivably "[bear a] reasonable relationship to the range of actual damages that the parties could have anticipated would flow from [termination of the Dealer Agreement] . . ."  At the very least, there are factual issues in dispute regarding the enforceability of Section 1 of the SMF Release to terminate payments.

> 3.  <u>AT&T cannot rely on termination of the Dealer Agreement to the extent its unfair and oppressive conduct forced Viva out of business.</u>

Finally, even assuming the correctness of AT&T's interpretation and that such interpretation passes scrutiny under section 1671(b), AT&T cannot rely on this provision to justify termination of the SMF Release monthly payments to the extent AT&T caused Viva to

---

[2]  <u>Applied Elastomerics</u> can be distinguished from <u>Travelodge Hotels v. Kim Shin Hospitality</u>, 27 F. Supp. 2d 1377, 1383 (S.D. Fla. 1998), a case upholding a liquidated damages clause under Florida and California law.  There, unlike in this case, the liquidated damages clause took effect only upon a termination "for cause".  Id.  Here, the SMF Release is silent on this point, and in any event, there are numerous factual disputes surrounding the termination of the 2006 Dealer Agreement.

1  wind down.  A fundamental rule of contracts is that "neither party [may] do anything to deprive

2  the other of the benefits of the agreement."  <u>Freeman & Mills v. Belcher Oil Co.</u>, 11 Cal. 4th

3  85, 91 (Cal. 1995).  Viva alleges that AT&T acted in bad faith, and engaged in conduct which

4  forced Viva out of business.  To the extent AT&T is ultimately found to have acted in bad faith,

5  or is found otherwise responsible for actions which caused Viva to wind down, AT&T cannot

6  rely on termination of the 2006 Dealer Agreement in terminating the monthly payments,

7  regardless of whether Section 1 of the SMF Release is enforceable. *See* <u>Freeman & Mills v.</u>

8  <u>Belcher Oil Co.</u>, 11 Cal. 4th 85, 91 (Cal. 1995).  Numerous factual disputes as to whether

9  AT&T's actions were the cause of Viva being forced out of business preclude the grant of

10  summary judgment in AT&T's favor on the SMF Release claim.

**C.   VIVA'S CLAIMS UNDER THE 2001 DEALER AGREEMENT SURVIVE TO THE EXTENT**
11
**THE SMF RELEASE IS UNENFORCEABLE OR AT&T MATERIALLY BREACHED**
12
13         AT&T argues it is entitled to summary judgment on Pestano's claims under the 2001

14  Dealer Agreement because Pestano waived all such claims upon entering into the SMF Release.

15  Pestano pleads her claims under the 2001 Dealer Agreement in the alternative – i.e., in the

16  event she alleges facts sufficient to unwind the SMF Release.  This may occur in one of two

17  scenarios, neither of which are factually undisputed at this time.  First, Pestano's claims under

18  the 2001 Dealer Agreement may be revived to the extent AT&T is found to have materially

19  breached the SMF Release in a manner that frustrates the basic purpose of the agreement. *See*,

20  *e.g.*, <u>Warner Bros. Pictures, Inc. v. Bumgarner</u>, 197 Cal. App. 2d 331, 350, 17 Cal. Rptr. 171

21  (1961) (willful failure to pay weekly salary payments sufficient to justify rescission).  Second,

22  the SMF Release may be unwound to the extent Pestano proves sufficient facts to show that

23  there was a mistake about whether the SMF Release allows for termination of the monthly

24  payments.  <u>Harris v. Rudin, Richman & Appel</u>, 95 Cal. App. 4th 1332, 1339, 116 Cal. Rptr. 2d

25  552 (2002) (reversing summary judgment because defendants raised issues of fact as to whether

26  rescission was appropriate based on mistake of fact or law).  Additional discovery is

27  appropriate as to whether the claims under the 2001 Dealer Agreement may be revived in either

28  one of these scenarios, and therefore, summary judgment is inappropriate as to claims under the

Case No. C07-05463 WHA – CAROLYN PESTANO'S OPP. TO AT&T'S MOT. TO DISMISS

2001 Dealer Agreement.

**D.    PESTANO'S NEGLIGENT MISREPRESENTATION CLAIM IS NOT BARRED BY THE DISCLAIMER IN THE 2006 DEALER AGREEMENT**

AT&T argues that Pestano's claim for negligent misrepresentation must be dismissed because a disclaimer in the 2006 Dealer Agreement precludes "Viva from relying upon any statements made by AT&T Mobility in connection with the choice of a retail location or decision to build-out or renovate a retail location." (AT&T's Motion, pp 7-8.) This argument is contrary to California law on disclaimers. The legal effect of a disclaimer contained in the 2006 Dealer Agreement presents a classic factual issue. Pestano's misrepresentation claims do not arise out of the 2006 Dealer Agreement – they arise out of the APA which AT&T argues was a separate (and discrete) transaction from the 2006 Dealer Agreement.

