IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

AT&T MOBILITY II, LLC, a Delaware
limited liability company,

    Plaintiff,

  v.

CAROLYN PESTANO, an individual,

    Defendant.
                              /

AND RELATED COUNTERCLAIMS.
                              /

No. C 07-05463 WHA

**ORDER (1) DENYING PLAINTIFF'S MOTION TO COMPEL ARBITRATION AND (2) GRANTING DEFENDANT'S REQUEST FOR RELIEF UNDER RULE 56(F)**

**INTRODUCTION**

In this dealer dispute, the company sued the dealer's shareholder on a guaranty. This provoked counterclaims. The company's instant motion now seeks to continue its action in federal court but to steer the counterclaims into arbitration via a motion to compel arbitration. This order holds that the arbitration clause in question is unconscionable and should not be enforced. All motions by the company are **DENIED.** The dealer's request for relief under Rule 56(f) is **GRANTED**.

**STATEMENT**

Plaintiff AT&T Mobility II, LLC (AT&T) is a Delaware company formerly known as AT&T Wireless Services, Inc. and Cingular Wireless II, LLC. Defendant Carolyn Pestano, a

Washington resident, was the CEO and sole shareholder of Viva Wireless, Inc. ("Viva"), a California corporation and authorized dealer that sold AT&T wireless products and services in kiosks in Northern Californian shopping malls.

AT&T and Viva's relationship dates back to 2001 when the companies entered into a dealer agreement.[1] This agreement included an explicit arbitration clause. In January of 2006 the companies superseded the 2001 agreement with a second dealer agreement, which also included an explicit arbitration clause: "all claims (including counterclaims and cross-claims and also including claims based on tort or other legal theories) and disputes between Dealer and Company must be resolved by submission to binding arbitration" (Miguel Decl. Exh. B). The 2006 dealer agreement included a 120-day notice provision, a 180-day limitations period, a confidentiality provision, a fee-splitting provision, and a provision that allowed AT&T, but not Viva, to assign its rights to a third party.

In February of 2006, the companies further amended the terms of their relationship through the "SMF Release," which altered the fees due to Viva for subscriber accounts activated prior to February 1, 2006. Pursuant to this release, Viva agreed to surrender rights to subscriber management fees in exchange for which AT&T agreed to pay Viva a lump sum payment of $193,152.64 and monthly payments of $22,655.45 for 24 months. The SMF Release stated that "[a]ny disputes related to this 2/1/06 SMF Release between the parties must be resolved under the dispute provisions of the Dealer Agreement" (Miguel Decl. Exh. C).

In October of 2006, AT&T agreed to advance Viva a lump sum of $250,000 pursuant to the Advance Payment Agreement ("APA") to help Viva expand its operations. The advance payment was to be repaid on a monthly basis as AT&T withheld payments due to Viva under the SMF Release. The APA did not include explicit language concerning arbitration but it referenced the earlier agreements between the parties as follows (Miguel Decl. Exh. D):

> The APA shall be construed and interpreted in conjunction with
> the Dealer Agreement and the 2/1/06 SMF Release. To the extent
> that this APA revises the terms of the Agreement or the 2/1/06
> SMF Release, it shall be treated as an amendment to those

---

[1] AT&T was known as AT&T Wireless Services, Inc. and Cingular Wireless II, LLC during some of the time periods discussed herein. For the sake of clarity, however, this order uses the name AT&T throughout.

2

respective documents. Similarly, to the extent that this APA adds
to the terms of the Dealer Agreement or the 2/1/06 SMF Release,
it shall be treated as a supplement to those respective documents.
If a conflict exists between the terms of the Dealer Agreement, the
2/1/06 SMF Release and this APA, the terms of this APA shall
control.

Along with the APA, Defendant Pestano executed a "Dealer Principal Personal Guaranty" in which she agreed to personally guarantee "payment and/or Viva's obligations under the Advance Payment Agreement" (Miguel Decl. Exh. D). The guaranty, which was included as Exhibit B of the APA, included the following language (*ibid.*):

> In the event GUARANTOR fails to make any payment due
> COMPANY when due, or to perform any other obligation
> guaranteed by GUARANTOR hereunder in a timely manner,
> GUARANTOR shall be deemed in default under this Guaranty,
> and COMPANY may, in addition to any other remedies available
> to COMPANY at law or in equity, immediately declare all
> amounts due and owing COMPANY by GUARANTOR to be
> immediately due and payable.

