Ronald J. Kohut, Esq. (SBN 66463)
Sarah K. Kohut, Esq. (SBN 197655)
KOHUT & KOHUT LLP
3554 Round Barn Blvd., Suite 204
Santa Rosa, California 95403
Telephone: (707) 573-3100
Facsimile:  (707) 573-3101

Attorneys for Plaintiff
AT&T MOBILITY II LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AT&T MOBILITY II, LLC, a Delaware limited liability company,<br><br>        Plaintiff,<br><br>v.<br><br>CAROLYN PESTANO, an individual,<br><br>        Defendant.<br><br>AND RELATED COUNTERCLAIMS | **Case No. CV 07-05463 WHA**<br><br>**STIPULATION TO ALLOW PLAINTIFF AT&T MOBILITY II LLC TO FILE FIRST AMENDED COMPLAINT** |

1

1    Pursuant to the Court's ruling of February 4, 2008 and Federal Rules of Civil

2    Procedure Rule 15(a)(2), Plaintiff AT&T Mobility II LLC and Defendant Carolyn Pestano

3    jointly agree, by and through their respective attorneys of record, to the filing by AT&T

4    Mobility II LLC of the First Amended Complaint attached hereto as Exhibit 1.

5

6

7    DATED: March 28, 2008                    KOHUT & KOHUT LLP

8

9

10                                           By:_____
                                                Ronald J. Kohut, Esq.
11                                              (SBN 66463)
                                                Sarah K. Kohut, Esq.
12                                              (SBN 197655)
                                                Attorneys for Plaintiff
13                                              AT&T Mobility II LLC

14

15

16   DATED: March 28, 2008                    BALASUBRAMANI LAW

17

18

19                                           By:_____
                                                Venkat Balasubramani, Esq.
20                                              (SBN 189192)
                                                Attorneys for Defendant
21                                              Carolyn Pestano

22

23

24

25

26

27

28                                           2

STIPULATION TO ALLOW PLAINTIFF AT&T MOBILITY II LLC TO FILE FIRST
AMENDED COMPLAINT

# EXHIBIT 1

Ronald J. Kohut, Esq. (SBN 66463)
Sarah K. Kohut, Esq. (SBN 197655)
KOHUT & KOHUT LLP
3554 Round Barn Blvd., Suite 204
Santa Rosa, California 95403
Telephone: (707) 573-3100
Facsimile:  (707) 573-3101

Attorneys for Plaintiff
AT&T MOBILITY II, LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AT&T MOBILITY II, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>CAROLYN PESTANO, an individual; and VIVA WIRELESS, INC., a California corporation;<br><br>Defendants.<br><br>AND RELATED COUNTERCLAIMS | Case No. CV 07-05463 WHA<br><br>**FIRST AMENDED COMPLAINT FOR: ENFORCEMENT OF GUARANTY; BREACH OF GUARANTY; BREACH OF CONTRACT (ADVANCED PAYMENT AGREEMENT); BREACH OF CONTRACT (DEALER AGREEMENT); GOODS SOLD AND DELIVERED AT AGREED PRICE** |

Plaintiff AT&T MOBILITY II, LLC ("AT&T MOBILITY") alleges:

## GENERAL ALLEGATIONS

**A.    The Parties; Jurisdiction; Venue**

1.    AT&T MOBILITY is a Delaware limited liability company, authorized to do business in California, headquartered in Atlanta, Georgia, and formerly known as Cingular Wireless II, LLC.

1

2.      Defendant Carolyn Pestano ("PESTANO") is a resident of Seattle, Washington.

3.      Upon information and belief, AT&T MOBILITY alleges, Defendant Viva Wireless, Inc. ("VIVA") is a California corporation, with its principal place of business at 3521 Investment Blvd., Suite 2, Hayward, California.

4.      Upon information and belief, AT&T MOBILITY alleges, that PESTANO is, and at all times mentioned in this Complaint was, the CEO and sole shareholder of VIVA.

5.      AT&T MOBILITY is informed and believes, and thereon alleges, that the actions of each Defendant as alleged herein were duly ratified by the other Defendants, with each Defendant acting as an agent of the other and within the course and scope of said agency.  AT&T MOBILITY is further informed and believes, and thereon alleges, that each of the Defendants designated herein is liable to AT&T MOBILITY for the actions hereinafter alleged.

6.      Jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1332 because AT&T MOBILITY and Defendants are of diverse citizenship and the amount in controversy exceeds $75,000, exclusive of interest, fees and costs.

7.      Venue is proper in this Court pursuant to 28 USC § 1391(a) by virtue of the facts that: (1)  VIVA resides in this Judicial District; (2) the contracts at issue in this Action were entered into and to be performed in this Judicial District; (3)  PESTANO and VIVA were doing business in this Judicial District at the time they entered into the contracts at issue in this Action; (4)  the acts giving rise to this First Amended Complaint occurred in this Judicial District; and (5) with the exception of PESTANO, the principal witnesses to the acts giving rise to this First Amended Complaint reside or work in this Judicial District.

**B.      The Dealer Agreement**

8.      On or about January 1, 2006, VIVA and AT&T MOBILITY entered into an Exclusive Dealer Agreement ("Dealer Agreement"), which authorized VIVA to offer and sell wireless service from approved retail locations.  A true and correct copy of the Dealer Agreement is attached as Exhibit "A."

2

9.    Under the terms of the Dealer Agreement, VIVA was required, among other things, to pay to AT&T MOBILITY the sum owed for Equipment purchased by VIVA from AT&T MOBILITY. Exhibit A, ¶ 7.3.3.

10.    VIVA was also obligated to not sell or ship Equipment purchased from AT&T MOBILITY outside of VIVA's "Area" as defined by the Dealer Agreement ("Transshipment"). Exhibit A. ¶ 7.7.

11.    The terms of the Dealer Agreement also obligated VIVA to pay the balance of any "Chargebacks" to AT&T MOBILITY. Exhibit A, ¶ 10.5.

12.    If VIVA chose to terminate its interest in an Approved Retail Location, paragraph 3.2.1 of the Dealer Agreement obligated VIVA to provide AT&T MOBILITY "with 90 days advance written notice setting forth the reasons for the closure, transfer, sale, or disposal, and with a copy of the relevant lease."

13.    Under paragraph 10.6 of the Dealer Agreement, VIVA was obligated to: Obligations of Dealer Upon Termination. Upon the termination of this Agreement, Dealer must: (a) discontinue the use of all Marks, and any similar trade names, service marks, trademarks, signs, or designs, and must return to Company all materials containing any Mark or otherwise identifying or relating to Company's business; (b) cease representing itself in any fashion as a Dealer or representative of Company; (c) return to Company or destroy those documents, records, or other materials (including all copies, either photocopies or electronic copies) that were provided to Dealer by Company or that contain any Confidential Information, including without limitation all information related to Subscribers and all CPNI; and (d) not solicit Subscribers for one year in accordance with the non-solicitation provision of this Agreement.

14.    Pursuant to paragraph 12.1 of the Dealer Agreement, the Dealer Agreement is governed by "the substantive laws of the State of Georgia." Exhibit A, ¶ 12.1.

3

**FIRST AMENDED COMPLAINT**

**C.     The Advance Payment Agreement**

15.     On or about August 8, 2006, PESTANO, on behalf of VIVA, proposed the terms of a loan from AT&T MOBILITY to VIVA for the build-out of five (5) "new" locations.  Under the proposal, AT&T MOBILITY would loan to VIVA $250,000.00, which VIVA would repay within one (1) year.  A true and correct copy of PESTANO's proposal is attached as Exhibit "B."

16.     The terms proposed by PESTANO were memorialized in an "Advance Payment Agreement" ("APA"), which AT&T MOBILITY and VIVA entered into on or about October 10, 2006.  A true and correct copy of the APA is attached as Exhibit "C."

**D.     The Dealer Principal Personal Guaranty**

17.     In order to induce AT&T MOBILITY to make the Advance to Viva under the APA, PESTANO, executed a "Dealer Principal Personal Guaranty" ("Guaranty").  A true and correct copy of the Guaranty is attached as Exhibit "D."

18.     Under the terms of the Guaranty, PESTANO "unconditionally and absolutely guarantee[d] to [AT&T MOBILITY] the prompt and full payment and/or performance of any and all of [Viva's] obligations under the APA, including payment in full of the Advance."

19.     Pursuant to Section 1 of the Guaranty "[i]n the event [PESTANO] fails to make any payment due [AT&T MOBILITY] when due, or to perform any other obligation guaranteed by [PESTANO] hereunder in a timely manner, [PESTANO] shall be deemed in default under this Guaranty, and [AT&T MOBILITY] may, in addition to any other remedies available to [AT&T MOBILITY] at law or in equity, immediately declare all amounts due and owing [AT&T MOBILITY] by [PESTANO] to be immediately due and payable."

20.     Pursuant to Section 2 of the Guaranty, "[t]he Guaranty is absolute, continuing, and unlimited for the benefit of [AT&T MOBILITY] and its successors and assigns, and [AT&T MOBILITY] [is] not [ ] required to proceed first, or at all against DEALER [VIVA] or against any other person, firm, or corporation, or against any

4

**FIRST AMENDED COMPLAINT**

collateral or other security for payment or performance of the Obligations before resorting to the Guarantor."

21.    Pursuant to Section 4 of the Guaranty, "GUARANTOR [PESTANO] agree[s] that GUARANTOR's [PESTANO's] responsibilities under the terms of this Guaranty shall not be released, diminished, impaired or affected by the occurrence of one or more of the following events. . .

> d.  The death, insolvency, bankruptcy, disability or termination of GUARANTOR [PESTANO] or of any one or more of the persons comprising DEALER [VIVA], or the dissolution, receivership, or reorganization of DEALER [VIVA]. . .
>
> f.  (f) Any neglect, delay, omission, failure or refusal by [AT&T MOBILITY] to take or prosecute any action for the collection of DEALER'S [VIVA's] or GUARANTOR'S [PESTANO's] obligations hereunder, or [AT&T MOBILITY's] failure to commence any action to foreclose upon any security or collateral given by DEALER [VIVA] or GUARANTOR [PESTANO] therefore;
>
> h.  The unenforceability or uncollectability of all or any part of the obligations against DEALER [VIVA] for any reason, it being agreed that GUARANTOR [PESTANO] shall remain liable hereon regardless of whether DEALER [VIVA] or any other person shall be found not liable with respect to the obligations or any part thereof...

22.    Pursuant to Section 5 of the Guaranty, the Guaranty remains "in full force and effect until the amount owed to [AT&T MOBILITY] under the APA . . . is paid in full."

23.    Pursuant to Section 2 of the Guaranty, "GUARANTOR [PESTANO] shall pay any and all reasonable attorney's fees and other reasonable costs and expenses which may be incurred by [AT&T MOBILITY] in the enforcement of this Guaranty.

24.    AT&T MOBILITY has been required to engage and employ Kohut & Kohut LLP, to commence and prosecute this action, to enforce AT&T MOBILITY's rights under the Guaranty, and to recover damages and other relief resulting from PESTANO's breach

1    of the Guaranty. Accordingly, AT&T MOBILITY is entitled to recover its reasonable

2    attorneys' fees and other reasonable costs and expenses incurred in this Action.

3    **E.    VIVA's Breach of the Dealer Agreement.**

4         25.    On or about, April 5, 2007, VIVA informed AT&T MOBILITY that it was

5    ceasing business and terminating the Dealer Agreement. A true and correct copy of the

6    notice sent by VIVA is attached as Exhibit "E."

7         26.    Although terminating nine (9) Approved Retail Locations, VIVA did not

8    comply with the 90 day notice requirement set forth in paragraph 3.2.1 of the Dealer

9    Agreement. Pursuant to paragraph 3.2.2of the Dealer Agreement:

10            Failure to provide [AT&T MOBILITY] with the required advance

11            written notice may result in the unnecessary closure of an Approved

12            Retail Location, which would cause [AT&T MOBILITY] to suffer

13            monetary damages and damages to its reputation and goodwill. These

14            damages would be difficult to quantify and measure. As a result,

15            [VIVA] must pay [AT&T MOBILITY] $50,000 as liquidated damages

16            for each Approved Retail Location that is closed without providing the

17            required advance written notice. Acceptance by [AT&T MOBILITY]

18            of liquidated damages under this provision does not limit [AT&T

19            MOBILITY's] right to seek any other appropriate remedies under this

20            Agreement, including without limitation termination of this Agreement.

21         27.    At the time VIVA ceased business, VIVA owed AT&T MOBILITY

22    $432,616.70 for equipment ordered and received. Under paragraph 7.3.4(b) and 10.5 of the

23    Dealer Agreement, AT&T MOBILITY offset $261,817.25 of the amount owing from

24    commissions payable to VIVA. VIVA, however, did not earn enough commissions to

25    offset the entire owed equipment balance. There remains owing and unpaid a balance of

26    $170,799.45. VIVA has not paid any portion of this sum to AT&T MOBILITY.

