Venkat Balasubramani
(State Bar No. 189192)
BALASUBRAMANI LAW
8426 40th Ave. SW
Seattle, Washington 98136
(206) 529-4827 phone
(206) 260-3966 fax
venkat@balasubramani.com
Attorney for Carolyn Pestano

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AT&T MOBILITY II, LLC, a Delaware limited liability company,<br><br>     Plaintiff,<br><br>vs.<br><br>CAROLYN PESTANO, an individual,<br><br>     Defendant. | No. C07-05463 WHA<br><br>**ANSWER AND SECOND AMENDED COUNTERCLAIMS**<br><br>**JURY TRIAL DEMANDED** |

Carolyn Pestano ("**Pestano**") Answers the Complaint (the "**Complaint**") of AT&T Mobility II, LLC and asserts amended counterclaims as follows:

## INTRODUCTORY STATEMENT

This lawsuit arises out of an exclusive dealer relationship between Viva Wireless, Inc. ("**Viva**") and AT&T Mobility II, LLC ("**AT&T**"), pursuant to which Viva distributed AT&T products and services. Pestano was the CEO of Viva, a constantly well performing AT&T dealer in the Northern California area. Over the course of their five year relationship, Viva

and AT&T (and AT&T's predecessors-in-interest) entered into several agreements (starting in 2001) governing the dealer relationship. Under the initial dealer agreement, AT&T was obligated to pay Viva residual compensation based on subscribers enrolled by Viva. In February 2006, AT&T sought to restructure the residual compensation owed to Viva. In late 2005, AT&T systematically denied Viva compensation to which Viva was entitled. Accordingly, Viva was forced to into a purported agreement (the "**SMF Release**") which required AT&T to pay Viva an initial lump sum, and certain monthly payments. Around this same time, AT&T changed its inventory terms from 60 to 30 days. Near the end of 2006, AT&T agreed to advance Viva amounts AT&T was required to pay Viva under the SMF Release. Viva sought these funds in connection with Viva's proposed expansion of its business. The parties entered into an advance payment agreement (the '**APA**"), along with which Pestano signed a personal guaranty. AT&T was aware of material facts which would have affected Pestano's decision to enter into the APA and expand the business, and AT&T failed to disclose these facts to Pestano. In any event, the personal guaranty only required Pestano to be responsible for Viva's monetary obligations to the extent the funds due to Viva under the SMF Release were not available (e.g., to the extent these funds were used for another purpose). Ultimately, due to factors beyond Viva's control, including an overly saturated and uncontrolled dealer market, Viva was forced to wind up operations. At this time, AT&T withheld – purportedly as reserves against "chargebacks," and other fees – numerous compensation payments earned by and due to Viva. AT&T has failed to account to Viva for any such funds, and now asserts claims against Pestano under the personal guaranty.

Pestano counterclaims against AT&T and seeks an itemized accounting, damages for AT&T tortious conduct, and a return of monies owed to Viva.

**ANSWER**

**A.    The Parties; Jurisdiction; Venue**

1.    Pestano is without knowledge and information sufficient to admit or deny the allegations of Paragraph 1 of the Complaint, and on this basis DENIES those allegations.

2.    Pestano ADMITS the allegations of Paragraph 2 of the Complaint.

3.    Pestano ADMITS the allegations of Paragraph 3 of the Complaint.

4.    Pestano ADMITS the allegations of Paragraph 4 of the Complaint.

**B.    The Advance Payment Agreement**

5.    Pestano ADMITS the allegations of Paragraph 5 of the Complaint.

6.    Pestano ADMITS that Viva and AT&T signed a document titled "Advance Payment Agreement," pursuant to which AT&T advanced certain funds to Viva, but DENIES the remaining allegations of Paragraph 6 of the Complaint.

**C.    The Dealer Principal Personal Guaranty**

7.    Pestano admits that she signed a document titled "Dealer Principal Personal Guaranty," but DENIES the remaining allegations of Paragraph 7 of the Complaint.

8.    Pestano ADMITS that the foregoing documents (the Advanced Payment Agreement and the Dealer Principal Personal Guaranty) contain the language quoted in Paragraph 8 of the Complaint, but DENIES the legal effect of such language.

9.      Pestano ADMITS that the foregoing documents (the Advanced Payment Agreement and the Dealer Principal Personal Guaranty) contain the language quoted in Paragraph 9 of the Complaint, but DENIES the legal effect of such language.