1.    The disclaimer is inapplicable since it was contained in a separate agreement.

Reasonable reliance in the context of a misrepresentation claim presents a classic question of fact. OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp., 157 Cal. App. 4th 835, 864 (Cal. Ct. App. 2007) ("Except in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact."). A plaintiff (even one who alleges negligent misrepresentation) will not be denied recovery based on his or her own negligence "unless his conduct, in the light of his own information and intelligence, is preposterous and irrational." Id. In CIBC, the California Court of Appeal rejected defendants' argument that a disclaimer in an offering circular rendered the reliance of the investors per se unreasonable. CIBC, 157 Cal. App. 4th at 864. Investors brought claims, including misrepresentation claims with respect to offerings made in the context of expansion of a cosmetics company. Defendants argued that any reliance on statements regarding the health of the company was per se unreasonable, in light of disclaimers contained in offering circulars (which provided that "[i]n making an investment decision, prospective investors must rely on their own examination of the company and the terms of the offering … ."). Id. The court rejected defendants' arguments regarding reliance, noting that reliance is a question of fact, and that the disclaimer in question did not

1   speak to the misrepresentation alleged, and conflicted with other language in the offering

2   memorandum. Id.

3        The disclaimer in the 2006 Dealer Agreement does not preclude justifiable reliance in

4   this case because the disclaimer AT&T points to is contained in a separate agreement which

5   was executed in the context of a separate transaction.  AT&T has argued that the APA is a non-

6   typical dealer transaction which AT&T engaged in specially with Viva.  (*See* Hennessey Decl.

7   (Dkt. 19), ¶ 5 ("AT&T Mobility does not generally enter into APA's with its dealers . . .

8   entering into the APA was a very unusual exception made [for Viva].").)  Additionally, the

9   disclaimer itself conflicts with the APA.  The disclaimer states that the dealer is "responsible

10  for independently deciding on the location of each [location] and [AT&T] is not responsible for

11  Dealer's decision to open any location."  But the APA states that the new locations opened by

12  Viva pursuant to the APA are "retail locations approved by Cingular pursuant to the terms of

13  the Dealer Agreement."  Regardless of what the disclaimer recites, Pestano alleges that AT&T

14  played a significant role in determining the locations and withheld and misrepresented

15  information which would have altered the decisionmaking calculus.  In these circumstances, the

16  disclaimer does not render Pestano's reliance unreasonable as a matter of law.

17        2.   California law prohibits the use of disclaimers to insulate a party from negligent

18             misrepresentations.

19        In addition, California has a strong policy disfavoring any contractual attempts of one

20  party to insulate itself "from responsibility for his own fraud, or willful injury to the person or

21  property of another, or violation of law, whether willful *or negligent* . . . ."  Cal. Civ. Code §

22  1668 (emphasis added).  A recent California Court of Appeals decision illustrates the expansive

23  nature of this prohibition.  McClain v. Octagon Plaza, LLC, 2008 Cal. App. LEXIS 157 (Cal.

24  Ct. App. 2008).  McClain involved two parties to a commercial lease agreement.  Plaintiff

25  alleged that the landlord concealed the true size of the space which resulted in the imposition of

26  additional common area maintenance expenses.  The landlord pointed to two provisions of the

27  lease which it claimed effectively barred justifiable reliance by the tenant:  (1) a provision that

28  the tenant had adequate opportunity to inspect the premises and (2) a provision that any

1    statements of size were only estimates.  The court held that neither of these provisions were

2    sufficient to preclude reliance on the part of the tenant, noting that "California courts have

3    concluded that a variety of contract terms neither bar fraud claims nor establish as a matter of

4    law that reliance upon the defendant's misrepresentations was unjustifiable."  McClain v.