The parties dispute who terminated the business relationship. AT&T alleges that Viva informed AT&T that it was "ceasing business" on or about April 5, 2007 (Compl. ¶ 15). According to AT&T, $130,000 remained outstanding under the APA; Pestano disputes this assertion.

In September of 2007, AT&T filed suit against Pestano in Alameda County Superior Court, asserting claims under the guaranty. Pestano removed to federal court under 28 U.S.C. 1332 and filed a responsive pleading, which asserted the following affirmative defenses (Ans. 6):

1. AT&T's claims are barred by offset of amounts due to [Viva] under the SMF Release.

2. The Advance Payment Agreement (and the guaranty) is unenforceable by reason of mutual mistake.

3. AT&T is barred by reason of its unclean hands from enforcing the Advance Payment Agreement (and the guaranty).

4. AT&T is barred by reason of its own inequitable conduct from enforcing the Advance Payment Agreement (and the guaranty).

5. The personal guaranty and Advance Payment Agreement are unenforceable by reason of lack of consideration.

3

Pestano's responsive pleading also included the following counterclaims, which Pestano claims Viva assigned to her (Ans. 12–16):

    1.    Breach of contract arising from an alleged failure to pay amounts due under the SMF Release;

    2.    Breach of contract arising from an alleged failure to pay amounts owed under the 2001 dealer agreement;

    3.    Breach of contract arising from an alleged failure to return excess reserves and to account to Viva under the 2006 dealer agreement;

    4.    Breach of the duties of good faith and fair dealing, which were implied in the 2001 and 2006 dealer agreements;

    5.    Negligent misrepresentation concerning the APA and the guaranty;

    6.    Unfair competition under Section 17200 of the California Business and Professional Code.

AT&T subsequently filed this motion to compel arbitration of Pestano's counterclaims. According to AT&T, its motion to compel arbitration "does not purport to affect Pestano's affirmative defenses" (Reply Br. 15). AT&T also filed a motion to dismiss Pestano's first, second, fifth, and sixth counterclaims on the merits (numbered as above).

## ANALYSIS

**1.    LEGAL STANDARD.**

Plaintiff's motion to compel arbitration is governed by the Federal Arbitration Act ("FAA"). A district court's role under the FAA is limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue. *Lifescan, Inc. v. Premier Diabetic Services, Inc.,* 363 F.3d 1010, 1012 (9th Cir. 2004). If the district court determines that a valid arbitration agreement encompasses the dispute, then the FAA requires the court to enforce the arbitration agreement in accordance with its terms.

4

*Ibid.* "Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 720 (9th Cir. 1999).[2]

To determine whether a valid, enforceable arbitration agreement exists, a district court must look to state law. *Lowden v. T-Mobile USA, Inc.,* 512 F.3d 1213, 1217 (9th Cir. 2008) ("We apply state-law principles that govern the formation of contracts to determine whether a valid arbitration agreement exists."); *see also* Wright, Miller and Cooper, *Federal Practice & Procedure: Jurisdiction* § 3569 (3d ed. 2007). Here, both parties have briefed and argued the issues solely under California law. Accordingly, this order will take California law as controlling, just as the parties have done. *See Nagrampa v. MailCoups, Inc.,* 469 F.3d 1257, 1267 (9th Cir. 2006).

The 2001 and the 2006 dealer agreements both included arbitration clauses. Because the 2006 dealer agreement purported to supersede the 2001 dealer agreement, this order concludes that the 2006 arbitration clause controls. The parties dispute whether or not the SMF Release and the APA incorporated this arbitration clause. Because this order holds that the arbitration clause is unenforceable regardless, this order declines to reach the issue.

### 3. UNCONSCIONABILITY OF THE AT&T ARBITRATION AGREEMENT.

To be deemed unenforceable under California law, an arbitration agreement must be both *procedurally* and *substantively* unconscionable. *See Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 99 (2000); *see also* Ting v. AT&T, 319 F.3d 1126, 1148 (9th Cir. 2003) (applying California law). The California Supreme Court has explained that the inquiry into procedural validity focuses on "oppression or surprise due to unequal bargaining power" while the substantive inquiry focuses on "overly harsh or one-sided results." *Armendariz,* 24 Cal. 4th at 114. *See also Ting,* 319 F.3d at 1148. The validity of an agreement is judged on a "sliding scale:" "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Armendariz,* 24 Cal. 4th at 114.

---

[2] Internal quotations have been omitted unless otherwise stated.

5

No court decision has been found that reviews the particular AT&T arbitration agreement at issue here.