27

28

**FIRST AMENDED COMPLAINT**

28.     Upon information and belief, AT&T MOBILITY alleges that upon ceasing operations VIVA transshipped the equipment in its possession, including equipment for which it had not paid AT&T MOBILITY.

29.     Pursuant to paragraph 10.5 of the Dealer Agreement, VIVA is responsible for the amount of any "Chargebacks" that occur within 180 days of termination of the Dealer Agreement.  Within the 180 days subsequent to VIVA's termination of the Dealer Agreement, $92,489.74 of "Chargebacks" accrued and remains owing and unpaid.  VIVA has not paid any portion of this sum to AT&T MOBILITY.

30.     Pursuant to paragraph 10.6 of the Dealer Agreement, VIVA was required, upon terminating its relationship with AT&T MOBILITY, "to return to Company or destroy those documents, records, or other materials (including all copies, either photocopies or electronic copies) that were provided to Dealer by Company or that contain any Confidential Information, including without limitation all information related to Subscribers and all CPNI."  VIVA has not complied with this paragraph.

**F.     VIVA's Breach of the APA and PESTANO's Breach of the Guaranty.**

31.     At the time VIVA ceased business, $130,000.00 remained outstanding under the APA.

32.     By letter dated April 17, 2007, AT&T MOBILITY declared all amounts owing under the APA and Guaranty to be immediately due and payable.

33.     By letter dated July 17, 2007, AT&T MOBILITY again demanded payment of all amounts due and payable under the APA and Guaranty.

34.     Through this Complaint, AT&T MOBILITY again demands payment of all amounts due and payable under the APA and Guaranty.

35.     Neither VIVA nor PESTANO has paid any portion of the $130,000.00 that remains outstanding under the APA and Guaranty.

7

**FIRST AMENDED COMPLAINT**

## FIRST CAUSE OF ACTION

(Enforcement of Guaranty Against PESTANO)

36.    AT&T MOBILITY repeats and realleges paragraphs 1 through 7, 15 through 24, and 31 through 35, inclusive.

37.    In order to induce AT&T MOBILITY to make the Advance to VIVA under the APA, on or about October 3, 2006, at Hayward, California, VIVA's CEO, PESTANO, for valuable consideration, executed the Guaranty in favor of AT&T MOBILITY.

38.    Under the terms of the Guaranty, PESTANO "unconditionally and absolutely guarantee[d] to [AT&T MOBILITY] the prompt and full payment and/or performance of any and all of [VIVA's] obligations under the APA, including payment in full of the Advance."

39.    AT&T MOBILITY accepted the Guaranty, and, in reliance thereon, advanced the sum specified in the APA to VIVA.

40.    AT&T MOBILITY has fully and faithfully performed all terms, conditions, covenants and promises on its part to be performed in accordance with the APA and Guaranty, excepting only such performance as has been excused, discharged and/or exonerated by virtue of the acts, omissions, and unlawful acts of PESTANO and VIVA.

41.    VIVA has breached the APA by failing to repay the Advance as required by the APA. AT&T MOBILITY has suffered, and will in the future continue to suffer, monetary damages in an amount to be proven at the time of trial but reasonably believed to be no less than $130,000.00. Pursuant to the Guaranty PESTANO is obligated to pay AT&T MOBILITY for such damages. Additionally, pursuant to Section 2 of the Guaranty, AT&T MOBILITY is entitled to recover its "reasonable attorney's fees and other reasonable costs and expenses" incurred in this action, in an amount to be proven pursuant to the Federal Rules of Civil Procedure and Local Rules. Finally, AT&T MOBILITY is entitled to recover pre-judgment interest on all sums owed under the Guaranty.

8

**FIRST AMENDED COMPLAINT**

## SECOND CAUSE OF ACTION

(Breach of Guaranty Against PESTANO)

42.     AT&T MOBILITY repeats and realleges paragraphs 1 through 7, 15 through 24, 31 through 35, and 36 through 41 inclusive.

43.     In order to induce AT&T MOBILITY to make the Advance to VIVA under the APA, on or about October 3, 2006, at Hayward, California, VIVA's CEO, PESTANO, for valuable consideration, executed the Guaranty in favor of AT&T MOBILITY whereby she unconditionally guaranteed payment to AT&T MOBILITY of all amounts owing under the APA.

44.     AT&T MOBILITY accepted the Guaranty, and, in reliance thereon, advanced the sum specified in the APA to VIVA.

45.     AT&T MOBILITY has fully and faithfully performed all conditions precedent on its part to be performed in accordance with the Guaranty and APA, except for any obligations excused by VIVA's or PESTANO's conduct or otherwise.

46.     VIVA has breached the APA by failing to repay the Advance as required by the APA. AT&T MOBILITY has suffered, and will in the future continue to suffer, monetary damages in an amount to be proven at the time of trial but reasonably believed to be no less than $130,000.00. PESTANO has breached the Guaranty by failing to pay to AT&T MOBILITY the sums owed by VIVA under the APA.

47.     As a direct consequence of PESTANO's breaches of the Guaranty, AT&T MOBILITY has been damaged in an amount according to proof, but in no event less than $130,000.00. Additionally, pursuant to Section 2 of the Guaranty, AT&T MOBILITY is entitled to recover its "reasonable attorney's fees and other reasonable costs and expenses" incurred in this action, in an amount to be proven pursuant to the Federal Rules of Civil Procedure and Local Rules. Finally, AT&T MOBILITY is entitled to recover pre-judgment interest on all sums owed under the Guaranty.

9

### THIRD CAUSE OF ACTION

(Breach of Contract [APA] Against VIVA)

48.     AT&T MOBILITY repeats and realleges paragraphs 1 through 35, inclusive.

49.     In order to induce AT&T MOBILITY to make the Advance to VIVA under the APA, VIVA unconditionally guaranteed payment to AT&T MOBILITY of all amounts owing under the APA.

50.     In order to induce AT&T MOBILITY to make the Advance to VIVA under the APA, VIVA also promised to use the monies advanced by AT&T MOBILITY to build-out four (4) new Dealer locations and renovate two (2) existing locations.

51.     AT&T MOBILITY accepted VIVA's promises, and, in reliance thereon, advanced $250,000.00 to VIVA.

52.     AT&T MOBILITY has fully and faithfully performed all conditions precedent on its part to be performed in accordance with the APA, except for any obligations excused by VIVA's conduct or otherwise.

53.     Upon information and belief, AT&T MOBILITY alleges that VIVA breached the APA by failing to use the $250,000.00 advanced by AT&T MOBILITY to build-out four (4) new Dealer locations and renovate two (2) existing locations.

54.     VIVA also breached the APA by failing to repay the Advance as required by the APA.

55.     As a direct consequence of VIVA's breaches of the APA, AT&T MOBILITY has been damaged in an amount according to proof, but in no event less than $130,000.00. Additionally, AT&T MOBILITY is entitled to recover pre-judgment interest on all sums owed under the APA.

### FOURTH CAUSE OF ACTION

(Breach of Contract [Dealer Agreement] Against VIVA)

56.     AT&T MOBILITY repeats and realleges paragraphs 1 through 35, inclusive.

57.     On or about January 1, 2006, AT&T MOBILITY and VIVA entered into the Dealer Agreement.

10

---

**FIRST AMENDED COMPLAINT**

58.    Under the Dealer Agreement, AT&T MOBILITY authorized VIVA to offer and sell wireless service from approved retail locations.

59.    In order to induce AT&T MOBILITY to enter into the Dealer Agreement, VIVA promised, among other things, to pay to AT&T MOBILITY the sum owed for Equipment purchased by VIVA from AT&T MOBILITY.  Exhibit A, ¶ 7.3.3.

60.    VIVA also promised to not sell or ship Equipment purchased from AT&T MOBILITY outside of VIVA's "Area" as defined by the Dealer Agreement ("Transshipment").   Exhibit A. ¶ 7.7.

61.    VIVA also promised to pay the balance of any "Chargebacks" to AT&T MOBILITY incurred within 180 days of termination of the Dealer Agreement.  Exhibit A, ¶ 10.5.

62.    VIVA also promised to provide AT&T MOBILITY with "90 days advance written notice setting forth the reasons for the closure, transfer, sale or disposal [of any Approved Retail Location] and with a copy of the relevant lease."  VIVA promised to pay AT&T MOBILITY $50,000.00 per Approved Retail Location that was closed or terminated without such advance written notice having been given.

63.    VIVA also promised to:

Upon the termination of this Agreement, Dealer must: (a) discontinue the use of all Marks, and any similar trade names, service marks, trademarks, signs, or designs, and must return to Company all materials containing any Mark or otherwise identifying or relating to Company's business; (b) cease representing itself in any fashion as a Dealer or representative of Company; (c) return to Company or destroy those documents, records, or other materials (including all copies, either photocopies or electronic copies) that were provided to Dealer by Company or that contain any Confidential Information, including without limitation all information related to Subscribers and all CPNI;

11

FIRST AMENDED COMPLAINT

1    and (d) not solicit Subscribers for one year in accordance with the non-

2    solicitation provision of this Agreement.  Exhibit A, ¶ 10.6.

3          64.    AT&T MOBILITY accepted VIVA's promises, and, in reliance thereon,

4    authorized VIVA to offer and sell wireless service, shipped equipment to VIVA on credit,

5    and advanced commissions payments to VIVA before the "Chargeback" periods expired on

6    such commissions.

7          65.    AT&T MOBILITY has fully and faithfully performed all conditions

8    precedent on its part to be performed in accordance with the Dealer Agreement, except for

9    any obligations excused by VIVA's conduct or otherwise.

10         66.    VIVA has breached the Dealer Agreement by failing to pay for equipment

11   ordered and received from AT&T MOBILITY.

12         67.    Viva has also breached the Dealer Agreement by failing to pay AT&T

13   MOBILITY for "Chargebacks" incurred within 180 days of VIVA's termination of the

14   Dealer Agreement.

15         68.    Upon information and belief, AT&T MOBILITY alleges that VIVA also

16   breached the Dealer Agreement by transshipping equipment received from AT&T

17   MOBILITY.

18         69.    VIVA also breached the Dealer Agreement by failing to provide advance

19   written notice of its closure of nine (9) Approved Retail Locations.

20         70.    VIVA also breached the Dealer Agreement by failing "to return to Company

21   or destroy those documents, records, or other materials (including all copies, either

22   photocopies or electronic copies) that were provided to Dealer by Company or that contain

23   any Confidential Information, including without limitation all information related to

24   Subscribers and all CPNI."

25         71.    As a direct consequence of VIVA's breaches of the Dealer Agreement,

26   AT&T MOBILITY has been damaged in an amount according to proof, but in no event less

27   than $713,289.19.  Additionally, AT&T MOBILITY is entitled to recover pre-judgment

28   interest on all sums owed under the Dealer Agreement.

12

---

**FIRST AMENDED COMPLAINT**

## FIFTH CAUSE OF ACTION

(Goods Sold and Delivered at Agreed Price Against all Defendants)

72.     AT&T MOBILITY repeats and realleges paragraphs 1 through 35, inclusive.

73.     Within the last four years, VIVA became indebted to AT&T Mobility in the sum of $170,799.45 for wireless phones sold and delivered to VIVA.

74.     AT&T MOBILITY has repeatedly demanded payment from VIVA. The last demand was made on July 19. 2007.

75.     No payment has been made by VIVA to AT&T MOBILITY, and there is now owing the sum of $170.799.45, with interest on that amount at the legal rate.