10.     Pestano ADMITS that the foregoing documents (the Advanced Payment Agreement and the Dealer Principal Personal Guaranty) contain the language quoted in Paragraph 10 of the Complaint, but DENIES the legal effect of such language.

11.     Pestano ADMITS that the foregoing documents (the Advanced Payment Agreement and the Dealer Principal Personal Guaranty) contain the language quoted in Paragraph 11 of the Complaint, but DENIES the legal effect of such language.

12.     Pestano ADMITS that the foregoing documents (the Advanced Payment Agreement and the Dealer Principal Personal Guaranty) contain the language quoted in Paragraph 12 of the Complaint, but DENIES the legal effect of such language.

13.     Pestano ADMITS that the foregoing documents (the Advanced Payment Agreement and the Dealer Principal Personal Guaranty) contain the language quoted in Paragraph 13 of the Complaint, but DENIES the legal effect of such language.

14.     Pestano is without knowledge and information sufficient to form a belief regarding the veracity of the allegations of Paragraph 14, and on this basis DENIES those allegations.

**D.      Viva's Alleged Breach of the APA and Pestano's Breach of the Guaranty**

15.     Pestano ADMITS the allegations of Paragraph 15 of the Complaint.

16.     Pestano DENIES the allegations of Paragraph 16 of the Complaint.

17. Pestano DENIES that AT&T is owed any of the monies which it demands, but ADMITS the remaining allegations of Paragraph 17 of the Complaint.

18. Pestano DENIES that AT&T is owed any of the monies which it demands, but ADMITS the remaining allegations of Paragraph 18 of the Complaint.

19. Pestano DENIES that AT&T is owed any of the monies which it demands, but ADMITS the remaining allegations of Paragraph 19 of the Complaint.

20. Pestano DENIES that AT&T is owed any of the monies which it demands, but ADMITS the remaining allegations of Paragraph 20 of the Complaint.

## FIRST CAUSE OF ACTION

21. Pestano repeats and realleges her responses to Paragraphs 1 through 20, inclusive.

22. Pestano DENIES the allegations of Paragraph 22 of the Complaint.

23. Pestano ADMITS that the personal guaranty contains the language quoted in Paragraph 23 of the Complaint, but DENIES the legal effect of such language.

24. Pestano ADMITS that AT&T "advanced the sum specified in the APA to Viva," but DENIES the remaining allegations of Paragraph 24 of the Complaint.

25. Pestano DENIES the allegations of Paragraph 25 of the Complaint.

26. Pestano DENIES the allegations of Paragraph 26 of the Complaint.

## SECOND CAUSE OF ACTION

27. Pestano repeats and realleges her responses to Paragraphs 1 through 26, inclusive.

28. Pestano DENIES the allegations of Paragraph 28 of the Complaint.

29. Pestano ADMITS that AT&T "advanced the sum specified in the APA to Viva," but

DENIES the remaining allegations of Paragraph 29 of the Complaint.

30. Pestano DENIES the allegations of Paragraph 30 of the Complaint.

31. Pestano DENIES the allegations of Paragraph 31 of the Complaint.

32. Pestano DENIES the allegations of Paragraph 32 of the Complaint.

**Prayer for Relief**

Pestano DENIES that AT&T is entitled to any of the relief sought in the Complaint.

**Affirmative Defenses**

1. AT&T's claims are barred by offset of amounts due to the Company, including under the SMF Release.

2. The Advance Payment Agreement (and the guaranty) is unenforceable by reason of mutual mistake.

3. AT&T is barred by reason of its unclean hands from enforcing the Advance Payment Agreement (and the guaranty).

4. AT&T is barred by reason of its own inequitable conduct from enforcing the Advance Payment Agreement (and the guaranty).

5. The personal guaranty and Advance Payment Agreement are unenforceable by reason of lack of consideration.

**COUNTERCLAIMS**

**A.   Parties; Jurisdiction; and Venue**

1. Pestano is a resident of, and domiciled in, the State of Washington.

2. On information and belief, AT&T is a Delaware limited liability company

headquartered in San Antonio, Texas.

3.  The Court has personal jurisdiction over AT&T because it regularly conducts business in the State of California, including in this judicial district, and engaged in the acts in this judicial district giving rise to the claims asserted herein.