5    Octagon Plaza, LLC, 2008 Cal. App. LEXIS 157 (Cal. Ct. App. 2008).

6         McClain and the numerous cases cited by McClain are on point.  Pestano alleges that

7    AT&T failed to disclose material facts underlying Viva's and Pestano's decision to incur

8    $250,000 in expenses and to proceed with the expansion.  Principally, Pestano alleges that

9    AT&T failed to disclose and concealed facts (i) that would affect the viability of the locations

10   which Viva proposed to open pursuant to the expansion, and (ii) around the dealer market, and

11   actions that AT&T took and would take regarding other dealers in the market.  (See

12   Counterclaims, ¶ 54.)  AT&T does not contest whether these misrepresentations occurred.

13   Rather, AT&T alleges that Pestano's reliance on the representations were unreasonable as a

14   matter of law.  In the same manner that the disclaimer was insufficient to preclude justifiable

15   reliance in McClain, the disclaimers in the 2006 Dealer Agreement are insufficient to preclude

16   Pestano's justifiable reliance under Cal. Civ. Code § 1668.

17   **E.    SECTION 17200 PROVIDES FOR BROAD RESTITUTION REMEDIES**

18        AT&T argues that Pestano's 17200 claim must be dismissed because Section 17200

19   does not allow for the remedy Pestano seeks.  AT&T does not challenge whether the underlying

20   allegations constitute an unfair or unlawful practice under section 17200.  According to AT&T,

21   remedies under section 17200 are limited to injunctive relief and restitution.  AT&T is correct

22   that section 17200 only provides for restitution and injunctive relief.  However, AT&T's

23   position that Pestano cannot allege a restitutionary claim in these circumstances is contrary to

24   California cases construing section 17200.  Courts have repeatedly recognized that section

25   17200 was intended to provide for a broad array of equitable remedies.

26        1.   Section 17200 background.

27        Section 17200 covers a range of "unfair," "unlawful," or "fraudulent" business

28   practices.  See, generally, Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co., 20

1   Cal. 4th 163, 180 (1999); State Farm Fire & Casualty Co. v. Superior Court, 45 Cal.App.4th

2   1093, 1103 (1996) (holding that a breach of the duty of good faith and fair dealing will support

3   an injunction under § 17200).  While the conduct covered by section 17200 is broad, the

4   remedies authorized are narrow.  Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th

5   1134, 1136 (2003).  Section 17200 authorizes two remedies:  injunctive relief (to prevent future

6   violations) and restitution.  The court may issue one form of relief without the other.  ABC

7   Internat. Traders v. Matsushita Elec. Corp., 14 Cal. 4th 1247, 1252 (Cal. 1997) ("injunctive

8   relief is not a prerequisite to restitution under section 17203"); Cortez v. Purolator Air Filtration

9   Products Co., 23 Cal.4th 163, 170-71 (2000) (noting that ABC authorizes an order of restitution

10  regardless of whether an injunction to prohibit future violations issues).  AT&T does not

11  challenge whether the conduct alleged by Pestano falls within 17200.  Therefore, the critical

12  issue is whether Pestano can make out claim for restitution in these circumstances.

13      2.   Section 17200 provides for broad restitutionary remedies.

14      AT&T cites to language in Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th

15  1134 (2003), and argues that Pestano cannot allege a claim for restitution against AT&T under

16  any circumstances.  A recent decision from the California Court of Appeal illustrates why this

17  is incorrect.  Shersher v. Superior Court, 154 Cal. App. 4th 1491, 1501 (Cal. Ct. App. 2007).

18  Shersher involved claims brought by consumers against Microsoft who alleged that they had

19  been deceived by statements regarding the capacity of routers and other devices.  The

20  consumers had not purchased any products from Microsoft directly.  Microsoft argued that the

21  customers were not entitled to restitution under 17200 because "[a]ny award that plaintiff

22  would recover from defendants would not be restitutionary as it would not replace any money

23  or property that defendants took directly from plaintiff."  Shersher v. Superior Court, 154 Cal.

24  App. 4th 1491, 1501 (Cal. Ct. App. 2007).  The court rejected Microsoft's position, holding that

25  its "argument is contrary to the plain language of the UCL and the Supreme Court's mandate

26  that the UCL be interpreted broadly."  Ultimately, the court held that an action under 17200

27  could be used to seek the "return of money or property the *defendant acquired through*

28  *[defendant's] unfair practices*."  Shersher v. Superior Court, 154 Cal. App. 4th 1491, 1501

14

(Cal. Ct. App. 2007) (emphasis added).  In any event, California courts have rejected the proposition that an award of restitution is limited to disgorging *money (i.e., cash) actually obtained from the plaintiff*.  In <u>Korea Supply</u> (cited by AT&T) the court noted it had previously determined that "earned wages that are due and payable . . . are as much the property of the employee who has given his or her labor to the employer in exchange for that property as is property a person surrenders through an unfair business practice."  <u>Korea Supply Co. v. Lockheed Martin Corp.</u>, 29 Cal. 4th 1134, 1149 (Cal. 2003) (citing <u>Cortez v. Purolator Air Filtration Prods. Co.</u>, 23 Cal. 4th 163, 178 (Cal. 2000) ("The concept of restoration or restitution, as used in the UCL, is not limited only to the return of money or property that was once in the possession of that person.")).