### A.     Procedural Validity.

Under California law, procedural unconscionability arises from "an inequality of bargaining power that results in no real negotiation and an absence of meaningful choice." *Flores v. Transamerica HomeFirst, Inc.*, 93 Cal. App. 4th 846, 853 (2001) (citing *A & M Produce Co. v. FMC Corp.*, 135 Cal. App. 3d 473, 486 (1982)).  An adhesion contract is generally considered to be procedurally unconscionable.  The Ninth Circuit, applying California law, has explained that "[a] contract is procedurally unconscionable if it is a contract of adhesion, *i.e.,* a standardized contract, drafted by the party of superior bargaining strength, that relegates to the subscribing party only the opportunity to adhere to the contract or reject it." *Ting*, 319 F.3d at 1148; *see also Flores v. Transamerica HomeFirst, Inc.*, 93 Cal. App. 4th 846, 853 (2001) ("A finding of a contract of adhesion is essentially a finding of procedural unconsciononability.").

Even though this case arises in the franchise rather than the consumer context, and it does not involve the "necessities of life," the Ninth Circuit has explained that "California courts have long recognized that franchise agreements have some characteristics of contracts of adhesion because of the vastly superior bargaining strength of the franchisor." *Nagrampa,* 469 F.3d at 1282; *see also Postal Instant Press, Inc. v. Sealy*, 43 Cal. App. 4th 1704, 1715–16 (1996) ("Although franchise agreements are commercial contracts they exhibit many of the attributes of consumer contracts.").

Viva argues that it had no choice but to enter into the 2006 agreement and that the agreement, therefore, was an adhesion contract.  By 2006, Viva had been an AT&T dealer for five years; the company stood to "lose its existing investment in the relationship" if it did not enter into the 2006 agreement (Opp. 11).  In her declaration, Pestano asserted that "I did not have an opportunity to negotiate the provisions of the 2006 dealer agreement, including in particular the dispute resolution provisions" (Pestano Decl. ¶ 7).  AT&T does not appear to contest Pestano's argument that the 2006 dealer agreement was an adhesion contract; rather, AT&T

6

argues that "[c]ontracts of adhesion are not *per se* procedurally unconscionable or even, 'oppressive'" (Reply Br. 6). AT&T argues that the arbitration clause is not oppressive because other options existed for Viva. It could have become a dealer for another wireless provider or, alternatively, Viva could have "remained a dealer under the [2001 agreement], as some dealers chose," according to AT&T (*ibid.*).

This order concludes that the arbitration agreement was procedurally unconscionable. AT&T's contention that Viva could have become a dealer for another wireless provider is unrealistic. So too is its contention that Viva could have elected to remain a dealer under the 2001 agreement. The termination provision of the 2001 agreement, which allowed either party to terminate without cause (Miguel Decl. Exh. A), suggests that Viva in fact had no "meaningful choice" but to enter into the 2006 agreement. Notably, AT&T does not assert that Viva had the option of negotiating the terms of the 2006 agreement. The unequal nature of the parties' bargaining positions is clear; the 2006 dealer agreement was a take-it-or-leave-it adhesion contract. The 2006 dealer agreement was "oppressive" and therefore procedurally unconscionable.

### B.    Substantive Validity.

To be substantively valid, an arbitration agreement must possess a "modicum of bilaterality." *Armendariz,* 24 Cal. 4th at 117. "[T]he determinative question is whether the contract terms are so harsh or one-sided that they lack basic fairness." *Abramson v. Juniper Networks, Inc.,* 115 Cal. App. 4th 638, 658 (2004). Pestano argues that five different provisions of the arbitration agreement within the 2006 dealer agreement are substantively unconscionable.

#### *(1)    The 120-Day Notice Provision and the 180-Day Limitation.*

The 2006 dealer agreement includes two one-sided provisions that operate as time limitations to claims by Viva. Under the "Notification and Limitation of Actions" provision of the 2006 dealer agreement, "the dealer must notify Company in writing of any controversy or claim it may have regarding this Agreement or its relationship with Company within 120 days of the date Dealer became aware or should have become aware of this grievance or dispute." Failure to notify is an "absolute bar to the institution of any proceedings that may have been

7

based upon this grievance or dispute*."* Significantly, this notice requirement applies only to Viva, not to AT&T (Miguel Decl. Exh. B).