WHEREFORE, AT&T MOBILITY prays for judgment as follows:

### On the First Cause of Action

1.     For the principal sum of $130,000.00;

2.     For prejudgment interest at the legal rate on the sum of $130,000, accruing through the date of judgment;

3.     For AT&T MOBILITY's reasonable attorneys' fees, costs, and expenses; and

4.     For such other and further relief as the Court may deem just and proper.

### On the Second Cause of Action

1.     For the principal sum of $130,000.00;

2.     For prejudgment interest at the legal rate on the sum of $130,000, accruing through the date of judgment;

3.     For AT&T MOBILITY's reasonable attorneys' fees, costs, and expenses; and

4.     For such other and further relief as the Court may deem just and proper.

### On the Third Cause of Action

1.     For the principal sum of $130,000.00;

2.     For prejudgment interest at the legal rate on the sum of $130,000.00, accruing through the date of judgment;

FIRST AMENDED COMPLAINT

3.  For AT&T MOBILITY's reasonable attorneys' fees, costs, and expenses; and

4.  For such other and further relief as the Court may deem just and proper.

### On the Fourth Cause of Action

1.  For an amount to be proven at trial but no less than $713,289.19;

2.  For prejudgment interest at the legal rate on the sum of $713,289.19, accruing through the date of judgment; and

3.  For such other and further relief as the Court may deem just and proper.

### On the Fifth Cause of Action

1.  For the principal amount of $170,799.45;

2.  For prejudgment interest at the legal rate on the sum of $170,799.45, accruing through the date of judgment; and

3.  For such other and further relief as the Court may deem just and proper.

DATED: March 28, 2008                KOHUT & KOHUT LLP

By: _____
    Ronald J. Kohut, Esq.
    Sarah K. Kohut, Esq.
    Attorneys for Plaintiff
    AT&T Mobility II, LLC

14

**FIRST AMENDED COMPLAINT**

# EXHIBIT A

# CINGULAR WIRELESS
## EXCLUSIVE DEALER AGREEMENT

| Dealer | Cingular Wireless |
|---|---|
| Legal Name:  Viva Wireless, Inc.<br>Business Name (if different):<br>Type of Entity:  A California corporation ("Dealer") | Cingular Wireless II, LLC, on behalf of its affiliated companies operating in the Area ("Company") |
| **Dealer Address (For Official Notices)** | **Company Address (For Official Notices)** |
| 3521 Investment Blvd., Ste. 2<br>Hayward, CA 94545 | Cingular Wireless<br>4420 Rosewood, Bldg. 2<br>Pleasanton, CA 94588<br>Attn:   Vice President/General Manager |
| **Dealer Contact** | **Company Contact** |
| Name:  Carolyn Pestano ~~415 298-6588~~<br>Title:  CEO                          or<br>Telephone: ~~415-454-8377~~  510 783-9119<br>Fax: ~~415-454-8387~~  510 783-9618 | Name:  Matthew Woolsey<br>Title:  Director of Sales<br>Telephone: 925-227-3272<br>Fax: 925-227-4355 |
| **Dealer Billing Address** | |
| Same as above | |

This Agreement consists of this Cover Page, the attached Terms and Conditions, **Schedule 1 (Area & Approved Retail Locations), Schedule 2 (Compensation Schedule)**, and all **Dealer Policies** issued in accordance with the Terms and Conditions (collectively, this **"Agreement"**).

This Agreement is effective as of January 1, 2006, and continues in effect for an initial term of 3 years, unless earlier terminated in accordance with the provisions of this Agreement.

---

**DEALER'S SIGNATURE BELOW ACKNOWLEDGES THAT DEALER HAS READ AND UNDERSTANDS EACH OF THE PROVISIONS OF THIS AGREEMENT AND AGREES TO BE BOUND BY THEM.**

---

| VIVA WIRELESS, INC. | Cingular Wireless II, LLC, on behalf of its affiliated companies operating in the Area |
|---|---|
| By: *(signature)*<br>(Authorized Signature) | By: *(signature)*<br>(Authorized Signature) |
| Name:  Carolyn Pestano<br>Title:   CEO<br>Date:  12/20/05 | Name:  Frederick Devereux<br>Title:   Vice President, General Manager<br>Date:  01/12/06 |

Cingular Wireless Proprietary & Confidential
Use According to Company Instructions

exclu dlr - v.1, 7/1/05

Exhibit  A
Page  15

1

## CINGULAR WIRELESS EXCLUSIVE DEALER AGREEMENT
### Terms and Conditions

1.    **DEFINITIONS.**

    **1.1    Affiliate**: Dealer's employees, officers, directors, consultants, owners' immediate family members, or any person, company, partnership or other entity that directly or indirectly, through one or more intermediaries controls, is controlled by, or is under common control with Dealer, Dealer's employees, officers, directors, or owners' immediate family members.

    **1.2    Competitive Service**: Any wireless communications service offered by any person, entity, or business (other than Company) in the Area that is capable of providing wireless voice or data service that is functionally similar or equivalent to Company's Service, irrespective of the radio frequency on which the service is offered, including, without limitation: commercial mobile radio service, specialized mobile radio communications, mobile satellite communications, cellular service, personal communications services, Wi-Fi, Wi-Max, one and two-way paging services, and services on similar frequencies or technologies; and any service that competes with any other service that Company offers under this Agreement.

    **1.3    Equipment:**  Wireless devices necessary for using Service that meet FCC and Company technical standards, that comply with all fraud prevention specifications required by Company, and that are certified by Company for use on its Service.

    **1.4    Service:**    All voice and data wireless services that Company provides within the Area, whether or not Dealer is authorized to sell these services.

    **1.5    Subscriber:**  A customer of Service, including without limitation all end-users of Service, or an applicant to Service.

2.    **RELATIONSHIP OF THE PARTIES.**

    **2.1    Area.**  Company has received regulatory authority to operate as a facilities-based provider of Service within the Area.  The Area is defined as the one or more Company operating markets that are listed on the attached **Schedule 1 – Area & Approved Retail Locations**. If Dealer is authorized to operate in more than one market, an additional Schedule 1 will correspond to each additional market.  Company's authorization to add a market to the Area listed on Schedule 1 must be in writing and signed by Company.  Each Company market may have a different Compensation Schedule and different Dealer Policies from those of other markets operating under this Agreement.  Company may terminate Dealer's authorization to operate in any individual market due to a breach of this Agreement or as otherwise specified in this Agreement.

    **2.2    Authorization from Approved Retail Locations.**  Company authorizes Dealer to offer and sell Service -- excluding Service that Company has defined as non-authorized Service -- only from **Approved Retail Locations,** which are Dealer's retail locations within the Area that have been approved by Company in writing under this Agreement.  The Approved Retail Locations are listed on Schedule 1, which Company may issue from time to time to update the list of Approved Retail Locations within an existing market.

    **2.3    Nature of Relationship.** The relationship created by this Agreement is that of independent contracting parties and is not any other relationship, including, without limitation, that

Cingular Wireless Proprietary & Confidential
Use According to Company Instructions

Exhibit  A

Page  16

of joint employers, a joint venture, or a partnership. Personnel employed by, or acting under the authority of a party to this Agreement are not employees or agents of the other party. Company and Dealer assume sole responsibility for the employment, compensation, discharge, and control of their own respective employees, contractors, and agents, and for ensuring their compliance with this Agreement. Dealer is not a general agent of Company. Dealer has not paid and is not required to pay any franchise fee or other fee to be a dealer for Company or to use Company's name or other intellectual property. This Agreement does not create any franchise between the parties. Neither Dealer nor any Affiliate may be a reseller of Company's Service.

## 2.4    Prohibitions and Restrictions.

**2.4.1**    Dealer is prohibited from conducting any telemarketing, direct marketing, or electronic commerce effort to solicit Subscribers from the general public. Any exceptions to this restriction must be made in writing and signed by Company. Further details regarding this restriction and any limited exceptions may be contained in the Dealer Policies related to direct marketing and electronic commerce.

**2.4.2**    Company reserves the right to declare selected Service as non-authorized Service by restricting Dealer from selling Service: (a) on certain non-authorized service rate plans (voice or data); (b) on certain types of technologies; (c) on certain models of Equipment; (d) to certain specifically enumerated Subscribers; (e) to certain classes of Subscribers, such as those that generate revenues above a specific level, or governmental or corporate entities; and (f) by certain sales or marketing methods. All applicable restrictions are defined in the Dealer Policies or may be communicated to Dealer in writing from time to time.

**2.4.3**    Dealer is prohibited from having subdealers under this Agreement. Dealer must not, directly or indirectly, share any compensation earned under this Agreement with any other person or entity that sells Service to the public, except for Dealer's own employees or contracted sales representatives. Dealer must not allow any other person or entity to use its dealer codes issued by Company under this Agreement. Any exceptions to these prohibitions must be under a separate written amendment between the parties.

## 2.5    Other Competitive Distributors.    Company currently sells Service and equipment directly to potential Subscribers and has also appointed other dealers, retailers, resellers, and others to sell Company's Service in the Area in direct competition with Dealer. Company reserves the right to continue these direct and indirect distribution practices in the future at any location within the Area regardless of the proximity to any Approved Retail Location. Company and others may also sell other products and services and provide installation, repair, or warranty service in the Area. In addition, Company may enter into agreements with other exclusive or nonexclusive distributors that contain compensation and terms and conditions that are different than the compensation and terms and conditions in this Agreement, and that permit these competitive distributors to offer products and services in the Area that are different than the products and Services that Dealer is authorized to distribute under this Agreement. Company, in its sole discretion, determines which products and services that Dealer is authorized to distribute under this Agreement and Company is not obligated to authorize Dealer to distribute any of the products or services offered by the competitive distributors.

## 2.6    Acknowledgments and Representations.

Cingular Wireless Proprietary & Confidential
Use According to Company Instructions

**2.6.1** Company and Dealer understand and accept that the terms, conditions, and covenants contained in this Agreement are reasonably necessary to maintain Company's high standards for Service and to protect and preserve the goodwill of Company's Service and its brand. Dealer has made material representations to Company in its application to become an authorized dealer of Company and Company has relied upon these representations as a material inducement to enter into this Agreement.

**2.6.2** Dealer represents and warrants to Company that the execution and performance of this Agreement does not violate any other contract or obligation to which Dealer is a party, including terms relating to covenants not to compete, exclusive dealing, and confidentiality covenants. Dealer must not disclose to Company, or use or induce Company to use, any proprietary information or trade secrets of any other person, association, or entity.

**2.6.3** Company expressly disclaims the making of, and Dealer acknowledges that it and its Affiliates have not received, have no knowledge of, and are not relying on any representation by any employee or representative of Company or its affiliates as to: (i) the revenue or profitability that Dealer might achieve as a result of entering into this Agreement; (ii) the number of activations, upgrades, or other business activity that Dealer may facilitate as a result of entering into this Agreement; (iii) the quality of the network from which Services are provided; and (iv) any other factor relating to the business operations of Dealer, except as expressly set forth in this Agreement. Dealer represents that it has independently investigated the risks and opportunities of the business outlined in this Agreement and has independently decided to sign this Agreement. Dealer acknowledges that it is responsible for independently deciding on the location of each Approved Retail Location and Company is not responsible for Dealer's decision to open any Approved Retail Location.

## 3.    APPROVED RETAIL LOCATIONS.

**3.1    Opening an Approved Retail Location.**  When Dealer is opening its initial Approved Retail Location(s), and if Dealer desires to open any additional location, Dealer must first receive written approval from Company. Dealer is solely responsible for selecting any potential location, but Company may approve or deny any location at its sole discretion. The lease for any location that Company approves must be in Dealer's own name. Company must be named in each lease as a preapproved assignee of that lease. Dealer expressly acknowledges that it does not have the authority to bind Company or its affiliates to any lease agreements. Upon request by Company, Dealer must submit any proposed lease to Company for its approval before Dealer signs the lease. Dealer must promptly notify Company of the date a new location opens so that Company may issue a revised Schedule 1. Any retail location approved by Company under this Agreement that Dealer opens in the Area constitutes an Approved Retail Location subject to the terms and conditions of this Agreement, whether or not the change is actually reflected on Schedule 1.