4.  Venue is proper in this judicial district because the majority of events giving rise to the claims took place in this judicial district.

**B.  Viva Wireless, Inc. – Background**

5.  Pestano is the former CEO of Viva Wireless, Inc. (the "***Company***"), a company which was an authorized exclusive dealer of AT&T wireless products and services.[1]  Viva is a closely held company with many of Pestano's family members as shareholders and employees.  The Company sold AT&T products and services through kiosks located in shopping malls.

6.  Pestano started the business in 2001, and at all times has been the Chief Executive Officer of the Company.  During the underlying relationship the Company was consistently one of the top performing AT&T dealers, and won numerous accolades.

7.  In 2001, the Company entered into an "***Exclusive Dealer Agreement***" (the "***Original Dealer Agreement***") with AT&T Wireless Services, Inc. (the predecessor-in-interest to

---

[1] Viva Wireless, Inc. assigned to Pestano its claims which Pestano asserts against AT&T in this litigation.

AT&T).[2]

8.    The Original Dealer Agreement contained numerous restrictions on the Company's marketing practices, including an exclusivity provision. The agreement contained a license with respect to AT&T's trademarks and servicemarks. The Company was required to purchase (for resale) equipment (phones) from AT&T "at prices established by [AT&T] from time to time."

9.    As such, the Company was required to pay AT&T a myriad of fees, beyond any ordinary costs of business which AT&T passed on to the Company.

**C.    The SMF Release; The Advance Payment Agreement**

11.   In late 2004, Cingular Wireless LLC acquired AT&T Wireless Services, Inc. Thereafter, Cingular Wireless LLC formed Cingular Wireless II, LLC by contributing the assets of Cingular Wireless LLC and AT&T Wireless Services, Inc. Effective January 1, 2006, the Company entered into a dealer agreement (the "***Dealer Agreement***") with Cingular Wireless II, LLC, which superseded the Original Dealer Agreement. Cingular Wireless II, LLC is now known as AT&T Mobility II, LLC (the Plaintiff).

---

[2] Viva Wireless, Inc. entered into an agreement with AT&T Wireless Services, Inc., which was acquired by Cingular Wireless LLC (a joint venture between SBC Communications Inc. and BellSouth Corporation). Following the acquisition, Cingular and AT&T Wireless contributed a significant portion of their respective assets to Cingular Wireless II, LLC. AT&T (the Plaintiff) is the successor-in-interest to Cingular Wireless II, LLC. Pestano alleges that AT&T Mobility II, LLC (the Plaintiff) was assigned and assumed all of the obligations (or is otherwise responsible for the obligations) of AT&T Wireless Services, Inc. and Cingular Wireless II, LLC under the various dealer agreements.

12. In February 2006, the Company and Cingular Wireless II, LLC ("*Cingular*") entered into an agreement (the "*SMF Release*") pursuant to which Cingular agreed to pay the Company a total amount of $735,883.44, consisting of a one-time payment of $192,152.64 and "the sum of $22,655.45 each month for 24 months." Prior to entry into the SMF Release, AT&T systematically denied the Company compensation which the Company was owed such that the Company was not in a position to exercise any choice with respect to entry into the SMF Release, or negotiate any of its terms. Additionally, prior to entry into the SMF Release, AT&T failed to disclose to the Company the fact that AT&T verified Company's claims that the Company had been under-compensated and in fact found accounting errors and shortfalls in previous compensation payments to the Company.

13. Cingular drafted this agreement (the SMF Release), and did not allow the Company to negotiate any of its terms. Both parties understood the foregoing amount to be unconditionally owed to the Company, although it would be paid over time. The amounts which the Company purportedly forfeited in exchange for the amounts due under the SMF Release were vested (i.e., these were amounts due to the Company as residual subscriber compensation under the Original Dealer Agreement). The amounts due under the SMF Release represented a material reduction of amounts which the Company would have been paid as residual compensation under the Original Dealer Agreement. The SMF Release contained numerous unconscionable provisions and a provision which constitutes an unenforceable penalty clause.

14. On or around this time, Cingular also changed its inventory terms from 60 days to 30 days (the Company would have to pay AT&T for inventory within 30 days as opposed to 60). The restructuring of the residual income (pursuant to the SMF Release) and change in inventory terms materially affected the Company's cashflow, and caused the Company to experience a cash crunch.