These authorities make clear that there is some restitutionary component to the relief sought by Pestano.  Pestano alleges a wide range of unfair business practices and alleges that Viva generated revenues for AT&T and paid monies to AT&T in which Viva had a proprietary interest.  For example, Pestano alleges that AT&T had a bonus structure in place that could not be met by dealers.  Dealers, including Viva, sold AT&T's products (paying AT&T monies) in an effort to achieve AT&T-set bonuses.  These activities generated revenues and profits to AT&T (including amounts paid by Viva to AT&T).  17200's restitutionary remedies encompass these amounts.  Viva also alleges that AT&T is improperly withholding compensation due to Viva (in the form of subscriber revenues and activation fees) and amounts due under both dealer agreements.  These amounts are similarly subject to disgorgement under 17200 (and are analogous to the wages that were held to fall under section 17200 in <u>Cortez</u>).  Simply put, AT&T's has improperly acquired monies in which Viva had an interest, both directly from Viva and from customers.  Therefore section 17200 authorizes restitutionary remedies to the extent the Court finds in Viva's favor.

## F.   PESTANO IS ENTITLED TO RELIEF UNDER RULE 56(F)

A party opposing a request for summary judgment may argue that additional discovery may be required to oppose the request.  <u>United States v. Ritchie</u>, 342 F.3d 903, 907 (9th Cir. 2003).  Rule 56(f) expressly so provides, and allows for a continuance where the party seeking

1   relief identifies what additional discovery may be obtained and how this will allow the party to

2   oppose the request for summary judgment.  Rule 56(f).  Here, Pestano requests relief under

3   Rule 56(f).  Neither party has conducted any discovery in this action.  Pestano should be given

4   an opportunity to conduct such discovery in order to oppose AT&T's request for summary

5   judgment.  As set forth above, Pestano would conduct discovery as to: (1) the intent of the

6   parties and the circumstances surrounding the SMF Release (including Section 1) and the APA;

7   (2) facts surrounding the enforceability of SMF Release (due to breach or mistake) and Section

8   1 of the SMF Release; (3) facts known to AT&T which it did not disclose prior to entry into the

9   APA and representations made around the APA; (4) the nature and extent of AT&T's unfair

10  and oppressive conduct; and (5) steps AT&T took to address the issues in the dealer market.

11  **G.   PESTANO SHOULD BE GRANTED LEAVE TO AMEND**

12        Rule 15 provides that leave to amend "shall be freely given when justice so requires."

13  <u>Allen v. Beverly Hills</u>, 911 F.2d 367, 373 (9th Cir. 1990).  Pestano seeks leave to amend her

14  pleading to the extent the Court grants AT&T's Motion to Dismiss on any of the claims.  In

15  particular, Pestano seeks leave to replead her claim under section 17200 to allege a claim for

16  restitution.  Pestano can allege a set of facts which would entitle her to relief under 17200.

**V.      CONCLUSION**

17

18  AT&T's Motion should be denied.  Pestano's contractual and negligent misrepresentation

19  counterclaims require resolution of factual issues that render their disposition inappropriate at

20  this time.  With respect to Pestano's 17200 claim, AT&T's position is not supported by

21  California law.  Section 17200 authorizes the Court to fashion a broad range of remedies to the

22  extent it finds AT&T's conduct to be unfair or otherwise improper.  Pestano should be allowed

23  to conduct additional discovery to prove up her claims.

24        Respectfully submitted, and dated this 14th day of February, 2008.

25                          **BALASUBRAMANI LAW**

26  By: _____

27                          Venkat Balasubramani, (SBN 189192)
                            Attorneys for Defendant, Carolyn Pestano
28

16

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused to be filed a copy of the foregoing **Opposition to AT&T's Motion to Dismiss** via the court's CM/ECF system, which will provide a copy to counsel for Plaintiff:

> Ronald J. Kohut, Esq. (SBN 66463)
> Sarah K. Kohut, Esq. (SBN 197655)
> KOHUT & KOHUT LLP
> 3554 Round Barn Blvd., Suite 204
> Santa Rosa, California  95403
> Facsimile:   (707) 573-3101

I certify that the foregoing is true and correct.  Executed on February 14, 2008 at Seattle, Washington.

By: _____
    Venkat Balasubramani, (SBN 189192)
    For Defendant, Carolyn Pestano