In addition, under the "Limitation of Actions" provision, the parties must submit all claims and disputes for arbitration within "180 days after the aggrieved party became aware or should have become aware that the act or omission giving rise to the claim or dispute occurred (Miguel Decl. Exh. B). Failure to do so is an "absolute bar" to future proceedings. The provision makes an express exception, however, for "failure to pay invoices for equipment purchased by Dealer from Company." In other words, the 180-day limitations period applies to *all* of Viva's claims but to only *some* of AT&T's claims.

This order holds that the 180-day limitation and the 120-day notice requirement are both unconscionable. Even if these time bars applied equally to both parties, they would possibly be unconscionable. But the provisions here do *not* apply equally. Longer limitation periods than these have been held to be unconscionable in the employment context. *Ingle v. Circuit City Stores, Inc.,* 328 F.3d 1165, 1175 (9th Cir. 2003) (applying California law and holding that a one-year statute of limitations for an employee's claims was unconscionable "because the benefit of this provision flows only to" the employer); *see also Davis v. O'Melveny & Myers,* 485 F.3d 1066, 1077 (9th Cir. 2007) (applying California law and holding that a one-year notice requirement functioned as a statute of limitations and was unconscionable). These limitation provisions are one-sided and their benefits flow disproportionately to AT&T. This order therefore finds these provisions to be unconscionable.

AT&T argues that the validity of the notice provision is an issue for the arbitrator to decide, not the court, because the provision is not contained within the arbitration subsection of the 2006 agreement. It is true that the notice provision is located one paragraph above the arbitration subsection of the contract (both the notice provision and the arbitration subsection fall within the section titled "Disputes"). But because the notice provision profoundly affects the terms in the arbitration subsection — it can operate as a complete bar to arbitration — this order concludes that the notice provision is an inherent part of the arbitration agreement and therefore

8

1  properly within this Court's review.  A contrary conclusion would allow parties to avoid judicial
2  scrutiny merely through clever placement of objectionable arbitration terms.

3  AT&T also argues that case law from the employment context is inapposite here.  We
4  recognize that a dealer is not an employee.  But this dealer is a relatively small business that sold
5  products and services through kiosks.  The relationship between it and AT&T shares a number of
6  the characteristics of an employer/employee relationship.  As such, case law from the
7  employment context informs our analysis, as it has that of other courts in similar cases.
8  *See Nagrampa*, 469 F.3d at 1282–1292.

### (2) Fee-Splitting Provision.

The 2006 dealer agreement requires the parties to "split equally" any arbitrator's fees "unless the arbitrator rules otherwise . . . or this allocation is prohibited as a matter of law." In addition, if one party fails to pay its share of fees, the other party can opt to "forego the use of the arbitration process and bring its claim to a court having jurisdiction" (Miguel Decl. Exh. B).

A fee-splitting provision is "not per se substantively unconscionable." *Nagrampa,* 469 F.3d at 1285 (applying California law).  But a fee-splitting provision may be unenforceable as contrary to public policy if it "impedes the vindication" of unwaivable *statutory* rights.  *Ibid.* In *Armendariz v. Foundation Health Psychcare Services, Inc.*, the California Supreme Court held that for an agreement to arbitrate statutory rights to be enforceable, the agreement must meet "certain minimum requirements," including limitations on the costs of arbitration.  24 Cal. 4th at 91.  Of particular concern are those statutory rights that further a public purpose.  Indeed, California Civil Code Section 3513 states that "a law established for a public reason cannot be contravened by a private agreement."

One of Pestano's counterclaims arises under Section 17200 of the California Business and Professional Code.  Pestano asserts that the fee-splitting provision improperly impedes her ability to vindicate rights under this statute.  At least one California court has determined that this statute creates the kind of unwaivable statutory right that deserves protection in the context of arbitration fees.  *Independent Ass'n of Mailbox Center Owners, Inc. v. Superior Court,*

9

133 Cal. App. 4th 396, 416 (2005). Assuming that Pestano has a viable claim under Section 17200, this provision would impede her efforts to vindicate an unwaivable right.

In addition, the fee-splitting provision appears to create a backdoor and one-sided way around the arbitration agreement. This is troubling. Under the provision, if one party fails to pay its share of the fees, the other party can bring its claims in court. The provision seems designed to benefit AT&T — chances are far greater that a small dealer will find itself unable to pay fees than a company like AT&T. Although facially neutral, the provision will likely lead to one-sided results, with the dealer more frequently being relegated to an inferior forum. In light of these factors, this order finds the fee-splitting provision to be unconscionable.