**3.2    Selling or Closing a Leased Approved Retail Location.**

**3.2.1**    If Dealer wants to terminate, transfer, sell, or otherwise dispose of its leasehold interest in an Approved Retail Location, Dealer must provide Company with 90 days advance written notice setting forth the reasons for the closure, transfer, sale, or disposal, and with a copy of the relevant lease. Company has 45 days from the date it receives this notice to decide to either assume or reject the remainder of each lease. If Company decides to assume a lease, Dealer must assign the lease, together with all leasehold improvements to this Approved Retail

Cingular Wireless Proprietary & Confidential
Use According to Company Instructions

Exhibit _A_

Page _18_

Location, to Company without any additional consideration. However, Company will reimburse Dealer for the depreciated value of any direct out-of-pocket expenses that Dealer incurred for the purchase of any equipment, furniture, or fixtures that were required by Company and for which Dealer was not previously reimbursed. Company has no obligation to reimburse Dealer for any expenditures that were not required by Company. Dealer remains responsible for all of its obligations under the lease through the effective date of the assignment. If Company decides not to assume any lease, Dealer must notify Company as soon as the Approved Retail Location actually closes or is transferred so that Company may issue a revised Schedule 1. If Dealer closes down or stops selling Service from any Approved Retail Location, that location automatically loses its approval and is no longer an Approved Retail Location, whether or not Dealer complied with this Agreement regarding that closure or transfer and whether or not the change is actually reflected on Schedule 1.

**3.2.2** Failure to provide Company with the required advance written notice may result in the unnecessary closure of an Approved Retail Location, which would cause the Company to suffer monetary damages and damages to its reputation and goodwill. These damages would be difficult to quantify and measure. As a result, Dealer must pay Company $50,000 as liquidated damages for each Approved Retail Location that is closed without providing the required advance written notice. Acceptance by Company of liquidated damages under this provision does not limit Company's right to seek any other appropriate remedies under this Agreement, including without limitation termination of this Agreement.

**3.3     Termination of Agreement.** If Dealer elects to terminate this Agreement without cause, or to not renew this Agreement at the end of any term, then Company has the option in its sole discretion, to require Dealer to assign to Company the leases together with all leasehold improvements for those Approved Retail Locations that Company selects without any additional consideration. However, Company will reimburse Dealer for the depreciated value of any direct out-of-pocket expenses that Dealer incurred for the purchase of any equipment, furniture, or fixtures that were required by Company and for which Dealer was not previously reimbursed. Company has no obligation to reimburse Dealer for any expenditures that were not required by Company. Dealer remains responsible for all of its obligations under all leases through the effective date of the assignment.

**3.4     Right of First Refusal for Dealer-Owned Approved Retail Locations.** If Dealer owns one or more Approved Retail Location and if at any time during the term of this Agreement or upon termination of this Agreement, Dealer receives a bona fide offer from a third party to lease any or all of these Approved Retail Locations (whether directly or indirectly), and Dealer desires to accept this offer, Dealer must notify Company in writing of the terms of this offer. Dealer must provide Company 60 days in which to exercise Company's right of first refusal from the date Company receives notice of the pending lease. If Company elects to exercise this right related to leasing Dealer's Approved Retail Locations, then Company will deliver a written notice to Dealer representing Company's desire to lease these Approved Retail Locations at the same price that is offered to Dealer by the third-party.

**3.5     Dealer Cooperation.** If Company elects assignment or purchase of any Approved Retail Location, then Dealer must cooperate with Company to provide and sign all appropriate documents requested by Company to facilitate the transaction. Dealer must convey all right, title, and interest to Company in all furniture, fixtures, improvements, and other personal property located in the assigned Approved Retail Locations. Dealer must also cooperate with Company if the landlord or other third party requires additional steps to facilitate the transaction.

## 4.     DEALER'S RESPONSIBILITIES.

**4.1     General.** Dealer must devote sufficient resources and use commercially reasonable efforts to promote and sell the Service authorized by Company at all times while this Agreement is in effect. Dealer must not take any action inconsistent with this Agreement and must support Company's efforts in providing Service to Subscribers. Dealer must provide timely, courteous, and efficient service to Subscribers and must be governed in all dealings with members of the public by the highest standards of honesty, integrity, ethical conduct, and fair dealing. Dealer must not engage in any business practice, promotion, or advertising that may be harmful to Company's business or goodwill.

### 4.2     Confidentiality.

**4.2.1** Dealer may receive certain confidential or proprietary information relating to Company or its affiliates, including without limitation, lists of Subscribers, Subscriber information, Customer Proprietary Network Information "CPNI" as defined in the Telecommunications Act (47 U.S.C § 222), technical, financial, and business information, including without limitation, compensation information, the terms of this Agreement, computer programs, data, specifications, and other information not generally known to the public relating to Company (collectively, "Confidential Information"). Any Confidential Information disclosed to Dealer has been disclosed solely for the performance of its duties under this Agreement, and any improper use or disclosure would irreparably injure Company. All Confidential Information is Company's trade secret and exclusive property, and must be returned to Company upon request or upon the termination of this Agreement.

**4.2.2** During and after the term of this Agreement, Dealer must not directly or indirectly, divulge, sell, give away, or transfer any Confidential Information. Dealer may only use Confidential Information for the performance of its duties under this Agreement and Dealer must comply with further restrictions related to Subscribers' Confidential Information and Subscriber privacy as set forth in the Dealer Policies. Dealer may only provide its Affiliates with the specific Confidential Information that they require for the performance of Dealer's duties under this Agreement. Dealer must advise these individuals of the non-disclosure restrictions, and make reasonable efforts to prevent the improper disclosure or use of Confidential Information, including without limitation, having any Affiliates who are not employees agree in writing not to disclose any Confidential Information. If Dealer is served with any form of legal process to obtain Confidential Information, it must immediately notify Company, which has the right to seek to quash this process.

**4.3     Access to Company Systems.** If Company, in its sole discretion, provides Dealer access to any of Company's systems for purposes of performing Dealer's duties under this Agreement, Dealer must use this access only for the purpose authorized explicitly in writing by Company. If Company provides any equipment or software for this purpose, the equipment and software are the sole property of Company at all times, and any software may be subject to a separate license agreement.

**4.4     Non-Solicitation.** While this Agreement is in effect and for one year after it is terminated, Dealer and its Affiliates must not contact Company's Subscribers for the purpose of soliciting or giving any incentive to those Subscribers to terminate their agreement with Company or to convert to a Competitive Service within the Area. During the one-year period after this

Agreement is terminated, any Subscribers who contact Dealer regarding any aspect of Company's Service must be referred directly to Company.

**4.5     Solicitation and Enrollment.**     Dealer must solicit Subscribers strictly in accordance with the Dealer Policies for enrollment of Subscribers and must provide adequate training for its salespersons. Company has the sole right to accept or reject all customer applications for Service. Dealer must market Service that Dealer is authorized to sell to potential Subscribers at rates and on terms and conditions established and published solely by Company, as revised by Company from time to time. Dealer has no right or authority to offer any other service plans, or to vary in any way, rates, rate plans, terms, or conditions related to Service. Dealer must comply with any Dealer Policies regarding security deposits for Service.

**4.6     Subscriber is Company's Customer.**     Once activated, the Subscriber is a customer of Company, and Company is solely responsible for providing billing services to Subscribers. Company may also directly market to and solicit Subscribers as it determines to be in its best interest, without obligation or liability to Dealer. Dealer must not interfere with the contractual relationship between Company and Subscriber in any way. Dealer is not permitted to: a) bill or collect any money from a Subscriber or potential Subscriber for Service, except for prepaid Service and security deposits; b) take any financial responsibility for a Subscriber's Service charges; or c) suggest or facilitate any arrangement to improperly decrease a Subscriber's financial obligation under its Service agreement.

**4.7     Fraudulent Activity.**     Dealer must assist Company's efforts to prevent fraudulent or abusive subscription to or use of Company's Service and must comply with all fraud prevention Dealer Policies. Dealer must not process any application for Service or facilitate Service enrollment that would in any way improperly or fraudulently inflate the number of Subscribers for which it receives compensation or the amount of compensation payable to Dealer for a Subscriber. If Company determines that Dealer has performed any Subscriber activations in a fraudulent, deceitful, or misleading manner, then Dealer is not entitled to compensation under this Agreement for those activations and Dealer is required to compensate Company for losses caused by Dealer's actions in violation of this section or of the related Dealer Policies.

**4.8     Dealer's Business Records.**     Dealer must create and maintain at its principal office, and preserve for at least 4 years from the date of their preparation, complete and accurate records of its business conducted under this Agreement. These records must include, without limitation, records of all activations of Subscribers, compensation earned, advertising, Subscriber solicitations, equipment sales, and Subscriber complaints. Copies of these records must be provided to Company by Dealer upon reasonable advance notice. Dealer must comply with all requirements for the destruction of business records imposed by law, in addition to all Company requirements that are set forth in the Dealer Policies. Upon reasonable advance notice, Dealer must allow Company or its representative access to Dealer's facilities and Approved Retail Locations during normal business hours for inspection of these locations and of these business records and to verify compliance with Company's document destruction policy.

**4.9     Minimum Performance Requirements.**     Company may require Dealer to achieve minimum performance requirements related to Dealer's Subscriber activations, Subscriber churn, and average revenue per Subscriber within an individual market or within the Area, as set forth in the Dealer Policies. Company may add additional minimum performance requirements, or modify existing minimum performance requirements in any way with 30 days advance written notice to Dealer. Dealer's failure to achieve the applicable minimum performance requirements in any

individual market or in the Area may result in termination of Dealer's authorization to operate in any individual market or in termination of this Agreement, or in making Dealer ineligible for certain compensation, as set forth in the Dealer Policies.

**4.10    Insurance.**  Dealer must maintain sufficient workers' compensation insurance and commercial general liability insurance for claims arising out of or occurring in connection with this Agreement, including but not limited to the acts, omissions, or representations of Dealer and its officers, employees, and representatives. This insurance coverage must be maintained at all times during the term of this Agreement at Dealer's sole expense.  Company must be named as an additional insured on each commercial general liability policy. This insurance coverage must be maintained under one or more policies from an insurance company qualified to do business within the Area, with an A.M. Best rating of at least A-, providing minimum liability protection of $1 million per occurrence for bodily and personal injury and death and $1 million per occurrence for property damage.  Dealer must provide Company with a certificate of insurance verifying compliance with the provisions of this paragraph upon request.

**4.11    Regulatory Matters.**  This Agreement is subject to changes necessary to comply with the laws, orders, or regulations of local, state, and federal regulatory agencies with jurisdiction over Service in the Area or over Dealer's activities.  Company may take any action it determines is reasonably necessary to comply with these laws, orders, and regulations.  Dealer must not take any action inconsistent with Company's efforts, and must cooperate with Company before any regulatory authorities.

**4.12    Compliance with Laws.**    Dealer must comply with all local, state, and federal laws and regulations applicable to Dealer's business under this Agreement. Dealer must not discriminate against any Subscriber, employee, or applicant for Service because of race, color, religion, age, sex, national origin, or physical handicap during the performance of this Agreement, and must comply with all applicable nondiscrimination laws.

**4.13    Exclusivity.**

**4.13.1** Within the Area, Dealer and its Affiliates must not, directly or indirectly: (a) solicit, sell, offer, or accept offers for a Competitive Service; (b) induce or refer any actual or prospective Subscriber of Service to subscribe to a Competitive Service; (c) provide any leads to a distributor of Competitive Service; (d) activate subscribers through a reseller or act as a reseller, whether for Company or a Competitive Service; (e) lease, sub-lease, or otherwise provide space to any distributor of Competitive Service; or (f) share financial resources, retail space, administrative support, sales support, managerial support, or any other business resources with any distributor of Competitive Service.

**4.13.2** If, as a result of a violation of this exclusivity provision of this Agreement, Dealer or any Affiliate activates a customer on Competitive Service, Company will suffer monetary damages and loss of goodwill, the value of which is difficult to measure.  As a result, Dealer must pay Company $1500 as liquidated damages for each end-user customer that Dealer or its Affiliate activates on Competitive Service, which sum Dealer agrees is reasonable.  Dealer must, upon Company's written notice, make its books and records available to Company to permit verification of Dealer's compliance with this provision.  In the event of Dealer's refusal to permit this inspection, Dealer must pay Company $1500 as liquidated damages for each end-user customer that Dealer or its Affiliate activates on Competitive Service, as determined by Company. Acceptance by Company of liquidated damages under this provision does not limit Company's

Cingular Wireless Proprietary & Confidential
Use According to Company Instructions

Exhibit __A__
Page __22__

right to seek any other appropriate remedies under this Agreement, including without limitation termination of this Agreement.

## 5.    COMPANY'S RESPONSIBILITIES.

**5.1    Service.**    Company will provide Service to Subscribers subject to regulatory and legal approvals, and based on Company's own guidelines and standards for the provision of Service, which Company may change from time to time at its sole discretion.