15. Later that year, Cingular and the Company discussed the possibility of the Company receiving an advance of the funds owed under the SMF Release in order to facilitate the Company's expansion of its operations. Cingular and the Company discussed the possibility of the Company opening four additional kiosks, and refurbishing two existing kiosks. The Company required Cingular's permission to open any additional kiosks and undertake such material expansions. The Company expressed its concerns that there was a high degree of dealer concentration in the Northern California market.

16. The Company also expressed its concerns that another dealer who was servicing the Northern California market engaged in lax customer service practices, and that the business and customer service practices of the other Northern California dealer were having a negative impact on the Company and its operations. The Company was concerned that customers in the market were associating the Company with the other local dealer.

17. Cingular provided assurances to the Company that the market could support additional stores and that Cingular would take affirmative steps to address the practices of the

other dealer which concerned the Company.  These steps included more strictly enforcing Cingular's policies against the other dealer.

18.    Based on these assurances, and based on numerous conversations with Cingular sales persons, the Company signed the "Advanced Payment Agreement," pursuant to which Cingular "advanced" the Company $250,000.00.  This agreement expressly provided that Cingular would be "reimbursed . . . from future monthly payments due to [Company] under the . . . SMF Release."

19.    The Advance Payment Agreement (the APA) did not contain any prohibition on offsetting amounts owed by Company to Cingular under the Advance Payment Agreement against funds otherwise owed to the Company by Cingular.  Indeed, the agreement expressly envisioned that Cingular would merely net the amounts due to the Company against the amounts advanced to the Company.

20.    Cingular requested and Pestano agreed to sign a document titled "Dealer Principal Personal Guaranty."  Under this document, Pestano agreed to personally guarantee "payment and/or performance of any and all of [Company's] obligations under the [Advance Payment Agreement]."

**D.    Cingular's Failure to Address Issues in the Market; Viva Winds Down**

21.    Following the advance of funds to the Company by Cingular, the Company set about expanding into the four new retail locations discussed by the parties.  The Company substantially fulfilled its non-monetary obligations under the Advanced Payment Agreement.

22. In this process, the Company paid significant sums to Cingular, including to purchase inventory and to purchase other items (equipment mandated by Cingular for any dealer kiosk) necessary to effect the build out.

23. Ultimately, Cingular failed to address the overall market issues the parties discussed prior to entry into the Advance Payment Agreement. Cingular failed to enforce its policies vis-a-vis the other Northern California Cingular dealer, whose lax customer service practices continued to negatively impact the market and the Company.

24. Customers continued to associate the Company with the other Northern California dealer who had less than acceptable customer service levels. Customers repeatedly made complaints about this dealer to the Company. The Company, in turn, complained to Cingular. Cingular failed to respond adequately to these complaints.

25. Eventually, cashflow became a problem for the Company, and the Company was forced to suspend operations.

26. Upon suspension of the Company's operations, Cingular – now renamed AT&T – sought to take possession of the inventory. Cingular did not offer to repurchase the inventory.

27. Upon termination of the relationship between AT&T and the Company, AT&T withheld compensation due to the Company under the Dealer Agreement, claiming that this amount (i) was necessary for a reserve against chargebacks; and (ii) was necessary to offset amounts owed by the Company to AT&T.

28. AT&T has yet to provide an accounting with respect to the funds it withheld upon

termination of the relationship.  AT&T sent Pestano a letter claiming that Pestano owed AT&T numerous amounts, including $130,000 under the terms of the personal guaranty.  AT&T's actions have left the Company shareholders (Pestano's family members) saddled with debt.  AT&T's actions have had a significant detrimental effect on their lives.

**FIRST CLAIM: BREACH OF CONTRACT (SMF RELEASE)**

29.    Pestano realleges the allegations of Paragraphs 1 through 28 of her Counterclaims as fully set forth herein.

30.    AT&T entered into a valid and enforceable agreement with the Company (the SMF Release).

31.    This agreement required the AT&T to pay the Company $735,883.44.

32.    AT&T has failed to pay the Company the full amount owed under this agreement and is in material breach of this Agreement.