### (3) *The Confidentiality Provision.*

Pestano also contests the confidentiality provision of the arbitration agreement, which requires that the "nature and outcome of any arbitration under this Agreement" be kept confidential (Miguel Decl. Exh. B). In a 2002 decision, a district court found a similar confidentiality provision to be so one-sided and "overly harsh" as to support a finding of unconscionability. *Acorn v. Household Intern., Inc.,* 211 F. Supp. 2d 1160, 1174 (N.D. Cal. 2002) (applying California law). In that case, which arose in a consumer context, the arbitration agreements required "that the award shall be kept confidential." *Id.* at 1171. The court discussed the advantages that typically inure to the benefit of companies as repeat participants in arbitration proceedings (*ibid.*):

> The advantages to repeat participants in the arbitration market are well known and need not be recounted at length here. Suffice it to say that several studies have found and several courts have held that a party's repeated appearance before the same group of arbitrators conveys distinct advantages over the one-time participant.

*See also Mercuro v. Superior Court*, 96 Cal. App. 4th 167, 178 (2002) ("These [repeat player] advantages include knowledge of the arbitrators' temperaments, procedural preferences, styles and the like and the arbitrators' cultivation of further business by taking a 'split the difference' approach to damages."). The court found that the confidentiality provision reinforced these "repeat participant" advantages by sheltering awards from scrutiny. *Acorn v. Household Intern., Inc.,* 211 F. Supp. 2d at 1171.

10

In a 2003 decision, the Ninth Circuit, applying California law, held that a district court did not err in finding a confidentiality provision in an arbitration agreement unconscionable. *Ting,* 319 F.3d at 1152; *see also Davis,* 485 F.3d at 1079 (holding that a confidentiality provision of an agreement in the employment context supported a finding of unconscionability). In that case, in which AT&T was a party, an arbitration clause in a long-distance service contract included a confidentiality provision. The Ninth Circuit explained that the confidentiality provision allowed AT&T to place itself "in a far superior legal posture by ensuring that none of its potential opponents have access to precedent while, at the same time, AT&T accumulates a wealth of knowledge on how to negotiate the terms of its own unilaterally crafted contract." *Ting,* 319 F.3d at 1152. This applies here as well. This order holds that the confidentiality provision is one-sided. It allows AT&T to accumulate knowledge concerning dealer awards but keeps all dealers in the dark.

### (4) *Provision Concerning Assignment of Rights.*

Finally, Pestano argues that the provision of the 2006 dealer agreement concerning assignment of rights supports a finding of unconscionability. Pestano asserts that this provision allows AT&T, but not Viva, to assign its rights to another party, including the right to enforce arbitration. While this provision might affect the validity of the contract as a whole, a district court's role in a motion to compel is limited to reviewing the arbitration agreement. *Nagrampa*, 469 F.3d at 1264. And Pestano has not made clear how the provision affects the unconscionability of the arbitration agreement in particular as opposed to the contract as a whole. Nor does Pestano cite to any case law to support her position. This order therefore concludes that the assignment provision does not support a finding of unconscionability on the arbitration agreement.

### C.     Severability of Objectionable Provisions.

If a trial court determines that a particular provision of an arbitration agreement is unconscionable, it can proceed in one of two ways. In some situations, the offending provision can be severed and the remaining agreement enforced. *McManus v. CIBC World Markets Corp.*, 109 Cal. App. 4th 76, 101 (2003) ("An agreement to arbitrate may be enforced if the

11

1  unconscionable provisions can be severed from the agreement."). In other situations, the trial
2  court has the discretion to declare the entire arbitration agreement invalid. *Armendariz*, 24 Cal.
3  4th at 122.

4  In *Armendariz*, the California Supreme Court discussed the contours of a trial court's
5  discretion to declare an entire arbitration agreement invalid. *Id.* at 121–127. In that case, an
6  employment contract required arbitration of an employee's wrongful termination claims but did
7  not require arbitration of an employer's claims against an employee. In addition, the arbitration
8  agreement limited damages to back pay and precluded discovery. The trial court found the
9  arbitration agreement to be invalid in its entirety and the California Supreme Court concluded
10 that the trial court did not abuse its discretion in so holding. Looking at the relevant statute (Cal.
11 Civ. Cod. § 1670.5), as well as its legislative history, the court concluded that "the statute
12 appears to give a trial court some discretion as to whether to sever or restrict the unconscionable
13 provision or whether to refuse to enforce the entire agreement. But it also appears to
14 contemplate the latter course only when an agreement is permeated by unconscionability." *Id.* at
15 122. Noting a dearth of case law on the issue of severability in the arbitration context, the
16 California Supreme Court looked to general contract law, summarizing the general principles of
17 severability in this way (*id.* at 124):

> Courts are to look to various purposes of the contract. If the central purpose of the contract is tainted with illegality, then the contract as a whole cannot be enforced. If the illegality is collateral to the main purpose of the contract, and the illegal provision can be extirpated from the contract by means of severance or restriction, then such severance and restriction are appropriate.