**5.2    Training.**    Company will make sufficient training available to Dealer for it to properly offer and sell products and services under this Agreement, in Company's sole discretion.

**5.3    Marketing Support.**    Company will promote and advertise its Service and provide promotional literature from time to time as Company considers appropriate.

**5.4    Compliance with Laws.**    Company will comply with all local, state, and federal laws applicable to Company's business under this Agreement.

**5.5    Reporting.**    Company will provide information and reporting related to Dealer's business conducted under this Agreement as Company considers appropriate based on Company's systems and capabilities.

## 6.    COMPENSATION.

**6.1    Compensation Schedule.**    Subject to the terms and conditions of this Agreement, Dealer will earn from Company the compensation set forth in the attached **Schedule 2 – Compensation Schedule.**  The Compensation Schedule specifies the complete amount owed to Dealer for Dealer's performance of services and its compliance with obligations under this Agreement.

**6.2    Modifications.**  Company may modify the terms and conditions or the payment amounts of every type of compensation listed in the Compensation Schedule in any way with at least 30 days advance written notice to Dealer, including without limitation any Subscriber Management Fees that may be offered in the Compensation Schedule. Company may, without advance notice to Dealer, stop offering any Service plans, or may introduce new or revised Service plans and new services with different compensation than what is set forth in the Compensation Schedule.

**6.3    Offset/Recoupment.**  Company or its affiliates may, at any time, offset and recoup against any and all amounts owed to Dealer or its Affiliates any amounts owed by Dealer or its Affiliates to Company, including but not limited to amounts owed or to be owed under this Agreement, or any other agreement, and any costs or damages incurred by Company and indemnified by Dealer.

**6.4    Compensation Net of Chargebacks.**  All compensation earned by Dealer under this Agreement for a Subscriber must be paid back to Company if the Subscriber deactivates from Service or other changes to Service occur that constitute a Chargeback as defined in the Compensation Schedule.  The time period in which a Chargeback applies is called the Chargeback Period, which is also defined in the Compensation Schedule.  Any compensation

Cingular Wireless Proprietary & Confidential
Use According to Company Instructions

Exhibit ___A___
Page ___23___

generated by Dealer under this Agreement is not owed by Company to Dealer until after Dealer's Chargebacks have been deducted.

## 7.    EQUIPMENT.

**7.1    Certified Equipment.**  Dealer may only sell or lease to Subscribers models of Equipment and SIMs that are fully compatible with Company's Service and that are certified by Company.  Dealer must not recommend, sell, or furnish any equipment or accessories disapproved by Company or the FCC for any reason, including without limitation for failure to meet reasonable technical, security, or reliability standards.  Equipment sold by Company meets all standards required under this Agreement.  Company may require or prohibit the use of certain Equipment with selected rate plans or in certain geographic areas, at Company's sole discretion.

**7.2    Credit Approval/Limitations on Equipment Sales.**  Dealer must apply for credit approval in order to purchase Equipment from Company other than on a cash delivery basis, and may be required to sign security agreements, financing statements, and related documents in seeking credit approval. Company may accept or reject Dealer's credit application and may reevaluate Dealer's credit status and limit or eliminate Dealer's credit purchases at Company's sole discretion at any time.  Company may not sell Equipment to Dealer at certain times for various reasons, including, but not limited to, exhaustion of Equipment supplies, manufacturing shortages, supply disruptions, legal prohibitions, or technological obsolescence.

**7.3    Dealer Purchase of Equipment.**

**7.3.1**  All Equipment sold by Company to Dealer is sold at prices established by Company from time to time and under the terms and conditions of this Agreement.  Company reserves the right to only make certain models of Equipment available for purchase by Dealer.  All purchases must be made by Dealer in the form of a written purchase order that must be placed with Company, subject to acceptance by Company.  The terms and conditions appearing on the purchase order form and made a part of this Agreement are limited to the following information, which is necessary to assure prompt processing:  (a) Company's invoice number; (b) delivery information; (c) Company's shipping charges (if applicable); (d) description; (e) quantity (within applicable limits); (f) applicable sales tax; (g) Company's price of each item and final total cost; and (h) signed purchase authorization.  Any additional terms or terms inconsistent with this Agreement contained in the purchase order are deleted and are of no effect.

**7.3.2**  Delivery of Equipment is made to Dealer's designated delivery point. Company may charge delivery costs at its discretion to cover its expenses.  Title and risk of loss of Equipment pass to Dealer when the Equipment is shipped from the dock of either Company or its supplier.

**7.3.3**  Payment for Equipment sold on credit to Dealer is due 30 days from the date of invoice.  Dealer must pay the full invoiced amount without deductions.  If Company agrees that any disputed invoice is incorrect, Company will submit another invoice for the corrected amount.

**7.3.4**  If any amount payable by Dealer to Company becomes past due, in addition to other remedies for breach including but not limited to the immediate termination of this Agreement, Company may elect one or more of the following: (a) require Dealer to pay its account in full; (b) exercise Company's right of offset to collect any money owed by Dealer; (c) require Dealer to deposit with Company an irrevocable commercial letter of credit, cash, or other form of

security, in form and content acceptable to Company; or (d) require Dealer to pay interest charges of 1.5 percent per month, or the maximum rate allowed by law, whichever is lower, on the outstanding balance due.

**7.4    Manufacturer's Warranty.**  Dealer must make the manufacturer's limited warranty statement for Equipment readily available to its customers at the time of sale.  Dealer must not make any warranty representations that are in addition to the statements in the manufacturer's limited warranty.

**7.5    Disclaimer of Warranty by Company.**  Except for the warranty of title, which is provided by Company with Equipment purchased under this Agreement, COMPANY MAKES NO WARRANTIES, EXPRESS OR IMPLIED, AS TO ANY EQUIPMENT.  COMPANY SPECIFICALLY DISCLAIMS ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR ANY OTHER WARRANTY OF FITNESS OR QUALITY.

**7.6    Limitation of Liability for Equipment.**  COMPANY IS NOT LIABLE TO DEALER FOR LOST PROFITS OR REVENUES, WHETHER PRESENT OR PROSPECTIVE, FOR LOSS OF TIME OR BUSINESS REPUTATION, INCONVENIENCE, LOSS OF USE OF ANY EQUIPMENT, PROPERTY DAMAGE, OR FOR ANY OTHER INDIRECT, SPECIAL, RELIANCE, INCIDENTAL, OR CONSEQUENTIAL LOSS OR DAMAGE CAUSED BY ANY EQUIPMENT OR ITS FAILURE TO WORK.  THESE LIMITATIONS OF LIABILITY APPLY TO ALL CAUSES OF ACTION IN ANY WAY RELATED TO THE EQUIPMENT, INCLUDING, WITHOUT LIMITATION, ALLEGED BREACH OF WARRANTY, BREACH OF CONTRACT, PATENT OR COPYRIGHT INFRINGEMENT, OR TORT, WHETHER IN NEGLIGENCE, STRICT LIABILITY, OR OTHERWISE, EVEN IF COMPANY HAS BEEN ADVISED OF THE POSSIBILITY OF ANY SUCH LOSSES OR DAMAGES.  IN THE EVENT OF ANY LIABILITY OF COMPANY TO DEALER RELATED TO EQUIPMENT SOLD UNDER THIS AGREEMENT, THIS LIABILITY IS LIMITED TO THE LESSER OF (a) DEALER'S PROVEN DIRECT DAMAGES, OR (b) THE PURCHASE PRICE OF THE EQUIPMENT WITH RESPECT TO WHICH THE ALLEGED LOSSES OR DAMAGES ARE CLAIMED.

**7.7    Transshipment.**  Dealer must sell Equipment and SIMs purchased from Company or bearing Company's Marks to individuals or businesses that it reasonably believes are the actual end users of this Equipment for activation to Service within the Area.  Dealer must not sell or ship these SIMs or Equipment to any location outside of the Area, directly or indirectly.  Dealer must comply with all Dealer Policies regarding transshipment and inactivated Equipment levels.  If Company determines that Dealer has engaged in transshipment, this Agreement may be terminated immediately and Dealer must pay for losses suffered by Company.

**7.8    Equipment Pricing/Returns.**  All prices for sale of Equipment and accessories by Dealer to Subscribers must be established solely by Dealer.  Dealer must abide by Company's Equipment return policies relative to Subscribers and to Dealer, as set forth in the Dealer Policies.

**8.    DEALER POLICIES.**

**8.1    Compliance with Dealer Policies.**  Dealer must comply with all policies governing the conduct of Dealer's business under this Agreement reasonably prescribed from time to time by Company.  All policies issued by Company under this Agreement are incorporated by reference in this Agreement in their entirety ("Dealer Policies").  Dealer's failure to comply with these Dealer Policies constitutes a material breach of this Agreement and may subject Dealer to monetary

penalties that are specifically outlined in the Dealer Policies, forfeiture of Dealer's right to sell certain products or services, termination of this Agreement, or other remedies identified in the Dealer Policies. Company will send written notice to Dealer of any new Dealer Policies issued by Company or of any changes to existing Dealer Policies. In addition, Dealer must comply with other operational manuals, procedural guides, or information statements that Company may issue from time to time.

**8.2    Distribution of Other Products and Services.**   Company may, in its sole discretion, offer Dealer the opportunity to distribute other products and services under the terms and conditions of this Agreement through a Dealer Policy.   If Dealer chooses to participate in distributing other products and services, it must comply with any additional terms and conditions set forth in the relevant Dealer Policies.

## 9.    USE AND PROTECTION OF MARKS.

**9.1    Use of Marks.**   During the term of this Agreement, Company authorizes Dealer to be an Authorized Dealer of Company and to use its trademarks, service marks, trade names, logos, or similar markings that Company owns or is licensed to use ("Marks") subject to the limitations contained in this Agreement, including the Dealer Policies. Company will publish a list of authorized Marks that Dealer is licensed to use on a nonexclusive basis and the words identifying or qualifying Dealer's relationship to Company, all of which Company may change from time to time. Dealer must indicate that Company is the provider of the Service in its advertising, and may use the authorized Marks in its advertising. Dealer must not use the Marks for any other purpose without the express prior written consent of Company.

**9.2    No Transfer of Rights.**  This Agreement does not transfer any rights to use any Marks (except to the limited extent expressly set forth in this Agreement) and does not confer any goodwill or other interest in the Marks. All Marks and the great value of the associated goodwill are the exclusive property of Company. All displays, banners, signs, and other similar tangible property bearing Company's name or Marks are the sole property of Company. Dealer must not challenge Company's ownership of the Marks in any way. Company transfers no rights and grants no licenses, express or implied, under any patents or other intellectual property owned or licensed by Company.

**9.3    Unauthorized Use.**  Any unauthorized use of the Marks by Dealer or its Affiliates or agents constitutes infringement of Company's rights and a material breach of this Agreement. Upon demand by Company or upon termination of this Agreement for any reason, Dealer must immediately discontinue use of all Marks. In this event, Dealer must promptly return all signage and other materials bearing Company's name, or allow Company to enter Dealer's premises to remove these materials upon 5 business days advance notice. If landlord or governmental approval is required to remove any signage, Dealer must take reasonable action to assist Company's efforts to obtain these approvals. Dealer must cooperate with Company's efforts to protect its Marks and other intellectual property.

**9.4    Advertising.**  Dealer is under no obligation to conduct any type of advertising. If Dealer chooses to advertise, however, Dealer must conform to the highest ethical standards for advertising, take all reasonable steps to make sure that its advertising materials are factually correct, comply with all applicable laws, and correctly use the Marks. Company may require that Dealer's marketing and advertising materials be submitted to Company for review before being used, as set forth in the Dealer Policies.

Cingular Wireless Proprietary & Confidential
Use According to Company Instructions

Exhibit   A
Page   26

## 10.    TERM AND TERMINATION.

**10.1    Term.**  This Agreement will automatically renew for successive one-year periods under the same terms and conditions as are in effect at the time of the renewal.  Either party may terminate this Agreement if it gives written notice to the other party of its intention to terminate this Agreement at least 60 days before the expiration of the then current term.

**10.2    Termination for Cause with Cure Period.**  Subject to the provisions contained in section 10.3, either party may terminate this Agreement by written notice to the other party if the other party breaches any material provision of this Agreement.  In the event of a breach, the allegedly breaching party must be provided with written notice of any violation of this Agreement and offered 30 days to cure this violation after receiving this notice.  If the breach is not cured by the end of the 30-day period, then any previously delivered termination notice becomes effective without further notice.

**10.3    Termination for Cause Immediately Upon Written Notice.**  Despite the above, a breach by Dealer of any part of sections 2.6.2, 3.2, 4.1, 4.2, 4.3, 4.4, 4.7, or 9 of this Agreement is not subject to cure and, accordingly, any such breach gives Company the right to terminate this Agreement immediately upon written notice to Dealer.  Either party may also terminate this Agreement immediately upon written notice to the other party if the FCC or any other regulatory agency promulgates any regulation or order that prohibits or substantially impedes either party from fulfilling its obligations, or if the other party: (a) becomes financially insolvent; (b) makes an assignment for the benefit of creditors; (c) has an Order for Relief under the United States Bankruptcy Code entered by any federal court against it; or (d) has a trustee or receiver of any substantial part of its assets appointed by any court.  Company may terminate this Agreement immediately upon written notice if for any reason Company is no longer authorized to provide Service within the Area, if Dealer is found to have made a material misrepresentation or omission to Company during the application process, or if Dealer is found to have engaged in fraudulent or illegal conduct that either harms Company or that is likely in Company's sole discretion to adversely affect Company's reputation or goodwill.

**10.4    Termination Without Cause.**  Either party may terminate this Agreement in its entirety, without cause, with 90 days prior written notice to the other party.  Either party may also terminate this Agreement with respect to any individual market or markets listed on Schedule 1, without cause, with 90 days prior written notice to the other party.

**10.5    Termination Reserve/Payment of Chargebacks.**  Upon any notice of termination of this Agreement, or notice of termination of Dealer's authorization to operate in any market, or if Company determines in its sole discretion that Dealer is likely to stop doing business in any market, Company may withhold a reserve from any money owed to Dealer that may be used to satisfy any obligations owed or to be owed by Dealer to Company, including but not limited to, anticipated Chargebacks after the termination of this Agreement or after Dealer stops doing business.  Accordingly, Company may hold a reserve in the amount of the approximate value of Dealer's Chargebacks over the previous 180 days, adjusted for the amount Company expects Dealer to owe, in Company's sole discretion.  Any remaining balance in the reserve 180 days after the termination date will be promptly paid to Dealer.  Despite any reserve, if Dealer still owes Company money for Dealer's post-termination Chargebacks, then Dealer must pay the remaining balance of the Chargebacks to Company within 30 days of written request.

Cingular Wireless Proprietary & Confidential
Use According to Company Instructions

**10.6    Obligations of Dealer Upon Termination.** Upon the termination of this Agreement, Dealer must: (a) discontinue the use of all Marks, and any similar trade names, service marks, trademarks, signs, or designs, and must return to Company all materials containing any Mark or otherwise identifying or relating to Company's business; (b) cease representing itself in any fashion as a Dealer or representative of Company; (c) return to Company or destroy those documents, records, or other materials (including all copies, either photocopies or electronic copies) that were provided to Dealer by Company or that contain any Confidential Information, including without limitation all information related to Subscribers and all CPNI; and (d) not solicit Subscribers for one year in accordance with the non-solicitation provision of this Agreement.

**10.7    No Compensation.** Upon termination of this Agreement, Dealer's right to all forms of compensation under this Agreement ends, including without limitation any Subscriber Management Fees. Similarly, upon termination of Dealer's authorization to operate in any individual market, Dealer's right to all compensation under this Agreement related to that market ends, including without limitation any Subscriber Management Fees. However, if under the relevant Compensation Schedule, Dealer is eligible for commission for a Subscriber activation before the termination date of this Agreement and that Subscriber remains active through the relevant Chargeback Period after the termination of the Agreement, then Dealer earns its one-time commission for that Subscriber.

## 11.    DISPUTES.

**11.1    Notification and Limitation of Actions.** Dealer must notify Company in writing of any controversy or claim it may have regarding this Agreement or its relationship with Company within 120 days of the date Dealer became aware or should have become aware of this grievance or dispute. If Dealer fails to notify Company of the controversy or claim within 120 days, then Company is not liable to Dealer for any loss or injury relating to that controversy or claim. The failure by Dealer to timely notify Company of any grievance or dispute is an absolute bar to the institution of any proceedings that may have been based upon this grievance or dispute.

**11.2    Mandatory Pre-arbitration Dispute Resolution Procedures.** If a controversy or claim arises out of or related to this Agreement, the dispute resolution procedures in this section are required before either party may initiate arbitration. Either party must request to meet the other party within 14 days, at a mutually agreed time. A representative of Dealer and of Company who are empowered to resolve the matter will meet at least once and will attempt in good faith to resolve the matter. If the matter has not been resolved within 21 days of their first meeting, the matter then becomes the responsibility of a senior executive of each party who has authority to settle the dispute. The parties must promptly prepare and exchange memoranda stating all of the disputed issues and their positions on these issues, an estimate of the amount of direct losses suffered and of the amount of damages claimed, a summary of the negotiations that have taken place, and attaching relevant documents. A senior executive of Company and Dealer will meet for negotiations within 14 days after the end of the 21-day period referred to above at a mutually agreed time. The first meeting of senior executives should be held at the offices of the party receiving the request to meet, and future meetings will rotate between the offices of Dealer and Company.

**11.3    Arbitration of Disputes.**

**11.3.1 Arbitration Clause.** If the matter has not been resolved under the mandatory dispute resolution procedures above, then, except as stated in section 11.3.4 of this Agreement, all claims (including counterclaims and cross-claims and also including claims based

Cingular Wireless Proprietary & Confidential
Use According to Company Instructions

exclu dlr - v.1, 7/1/05

14

Exhibit   A
Page   23

on tort or other legal theories) and disputes between Dealer and Company must be resolved by submission to binding arbitration. The parties understand that they are waiving all right to a jury trial, even if this arbitration clause is found to be inapplicable or invalid, in which case a judge must decide the dispute. The parties must submit any disputes to the American Arbitration Association ("AAA") nearest to Dealer within the Area to be decided under the then current AAA commercial arbitration rules, as modified by this Agreement. In the event that AAA declines to administer this arbitration, the parties will then mutually agree upon another qualified arbitration institution. The arbitration must be conducted by 3 arbitrators. The nature and outcome of any arbitration under this Agreement is Confidential Information.

**11.3.2  Limitations of Actions.**  All claims and disputes covered by this provision must be submitted to arbitration by initiating the arbitration no later than 180 days after the aggrieved party became aware or should have become aware that the act or omission giving rise to the claim or dispute occurred, except for the failure to pay invoices for equipment purchased by Dealer from Company.  The failure to initiate arbitration within this period is an absolute bar to the institution of any proceedings based on such act or omission.  The aggrieved party must initiate arbitration under this provision by sending written notice of an intention to arbitrate to all parties. The notice must contain a description of the dispute, the amount involved, and the remedy sought. Notwithstanding any other limitations set forth in this Agreement, either party is entitled to assert counterclaims within 30 days from the date that it receives notice of any claim asserted against it.

**11.3.3  Procedures and Discovery.**  A prehearing conference must take place to reach agreement on procedural matters, arrange for the exchange of information, obtain stipulations, schedule the arbitration hearing, and attempt to narrow the issues.  In order to expedite the arbitration proceedings, the parties agree to place the following limitations on discovery:

(i)   Each party may propound only 10 interrogatories (each subpart counting as one interrogatory) to each other party;

(ii)  The parties may serve document requests.  Responsive documents are to be exchanged no later than 45 days after service of the request;

(iii) Each party may depose up to 8 witnesses of each other party (including current and former employees and officers) and up to two non-party witnesses per each adverse party. Any party deposing an opponent's expert witness must pay the expert's fee for attending the deposition; and

(iv)  Parties may conduct additional discovery beyond the limitations of these express rules only by written stipulation or express permission from the arbitrator upon a showing of good cause.

**11.3.4  Right to Seek Injunction.**  Despite anything to the contrary in this arbitration provision, either party may bring court proceedings to seek an injunction or other equitable relief to enforce any right or obligation under this Agreement.  To obtain injunctive or other equitable relief, neither party is required to post a bond, but if required by law or by the court, both parties consent to a bond in the lowest amount permitted by law.

**11.3.5  Enforcement of Award.**  This Agreement provides no greater right of review than that which is conferred under applicable state and federal law.  The award of the

arbitrator may be confirmed or enforced in any court having jurisdiction under the enforcement provisions of the Federal Arbitration Act.

**11.3.6 Fees.** Arbitrator's fees are split equally between the parties unless the arbitrator rules otherwise at the conclusion of the arbitration or this allocation is prohibited as a matter of law. If a party defaults on its obligation to pay, the non-defaulting party has the option to either: (a) make the missed payments and recover them at the conclusion of the arbitration regardless of who prevails, or (b) forego the use of the arbitration process and bring its claim to a court having jurisdiction. If the non-defaulting party brings its claim to a court having jurisdiction, then any statutory or contractual limitations period is tolled from the time that the arbitration was initiated until the matter is officially closed.

## 12.    MISCELLANEOUS.

**12.1    Governing Law.** Except to the extent governed by federal laws or regulations that preempt state law, the entire relationship of the parties based on this Agreement is governed by the substantive laws of the State of Georgia, without reference to its choice of law rules.

**12.2    Cumulative Rights/Waivers.** The rights of the parties under this Agreement are cumulative and not exclusive of any other rights or remedies. Either party's waiver of any right or remedy under this Agreement does not constitute a waiver of that same right or remedy or of any other right or remedy on a future occasion.

**12.3    Events Beyond a Party's Control.** Neither party is liable for loss or damage or is in breach of this Agreement if its failure to perform its obligations results from: (a) compliance with any law, order, regulation, or requirement of any federal, state, or local government, or any court of competent jurisdiction; (b) acts of God; or (c) fires, strikes, embargoes, war, terrorism, insurrection, riot, and other causes beyond the reasonable control of the party. Any delay resulting from any of these causes extends performance accordingly or excuses performance, in whole or in part, as may be reasonable.

**12.4    Entire Agreement.** This Agreement represents the entire agreement of the parties with respect to the subject matter of the Agreement. There are no other oral or written understandings or agreements between Company and Dealer relating to the subject matter of this Agreement, and this Agreement supersedes all prior negotiations, communications, agreements, and addenda between the parties with respect to the subject matter of this Agreement, but any releases or post-termination covenants are not superseded. Nothing in this Agreement is intended or should confer any rights or remedies upon any person or entity not a party to this Agreement.

**12.5    Modification.** This Agreement may only be amended or superseded by written agreement signed by authorized representatives of both parties, unless expressly permitted under the terms of this Agreement. Each written modification is effective only in the specific instance and for the specific purpose for which it was given. No course of dealing, course of performance, or usage of trade may be invoked to modify the terms and conditions of this Agreement. No other understandings or representations, whether oral or in writing, may amend or supersede this Agreement.

**12.6    Assignment.** Neither party may assign this Agreement or any of its rights or obligations under this Agreement without the other party's prior written consent, except that: (a) Company may fully assign its rights and duties under this Agreement to any affiliate, successor, or

to any entity or person in connection with a merger or consolidation of Company or with a sale of all or any portion of the assets or business of Company; and (b) Dealer may grant to an institutional lender as collateral for a loan or other credit facility a security interest in the other moneys payable to Dealer under this Agreement subject to the offset rights of Company provided in this Agreement and in any other agreement between Company and Dealer.  Any material change of ownership or control of the legal entity of Dealer, whether voluntary or involuntary, constitutes an assignment of this Agreement.  Any assignment by Dealer in violation of this section immediately renders this Agreement null and void and conveys no rights or interest.

**12.7    Survival.**  The terms, provisions, representations, and warranties contained in this Agreement that by their sense, context, or express language are intended to survive do survive the termination of this Agreement.  The parties must fulfill all surviving obligations in a timely manner, and these obligations are binding upon each party's respective successors and assigns. Regarding compensation to Dealer, no compensation, including without limitation Subscriber Management Fees, or other compensation related to Dealer's base of Subscribers under this Agreement or any amendment, survives the termination of this Agreement. The only compensation items that survive are: (a) Company's obligation to pay Dealer a one-time commission under the Compensation Schedule for a Subscriber who was activated before the termination of this Agreement and who remains on Service beyond the Chargeback Period; (b) Company's right to Chargeback Dealer under the relevant Compensation Schedule after termination, and Dealer' obligation to pay Company for these Chargebacks; and (c) Company's right of Offset/Recoupment.

**12.8    Severability.**  A determination by a court or arbitrator of competent jurisdiction that any provision of this Agreement or any part of it is unenforceable does not cancel or invalidate the remainder of that provision or of this Agreement, which remain in full force and effect and must be construed to carry out the intent of the parties.

**12.9    Indemnity.**  Dealer and Company must defend and indemnify the other party and its affiliates, parents, subsidiaries, and their employees and agents from all liability, damages, punitive damages, fines, expenses, including reasonable attorneys' fees and disbursements, claims, demands, or suits arising from their breach of this Agreement or non-compliance with law, their negligent, willful, or fraudulent acts, or for their failure to act, with respect to the performance of each party's obligations under this Agreement, including, without limitation, any allegedly unauthorized use of a trademark, patent, copyright, process, method, or device, false or misleading advertising, or bodily injury, death, or damage to property to the extent occasioned by the acts or omissions of the indemnifying party or its affiliates, employees, or agents.  Prompt written notice must be provided to the indemnifying party of any claim for indemnity.  Each party may conduct its own defense of any claim in which it is named as a defendant without diminishing its indemnity rights.  This indemnity provision only applies to claims or liability from third parties and not to claims between the parties.  Each party is only responsible for any losses or damages proximately caused by it.  The Limitation of Liability provisions of this Agreement do not limit recovery under this Indemnity clause.

**12.10   Limitation of Liability.**  EXCEPT TO THE EXTENT OTHERWISE PROVIDED UNDER THE INDEMNITY PROVISION, NEITHER COMPANY NOR DEALER IS LIABLE TO THE OTHER FOR ANY INDIRECT, SPECIAL, RELIANCE, INCIDENTAL, CONSEQUENTIAL, PUNITIVE, OR EXEMPLARY DAMAGES, INCLUDING WITHOUT LIMITATION LOST PROFITS OR REVENUES, AS A RESULT OF ANY DEFAULT OR BREACH OF THIS AGREEMENT OR THE TERMINATION OR NON-RENEWAL OF THIS AGREEMENT OR ANY OTHER EVENT,

Cingular Wireless Proprietary & Confidential
Use According to Company Instructions

CONDUCT, ACT OR OMISSION ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER BASED ON CONTRACT, TORT, STATUTE, OR OTHERWISE. THIS LIMITATION OF LIABILITY IS MADE KNOWINGLY, INTENTIONALLY, AND VOLUNTARILY.

**12.11 Notices.** All notices, requests, demands, and other communications under this Agreement, must be in writing and are considered given if delivered personally, sent by certified mail, return receipt requested, or sent by nationally recognized overnight carrier to the current address for official notices under this Agreement. The official addresses for notices of this Agreement may be changed by written notice to the other party in accordance with this section. However, Company's notices regarding Dealer Policies and compensation changes may also be delivered by facsimile, electronic means, or by U.S. Mail.

Cingular Wireless Proprietary & Confidential
Use According to Company Instructions

Exhibit _A___
Page ___32__

18

**SCHEDULE 1**
**Area & Approved Retail Locations**
(List only one Company market per page of Schedule 1.)

**Effective Date: January 1, 2006**

**Area:**        **Northern California Region**

**Market:**    The Northern California Market compromising the counties of Monterey, San Benito, Santa Cruz, San Mateo, Santa Clara, Alameda, San Francisco, Contra Costa, Solano, Napa, Marin, Sonoma, Lake, Mendocino, Trinity, Humbolt, Del Norte Siskiyou, Modoc, Shasta, Lassen, Tehama, Plumas, Glenn, Butte, Colusa, Yolo, Sutter, Sacramento, San Joaquin, Stanislaus, Tuolemne, Calaveras, Amador, Alpine, El Dorado, Placer, Nevada, Yuba, and Sierra,  and, the Nevada counties of Washoe, Carson, and Douglas.

**B. Approved Retail Locations (in the Company market named above):**

| Approved Retail Locations: | Effective Date of Operation: |
|---|---|
| 1.  1350 Travis Blvd., Fairfield CA 94533 | 1/1/06 |
| 2.  925 Blossom Hill Rd., San Jose, CA 95123 | 1/1/06 |
| 3.  2556 Sommerville Rd., Antioch, CA 94509 | 1/1/06 |
| 4.  3521 Investment Blvd., Suite 2 Hayward, CA 94545 | 1/1/06 |
| 5.  3215 20th Avenue San Francisco, CA 94132 | 1/1/06 |
| 6.  447 Great Mall Drive Milpitas, CA 95035 | 1/1/06 |
| 7.  2855 Stevens Creek Blvd. Santa Clara, CA 95050 | 1/1/06 |
| 8.  1 Stoneridge Mall #15 Pleasanton, CA 94588 | 1/1/06 |

Cingular Wireless Proprietary & Confidential
Use According to Company Instructions

Exhibit __A__
Page __33__

19

# ADDENDUM TO
## AUTHORIZED AGENCY AGREEMENT
### BETWEEN
## CINGULAR WIRELESS II, LLC, SUCCESSOR IN INTEREST TO SOUTHWESTERN BELL MOBILE SYSTEMS, LLC
### d/b/a CINGULAR WIRELESS ("CINGULAR")
### AND
## VIVA WIRELESS, INC. ("AGENT")

WHEREAS, the parties entered into an Authorized Agency Agreement effective June 1, 2004, for the Sacramento Area ("Agreement"); and

WHEREAS, the parties desire to amend the Agreement.

NOW, THEREFORE in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, IT IS AGREED AS FOLLOWS:

Exhibit A is deleted in its entirety and the attached Exhibit A is substituted in lieu thereof.

This Addendum is effective January 1, 2006.

Except as modified herein, all terms and conditions of the Agreement and all Exhibits and Addenda thereto shall remain the same and in full force and effect.

IN WITNESS WHEREOF the parties hereto have executed, sealed and delivered this Addendum in two counterparts.

CINGULAR WIRELESS II, LLC, SUCCESSOR IN INTEREST
TO SOUTHWESTERN BELL MOBILE SYSTEMS, LLC
d/b/a CINGULAR WIRELESS

By: _____

Title: _Director of Sales_

Date: _12/22/2005_

VIVA WIRELESS, INC

By: _____

Title: _CEO_

Date: _12/20/05_

Exhibit __A__
Page __34__

## Exhibit A
## Area and Agent Locations

**Area:**

     The Area is defined as the Northern California /Northern Nevada marketing region comprising San Francisco, Alameda, Amador, Calaveras, Carson City, Churchill, Clark, Contra Costa, Douglas, Elko, Esmeralda, Eureka, Fresno, Humboldt, Kings, Lander, Lincoln, Lyon, Madera, Marin, Merced, Mineral, Monterey, Napa, Nevada, Nye, Pershing, Sacramento, San Joaquin, San Mateo, Santa Clara, Santa Cruz, Stanislaus, Storey, Tulare, Tuolumne and Washoe Counties.

**Authorized AGENT Locations:**

     This Exhibit A sets forth the locations at which VIVA WIRELESS is authorized to operate as described in this Agreement.

     It is agreed by VIVA WIRELESS and CINGULAR that if the initial business location(s) and/or the date upon which operations of VIVA WIRELESS will commence are not known at the date of execution of this Agreement, the same may be added from time to time as such information becomes known but no later than the effective date of VIVA WIRELESS operations.

     VIVA WIRELESS shall not close, change or add business locations without CINGULAR prior written approval in accordance with this Agreement.

     Any business locations that THE WIRELESS STORE opens and operates in the Area shall be subject to all of the terms of the Agreement, whether or not an amendment is signed by the parties adding the addresses of any new or different locations.

Business Locations:

| | |
|---|---|
| 1. | 1350 Travis Blvd., Fairfield, CA 94553 |
| 2. | 925 Blossom Hill Rd., San Jose, CA 95123 |
| 3. | 2556 Sommerville Road, Antioch, CA 94509 |
| 4. | 3521 Investment Blvd., Suite 2, Hayward, CA 94545 |
| 5. | 3215 20th Avenue, San Francisco, CA 94132 |
| 6. | 447 Great Mall Drive, Milpitas, CA 95035 |
| 7. | 2855 Stevens Creek Blvd., Santa Clara, CA 95050 |

8. 1 Stoneridge Mall #15, Pleasanton, CA 94588

This Exhibit A may be amended from time to time, subject to the procedures and requirements of this Agreement.

This Exhibit A is effective as of January 1, 2006.

VIVA WIRELESS's Initials and Date: _CP 12/20/05_

CINGULAR's Initials and Date: _MW 12/14/05_

Exhibit __A__
Page __38__

# EXHIBIT B

**From:**    Carolyn Pestano [cpestano@vivawirelessinc.com]
**Sent:**    Wednesday, September 06, 2006 3:03 PM
**To:**      Davis, Scott
**Subject:** FW: Expansion Loan Proposal

**From:** Carolyn Pestano [mailto:cpestano@vivawirelessinc.com]
**Sent:** Tuesday, August 08, 2006 7:12 PM
**To:** 'Davis, Scott'
**Cc:** Sean Oco
**Subject:** Expansion Loan Proposal

Scott,

- $250,000 for 5 new locations: Southland (kiosk), Eastridge (kiosk), NewPark (kiosk), Arden Fair (cart), and Tanforan (cart)
- 1 Year Term Loan, payable in 12 equal monthly payments or 12 equal monthly commission deductions
- Market interest rate
- Repayment date starting 12/1/06
- Option to payoff loan balance earlier

Let me know what you think.

Thanks,
Carolyn

ATT/PES 29295

CONFIDENTIAL
SUBJECT TO
PROTECTIVE ORDER

Exhibit _B_
Page _37_

# EXHIBIT C

## Advance Payment Agreement

This **Advance Payment Agreement** ("APA") is entered into on October *10*, 2006, between **Cingular Wireless II, LLC**, and its affiliates in the Area, ("Cingular"), with its office at 74420 Rosewood, Bldg. 2, Pleasanton, CA 94588, and **Viva Wireless, Inc.**, with its office at 3521 Investment Blvd., Ste. 2, Hayward, CA 94545 ("Dealer").

### RECITALS

Dealer is a party with Cingular to an existing Exclusive Dealer Agreement effective January 1, 2006 ("Dealer Agreement") and a Settlement and Release Concerning Dealer's Pre-2/1/06 Total Subscriber Base effective February 1, 2006 ("2/1/06 SMF Release").

Cingular makes periodic compensation payments to Dealer under both the Dealer Agreement and the 2/1/06 SMF Release. Dealer has requested that Cingular pay Dealer an advance a portion of its monthly payments due under the 2/1/06 SMF Release and Cingular agrees to advance Dealer said monthly payments subject to the terms of this APA.

Cingular and Dealer, in consideration of the mutual promises in this APA, agree as follows:

1.      Cingular will advance Dealer the following: $250,000.00 for the build-out of four (4) new dealer retail locations retail locations approved by Cingular pursuant to the terms of the Dealer Agreement and the renovation of two (2) existing dealer retail locations  (locations listed Exhibit A on the attached hereto), subject to terms of the this APA (the "Advance").  Cingular shall pay Dealer the Advance within thirty (30) days of the date of this APA.

2.      Dealer agrees to reimburse Cingular for the Advance from future monthly payments due to Dealer under the 2/1/06 SMF Release as follows:  Beginning in the first month in which a monthly payment is due to Dealer under the 2/1/06 SMF Release after this APA is executed and continuing each month until Dealer repays Cingular for 100% of the Advance, Cingular will withhold a maximum of $20,000.00 per month from the monthly payment due to Dealer under the 2/1/06 SMF Release.

3.      The full balance of Advance shall become immediately due and payable by Dealer to Cingular upon the occurrence of any of the following:  (a) the termination of the Dealer Agreement, or (b) Dealer's breach of any of the terms of this APA. Furthermore, in the event that Dealer defaults on payment of the Advance under the terms of this APA, Carolyn Pestano, Chief Executive Officer of Dealer, has executed a Personal Guaranty (attached hereto as Exhibit B), whereby she agrees to personally guarantee the immediate payment of the full balance of the Advance pursuant to the terms therein.

4.    The parties hereto agree that they shall keep confidential the terms and conditions of this APA, and that they will not disclose any of the provisions of this APA, including the fact that Cingular advanced build out funds to Dealer and the amount of the Advance, except to persons or entities necessary for the administration or enforcement of this APA, such as accountants and insurers, and except as provided by law or court order. If disclosure of the provisions of this APA is necessary by law or court order, the disclosing party shall, where possible, give ten (10) days written notice of its intention to disclose to the other parties.

5.    This APA shall be construed and interpreted in accordance with the laws of the State of California. If any provision is declared by any court to be invalid, the validity of the remaining provisions shall not be affected, and the invalid provision shall be deemed not a part of this APA.

6.    This APA, including but not limited to all of the covenants, agreements, representations and warranties herein, will be deemed to be effective upon, and their validity and enforceability is mutually dependent upon the execution and delivery to the parties, in accordance with its terms, of this APA and all documents referred to herein.

7.    This APA may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

8.    The parties represent and warrant that the execution and delivery of this APA and the actions required by the APA have been duly authorized and that this APA is a valid and binding agreement enforceable against them in accordance with its terms. The parties and the undersigned representatives individually further warrant and represent that the undersigned are duly authorized to execute and deliver this APA on behalf of them. The parties further represent and warrant that they are not breaching or interfering with any agreement, right or obligation to any person, entity, party or non-party by entering into the provisions of this APA.

9.    This APA does not relieve Dealer of existing liabilities to Cingular under the Dealer Agreement or any other agreements between the parties, such as Dealer's payment for the purchase of equipment. Except as specifically set forth in this APA, this Advance does not revise the terms of either the Dealer Agreement or the 2/1/06 SMF Release and Cingular retains the right to amend and/or modify the terms of Dealer's compensation schedule to the Agreement as provided in the Agreement.

10.    This APA may not be modified or amended without the express written consent of the parties hereto.

11.    The waiver by any party of a breach of this APA shall be in writing and will in no way be construed as a waiver of any succeeding breach of such provision or the waiver of the provision itself.

12.     All notices hereunder shall be in writing and deemed made and delivered by facsimile transmission, overnight express service, same or next day courier service, or by personal delivery to such party at its address given below, or such other address that shall have been furnished by such party in accordance with the terms of the Agreement.

13.     This APA shall be construed and interpreted in conjunction with the Dealer Agreement and the 2/1/06 SMF Release. To the extent that this APA revises the terms of the Agreement or the 2/1/06 SMF Release, it shall be treated as an amendment to those respective documents. Similarly, to the extent that this APA adds to the terms of the Dealer Agreement or the 2/1/06 SMF Release, it shall be treated as a supplement to those respective documents. If a conflict exists between the terms of the Dealer Agreement, the 2/1/06 SMF Release and this APA, the terms of this APA shall control.

(Signature page to follow)

SIGNED this _3rd_ day of October, 2006.

**VIVA WIRELESS, INC.**

By: _____
Name: Carolyn Pestaño
Title: Chief Executive Officer
Date: _10/3/06_

**CINGULAR WIRELESS II, LLC d/b/a
CINGULAR WIRELESS**

By: _____
Name: Fred Devereux,
Title: Vice President & General Manager
Date: _10/10/06_

# EXHIBIT A

**New Dealer Retail Locations:**

1. Southland Mall, 1 Southland Mall, Space #5540, Hayward, CA 94545
2. Eastridge, 2200 Eastridge Loop, Space #5534, San Jose, CA 95122
3. Arden Fair Mall, 1689 Arden Way, Space #17, Sacramento, CA 95815
4. NewPark Mall, 2086 Newpark Mall, Space #5541, Newark, CA 94560

**Existing Dealer Retail Locations for Renovation:**

1. 1 Stoneridge Mall, Space #15, Pleasanton, CA 94588
2. 447 Great Mall Drive, Space #ZMISC, Milpitas, CA 95035

# EXHIBIT D

# EXHIBIT B
## DEALER PRINCIPAL PERSONAL GUARANTY

WHEREAS, pursuant to the **Advance Payment Agreement** ("APA") entered into on October 13, 2006, between **Cingular Wireless II, LLC**, and its affiliates in the Area, ("COMPANY"), and **Viva Wireless, Inc.**, ("DEALER"), GUARANTOR hereunder has incurred and/or may in the future incur obligations to COMPANY, and has and/or may in the future become indebted to COMPANY in connection with DEALER's performance under the APA; and

WHEREAS, in order to induce COMPANY to advance DEALER funds for the build-out of new authorized dealer retail locations, GUARANTOR agrees to personally guarantee any and all indebtedness incurred by DEALER as a result of COMPANY's agreement to advance funds to DEALER under the APA.

NOW, THEREFORE, for and in consideration of the agreements contained herein, and other good and valuable consideration, including COMPANY's agreement to advance DEALER funds under the APA, the receipt and adequacy of which are hereby acknowledged, the undersigned, as GUARANTOR, hereby unconditionally and absolutely guarantees to COMPANY the prompt and full payment and/or performance of any and all of DEALER's obligations under the APA, including payment in full of the Advance of $250,000.00, when the same shall be due and payable to COMPANY. It is agreed by the parties that this Guaranty is subject to the following terms and conditions:

1. In the event GUARANTOR fails to make any payment due COMPANY when due, or to perform any other obligation guaranteed by GUARANTOR hereunder in a timely manner, GUARANTOR shall be deemed in default under this Guaranty, and COMPANY may, in addition to any other remedies available to COMPANY at law or in equity, immediately declare all amounts due and owing COMPANY by GUARANTOR to be immediately due and payable.

2. This Guaranty is absolute, continuing and unlimited for the benefit of COMPANY and its successors and assigns, and COMPANY will not be required to proceed first, or at all, against DEALER or against any other person, firm, or corporation, or against any collateral or other security for payment or performance of the Obligations before resorting to the Guarantor. This Guaranty is binding not only on GUARANTOR, but on GUARANTOR's heirs, personal representatives, successors and assigns. This Guaranty shall be governed by and constructed in accordance with the laws of the State of California. All obligations of GUARANTOR hereunder are performable in Alameda County, California, at a location designated by COMPANY. GUARANTOR shall pay any and all reasonable attorney's fees and all other reasonable costs and expenses which may be incurred by COMPANY in the enforcement of this Guaranty.

3.  GUARANTOR's performance under this Guaranty shall not affect DEALER's obligations to COMPANY under the APA or Exclusive Dealer Agreement effective January 1, 2006 between COMPANY and DEALER ("Dealer Agreement"). If GUARANTOR becomes liable to COMPANY for any other obligations, by endorsement or otherwise, such liability shall not in any manner be impaired or affected by this Guaranty, and the rights of COMPANY hereunder or under the Agreement shall be cumulative of any and all other rights that COMPANY may ever have against GUARANTOR. COMPANY's exercise of any right hereunder or under any other instrument shall not preclude the concurrent or subsequent exercise of any other right. If, for any reason whatsoever, COMPANY is now, or hereafter becomes indebted to GUARANTOR, such indebtedness and all interest thereon shall at all times be subordinate in all respects to the obligations of GUARANTOR hereunder, and GUARANTOR shall not be entitled to enforce or receive payment thereof until such obligations have been fully paid and/or performed. GUARANTOR shall not have any right of subrogation in or under any documents securing payment of GUARANTOR's obligations hereunder, and GUARANTOR expressly waives and releases any such rights of subrogation.

4.  GUARANTOR hereby agrees that GUARANTOR's responsibilities under the terms of this Guaranty shall not be released, diminished, impaired or affected by the occurrence of any one or more of the following events:

   a.  COMPANY's acceptance of any other security, collateral or guarantee for any or all of DEALER's obligations to COMPANY;

   b.  The release, surrender, exchange, subordination, or loss of any security or collateral at any time existing in connection with any or all of DEALER's or GUARANTOR's obligations to COMPANY;

   c.  The partial release of GUARANTOR hereunder, or if there is more than one person or entity signing the Guaranty, the complete or partial release of any one or more of them;

   d.  The death, insolvency, bankruptcy, disability or termination of GUARANTOR or of any one or more of the persons comprising DEALER, or the dissolution, receivership, or reorganization of DEALER;

   e.  Any renewal, extension, modification or rearrangement in connection with DEALER's or GUARANTOR's payment of any or all of DEALER's or GUARANTOR's obligations to COMPANY, either with or without notice to or consent of DEALER or GUARANTOR, or any adjustment, indulgence, forbearance, or compromise that may be granted or given by COMPANY to GUARANTOR or DEALER;

    f.  (f)  Any neglect, delay, omission, failure or refusal by COMPANY to take or prosecute any action for the collection of DEALER's or GUARANTOR's obligations hereunder,  or COMPANY's failure to commence any action to foreclose upon any security or collateral given by DEALER or GUARANTOR therefor;

    g.  Any failure of COMPANY to notify DEALER or GUARANTOR of any renewal, extension, rearrangements, modification or assignment of the obligations or any part thereof, it being understood that COMPANY shall not be required to give GUARANTOR any notice of any kind under any circumstances with respect to or in connection with GUARANTOR's obligations hereunder;

    h.  The unenforceability or uncollectability of all or any part of the obligations against DEALER for any reason, it being agreed that GUARANTOR shall remain liable hereon regardless of whether DEALER or any other person shall be found not liable with respect to the obligations or any part thereof; or

    i.  If any payment made by DEALER to COMPANY is held to constitute a preference under the bankruptcy laws, or if for any other reason COMPANY is required to refund or surrender any such payment.

5.  This Guaranty shall continue in full force and effect until the amount owed to the COMPANY under the APA, $250,000.00, is paid in full. The amount owed to COMPANY may be paid in full at any time and shall not affect the obligation of GUARANTOR with respect to amounts thereafter incurred by DEALER or GUARANTOR.

6.  It is the intent of GUARANTOR and COMPANY hereunder that the obligations and liabilities of GUARANTOR hereunder are absolute and  unconditional and that until the obligations are fully and finally paid and/or performed, such obligations shall not be discharged or released in whole or in part, or by any act or occurrence which might, but for the provisions of this Guaranty, be deemed a discharge or release of  GUARANTOR's obligations to COMPANY.

7.  GUARANTOR represents that GUARANTOR is the owner of a direct or indirect interest in DEALER and that GUARANTOR will receive a direct and material benefit under this Guaranty.

IN WITNESS WHEREOF, this Guaranty is executed by GUARANTOR this _3rd_ day of
_October_____, 2006.


GUARANTOR:

Signed: _____

Name:  Carolyn Pestano

Title: Chief Executive Officer




THE STATE OF CALIFORNIA          §
                                 §
COUNTY OF _Alameda_              §


SWORN TO AND SUBSCRIBED before me the undersigned notary public on this the
_3rd_ day of _October_____, 2006, to which witness my hand and seal.


_____
Notary Public, State of California

_Selena M Jordan_
Printed Name


My Commission Expires:

_08.02.08_

SELENA M. JORDAN
COMM. # 1505115
NOTARY PUBLIC – CALIFORNIA
ALAMEDA COUNTY
My Comm. Expires AUG 02, 2008

# EXHIBIT E

/2007  11:34     2067268826          PROMENADE RED APPLE          PAGE  8

# V I V A   W I R E L E S S ,   I N C.

April 5, 2007

Matthew Woolsey
4420 Rosewood Blvd.
Bldg. 2, 3rd Floor
Pleasanton, CA  94588

RE:  Termination of Operations

Dear Mr. Woolsey :

It is with great sadness and disappointment that I formally announce the termination of
operations for Viva Wireless, Inc. as a dealer for Cingular Wireless at the following locations
effective Thursday, April 5, 2007 (upon close of business at each location):

3521 Investment Blvd., Suite 2, Hayward, CA 94545 (Corporate Office)

2855 Stevens Creek Blvd., Space #9104, Santa Clara, CA  95050

2200 Eastridge Loop, Space #5534, San Jose, CA  95122

1350 Travis Blvd., Space #9013, Fairfield, CA  94533

3251 20th Avenue, #T011R, San Francisco, CA  94132

447 Great Mall Drive, #C-52, Milpitas, CA  95035

925 Blossom Hill Road, Space #9136, San Jose, CA  95123

1 Southland Mall, Space #5540, Hayward, CA  94545

1689 Arden Way, Space #17, Sacramento, CA  95815

Sincerely,

Carolyn Pestano
CEO

3521 INVESTMENT BLVD. SUITE 2 • HAYWARD, CA • 94545
PHONE: 510.783.9119 • FAX: 510.783.9618

Exhibit  E
Page  47