33.    AT&T's material breach of this agreement caused the Company injuries.

**SECOND CLAIM: BREACH OF CONTRACT (ORIGINAL DEALER AGREEMENT)**

35.    Pestano realleges the allegations of Paragraphs 1 through 28 of her Counterclaims as fully set forth herein.

36.    AT&T and the Company were party to a valid and enforceable agreement, pursuant to which AT&T was required to pay the Company certain compensation based on subscription revenues for subscribers enrolled by the Company.

37.   AT&T has failed to pay the Company the full amount owed under this agreement and is in material breach of this agreement.[3]

38.   AT&T's material breach of this agreement materially harmed and injured the Company.

**THIRD CLAIM: BREACH OF CONTRACT (DEALER AGREEMENT)**

39.   Pestano realleges the allegations of Paragraphs 1 through 28 of her Counterclaims as fully set forth herein.

40.   AT&T entered into a valid and enforceable agreement with the Company with governed the dealer relationship.

41.   AT&T retained a reserve upon termination of the relationship.  The agreement required AT&T to return the excess reserve and to account to the Company and to account to the Company.  AT&T has failed to comply with the foregoing obligations, and has failed to account to the Company for any of these funds withheld.  In so doing, AT&T materially breached its obligations to the Company under the Dealer Agreement.

42.   AT&T made express and implied promises to all of its dealers, including the Company, that AT&T would enforce its policies and procedures against its various dealers.  AT&T failed to fulfill this obligation.  AT&T failed to enforce its policies against the other Northern California AT&T dealer and did not require that dealer to

---

[3] The compensation claims under the Original Dealer Agreement are asserted in the alternative, in the event the SMF Release is unenforceable due to any reason, including mutual mistake or unconscionability.

adhere to the same customer service levels as the Company.  In so doing, AT&T materially breached its obligations under the Dealer Agreement, causing material injury to the Company.

**FOURTH CLAIM: BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING**

43.	Pestano realleges the allegations of Paragraphs 1 through 28 of her Counterclaims as fully set forth herein.

44.	Both the Original Dealer Agreement and the Dealer Agreement contained implied duties of good faith and fair dealing.

45.	This duty required AT&T to act at all times in good faith in its relationship with the Company.

46.	AT&T breached this obligation by unilaterally changing the inventory payment terms while reducing the amounts of residual compensation payable to the Company.

47.	AT&T also breached its obligation of good faith by offering AT&T products directly to consumers at prices at which it knew the Company could not compete.  AT&T purported to incentivize dealers (including the Company) to sell these products and services based on purported bonuses and offers which the dealers (including the Company) never achieved.  AT&T also breached its obligation of good faith by failing to disclose the fact that it found accounting errors, and shortfalls in compensation payments made to the Company.

48.	AT&T breached its obligation of good faith and fair dealing by engaging in the foregoing actions.

49.     AT&T's breaches materially injured the Company.

**FIFTH CLAIM: MISREPRESENTATION**

53.     Pestano realleges the allegations of Paragraphs 1 through 28 of her Counterclaims as fully set forth herein.

54.     Prior to entry into the SMF Release, AT&T failed to disclose to the Company the fact that AT&T found systematic shortfalls in previous compensation payments to the Company and found accounting errors underlying such compensation payments.  Prior to entry into the Advance Payment Agreement and prior to execution of the personal guaranty by Pestano, AT&T failed to disclose material facts regarding the state of the Northern California market for AT&T goods and services (of the type sold by the Company).  Among other facts, AT&T failed to disclose the extent of harm caused by the competing dealer in the Northern California market and the fact that the market could not support the concentration of dealers AT&T had in place.  AT&T further failed to disclose the extent of action it would take with respect to the competing Northern California dealer.  AT&T knew the Company did not have access to the foregoing facts.  AT&T had an obligation to disclose such facts through contractual obligations or otherwise.

55.     AT&T knowingly concealed the material facts as set forth above.

56.     AT&T's concealment was done with an intent to (or with the reasonable understanding that it would) induce reliance by Pestano and the Company.

57.    Such concealment materially altered the Company's and Pestano's position with respect to the foregoing transactions.

58.    Such reliance caused Pestano and the Company material injury.

**SIXTH CLAIM: UNFAIR BUSINESS PRACTICES (§ 17200)**

60.    Pestano incorporates the allegations of Paragraphs 1 through 28 of her Counterclaims as fully set forth herein.

61.    During the course of the relationship between AT&T and the Company, AT&T systematically denied the Company compensation which AT&T agreed to pay and to which the Company was entitled.

62.    AT&T then presented the Company with a document which drastically re-stated the compensation owed to the Company.[4]  This document purported to simplify and streamline AT&T's compensation structure, and contained unconscionable terms and a penalty clause.

63.    By systematically denying the compensation to which the Company was entitled, the Company was placed in a position in which it could not negotiate the terms of AT&T's proposal or exercise any meaningful choice with respect thereto.

64.    By reason of the foregoing unfair business practices, AT&T withheld payment of compensation to the Company which the Company had earned and was entitled to.

---

[4] Pestano brings a claim for compensation under the SMF Release, and in the alternative, brings a claim for compensation which would have been payable to the Company under the existing compensation structure.

65.     The Company requests restitution with respect to these amounts which have been

        withheld by AT&T by reason of its unfair practices.

**SEVENTH CLAIM: RESCISSION OF THE SMF RELEASE**

66.     Pestano incorporates the allegations of Paragraphs 1 through 28 of her Counterclaims

        as fully set forth herein.

67.     During the course of the relationship between AT&T and the Company, the Company

        raised the issue that AT&T had underpaid the Company approximately $190,000.00 in

        compensation payments.

68.     Upon receipt of the Company's complaint that AT&T had underpaid Company this

        compensation AT&T performed calculations which in fact verified that Company had

        been underpaid compensation.

69.     AT&T did not at any time disclose to the Company that AT&T performed these

        calculations and that in fact Company was owed the amounts which the Company

        claims it was owed.

70.     AT&T presented to the Company a document (the SMF Release) purporting to be a

        release of claims for this compensation which Company signed because it needed the

        $190,000.00 to continue operations.

71.     AT&T did not in good faith dispute whether the Company was entitled to these

        compensation payments.

73. The SMF Release is thus not supported by valid consideration because there was no good faith dispute as to whether the Company was entitled to the unpaid compensation amounts.

74. In addition, the SMF Release is subject to rescission due to AT&T's misrepresentation and concealment. AT&T failed to disclose material facts incident to the transaction, which it knew the Company was not aware of, and with reasonable knowledge that the Company would materially change its position if it knew such facts. As between the two parties, AT&T had access to such facts and was under a duty to disclose them, either contractually or otherwise.

### RELIEF REQUESTED BY PESTANO

WHEREAS, Pestano requests the Court award it the following relief:

1. A declaration that Pestano does not owe AT&T any obligations under the personal guaranty, and judgment against AT&T on all of AT&T's claims asserted against Pestano;

2. Judgment in Pestano's favor on all counterclaims asserted against AT&T;

3. A declaration that AT&T materially breached its obligations to the Company under the Dealer Agreement and the Original Dealer Agreement;

4. A declaration that AT&T materially breached its obligations under the SMF Release or that the SMF Release is invalid and unenforceable;

5. A declaration that AT&T engaged in unfair business practices;

6. A declaration that AT&T breached its duty of good faith and fair dealing;

7. Money damages arising from the foregoing breaches in an amount to be proved at trial;

8. Punitive and exemplary damages;

9. Attorney's fees under the Dealer Agreement, the APA and the personal guaranty, under California's Civil Code 1717, and any other statute or law which provides for such fees;

10. A jury trial on all claims with respect to which a jury trial is available; and

11. Such other relief as may be appropriate based on the evidence put forth by Pestano.

DATED this 10th day of April, 2008.

Venkat Balasubramani, Bar No. 189192
Balasubramani Law
8426 40th Ave SW
Seattle, WA 98136
(206) 529-4827 / (206) 260-3966 Fax
venkat@balasubramani.com
for CAROLYN PESTANO (Defendant)

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused to be filed via a copy of the foregoing **Answer and Second Amended Counterclaims** via the court's CM/ECF system, which will provide a copy to counsel for Plaintiff:

      Ronald J. Kohut, Esq. (SBN 66463)
      Sarah K. Kohut, Esq. (SBN 197655)
      KOHUT & KOHUT LLP
      3554 Round Barn Blvd., Suite 204
      Santa Rosa, California  95403
      Facsimile:   (707) 573-3101

I certify that the foregoing is true and correct.  Executed on April 14, 2008 at Seattle, Washington.

By:_____
      Venkat Balasubramani, (SBN 189192)
      For Defendant, Carolyn Pestano

1