22 In that case, two factors weighed against severance of the unlawful provisions. *First*, the
23 arbitration agreement included more than one unlawful provision. "Such multiple defects
24 indicate a systematic effort to impose arbitration on an employee not simply as an alternative to
25 litigation, but as an inferior forum that works to the employer's advantage." *Id.* at 124. *Second,*
26 because of the agreement's lack of mutuality, the unconscionability could not be cured by striking
27 offensive provisions; rather, "the court would have to, in effect, reform the contract . . . by
28 augmenting it with additional terms." *Id.* at 125; *see also Davis,* 485 F.3d at 1084 (holding an

12

entire arbitration agreement to be unenforceable because the unconscionable provisions could not be stricken without "gutting the agreement").

This order finds that the arbitration provision is so permeated with unconscionability as to make the entire arbitration clause invalid. The number of provisions in the agreement found to be unconscionable indicates a "systematic effort to impose arbitration" as an "inferior forum" that works to AT&T's advantage. *Armendariz.,* 24 Cal. 4th at 124. This order therefore declines to sever the unconscionable provisions and instead declares the entire arbitration provision invalid. AT&T's motion to compel arbitration is therefore **DENIED.**

This order does not reach the question of whether the arbitration clause in the 2001 agreement is unconscionable. AT&T has argued, and this order has accepted, that the 2006 agreement superseded the 2001 agreement (Reply Br. 13; Miguel Decl. Exh. B). The parties' briefs have concentrated on the validity of the 2006 agreement, not the validity of the 2001 agreement.

### 4. MOTION TO DISMISS PESTANO'S COUNTERCLAIMS.

AT&T also moves to dismiss Pestano's first, second, fifth, and sixth counterclaims under Rule 12(b)(6). AT&T, however, submits and relies on facts outside Pestano's responsive pleading. A federal court must convert a Rule 12(b)(6) motion to one for summary judgment when the parties submit, and the court does not reject, material beyond the pleadings. *In re Rothery*, 143 F.3d 546 (9th Cir. 1998). Entry of summary judgment is proper only where the pleadings, the admissions on file, and the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

Pestano requests relief under Rule 56(f) to conduct discovery in order to oppose AT&T's motion. Pestano asserts that further discovery would be conducted into (Opp. 16):

> (1) the intent of the parties and circumstances surrounding the SMF Release (including Section 1) and the APA; (2) facts surrounding the enforceability of SMF Release (due to breach or mistake) and Section 1 of the SMF Release; (3) facts known to AT&T which it did not disclose prior to entry into the APA and representations made around the APA; (4) the nature and extent of AT&T's unfair and oppressive conduct; and (5) steps AT&T took to address the issues in the dealer market.

13

Because Pestano has not yet had the opportunity to conduct discovery, this order grants relief under Rule 56(f) to do so. The motion to dismiss is **DENIED** as a disguised summary judgment motion.

Pestano also requests leave to amend her pleading to allege a claim for restitution under Section 17200. This order **GRANTS** Pestano 10 days to amend her pleading.

At the hearing on this motion, AT&T suggested that the main action (AT&T's affirmative claims) be stayed pending arbitration of the counterclaims. AT&T also offered to voluntarily submit its affirmative claims to arbitration. These suggestions come without the benefit of briefing. Since the arbitration clause is unenforceable, it is unnecessary to reach these suggestions.

**CONCLUSION**

For the reasons stated above, this order finds that the AT&T arbitration agreement is unconscionable and therefore invalid. Plaintiff's motion to compel arbitration is therefore **DENIED.** The motion to dismiss is **DENIED** without prejudice to renewal as a summary judgment motion after a fair opportunity for discovery. Defendant's requests for a continuance under Rule 56(f) and for leave to amend are **GRANTED**.

In no way does this order express any opinion on the merits of how the competing claims should be resolved. Counsel are reminded of the scheduling order and the need to meet all deadlines.

**IT IS SO ORDERED.**

Dated: March 7, 2008.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE